Exhibit A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Magistrate No. 08-1220-M |
| | : | |
| George Georgiou | : | |

WAIVER OF EXTRADITION AND SUPERVISION
PACKAGE TO SUPPORT MOTION TO AMEND CONDITIONS
OF RELEASE TO PERMIT RESIDENCE IN CANADA

1.      Affidavit of Edward L. Greenspan, Q.C.

      A.      Draft Affidavit of George Georgiou

      B.      *State of New York v. Benquesus and Weltman*, Court file #00-CV-187-071

      C.      *U.S. v. Valentine*, 02 CR8088, Southern District of Florida

      D.      *U.S. v. Black*, 05CR 00727, Northern District of Illinois

2.      Tips and Tactics by Theodore Simon, *The Champion*, May 1995

3.      *Pennsylvania v. McMaster*, No. 2877 Philadelphia 1998

4.      *U.S. v. Cirillo*, 1999 WL 1456536

# TAB 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | MAGISTRATE NO. 08-1220-M |
| Plaintiff | | |
| v. | : | |
| | | |
| GEORGE GEORGIOU | : | |
| Defendant | | |

## AFFIDAVIT OF EDWARD L. GREENSPAN, Q.C.

Edward L. Greenspan, Q.C., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I was called to the Bar in Ontario in 1970. I received my Queen's Counsel in 1982. I am a member of the American Bar Association, the American National Association of Criminal Defense Lawyers, the International Society of Barristers, the Canadian Bar Association, and the American College of Trial Lawyers. I have lectured extensively on criminal law and related topics. From 1972 to 1999, I lectured on criminal law at the University of Toronto Law School. From 1972 to 1981, I lectured on criminal procedure, and from 1987 to 1989, I lectured on advanced evidence in criminal cases at Osgoode Hall Law School at York University. Since 1978, I have also been the Editor of Martin's Annual Criminal Code and, since 1980, the Editor of Martin's Related Criminal Statutes, an annotated book of numerous federal criminal and quasi-criminal statutes including the *Extradition Act*.

2. My practice consists almost exclusively of criminal and quasi-criminal defence work. A component of this is extradition. I have been involved in and am presently involved in numerous extradition proceedings as defence counsel.

3.     The alleged conduct underlying the charges would, if committed in Canada, constitute criminal offences set out in the *Criminal Code of Canada* and, therefore, the charges in the Criminal Complaint are clearly extraditable offences.

4.     I have reviewed the Draft Affidavit of the Defendant, GEORGE GEORGIOU, which is attached to this my Affidavit and marked as Exhibit "A".

5.     The Draft Affidavit of the Defendant in paragraphs 5, 6, 7, 8, 9 and 10, attached to this my Affidavit and marked as Exhibit "A", irrevocably waives extradition from Canada.

6.     The Defendant has consulted with me and has been fully informed of his rights that he waives extradition freely and voluntarily and that for the waiver to be free and voluntary, he must not be doing so under duress or compulsion.

7.     In paragraph 12 of the Draft Affidavit, the Defendant swears that "I make this waiver freely and voluntarily, after having consulted with my attorney and with the full knowledge as to the nature of the rights I am waiving.   In this regard I have spoken with counsel in both Canada and the United States.   My rights and options have been explained to me and I understand them."   I confirm that I am the counsel in Canada that the Defendant spoke to and that this waiver is freely and voluntarily given and that he is not doing so under any duress and compulsion.

8.     The *Extradition Act* specifically contemplates that a defendant may consent to committal for surrender (s.70), consent to surrender (s.71) and waive extradition (s.72).   These provisions are as follows:

**70.** (1) A person may, at any time after the issuance of an authority to proceed, consent, in writing and before a judge, to committal.

(2) A judge before whom a person consents under subsection (1) shall

    (a) order the committal of the person into custody to await surrender to the extradition partner; and

    (b) transmit a copy of the consent to the Minister.

**71.** (1) A person may, at any time after arrest or appearance, consent, in writing and before a judge, to be surrendered.

(2) A judge before whom a person consents to being surrendered shall

    (a) order the committal of the person into custody to await surrender to the extradition partner; and

    (b) transmit a copy of the consent to the Minister.

(3) The Minister may, as soon as is feasible after receiving a consent to surrender, personally order that the person be surrendered to the extradition partner.

(4) When a person consents to being surrendered to the extradition partner, the following sections do not apply:

    (a) section 43 (submissions to the Minister);
    (b) section 44 (reasons for refusal);
    (c) section 48 (discharge of person);
    (d) section 57 (judicial review of Minister's decision); and
    (e) paragraph 62(1)(a) (delay before surrender).

**72.** (1) A person may, at any time after arrest or appearance, waive extradition in writing and before a judge.

(2) A judge before whom a person gives a waiver under subsection (1) must inform the person

    (a) of the consequences of the waiver including the consequences of waiving the protection of specialty; and

    (b) that they will be conveyed without delay to the extradition partner.

(3) The judge shall

    (a) order the conveyance in custody of the person to the extradition partner; and

    (b) transmit a copy of the waiver and the order to the Minister.

(4) The conveyance order must

    (a) contain the name of the person who is to be conveyed; and

    (b) state the extradition partner to which the person is to be conveyed.

9.    It is my view that this irrevocable waiver, as specifically set out in the Draft Affidavit and

attached to this my Affidavit and marked as Exhibit "A", is an effective, enforceable and

valid waiver for extradition purposes.


10.   I believe that the contents of this Draft Affidavit, attached to this my Affidavit and

marked as Exhibit "A", would preclude the Defendant from resisting any extradition

request made by the United States of America to Canada and that extradition would be a

foregone conclusion.


11.   An irrevocable authorization by my client tendered before a court of law, in Canadian

law means that if my client attempts to withdraw the irrevocable authorization that he has

given me in any future proceedings in Canada I, as an officer of the court, am duty bound

not to act on any instructions to withdraw his irrevocable authorization or my irrevocable

undertaking.


12.   I have been irrevocably instructed by the Defendant that I am a competent and

compellable witness on any bail hearing or extradition hearing should either or both

events arise as a result of any authorization on the Defendant's part to return to the United

States to answer the charges before this Honourable Court.   At such bail hearing or

extradition hearing I would confirm and undertake to confirm that the Defendant's

irrevocable waiver is truly free and voluntary and I undertake to unequivocally state at

such a hearing that any attempt to resist extradition would be an insult to the

administration of justice both in Canada and the United States and as such, in my view, it

is totally unlikely that the Defendant would be released on bail as it would be necessary

to deny him bail in order to maintain confidence in the administration of justice which is one of the separate standards for a judge to deny bail.

13.     Further, the Defendant's admission in paragraph 10 of the Draft Affidavit, attached hereto to this my Affidavit and marked as Exhibit "A", where he irrevocably admits that there is a sufficient basis for extradition and that all the prerequisites exist for extradition pursuant to the *Extradition Act* and the *Convention on Extradition Between Canada and the United States of America*, 27 U.S.T. 983, T.I.A.S. 237 in relation to the charges set out in the Indictment having been made freely and voluntarily, would obviate the necessity of anything more than a *pro forma* extradition hearing.

14.     With this sworn waiver, attached as a Draft Affidavit and marked as Exhibit "A" to this my Affidavit and my future testimony, it would mean, in my view, under Canadian law that the Defendant's extradition would be a foregone conclusion.  There is no doubt in my mind, the irrevocable waiver plus my testimony could be acted upon by the Court as fulfilling the requirements for consent or waiver under sections 70, 71 and 72 of the *Extradition Act* as it could not be successfully argued after my testimony that the Defendant's waiver was not free and voluntary.  No such argument could possibly succeed in the face of my clear testimony that his Affidavit was made truly freely and voluntarily.

15.     An order of the Minister could be made easily based solely on my testimony and the Defendant's waiver.  Bail would be a non-existent possibility in the circumstances.  Extradition would be a foregone conclusion.  The Defendant fully recognizes that it

would be a most unusual event for counsel retained by him to testify against him should he fail to respond with each and every order of this Honourable Court but he consents and authorizes it to underscore the *bona fides* in the argument that this Honourable Court can rely on his voluntarily return to meet and address the matters before this Honourable Court.

16.   I am aware that Courts in the United States have accepted extradition waivers of this type in the past and have allowed accused persons to travel to Canada while awaiting trial in the United States.

17.   In 2000, in the case of *The People of the State of New York v. Jack Banks and Larry Weltman*, Judge Bernard Fried, of the Supreme Court of the State of New York, allowed the defendants to travel to Canada with conditions that the defendants report to the Toronto Police Service.  In this case, an application was brought in the Ontario Superior Court of Justice to ensure that the waiver of extradition was valid.  Mr. Justice Lamek of the Ontario Superior Court of Justice Ordered that there was a valid waiver of extradition. The Order of Justice Lamek is attached to this my Affidavit and marked as Exhibit "B".

18.   In the case of *United States of America v. Mark Valentine*, US District Court Judge Wilkie D. Ferguson, Jr. ordered on motion to modify conditions of bond, that the defendant be permitted essential travel to the Greater Toronto area upon notice to the United States Probation Office along with the agreement of the Government or Court approval.  The Order setting conditions of release, including materials filed to support that Order are attached to this my Affidavit and marked as Exhibit "C".

19.   In the case of *United States of America v. Conrad Black*, US District Court Judge Amy St. Eve ordered the release of the defendant on conditions that he be allowed to travel to Canada.  The Order setting conditions of release, including materials filed to support that Order are attached to this my Affidavit and marked as Exhibit "D".  The co-defendants, Jack Boultbee and Peter Atkinson, were granted similar releases by Judge St. Eve, allowing them to travel to Canada.

20.   In the past, when defendants have been permitted by American Courts to travel to Canada, I have arranged with the Toronto Police Service, Bail and Parole Enforcement Unit to have the client report in Toronto.  This is referred to as a "Courtesy Supervision" and is done regularly with matters outside of Canada.  The Bail and Parole Enforcement Unit is prepared to have George Georgiou report to them when he is in Canada.

21.   I am also prepared to have the defendant, George Georgiou, report to me on a regular basis.  If Mr. Georgiou fails to report to me as required, I will immediately contact the American authorities.

22.   I make this Affidavit for no improper purpose.

SWORN before me at the City of            )
Toronto, in the Province of Ontario        )
This      <sup>th</sup> day of November, 2008.       )
                                                                      )
_____       )
A Commissioner, etc.                                          EDWARD L. GREENSPAN, Q.C.

# TAB A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA                    : MAGISTRATE NO. 08-1220-M
      Plaintiff

     v.                                     :

GEORGE GEORGIOU                             :
      Defendant

## AFFIDAVIT

GEORGE GEORGIOU, being duly sworn, deposes and says:

1.     I am a named Defendant in the above captioned case.   I am a citizen of Canada and of no other country.  My residence is in Ontario, Canada, with my wife and children.

2.     I was arrested on September 17, 2008, based on a Government complaint and affidavit accusing me of securities fraud.   Upon my arrest, I was incarcerated in the federal detention center in Philadelphia, and the Government sought my permanent detention.   On September 22, 2008, the Magistrate Judge granted the Government's motion based on risk of flight.  I immediately appealed.  Two days after filing the appeal, the Government agreed to a bail package that would allow my release.  The Magistrate Judge then entered a modified order allowing my release.

3.     I was released on October 3, 2008, after more than two weeks of incarceration. Since my release, I have fully complied with the conditions.  I posted the required bond and collateral.  I immediately moved to my uncle's home in the Eastern District of New

York. I reported to Pretrial Services for supervision, and have not traveled outside the Southern or Eastern District of New York, other than for meetings with my counsel and a meeting with the Government, all approved in advance by Pretrial Services.

4. I am seeking to amend only one aspect of the conditions of my release: the requirement that I live in home confinement in New York and not return to my family in Canada pending trial.

5. I hereby voluntarily and irrevocably waive any rights to contest extradition from Canada to the United States, in relation to the charges set out in the Criminal Complaint in this case.

6. In the event that I do not return to the United States of America as required, I hereby consent to my extradition or rendition to the United States of America from Canada and waive any and all rights I may have to contest my extradition or rendition to the United States of America from Canada in relation to the charges set out in the Criminal Complaint.

7. I hereby irrevocably consent to my committal for surrender and to my surrender to the United States of America in any extradition proceedings in Canada relating to the charges set out in the Criminal Complaint, and I irrevocably consent to this affidavit being filed in any such extradition proceedings, pursuant to sections 70 and 71 of the *Canadian Extradition Act,* S.C. 1999, c. 18.

8.     I also hereby irrevocably waive extradition to the United States of America in any extradition proceedings relating to the charges set out in the Criminal Complaint and I irrevocably consent to this affidavit being filed in any such proceedings as evidence of my waiver of extradition, pursuant to section 72 of the *Extradition Act*.

9.     I also irrevocably waive my right to seek bail in Canada in any extradition proceedings relating to the charges set out in the Indictment.  I fully understand and agree that upon this waiver being filed with the Court in any extradition proceedings relating to the charges set out in the Criminal Complaint, I would be conveyed without delay to the United States, without the protection of specialty, and that I would not have the right to make any appeal or application for judicial review.

10.     I hereby irrevocably admit that there is a sufficient basis for extradition and that all the prerequisites exist for extradition, pursuant to the *Extradition Act* and the Convention on Extradition Between Canada and the United States of America, 27 U.S.T. 983, T.J.A.S. 237, in relation to the charges set out in the Criminal Complaint.

11.     I make these admissions solely with regard to the issue of extradition proceedings and in order to help effectuate my ability to travel to and from Canada while these charges are pending in the United States.  These admissions cannot be used for any other purpose or in any other proceedings not related to extradition.

4

12.    I make this waiver freely and voluntarily, after having consulted with my attorney and with the full knowledge as to the nature of the rights I am waiving.  In this regard I have spoken with counsel in both Canada and the United States.  My rights and options have been explained to me and I understand them.


FURTHER AFFIANT SAYETH NOT


_____          _____
GEORGE GEORGIOU                                      DATE

        The foregoing instrument was acknowledged before me this _____ day of _____, 2008, by GEORGE GEORGIOU who is personally known to me and did take an oath.



        DATED this _____ day of _____, 2008.



                                        _____
                                        A Commissioner, etc.

# TAB B

Court file # 00-CV-187-071

## ONTARIO SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| THE HONOURABLE MR. JUSTICE | ) | FRIDAY THE 17TH DAY |
| | ) | |
| PAUL LAMEK | ) | OF MARCH, 2000 |

IN THE MATTER OF THE *EXTRADITION ACT*, S.C. 1999, c. 18;

AND IN THE MATTER OF THE PEOPLE OF THE STATE OF NEW YORK v. JACQUES BENQUESUS AND LARRY H. WELTMAN IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

B E T W E E N



JACQUES BENQUESUS and LARRY H. WELTMAN

Applicants

- and -

THE PEOPLE OF THE STATE OF NEW YORK

Respondent

## ORDER

THIS APPLICATION was heard this day at Toronto, Ontario, in the presence of counsel for the Applicants, without formal notice to the Respondent.

ON READING the following:

1.    the Notice of Application;

2.    the Affidavit of Alison Wheeler sworn March 16, 2000;

3.    the Affidavit of Alison Wheeler sworn March 17, 2000;

4.      the Affidavit of Jacques Benquesus waiving extradition from Canada, attached as Schedule A to this Order;

5.      the Affidavit of Jacques Benquesus waiving extradition from Israel, attached as Schedule B to this Order;

6.      the Affidavit of Jacques Benquesus waiving extradition from Gibraltar, attached as Schedule C to this Order;

7.      the Affidavit of Jacques Benquesus waiving extradition from the United Kingdom and the European Union, attached as Schedule D to this Order;

8.      the Affidavit of Jacques Benquesus waiving extradition from any other country, attached as Schedule E to this Order;

9.      the Affidavit of Larry H. Weltman waiving extradition from Canada, attached as Schedule F to this Order;

10.     the Affidavit of Larry H. Weltman waiving extradition from Israel, attached as Schedule G to this Order;

11.     the Affidavit of Larry H. Weltman waiving extradition from the United Kingdom and the European Union, attached as Schedule H to this Order;

12.     the Affidavit of Larry H. Weltman waiving extradition from any other country, attached as Schedule I to this Order;

AND ON HEARING the submissions of counsel for the Applicants;

AND UPON the Applicants Jacques Benquesus and Larry H. Weltman appearing before the Court by videoconference and reporting to the Court that they have ~~sworn~~ *affirmed* their Affidavits freely and voluntarily:

3

1.      THIS COURT DECLARES that the Affidavits, attached to this Order as Schedules A, B, C, D and E signed by Jacques Benquesus in the State of New York, were ~~sworn by oath~~ *affirmed by affirmation* transmitted to Ontario by videoconference before this Court and for all purposes the said affidavits were ~~sworn~~ *affirmed* in Ontario;

2.      THIS COURT DECLARES that the Affidavit of Jacques Benquesus waiving extradition from Canada, attached as Schedule A to this Order,  constitutes a valid consent to surrender, pursuant to s. 71 of the *Extradition Act* and constitutes a valid waiver of extradition, pursuant to s. 72 of the *Extradition Act., and* may be filed on any extradition hearing in Canada;

3.      THIS COURT DECLARES that the Affidavits, attached to this Order as Schedules F, G, H and I signed by Larry H. Weltman in the State of New York, were ~~sworn by oath~~ *affirmed by affirmation* transmitted to Ontario by videoconference before this Court and for all purposes the said affidavits were ~~sworn~~ *affirmed* in Ontario; and

4.      THIS COURT DECLARES that the Affidavit of Larry H. Weltman waiving extradition from Canada, attached as Schedule F to this Order, constitutes a valid consent to surrender, pursuant to s. 71 of the *Extradition Act* and constitutes a valid waiver of extradition, pursuant to s. 72 of the *Extradition Act., and* may be filed on any extradition hearing in Canada.

5.   THIS COURT DECLARES that the Affirmations affirmed before Justice Fried and reaffirmed in this matter, being Exhibits 2 through 10 before Justice Fried of the Supreme Court of the State of New York, and Schedules 2 through 10 to this Order, were reaffirmed before me by videoconference.

_____
JUSTICE

ENTERED AT/INSCRIT À TORONTO
ON/DOCK.NO:
LE/DANS LE REGISTRE NO.:

MAR 1 7 2009

AS DOCUMENT NO.:
À TITRE DE DOCUMENT NO.:
REGISTRÉ:

# TAB C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          Case No.  02-80088-CR-FERGUSON
                    Plaintiff,

                    Vs.

MARK E. VALENTINE
                    Defendant.
_____/

### ORDER ON MOTION TO MODIFY CONDITIONS OF BOND

**THIS CAUSE** is before the Court on a Motion to Modify Conditions of

Bond, in the above-styled case filed December 5, 2002.  After consideration of the

motion and all the premises it is hereby,

**ORDERED AND ADJUDGED** that the motion is ***DENIED*** in part.  The

defendant's bond condition of a curfew from 11:00 p.m. through 6:00 a.m. will

remain in place.  However, the motion is ***GRANTED*** in part to reflect the

following amendments: (1) To eliminate his electronic monitoring and (2) Permit

essential travel to the Greater Toronto Area upon notice to the United States

Probation Office along with the agreement of the Government or Court approval.

**DONE AND ORDERED** in Fort Lauderdale, Florida this _____ day of

January, 2003.

                              WILKIE D. FERGUSON, JR.,
                              UNITED STATES DISTRICT JUDGE

c:
Roger Stefin, AUSA
Michael Pasano, Esq,
Jack Goldberger, Esq.,
USPO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 02-80088-CR-FERGUSON/SNOW
(Magistrate Judge Seltzer - BOND)

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-

MARK E. VALENTINE,

        Defendant.

_____/



## DEFENDANT MARK E. VALENTINE'S MOTION TO MODIFY THE CONDITIONS OF HIS BOND

        The Defendant, Mark E. Valentine ("Mr. Valentine"), through undersigned counsel, and pursuant to 18 U.S.C. §3142, files this Motion to Modify the Conditions of his Bond, and in support thereof states:

        1.      Mr. Valentine has been indicted as part of a large scale FBI "sting" operation called Operation Bermuda Short. His involvement in this "sting" covers a period of only a few months, from approximately November 2000 to February 2001. During this time, two (2) transactions amounting to $35,000 occurred. The Government's evidence against Mr. Valentine consists primarily of tape recorded telephone conversations which are at best ambiguous. His case has been scheduled for trial on December 16, 2002, but both the Government and defense counsel are asking that trial be specially set in or around May 2003. He has recently filed a series of motions challenging the Government's Indictment and, *inter alia*, seeking dismissal of the charges against him. He adamantly asserts his innocence.

        2.      Mr. Valentine was arrested on August 14, 2002, while attempting to board a flight

CASE NO.: 02-80088-CR-FERGUSON

from Frankfurt to his home in Canada. Despite his almost immediate consent to extradition and request that he be transported to the Southern District of Florida to face these charges, he was held in the Weiserstadt Prison outside Frankfurt until Friday, September 20, 2002. (See transcription of German Court Order and Consent attached as Exhibit "A").

3.     On September 23, 2002, this Court conducted Mr. Valentine's first appearance in the United States and his arraignment (Dkt. #25). As part of the conditions of release pending trial, Mr. Valentine:

a)   executed a $500,000.00 Personal Surety Bond secured by his and his in-laws' condominiums on Key Biscayne (Mr. Valentine's wife and parent's are co-signatories) (See documents attached as Exhibit "B" indicating market value of $675,000);

b)   posted a $30,000.00 Corporate Surety Bond;

c)   executed and filed a Waiver of Extradition (Dkt. #28);

d)   was subjected to electronic monitoring through the use of an electronic bracelet;

e)   was restricted to travel within Miami-Dade and Broward Counties;

f)   was required to reside at his home on Key Biscayne;

g)   was placed on a curfew from 11:00 p.m. through 6:00 a.m.;

h)   surrendered his passport; and

i)   was required to comply with other standard conditions of bond.

4.     Mr. Valentine was born on March 4, 1970 in Brazil. Given his father's status as a Canadian diplomat, Mr. Valentine was educated in Canada, the United States and elsewhere around the world.[1]  He is a Canadian citizen. He has been married since 1994 to the former Stephanie

---

[1] Mr. Douglas Valentine is a retired career diplomat and former Canadian Ambassador, *inter alia*, to Saudi Arabia, Iran, Columbia and the United States (he was also consul general in Chicago for several years). Mrs. Beverly Valentine operates a language school in concert with the University

2

CASE NO.. 02-80088-CR-FERGUSON

Collins, whom he met at Concordia University in Montreal. They have three (3) children: Carly (age

six); Max (age four); and Victoria (age two). Mr. Valentine and his wife are active in various

charitable activities, including a special endowment fund they set up for the Intensive Care Unit at

Mount Sinai Hospital in Toronto. (See Affidavit from Stephanie Valentine attached as Exhibit "D").

     5.    Mr. Valentine has been gainfully employed his entire adult life as an investment

dealer. He was most recently Chairman of Thomson Kernaghan Investment Dealers in Toronto. He

has never been previously charged with any crime.

     6.    Attached as a sample of the strong feelings people hold for Mr. Valentine is a letter

and affidavit we have received on his behalf from his mother-in-law, Carolyn Collins, together with

affidavits from numerous well respected professionals and community leaders, who have known Mr.

Valentine for many years. (See Composite Exhibit "E"). The Collins' have pledged their winter

home on Key Biscayne, located at 199 Ocean Lane Drive, Apartment 201 as security for Mr.

Valentine's release.[2] The letters and affidavits attest to Mr. Valentine's reliability and underscore

that he does not pose a risk of flight.

     7.    Mr. Valentine waived further extradition proceedings in Germany in order to try to

get to the United States as quickly as possible to begin fighting the instant charges. While awaiting

his transport to the United States, he retained a Canadian extradition specialist to work with

---

of Toronto for foreign students. Both Mr. Valentine's parents traveled to Germany to help with the
extradition process. Mr. Valentine has a sister, Debra Van Donkersgoed Valentine, who is married
to a Dutch diplomat. Mr. Valentine has a brother, Christopher, who is married and lives in Toronto.
The Valentines are a close family and see each other regularly. Both Mr. Valentine's sister and
brother went to Germany to assist him after his arrest. (See Affidavit of Douglas Valentine attached
as Exhibit "C").

  [2] Stephanie Valentine's parent also live near Mark and Stephanie's home in Toronto. For
nearly 30 years, Arthur William Collins has operated Collins Auto Parts, a family business. Carolyn
Collins owns and operates Carolyn Collins Interiors.

undersigned counsel to fashion a process whereby Mr. Valentine could assure the United States prosecutors and this Court that if released on bond and allowed to return to Canada, he would be available to stand trial in the United States whenever the case was scheduled for trial. To that end, an extradition waiver was drafted which Mr. Valentine has executed before this Court. The Waiver of Extradition conforms to waivers that have been successful in other criminal cases in the United States. In addition, attached is an affidavit from our Canadian extradition expert, Edward Greenspan, Q.C., which indicates the Waiver is effective, valid and enforceable (Exhibit "F").

   8.   Immediately upon his release from custody, Mr. Valentine contacted Pretrial Services and met with Senior Officer Iram Ferguson, Jr. Mr. Ferguson, *inter alia*, inspected the Valentine home and installed an electronic bracelet on Mr. Valentine's ankle. Mr. Ferguson has been in frequent contact with Mr. Valentine since that time. Mr. Valentine has complied with each and every condition of this release and has cooperated fully with Pretrial Services. In particular, Mr. Valentine has scrupulously observed the geographic limits and curfew imposed by the Court.

   9.   Since the hearing, Mr. Valentine's wife and children have been living in Key Biscayne, Florida, the children have been enrolled in local schools, and his family has remained in South Florida.

ELECTRONIC MONITORING AND CURFEW

   10.   The electronic equipment, however, has proven to be more invasive than helpful. Three times, now, the equipment has had to be changed because of malfunctions. It beeps at odd times and places. It emits false readings. Mr. Valentine has been awakened numerous times in the early morning hours by telephone calls because the monitoring equipment does not work properly. Because Mr. Valentine is in regular contact with PTS and is being monitored by both frequent

4

CASE NO.: 02-80088-CR-FERGUSON

visitations as well as phone calls, we submit the electronic bracelet is unnecessary. We also submit a curfew is unnecessary.

TRAVEL TO CANADA

11.     Mr. Valentine has extensive business interests in Canada requiring his attention and needs to travel there between now and trial to address these and other personal matters, including, but not limited to, preparations necessary for his stay in South Florida, and to meet with his Canadian counsel, Joseph Groia and Samuel Schwartz, regarding various business matters and pending civil proceedings. One proceeding relates to Mr. Valentine's former firm, Thomson Kernaghan. Canadian counsel are working through thousands of documents and need Mr. Valentine with them during this document review. *See* Groia letter attached as Exhibit "G".

RELIEF REQUESTED

12.     Based upon Mr. Valentine's background, and his consistent reporting history, Mr. Valentine respectfully requests that the conditions of his bond be amended to eliminate the burden of the electronic monitor and of the curfew. Mr. Valentine also requests that his travel restrictions be modified to permit occasional travel to the Greater Toronto area, upon prior notice and with the agreement of Government counsel. If Government counsel does not agree, Mr. Valentine would then file the appropriate motion seeking permission to travel.

13.     Pursuant to Local Rule 88.9, Defendant's counsel has discussed this motion with Assistant United States Attorney, Roger Stefin who has advised Defendant's counsel that he has no objection to Mr. Valentine's bond conditions being amended as requested.

WHEREFORE, the Defendant, Mark Valentine, respectfully requests that the conditions of his bond be amended to eliminate his electronic monitoring and his curfew. Mr. Valentine also

CASE NO.. ა2-80088-CR-FERGUSON

respectfully requests that his travel restrictions be modified to permit occasional travel to the Greater

Toronto area, upon notice and the agreement of the Government.

Respectfully submitted,

Michael S. Pasano, Esq.
Florida Bar No. 475947
Glenn L. Widom, Esq.
Florida Bar No. 024775
Thierry Olivier Desmet, Esq.
Florida Bar No. 0143863
Zuckerman Spaeder LLP
Miami Center -- Suite 900
201 South Biscayne Boulevard
Miami, Florida 33131
Tel: (305) 358-5000
Fax: (305) 579-9749
Attorneys for Mark E. Valentine

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was forwarded by mail

on this __4th__ day of December 2002, to Roger Stefin, United States Attorney's Office, 500 E.

Broward Blvd., Suite 700, Ft. Lauderdale, Florida 33309; and Iram Ferguson, Jr., Sr. United States

Pretrial Services Officer, U.S. Pretrial Services, 330 Biscayne Blvd., Suite 500, Miami, FL 33132;

Jack Golderger, Esq., 250 Australian Avenue South, Suite 1400, West Palm Beach, Florida 33401.

Michael Pasano



6

# EXHIBIT "A"

27-AUG-02  18:47      Von-WHITE&CASE,FEDDERSEN FFM                    +4969282615              T-685   S.01/18  F-876

# WHITE & CASE, FEDDERS

RECHTSANWÄLTE    NOTARE    STEUERBERATER

BERLIN
BRATISLAVA
BRUSSEL
BUDAPEST
DRESDEN
DÜSSELDORF
FRANKFURT
HAMBURG
HELSINKI
ISTANBUL
LONDON
MAILAND
MOSKAU
PARIS
PRAG
ROM
STOCKHOLM
WARSCHAU

JOHANNESBURG

MEXIKO-STADT
SÃO PAULO

STIFTSTRASSE 9 - 17
60313 FRANKFURT AM MAIN
TELEFON: (0 69) 2 99 94 - 0
TELEFAX: (0 69) 28 26 15
EMAIL: FRANKFURT@WHITECASE.COM
DURCHWAHL: (0 69) 2 99 94 -(069) 29 99 4 - 303

FAX-DURCHWAHL: (069) 28 26 15

LOS ANGELES
MIAMI
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D C

ALMATY
ANKARA
BANGKOK
HO CHI MINH-STADT
HONGKONG
JAKARTA
MUMBAI
SHANGHAI
SINGAPUR
TOKIO

BAHRAIN
JEDDAH
RIAD

## TELEFAX

| | | | |
|---|---|---|---|
| **Datum:** | 27. August 2002 | **Anzahl der Seiten (mit Deckblatt):** | 18 |
| **An:** | Mr. Michael Pasano | **Telefax-Nummer:** | 001 305 579 9749 |
| **Von:** | Jutta Kurth | **Referenz-Nr.:** | VALENT.F020632.JSK |

# 299232 [FRA] 6#w001!

BITTE BEACHTEN: Die Angaben in dieser Telefax-Übertragung sind persönlich und vertraulich und nur für den angegebenen Adressaten bestimmt, sowie für jede andere dort genannte Person.  Wenn Sie nicht der Adressat sind, machen wir Sie darauf aufmerksam, daß jegliche Verbreitung, Verteilung oder das Kopieren dieser Übertragung streng untersagt sind.  Falls Sie diese Übertragung irrtümlich erhalten haben oder Probleme mit der Übertragung hatten, bitten wir Sie, uns umgehend telefonisch unter (0 69) 2 99 94 - 0 zu benachrichtigen

**Extradition proceedings against Mark Valentine**
**Documents for your information**

Dear Michael,

Attached please find the following documents:

–   translation of the minutes of the oral hearing before the Local Court in Darmstadt on Monday 26, 2002;

–   copy of the brief to the Higher Regional Court of Frankfurt of August 20, 2002 as well as

–   an English translation thereof.

Regards,

*Jutta Kurth*

Jutta Kurth                                                                                         Encl.

*English Translation for Information Purposes*

| | |
|---|---|
| Non-public hearing of the Local Court of Darmstadt | Darmstadt, August 26, 2002 |
| Case File Number:<br>25 Gs 1028/02 | In the extradition matter against<br>the Canadian citizen |
| Present: | Mark V a l e n t i n e,<br>born on May 4, 1970 in Rio de<br>Janeiro, Brazil, currently prison<br>Weiterstadt |
| Dr. Ganster<br>Judge at the Local Court | |
| Duffek<br>Court Clerk, as Clerk of the<br>Court's Office | for fraud |
| Ms. Howaldt,<br>as sworn interpreter for the English language | |
| As legal counsel to the person sought<br>Mr. Klengel, Esq., Frankfurt am Main | |

The person sought is brought before the judge.

The person sought declares:

The order of the Higher Regional Court of Frankfurt am Main dated August 16, 2002, Case File No.: A 41/01 was translated for me into the English language and a copy thereof was handed over to me.

I was informed that I would be provided with an English translation of this order soon.

My personal details are correctly stated in the order of the Higher Regional Court of Frankfurt am Main dated August 16, 2002. The person sought supplemented: My second name is Edward.

I am a Canadian citizen. The person sought supplemented: I also have an Irish passport which expired last month. In my opinion I am no Irish citizen. I only had an Irish grandfather; therefore I received in the year 1992 an Irish passport. I have been advised that a legal counsel may represent me at any stage of the proceedings and that I may raise objections against the warrant for arrest or its execution.

I have also been advised that I am free to make statements or refuse to make statements.

Dokument 298936 [FRA] 69/ns01!

- 2 -

The person sought declared:

I already had my legal counsel raise objections against the admissibility of the extradition proceedings by way of filing briefs. My legal counsel informs me that such objections have a good chance of success and would thus very likely prevent my extradition to the United States of America. I am, however, convinced that I can rebut the charges raised against me in the USA and I therefore withdraw the objections to the order of the temporary detention pending extradition and its execution made by my legal counsel. Therewith I would like to demonstrate my willingness to cooperate with the US authorities.

I have been advised on the possibility of a simplified extradition, which would shorten the proceedings, and the waiver of the rule of speciality. I have also been extensively advised on the respective legal consequences. I have in particular been advised about the fact that on the basis of the existing particularities regarding the German US-American extradition dealings my consent to the simplified extradition automatically results in my waiver of the rule of speciality. I have also been advised that any declaration of consent which will be recorded here will then be binding and irrevocable.

The competent public prosecutor in Florida stated vis-à-vis my lawyer Michael Pasano that she has no knowledge about any further pending preliminary investigations against me. I am also not aware of any further preliminary investigations and I cannot imagine that any such investigations exist.

Against this background I declare that I agree to the simplified formless extradition to the USA. I am aware, upon making this declaration of consent, that such consent automatically results in my waiver of the rule of speciality and that such consent is binding and irrevocable.

I request that the extradition proceedings will be executed as soon as possible.

My legal counsel Jürgen Detlef W. Klengel, Esq., Frankfurt am Main shall be informed about the arrest.


translated, approved and signed


-----------------------------------                    -------------------------------

(Person Sought)                                         (Interpreter)



-----------------------------------                    -------------------------------

(Clerk of the Court's Office)                           (Judge at the Local Court)

# EXHIBIT "B"

Aug 23 02 04:07p                                                                    p.2
08/23/2009  10:00  3085016999        EREALTY INTERNATINAL        ☎ 01/06

# *e*Realty ™
### International

## FAX COVER

FAX NO.: 306-361-6669

                                    TEL. NO.: 305-361-6606

DATE: 8/23/02          TOTAL PAGES with COVER: 6

TO:
COMPANY:
CITY/STATE/COUNTRY:
FAX NO.:        (905) 722 - 1987. (FAX)

FROM:  Jim Salas

RE:  Commodore Club south # 201

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stephanie,

    Attached please find comparable sales for
The above referenced apartment.

    Based on these recent sales unit # 201
has a market value of $675,000

    Based on improvements of $200,000.

    Please let me know if I can be of further
Assistance.

*e*Realty International
e-mail: info@erealtyinternational.com
Web Sites: www.keybiscayecondos.com  and  www.keybiscaynehouses.com
The Square Shopping Center #49  and
104 Crandon Boulevard Suite #426, Key Biscayne, Fl. 33149

p.3

Aug 23 02 04:07p
08/23/2002 18:28   :053616900         (REALTY INTERNATINAL.         3E 02/05

# Condo/Co-op/Villa/Townhouse Property

## 199 OCEAN LANE DR, #603/05
## KEYBISCY, FL 33139



List Price:      $630,000

Area, County:  42, Dade County

Listing Status:  Active, Available

ML Number:    M8175/1

Legal Description: COMMODORE CLUB SOUTH CONDO UNIT 605 - ET              Year Built: 74, Resale
Township: 42          Type: Condo                    Style: Condo 5+ Stories          Subdivision:
Complex: COMMODORE CLUB SOUTH COND           Development:
Model Name:                  Design: High Rise                                            Section: 1J
# Units in Complex:        Building #:        Total Floors in Bldg: 12     Total Units in Bldg           Unit Floor Location: 6
Detached: N       Governing Bodies: Condominium          Min # Days for Lease: 90      # Times Leased/Year: 1

Remarks:  MAGNIFICENT UNIT 2155 SQ FT OF LUXURY IN THIS 3 BEDROOMS/ 3 1/2 BATHROOM UNIT, PARQUET FLOORS IN
SOCIAL AREAS. 2 PARKING SPACES AT THE COMMODORE CLUB, KEY BISCAYNE MOST THOUGHT AFTER ADDRESS -
EXCELLENT CONDITION IN THIS BEACH FRONT BUILDING,

Main Living Area:                        Efficiency?      Convertible Bedrooms:     Furnished Info: Unfurnished
# Levels:      Room Dimensions:                                                                          # Ceiling Fans:
# Bedrooms: 3
Bedroom Description: Sitting Area + Master Bedroom
#Full Bathes: 3   #Half Baths: 1    Master Bath: 2 Master Bathrooms, Bidet
SQFT (living area): 2155        Dining Desc: Eat-In Kitchen, Formal Dining
SQFT (total area):        Floor Desc: Carpet Floors, Parquet Floors, Tile Floors
Rooms:
Interior Features: Other Interior Features
Equipment: Central Vacuum, Trash Compactor, Dishwasher, Disposal, Dryer, FIRE ALARM, Icemaker, Gas Range, Refrigerator, Washer

Construction: CBS Construction                                                          Front Exposure: S
Windows: Bay Window                   View: Ocean View, Other View                     Balcony/Prch/Patio: Y
Garage: #Spaces/Desc: 2            Carport: #Spaces/Desc:
Parking Space: 2 and Desc: 2 Or More Spaces, Guest Parking
Parking Restrictions:                                                              Dock Space:
Waterfront Info:  Y, Ocean Front           Water Access: Other
Exterior Features: Other              Security Info: Doorman, Lobby Secured
Amenities: Pool, Tennis
Heat:  Electric Heat, Central Heat          Cool: Humidistat, No Cooling
Maintenance Included:  Other Maintenance Includes
Restrictions: Renting Limited                              Pet Infos: N

Application Fee: $0        Approval Info:      Other Approvals:
Membership/Purchase Fee: N           Homeowners Assoc: N          Maintenance Charge per Month: $720
Terms Considered: Other
Range Price?/Low List Price:          Assumable?         Total Mortgage:          Land Lease Amount: $0
Dade Assessed/SOH: $583,480          Dade Market Assessed/ASV:        Recorded Land Lease per Month: $0
Tax Information: $4,019 from year00, Tax Reflects Other Tax Exemption

Directions:

*(c)2002 -- Southeast Florida Regional -- INFORMATION IS BELIEVED ACCURATE BUT IS NOT WARRANTED*      08/23/02  01:32 PM

Aug 23 02 04:08p

08/23/2002  16:23   7053610779        ERCALTY INTERNATINAL.              E  05/06

# Condo/Co-op/Villa/Townhouse Property

## 199 OCEAN LANE DR. #901
## KEYBISCY, FL 33149



List Price:     $699,000

Area, County:   42, Dade County

Listing Status: Pending Sale

ML Number:      D963669

Legal Description: COMMODORE CLUB SOUTH CONDO UNIT 901 - #F

Township: 42          Type: Condo              Style: Condo 5 - Stories        Year Built: 74, Resale

Complex: COMMODORE CLUB SOUTH COND            Development:

Model Name:            Design: Other                                           Section: 22

# Units in Complex:    Building #:           Total Floors in Bldg: 12   Total Units in Bldg:       Unit Floor Location: 90

Detached? N      Governing Bodies: Other                       Min # Days for Lease: 0      # Times Leased/Year: 0

Remarks:   STUNNING, OCEANFRONT, SOUTHEAST FXN, CORNER UNIT, WITH DRAMATIC BEACH AND OCEAN FULL VIEWS! SPARKLING JEWEL! READY TO BE MOVED INTO! 1,930 SQ. FT. OF LIVING ENJOYMENT! MARBLE FLOORS! REMODELED KITCHEN! BERBER CARPET IN BEDROOMS! CONTEM- PLATE THE ENDLESS BLUE OCEAN FROM ITS ENORMOUS WRAP AROUND

Main: Living Area:                    Efficiency?      Convertible Bedroom:      Furnished Info:                        # Ceiling Fans

# Levels:      Room Dimensions:

# Bedrooms:  3

Bedroom Description: Other

# Full Baths:  2    # Half Baths:  1   Master Bath:

SQFT (living area): 1930         Dining Desc:

SQFT (total area):        Floor Desc:  Marble Floors

Rooms:

Interior Features: Other Interior Features

Equipment: Other Equipment/Appliances

Construction:  Cbs Construction                                                       Front Exposure

Windows:                                  View:  Ocean View, Pool Area View, Tennis Court View      Balcony/Prch/Patio

Garage - # Spaces/Desc:  0               Carport   # Spaces/Desc: 0

Parking Space # and Desc: 1 Space, 1 Assigned Space                                  Dock Space:

Parking Restrictions:

Waterfront Info:  Y, Ocean Front                       Water Access: Deeded Beach Access

Exterior Features: Other                               Security Info: Doorman, Lobby Secured

Amenities: Other

Heat:  Other                                           Cool: Other

Maintenance Includes:  Other Maintenance Includes

Restrictions: Other Restrictions                                   Pet Info:  N

Application Fee: $0      Approval Info:  Other Approvals

Membership?/Purchase Fee: N       Homeowners Assoc: N          Maintenance Charge per Month: $650

Terms Considered: Other

Range Price?/Low List Price:            Assumable?   Total Mortgage:         Land Lease Amount: $0

Data Assessed/EOH: $508,530       Date Market Appraised/ABV:    Recorded Land Lease per Month: $0

Tax Information:  $10,574 from year 01, Tax Reflects Other Tax Exemption

Directions:  BALTON?ON-A-CLEAR-DAY-YOU-CAN-SEE-FOREVER!! ELEGANT! PACE SETTING! TROPICAL! UNSURPASSED! A TRUE GEM!!

*(c)2001 - Southeast Florida Regional — INFORMATION IS BELIEVED ACCURATE BUT IS NOT WARRANTED*    04/22/02  01:12 PM

# EXHIBIT "C"

## AFFIDAVIT OF DOUGLAS VALENTINE

I, Douglas Valentine, do hereby swear to the following:

1.      I am seventy years old and I was born in Calgary, Alberta, Canada on February 5th, 1932. I lived in Calgary until 1949 when I went to Vancouver for three years to attend the University of British Columbia. I received my Bachelor of Arts from the University of British Columbia in 1952. I returned to Calgary and worked with my father and brother in the family business, "Halford and Valentine Limited," in automobile servicing and sales for the next ten years.

2.      In 1962 I moved to Ottawa, Ontario and began working for the Department of External Affairs of the Government of Canada. I lived in Ottawa until 1963, and during that time I met and married my current wife, Beverly Valentine. My first assignment in the Foreign Service was in Germany where my wife and I lived for four years. Our daughter, Deborah, was born in Germany in 1964. My son, Christopher, was born in Canada in 1967 between postings. Over the next 28 years my wife and I lived in the following locations where I served as a Canadian Diplomat: Bogota, Colombia for 2 years; Rio De Janeiro for 4 years (where our son Mark Valentine was born in 1970); Ottawa, Ontario, Canada for 2 years; Tehran, Iran for 3 years; Dallas, Texas for 2 years; Ambassador to Colombia for 3 years; Ottawa, Ontario for 2 years; Ambassador to Saudi Arabia for 4 years; Consul General in Chicago, Illinois for 5 years; Ottawa, Ontario for one year.

2

3.      In 1993 my wife, Beverly and I moved to Toronto, Ontario, where I became the Director of International Business with the Department of Industry. I retired in 1995, and my wife and I remained in Toronto to be near our sons Christopher and Mark and their families. I am currently the Director of the World Trade Center at the Toronto Board of Trade. Beverly and I have lived at 164 Cumberland Street in Toronto, Ontario since 1993.

4.      Although Mark travelled with us for the greater part of his childhood, he remained in Canada prior to our move to Saudi Arabia so that he could attend his high school, Lakefield College, in Peterborough, Ontario. Mark then went to Concordia University in Montreal, Quebec, where he met his current wife, Stephanie. When Mark graduated from University in 1991, Beverly and I were living in Chicago, Illinois. I hoped Mark would come and live with us, but he chose to move to Toronto, where he started working as an investment broker. Mark and Stephanie were married in Toronto in 1994, and they have three children: Carly, Max and Victoria.

5.      Mark is very different from me, as his life does not involve much travel, and he has remained in Toronto for the past 11 years. Mark is a devoted father and husband and has not been away from his wife or children for more than a few days at any time prior to his arrest. Over the last 11 years, I have known Mark to travel to Europe on only a few occasions, his frequent travel spot has been to Key Biscayne, Florida with his family.

3

6.     My father, Mark's grandfather, was born in Ireland. When I learned that my children and I were eligible for Irish passports because of my father's heritage, I ensured that my three children and I acquire Irish passports in the event that any of them chose to attend a university or to work in Europe. My passport and those of my children have since expired and neither I nor my children have ever visited Ireland.

7.     Although my wife and I had not lived in the same location as Mark for several years, we maintained close and constant contact with each other. Further, for the last eight years we have lived in the same city and I have witnessed Mark's interactions with his wife, children, in-laws, friends, and business associates, and his active participation in several charitable organizations. Mark has the utmost respect for his in-laws and is very mindful of the fact that they have put up their Florida condominium as surety for his release. Mark is not someone who would ever jeopardize his family's trust or livelihood and would do what is expected of him no matter what he is facing.

8.     I can attest to Mark's awareness of his current situation and his determination to respond to his legal obligations. Although I have been advised that I cannot pledge any property or finances as my assets are Canadian, I can offer the Court my commitment to do whatever I can to facilitate the Court's consideration of allowing Mark to reside with his family in Toronto during this case.

4

9.      I make this affidavit in support of Mark Valentine's motion to modify his bond

conditions in *The United States of America v. Mark Valentine*, 02-80088-CR, in the

United States District Court for the Southern District of Florida, and for no improper

purpose.


SWORN before me at the City of        )

Toronto, in the Province of Ontario,  )

this 2̲8̲ day of November, 2002 .       )

                                      )

_____                    _____
A COMMISSIONER, ETC.                         DOUGLAS VALENTINE

Sharon Tagapulot, a Commissioner, etc.,
City of Toronto, for Greenspan, White,
Barristers and Solicitors.
Expires August 2, 2005.

# EXHIBIT "D"

## AFFIDAVIT OF STEPHANIE VALENTINE

I, STEPHANIE VALENTINE, do hereby swear to the following:

1.      I was born on August 27th, 1969 in Toronto, Ontario, Canada.  I have lived in Toronto nearly all my life, except for four years as an undergraduate when I attended McGill University in Montreal, Quebec, Canada.  My brother, sisters, parents, cousins, and Mark's parents and brother live in Toronto.  I married Mark Valentine on May 23rd, 1994 in Toronto.   We have lived  in Toronto for over 11 years and we have lived at 2 Ava Crescent in Toronto, for the last four years. Mark and I have three children:  Carly is six years; Max is almost five years; and Victoria is 2 and a half years old.  I received my B.A. from McGill in 1991 and then worked in my father's business, "Collins Auto Parts" as an administrative assistant to my father until 1997, following the birth of our second child, Max.  I have been a member of a local Jewish Synagogue, Holy Blossom Temple, for my whole life and Mark and I took out a family memebership since 1994.

2.      I met my husband, Mark, while at University.  I was in my second year at McGill University and Mark was in his second year at Concordia University in Montreal.  We met on the first night of our second year, in 1989 and have been a couple ever since. When we graduated University three years later, Mark agreed to move to Toronto with me because I wanted to be close to my family.

2

3.      Since Mark and I met, over thirteen years ago, we have been to Europe together on three occasions.  Mark has been to Europe alone on two occasions that I remember and the visits were only for a couple of days.  Mark's travel has mostly been to the United States and when he has travelled alone he has rarely been away for more than two or three days at a time until his arrest in this case.  Since our wedding, Mark and I had an understanding that family would come first and his business would come second.  For the last several years prior to Mark's arrest, nearly every Friday night our family would have dinner with my parents, cousins and siblings.  It was a traditional Jewish dinner.  We would have dinner with my in-laws on Sunday night.  Since our first child was born, Mark has been home most nights in time for dinner with the family.

4.      On August 14, 2002, my husband was arrested in this case.  My children did not see their father until October 1st, 2002.  Our oldest child, Carly, started acting out verbally in September, 2002.  She was not sleeping at night and would only sleep for short periods of time in my bed.  Teachers at her school and other parents told me that she seemed terribly sad, not the usually happy, social child from before.  In desperation, I brought her to a recommended psychologist, Dr. Ester Cole, who advised that Carly was exhibiting regressive behavior as a reaction to the family circumstances.  Dr. Cole advised that, at Carly's stage in development and her transition to Grade 1, it was crucial to maintain a predictable and familiar environment, but she also needed parental contact. I pulled Carly, her brother and little sister out of school and brought all three children to

3

Florida.  Although the benefits of being with their father have been important, Carly is now suffering from a prolonged absence from her friends, her school, her home, her neighborhood, her environment in Toronto.  She has started acting out again verbally, yelling and screaming about wanting to return to Toronto to her school and friends and cousins.

5.      Since mid October, I have stayed with Mark in Key Biscayne, Florida (except for one trip to Toronto to clean up our house) with our three children.  I enrolled Carly, Max and Victoria in local schools.  In responses to Carly's current behavior, I am in the process of transferring Carly to another school, because I don't know what else to do, short of returning to Toronto.  Although they regularly attended religious school at Holy Blossom Temple in Toronto, I have not yet been unable to send them to an equivalent school in Florida.

6.      Mark's only living grandparent, his maternal grandmother, is currently suffering serious health problems and has recently been hospitalized in Toronto.  She suffered a second heart attack and there is great concern about her future health.  Since I have known Mark, he has maintained a close relationship with his grandmother, and I have seen him distraught that he cannot be there for his family.

7.      As much as Mark's family has always come before his business, Carly, Max, Victoria and I rely on Mark for financial support.  Our financial situation has dramatically changed over the past couple of years.  His future earning ability is now of great importance to our family.   I know that it has been hard for Mark to support me and

4

our three children while he has remained in Florida and has been unable to attend to his business in Toronto. Mark's work is based in Toronto, his business associates and his business lawyers are all in Toronto.

8.      Since his release from custody, I have witnessed Mark's dedication to following all the orders of the Court without any hesitation. He has faithfully followed the curfew, the travel restrictions, and all the terms of his release. Mark has always been responsive to all of his obligations and has never acted in any manner to put his family in jeopardy nor would he ever do such a thing. He is highly conscious that my parents have pledged their apartment in Florida to facilitate his release and he would never do anything to jeopardize their livelihoods. As much as Mark's family comes first, he has told me about his obligations to this Court and his understanding that he will do whatever is ordered of him, regardless of where he resides throughout this case. I have been informed that I cannot pledge Canadian property, although I would pledge whatever I could on Mark's behalf to facilitate the Court's consideration to allow Mark to reside in Toronto during his case, as I know that he is dedicated to meeting all his responsibilities, no matter what the consequences.

9.      I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States of America v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.



5

FURTHER AFFIANT SAYETH NOT

STEPHANIE VALENTINE

Nov. 27, 2002
DATE


Subscribed and sworn to before me

This 27th day of November, 2002


[Seal]        _Estela Tamayo_(signature of officer]

_Estela Tamayo_(typed name of officer]

_notary_____[title of officer]


My commission expires: _____, 20____



ESTELA TAMAYO
MY COMMISSION # CC 884775
EXPIRES: October 31, 2003
Bonded Thru Notary Public Underwriters

# EXHIBIT "E"

To Whom It May Concern:

I am writing this letter to attest to the fine character of Mark Valentine.
Mark is not my blood son. He is my son-in-law. He is also the father of my
three grandchildren. Victoria is 2 ½ years old. Max who will be 5 in Dec.,
asks daily for his daddy. Carly is big sister at 6 years old.

I have known Mark for close to 13 years. Although he would not have been
my choice of son-in-law as we are of the Jewish faith and his background is
Catholic, Mark has become to us and our entire family as beloved as if he
were born of our own.

Mark is a truly good person. His contributions to the community and many
charities are a matter of public record, however in addition his daily acts of
goodness and charity have since this ordeal began, been conveyed to me on
a regular basis by countless people whose lives he has touched.

Mark is soft spoken, self effacing, constantly finding humor, and always
seeing the best in people. For him, the worst part of his present ordeal is the
pain he feels his loved ones are suffering as a result of his situation.

Mark is reliable, honest, steady and extremely devoted to his family. He and
his wife Stephanie (our daughter), are two halves of a whole. Together they
are the image of joy, commitment and everything one thinks of when
imagining a "perfect" couple. Their household until this ordeal began was
filled from morning to night with laughter.

The extreme pain we are all experiencing knowing that Mark has been
incarcerated in a German jail, with access only once per week by telephone
to his wife, seems remarkably unjust and heavy handed for the allegations
against him. We know that he looks forward to the opportunity to exonerate
himself.

I would trust Mark Valentine with my life, and would gladly give mine for
his in a heartbeat.

I beg the court, if there is truly humanity and mercy in this world, please
show it to this kind and deserving man by returning him to his family as
expeditiously as possible so that they my be whole again, and so that Mark

P.3

may be in a position to defend himself by due and fair process afforded by the American legal system.

Respectfully yours,

Carolyn Collins
154 Old Forest Hill Rd.
Toronto, Ontario
Canada   (primary residence)

199 Ocean Lane Dr. Apt. 201
Key Biscayne, Florida
33149  (winter residence)

*Carolyn Collins*

## AFFIDAVIT OF CAROLYN COLLINS

I, CAROLYN COLLINS, do hereby swear to the following:

1.      I was born on December 25, 1944 in Toronto, Ontario, Canada. I have

lived in Toronto my entire life. I reside at 154 Old Forest Hill Road, Toronto, with my

husband, Bill Collins. We have lived in the same home for over 31 years. Bill was also

born in Toronto and received his Bachelor of Arts from the University of Toronto. Bill

left Toronto for a year and a half to attend Columbia Business School in New York. Bill

and I were married in 1966 in Toronto, the same year that he received his MBA from

Columbia. Bill returned to Toronto and immediately went to work in his family business,

"C & S Auto Parts Limited", which has 83 employees. Bill has worked in the business for

over thirty years and is currently the President. I attended the Toronto School of

Interior Design for two years in the early 1970's when my children were young. I have

owned and operated "Carolyn Collins Interiors Limited" for over twenty years, although

the last few years I have been semi-retired.

2.      Bill and I have four grown children: Penny is 34 years old. She lives in

Southern California and is a Ph.D. graduate professor in the Department of Education at

Cal State University. Stephanie is 33 years old. She is a homemaker and is married to

Mark Valentine. Sarah is 31 years old. She lives in Toronto and is developing her own

business in image consulting. Andrew is 29 years old, he is a musician and plays the

mandolin with various performing groups. He recently got married on September 22nd,

2002. I met Mark Valentine shortly after my daughter, Stephanie, began dating him in

Montreal.

3.     I have known Mark for over 13 years. Although Mark is my son-in-law, he has become to us and our entire family as beloved as if he were born of our own. Mark is also the father of my three grandchildren. Victoria is 2 1/2 years old. Max will be 5 years old in December, and Carly is the big sister at 6 years old. Mark is reliable, steady and extremely devoted to his family. He and his wife, Stephanie (our daughter), are two halves of a whole. Their household until this ordeal began was filled from morning to night with laughter.

4.     I have closely witnessed Mark as a husband and a father over the last eight years. I have known Mark to consistently be home in the evenings to have dinner with his family and put his children to bed. Mark traveled to the United States often, frequently with his wife and children to Florida, but he rarely traveled anywhere else during the time I have known him. Stephanie and Mark traveled to Europe 3 times in the last 14 years and Mark has only been to Europe a couple of times without Stephanie. When Mark has been away from his family I have known him to only be away for a few days. Mark has shared in holidays and religious gatherings with my family for years before he and Stephanie were wed. Although Mark is Catholic, he has respected and embraced Stephanie's faith in Judaism and has been an active participant in raising their three children in the Jewish faith.

5.     Prior to Mark's arrest in Germany, our family gathered nearly every Friday night to share in a Shabbat dinner, a Jewish traditional family meal. This was an evening attended by not only immediate family members, but also very often extended family, comprising of Stephanie's cousins and their children. Mark and Stephanie are

raising their children in a traditional Jewish household in which Jewish custom is enriched by a close relationship with family. Since they have moved to Florida, their familiar environment including family, extended family, friends, school and religious community has been almost absent from their lives.. I have gone down to Florida to try to help my daughter, but my home is in Toronto and it has pained me that my grandchildren, daughter and son-in-law are not free to rejoin their family at home in Toronto.

6.      I have no doubt that Mark will live up to any demands the Court imposes. I have seen Mark, during my visits in Florida, to be totally mindful of all his bond conditions for the last few months. But, his children need to return home for the sake of their mental and emotional health.

I have seen the oldest, Carly, act out in an uncharacteristically loud and disruptive manner since their move to Florida. She yells about wanting to return home. She asks to return to school and cries to see her friends. Seeing the social solitude of a child who was always so happy and rich in friends, breaks my heart. Stephanie is attempting to improve the situation by yet again changing Carly's school in Key Biscayne, but I believe the only real remedy is to return the children to their home environment with both their parents.

7.      Bill and I were able to help secure Mark's current bond with our condominium on Key Biscayne. If we could offer more, we would do so without a moment's hesitation. I would trust Mark Valentine with my life and would gladly give mine for his in a heartbeat. To know Mark is to know that he would not violate any

Court order and there is nothing I would not risk for Mark in order that he may be able to come home to Toronto during this case.

      8.     I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in The United States of America v. Mark Valentine, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.

FURTHER AFFIANT SAYETH NOT

_____
CAROLYN COLLINS

_____
DATE

Subscribed and sworn to before me
This 27th day of November, 2002

_____ [signature of officer]
Estela Tamayo [typed name of officer]
Notary [title of officer]

My commission expires:



ESTELA TAMAYO
MY COMMISSION # CC 884775
EXPIRES: October 31, 2003
Bonded Thru Notary Public Underwriters

**AFFIDAVIT OF MENDEL M. GREEN, Q.C.**

I, MENDEL M. GREEN, do hereby swear to the following:

1.      I am 66 years old.  I have been married 43 years with 3 children and 8 grandchildren.  I was born in St. Thomas, Ontario and have lived in Toronto since 1960.  I have been a Barrister and Solicitor licensed to practice in Ontario for over 40 years.  I have been a Queen's Counsel since 1974, and I recently received the Queen's Golden Jubilee Medal.  My curriculum vitae is attached hereto as Exhibit "A".

2.      Mark Valentine became known to me about five years ago when he purchased my friend's country home on Lake Simcoe near Jackson's Point, Ontario.  He became friends with one of my children and I met Mark at my son's home.  He and his children, together with my grandchildren, would often play at my home.  I would see Mark on a weekly basis.  He has always been in the company of his wife or children and I got to know how he conducts his life with his family.  I am blessed with a close family and am impressed by others who have close families.  Mark impresses me as a father. He interacts with his children beautifully. He has inspired me, as one rarely sees today - a father who is busy in his business life and yet spends quality time with his children.

3.      Mark and his wife, Stephanie, have been in my home many times.  By coincidence, Mark's father-in-law became my neighbour this year.  As a result, I have had an opportunity to see them even more than before.  I have witnessed tremendous love and tenderness Mark and Stephanie appear to have with one another.  Of significance is the respect Mark shows his wife. Mark has consistently demonstrated respect for his father, mother, father-in-law and mother-in-

2

law. In today's world, it is a rarety to see this. My wife and I have commented on how well Mark interacts with the senior generation.

4.      Mark has held fundraisers for Children's Wish Foundation and raised unprecedented amounts. I am a Director of the Board of the Mount Sinai Hospital Foundation in Toronto. He has made a generous gift to this establishment. I am active in the community of Toronto and Mark has always supported my charitable work.

5.      I have known Mark to be a responsible and responsive person, both to his family and to any obligations he incurs.   I am aware that it has been a hardship for Mark to be unable to come home to Toronto for personal and financial reasons. I am confident that he understands his legal obligations and would not conduct himself an any manner that would disrespect the legal system and any Court order, in the event he was granted permission to reside in Toronto or travel to Toronto. I would not sign this affidavit if I had any concern that Mark would not abide by a Court's order to appear.

6.      I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.


SWORN before me at the City of       )

Toronto, in the Province of Ontario,  )

this 27 day of November, 2002 .       )

A COMMISSIONER, ETC.                         MENDEL M. GREEN, Q.C.

David Nakelsky

**Exhibit "A"**

## MENDEL M. GREEN, Q.C.

Called to the Bar of The Law Society of Upper Canada 1962

Appointed Queen's Counsel 1974

Senior Partner, Green and Spiegel, Barristers and Solicitors, Canada's largest immigration law firm

Founding Chairman, Canadian Bar Association, Immigration Section

Special Commissioner, Ministry of the Attorney General, Province of Ontario "to examine the office of the Special Examiner" 1978

Chairman, Immigration Law Specialty Committee, The Law Society of Upper Canada

Appointed by the Hon. Sergio Marchi, Minister of Citizenship and Immigration to make recommendations to the Government on the business immigration program, 1994

Adjunct Professor, University of Western Ontario Law School (until     summer 2001)

Adjunct Professor, Osgoode Hall Law School, York University (until summer 2001)

**LEXPERT**, Canada's legal directory, pointed out that Mendel Green is considered "the dean of immigration by Canada's immigration bar".

Honorary Vice Consul, Consulate of The Republic of Moldova in Toronto

Chairman of the Board of Governors, Yee Hong Wellness Foundation (the largest multicultural home for the aged)

Member of the Board of Directors, Mount Sinai Hospital Foundation

Vice President, Canada Shaare Zedek Hospital Foundation

Past Chairman, Board of Governors, Beth Sholom Synagogue

Past President, Beth Sholom Synagogue

## AFFIDAVIT OF WILLIAM HECHTER

I, WILLIAM HECHTER, do hereby swear to the following:

1.      I was born on April 16th, 1947 in Winnipeg, Manitoba.  I attended the University

of Manitoba and there I received both my Bachelor of Arts and my law degree.  I

attended Harvard Law School and received my LLM in 1974.  I taught at Hamlin Law

School in St.Paul, Minnesota from 1974 to 1975.  In 1976, I returned to Canada, and

moved to Toronto.  I have lived in Toronto ever since.  I was a prosecutor from 1976 to

1980, at the Crown Attorney's Office in Toronto.  I then established the law firm Hechter

& Associates, a private practice firm specializing in criminal law, from 1980 through

1997.  Since 1997, I have been President of Excalibur Capital Management, a securities

management company.  I have been admitted to practice law in Massachusetts,

Minnesota, Ontario and Manitoba.  I have two daughters, one who is about to receive her

medical degree from McMaster University in Hamilton, Ontario, and the other who is

currently an undergraduate at York University in Toronto.


2.      I first met Mark in 1997, while he was at Thomson Kernaghan.  Our relationship

became personal.  We shared an active involvement in charitable organizations.  I was the

President of the Canadian Friends of the Israel Museum from 1993 to 2001.  The Friends

of the Israel Museum charity is an international charity, and actively supported

throughout the United States.  Mark took a strong interest in the Canadian Friends of the

2

Israel Museum and has been a loyal supporter, participating in several functions over the last several years. I too became involved in Mark's charitable activities, particularly the Children's Wish Foundation. Over the last several years that I have known Mark, he has sponsored several major events for the Foundation and has been responsible for raising significant amounts of money for needy children. I know Mark is also a strong supporter of both the Mount Sinai Hospital and the Hospital for Sick Children in Toronto.

3.      I have no hesitation to declare my strong opinion that Mark is absolutely not a flight risk, and will attend Court as required. I know that Mark will honor all his legal obligations in this case. I am aware that it has been a hardship on Mark, his wife and children that he has not been able to return home for the last several months. I offer whatever support I can that would assist the Court in permitting Mark to return to Canada during this case.

4.      I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.

SWORN before me at the City of      )

Toronto, in the Province of Ontario,  )

this 28th day of November, 2002 .     )

_____             _____
A COMMISSIONER, ETC.                    WILLIAM HECHTER

## AFFIDAVIT OF PAUL WALKER

I, PAUL WALKER, do hereby swear to the following:

1.     I was born in London, Ontario on December 20th, 1949.  I currently reside in Toronto,

and I have lived in Toronto for the last thirty years.  In 1973, I received an M.D. from the

University of Western Ontario in London, Ontario.  I was admitted as a Fellow of the Royal

College of Physicians and Surgeons in 1977.  I received a PhD from the University of

Gothenburg in Sweden in 1984.  From 1980 through 2001 I was a vascular surgeon at Toronto

General Hospital  From 1991 through 1999 I was Surgeon in Chief at Toronto General Hospital,

and from 1999 until March, 2001 I was Chief Operating Officer.  For the last year and a half I

have been President and Chief Executive Officer for Spectral Diagnostics Inc, a leading

company in the research, development and commercialization of diagnostic technology.


2.     I have known and been friends with Mark Valentine and his wife for over three years.  I

first met the Valentines as a family through my wife's relationship with Stephanie,  Mark's wife.

I found the family to be close, with Mark an involved, caring father and husband.  We celebrated

religious holidays together as well as social times.


3.     In addition, I have interacted with Mark in some of his philanthropic activities.  He has

done a great deal for charities but perhaps most of all for the Children's Wish Foundation at the

Hospital For Sick Children in Toronto.   Through many activities Mark raised millions of dollars

2

for this worthwhile charity and has given many children a moment of happiness when they needed it most.

4.    I became involved with Mark in business matters following my becoming the CEO of Spectral Diagnostics Inc.  The investment firm Mark was involved with had a ten-year history with Spectral and at the Board's Direction, we approached Thompson Kernahan to manage our rights offering.  The offering was successful and run in a most business like manner.  In all my dealings with Mark I was impressed with his straightforward manner, his comprehensive business approach and his regard for the interests of others.

5.    I have known Mark only as one who meets his obligations and follows through on every commitment.  I have no hesitation in offering whatever support I can that would persuade the Court to permit Mark to return to Canada during this case.

6.    I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.

SWORN before me at the City of        )

Toronto, in the Province of Ontario,   )

this 2 8 day of November, 2002 .     )

_____

A COMMISSIONER, ETC.

_____

PAUL WALKER, M.D.

## <u>AFFIDAVIT OF EDWARD CARROLL</u>

I, EDWARD "EDDIE" CARROLL , do hereby swear to the following:

1.      I was born in Ireland on January 3rd, 1939. I moved to Canada in 1968 with my wife and two sons and I have lived in Etobicoke, a suburb of Toronto, Ontario, Canada for the last thirty years. My family and I have been Canadian citizens for nearly 30 years. In 1968 I had been employed as a banker with the Midland Bank in England for a few years, and I moved to Canada to work as a banker for the Toronto Dominion Bank in Toronto. I left the banking industry a few years later to enter the travel industry. I owned and operated a few small travel businesses and then became the President of the European Division of Sunquest Vacations for ten years. In 1995, my son, Jonathan, founded "ITravel 2000," a retail and wholesale travel service with an internet focus; that same year I left Sunquest Vacations to join my son's new business. I am currently the Chief Executive Officer of ITravel 2000 and Jonathan is the President. My other son, Shane, is the Executive Vice President. Over the last eight years, the business has grown to over 90 employees--the largest independent travel business in Canada.

2.      I first met Mark and his parents through my son, Jonathan, who attended high school with Mark at Lakefield College in Peterborough, Ontario.   My family has remained close with Mark and his family for over 20 years. I have watched Mark develop into an adult, become a productive and charitable member of society, and build a tremendous family.  In the more than 20 years I have been close with Mark and his family, Mark always finds time for his family and friends.  He is very loyal and

2

committed to helping those in need. I have known Mark to be responsible to his family, friends and colleagues. Although my relationship with Mark has been predominantly personal, I have had some dealings with Mark in business, and I have consistently found Mark to be responsive and trustworthy. I have never worried about him failing to complete an obligation, as Mark has always abided by his commitments.

3.      Since Mark's arrest in this case, Jonathan and I were able to travel to Florida to visit Mark and give him our support. I know that it has been difficult for him to remain in Florida for the last few months, away from much of his family, friends and unable to meet his obligations back home in Toronto. I am committed to doing anything I can on Mark's behalf that would help Mark be able to return to Canada during this case.

4.      I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.

SWORN before me at the City of        )

Toronto, in the Province of Ontario,   )

this 28ᵗʰ day of November, 2002 .     )

_____             _____
A COMMISSIONER, ETC.                    EDWARD CARROLL

## AFFIDAVIT OF JASON GOLDMAN

I, JASON "JAY" GOLDMAN , do hereby swear to the following:

1.      I was born in Toronto, Ontario, Canada on December 20th, 1961, and I have lived in Toronto nearly all my life.  I am married and I have two young children, ages 3 1/2 years and 14 months.  In 1984, I received my Bachelor of Arts in Economics from the University of Toronto.  From 1985 to 1988 I attended the University of Western Ontario in London, Ontario, and I received both my law degree and a Masters in Business Administration from the University of Western Ontario in 1988.  I returned to Toronto to practice law and I have been a member of the Ontario Bar since 1990.  I specialize in the areas of corporate and securities law.

2.      I first met Mark Valentine about five years ago at an engagement party for Mark's sister-in-law, Sarah.  My wife, Jennifer, and Mark's wife, Stephanie, are childhood friends.  Over the last five years, my family and Mark's family have spent a great deal of time together both in Toronto and in Lake Simcoe, at our summer cottages.  My wife and I have also vacationed on several occasions with Mark and Stephanie in Canada and the United States.

3.     In the years I have known Mark, I have known him to be a devoted father and husband, always making time to be with his children on weekends and in the evenings. Mark regularly spent significant time with his wife's family and his parents who all live in Toronto.  Mark rarely traveled away from his family but when he did so, it was for short intervals.  I have also seen Mark as a devoted business man, responsive to any obligations he sustains.  Mark has never given me or anyone I know cause to question him when he has committed to fulfilling a responsibility.

4.     Although I have not seen Mark since his arrest in this case, I have spoken to him on the phone frequently.  Mark has exhibited an awareness of his legal obligations and an understanding of his duties to the Court.  I know that Mark's business and legal representation are based in Toronto and it has been difficult for Mark to conduct his affairs and meet with counsel while he has remained in Florida.  I am aware that it has been difficult for Mark, Stephanie and their children to be away from their home in Toronto for personal and business reasons.  I would not submit this affidavit if I had any doubt that Mark would disrespect the legal process.  I am prepared to do whatever I can as Mark's friend and as an officer of the Court to facilitate the Court's consideration of permitting Mark to reside in Toronto during this case.

5.     I make this affidavit in support of Mark Valentine's motion to modify his bond conditions in *The United States v. Mark Valentine*, 02-80088-CR, in the United States District Court for the Southern District of Florida, and for no improper purpose.

3

SWORN before me at the City of    )

Toronto, in the Province of Ontario,  )

this 28rd day of November, 2002 .   )

A COMMISSIONER, ETC.                    JASON GOLDMAN

# EXHIBIT "F"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


CASE NO. 02-CR-80088-FERGUSON

----------------------------------------------------------------

UNITED STATES OF AMERICA,         :

       Plaintiff                :

                             :

vs.                         :      Magistrate Judge Lurana Snow

                             :

MARK VALENTINE,            :

       Defendant            :      **AFFIDAVIT OF**

                           :      **EDWARD L. GREENSPAN**

                           :

----------------------------------------------------------------


       Edward L. Greenspan, Q.C., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.     I was called to the Bar in Ontario in 1970. I received my Queen's Counsel in 1982. I am a member of the American Bar Association, the American National Association of Criminal Defense Lawyers, the International Society of Barristers, the Canadian Bar Association, and the American College of Trial Lawyers. I have lectured extensively on criminal law and related topics. From 1972 to 1999, I lectured on criminal law at the University of Toronto Law School. From 1972 to 1981, I lectured on criminal procedure, and from 1987 to 1989, I lectured on advanced evidence in criminal cases at Osgoode Hall Law School at York University. Since 1978, I have also been the Editor of Martin's Annual Criminal Code and, since 1980, the Editor of Martin's Related Criminal Statutes, an annotated book of numerous federal criminal and quasi-criminal statutes including the *Extradition Act.*

2

2.   My practice consists almost exclusively of criminal and quasi-criminal defence work.  A component of this is extradition.  I have been involved in and am presently involved in numerous extradition proceedings as defence counsel.

3.   The alleged conduct underlying the charges would, if committed in Canada, constitute criminal offences set out in the *Criminal Code of Canada* and, therefore, the charges in the Indictment are clearly extraditable offences.

4.   I have reviewed the Draft Affidavit of the Defendant, Mark Valentine, which is attached to this my Affidavit and marked as Exhibit "A".

5.   The Draft Affidavit of the Defendant in paragraphs 3, 4, 5, 6, 7 and 8, attached to this my Affidavit and marked as Exhibit "A",  irrevocably waives extradition from Canada.

6.   The Defendant has consulted with me and has been fully informed of his rights that he waives extradition freely and voluntarily and that for the waiver to be free and voluntary, he must not be doing so under duress or compulsion.

7.   In paragraph 10 of the Draft Affidavit, the Defendant swears that "I make this waiver freely and voluntarily, after having consulted with my attorney and with the full knowledge as to the nature of the rights I am waiving.  In this regard I have spoken with counsel in both Canada and the United States.  My rights and options have been explained to me and I understand them."  I confirm that I am the counsel in Canada that the Defendant spoke to and that this waiver is freely and voluntarily given and that he is not doing so under any duress and compulsion.

8.   The *Extradition Act* specifically contemplates that a defendant may consent to committal for surrender (s.70), consent to surrender (s.71) and waive extradition (s.72).  These provisions are as follows:

**70.** (1) A person may, at any time after the issuance of an authority to proceed, consent, in writing and before a judge, to committal.

3

(2)  A judge before whom a person consents under subsection (1) shall

   (a)  order the committal of the person into custody to await surrender to the extradition partner; and

   (b)  transmit a copy of the consent to the Minister.

**71.** (1) A person may, at any time after arrest or appearance, consent, in writing and before a judge, to be surrendered.

(2) A judge before whom a person consents to being surrendered shall

   (a)  order the committal of the person into custody to await surrender to the extradition partner; and

   (b)  transmit a copy of the consent to the Minister.

(3)  The Minister may, as soon as is feasible after receiving a consent to surrender, personally order that the person be surrendered to the extradition partner.

(4)  When a person consents to being surrendered to the extradition partner, the following sections do not apply:

   (a)  section 43 (submissions to the Minister);
   (b)  section 44 (reasons for refusal);
   (c)  section 48 (discharge of person);
   (d)  section 57 (judicial review of Minister's decision); and
   (e)  paragraph 62(1)(a) (delay before surrender).

**72.** (1) A person may, at any time after arrest or appearance, waive extradition in writing and before a judge.

(2)  A judge before whom a person gives a waiver under subsection (1) must inform the person

   (a)  of the consequences of the waiver including the consequences of waiving the protection of specialty; and

   (b)  that they will be conveyed without delay to the extradition partner.

(3)  The judge shall

   (a)  order the conveyance in custody of the person to the extradition partner; and

   (b)  transmit a copy of the waiver and the order to the Minister.



4

(4) The conveyance order must

    (a) contain the name of the person who is to be conveyed; and

    (b) state the extradition partner to which the person is to be conveyed.

9.    It is my view that this irrevocable waiver, as specifically set out in the Draft Affidavit and attached to this my Affidavit and marked as Exhibit "A", is an effective, enforceable and valid waiver for extradition purposes.

10.    I believe that the contents of this Draft Affidavit, attached to this my Affidavit and marked as Exhibit "A", would preclude the Defendant from resisting any extradition request made by the United States of America to Canada and that extradition would be a foregone conclusion.

11.    An irrevocable authorization by my client tendered before a court of law, in Canadian law means that if my client attempts to withdraw the irrevocable authorization that he has given me in any future proceedings in Canada I, as an officer of the court, am duty bound not to act on any instructions to withdraw his irrevocable authorization or my irrevocable undertaking.

12.    I have been irrevocably instructed by the Defendant that I am a competent and compellable witness on any bail hearing or extradition hearing in Canada should either or both events arise as a result of any authorization on the Defendant's part to return to the United States to answer the charges before this Honourable Court. At such bail hearing or extradition hearing I would confirm and undertake to confirm that the Defendant's

5

irrevocable waiver is truly free and voluntary and I undertake to unequivocally state at such a hearing that any attempt to resist extradition would be an insult to the administration of justice both in Canada and the United States and as such, in my view, it is totally unlikely that the Defendant would be released on bail as it would be necessary to deny him bail in order to maintain confidence in the administration of justice which is one of the separate standards for a judge to deny bail in Canada.

13.    Further, the Defendant's admission in paragraph 8 of the Draft Affidavit, attached hereto to this my Affidavit and marked as Exhibit "A", where he irrevocably admits that there is a sufficient basis for extradition and that all the prerequisites exist for extradition pursuant to the *Extradition Act* and the *Convention on Extradition Between Canada and the United States of America,* 27 U.S.T. 983, T.I.A.S. 237 in relation to the charges set out in the Indictment having been made freely and voluntarily, would obviate the necessity of anything more than a *pro forma* extradition hearing.

14.    With this sworn waiver, attached as a Draft Affidavit and marked as Exhibit "A" to this my Affidavit and my future testimony, it would mean, in my view, under Canadian law that the Defendant's extradition would be a foregone conclusion. There is no doubt in my mind, the irrevocable waiver plus my testimony could be acted upon by the Court as fulfilling the requirements for consent or waiver under sections 70, 71 and 72 of the *Extradition Act* as it could not be successfully argued after my testimony that the Defendant's waiver was not free and voluntary. No such argument could possibly succeed in the face of my clear testimony that his Affidavit was made truly freely and voluntarily.

6

15.   An order of the Minister could be made easily based solely on my testimony and the Defendant's waiver.  Bail would be a non-existent possibility in the circumstances. Extradition would be a foregone conclusion.  The Defendant fully recognizes that it would be a most unusual event for counsel retained by him to testify against him should he fail to respond with each and every order of this Honourable Court but he consents and authorizes it to underscore the *bona fides* in the argument that this Honourable Court can rely on his voluntarily return to meet and address the matters before this Honourable Court.

16.   I make this Affidavit for no improper purpose.

| | |
|---|---|
| SWORN before me at the City of | ) |
| Toronto, in the Province of Ontario | ) |
| This 16th day of September, 2002. | ) |
| | ) |
| | ) |
| _____ | ) |
| A Commissioner, etc. | ) |

EDWARD L. GREENSPAN, Q.C.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-CR-80088-FERGUSON

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

MARK VALENTINE,

      Defendant.

_____/

Magistrate Judge Lurana Snow

*DRAFT*

This is Exhibit....."**A**".................referred to in the
affidavit of..E.D.W.A.R.D....L....G.R.E.E.N.S.P.A.N,.Q.C.
sworn before me, this......*16*...........
day of....*September*....../.......*20.02*....

..........................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

## AFFIDAVIT

**MARK VALENTINE**, being duly sworn, deposes and says:

    1.    I am a named Defendant in the above captioned case. I am a citizen and resident of Canada, as well as a citizen of Ireland. My permanent residence is in Toronto, Canada with my wife and children.

    2.    On August __, 2002, I was arrested in connection with this matter while on business in Germany. I retained counsel in Germany and began extradition proceedings. I subsequently waived my extradition rights from that country, and voluntarily consented to be extradited to the United States for prosecution in this case.

    3.    I hereby voluntarily and irrevocably waive any rights to contest extradition from Canada to the United States, in relation to the charges set out in the Indictment in this case (the "Indictment").

    4.    In the event that I do not return to the United States of America as required, I hereby consent to my extradition or rendition to the United States of America from Canada and waive any and all rights I may have to contest my extradition or rendition to the United States of America from

Canada in relation to the charges set out in the Indictment.

     5.     I hereby irrevocably consent to my committal for surrender and to my surrender to the United States of America in any extradition proceedings in Canada relating to the charges set out in the Indictment, and I irrevocably consent to this affidavit being filed in any such extradition proceedings, pursuant to sections 70 and 71 of the *Canadian Extradition Act*, S.C. 1999, c. 18.

     6.     I also hereby irrevocably waive extradition to the United States of America in any extradition proceedings relating to the charges set out in the Indictment and I irrevocably consent to this affidavit being filed in any such proceedings as evidence of my waiver of extradition, pursuant to section 72 of the *Extradition Act*.

     7.     I also irrevocably waive my right to seek bail in Canada in any extradition proceedings relating to the charges set out in the Indictment. I fully understand and agree that upon this waiver being filed with the Court in any extradition proceedings relating to the charges set out in the Indictment, I would be conveyed without delay to the United States, without the protection of specialty, and that I would not have the right to make any appeal or application for judicial review.

     8.     I hereby irrevocably admit that there is a sufficient basis for extradition and that all the prerequisites exist for extradition, pursuant to the *Extradition Act* and the *Convention on Extradition Between Canada and the United States of America*, 27 U.S.T. 983, T.I.A.S. 237, in relation to the charges set out in the Indictment.

     9.     I make these admissions solely with regard to the issue of extradition proceedings and in order to help effectuate my ability to travel to and from Canada while these charges are pending in the United States. These admissions cannot be used for any other purpose or in any other proceedings not related to extradition.

2

10.    I make this waiver freely and voluntarily, after having consulted with my attorney and with the full knowledge as to the nature of the rights I am waiving. In this regard I have spoken with counsel in both Canada and the United States. My rights and options have been explained to me and I understand them.

FURTHER AFFIANT SAYETH NOT.


_____          _____
MARK VALENTINE                            Date


STATE OF FLORIDA        )
                        )SS:
COUNTY OF               )

The foregoing instrument was acknowledged before me this ___ day of _____, 2002, by MARK VALENTINE who is personally known to me and did take an oath.

DATED this _____ day of _____, 2002.


_____
NOTARY PUBLIC, State of Florida

My Commission Expires:

3

# EXHIBIT "G"

# ■■ Groia & Company
### Lawyers

Joseph Groia
Direct Line: (416) 203-4472
email: jgroia@groiaco.com
File No.: 1285-001

December 3, 2002

**VIA FACSIMILE AND COURIER**

To Whom It May Concern:

**Re:   Motion to Amend Mark Valentine's Bond Conditions**

Our firm is counsel for Mark Valentine with respect to various regulatory and civil matters in Toronto, Ontario.

These matters involve a large volume of documentation. We are currently in possession of over six bankers' boxes of documents related to five different matters. There are also approximately 18 bankers' boxes of materials that belong to Mr. Valentine being held at the premises of Thomson Kernaghan & Co. Limited ("Thomson Kernaghan"). We believe these bankers' boxes contain documents that are relevant to Mr. Valentine's outstanding matters and we need to review these materials with Mr. Valentine. There are also approximately 1,600 bankers' boxes of documents in electronic format in the possession of the Ontario Securities Commission (the "OSC") that have yet to be disclosed to us. We expect a portion of the OSC documents may be disclosed to us in the next two months. In addition, Mr. Valentine is involved in various civil matters that require him to disclose documents in his possession and control. We believe that it will be necessary for him to attend at his home in Toronto and at the Thomson Kernaghan premises to adequately comply with his disclosure obligations in those matters.

It has become increasingly difficult to prepare Mr. Valentine's cases without his presence over the past four months. The documents referred to above often relate to complex financial transactions and it is necessary for Mr. Valentine to review the documents with various advisors at our office as well as other advisors, including lawyers at Goodman and Carr LLP. In addition, a number of these matters require Mr. Valentine's immediate attention. Due to the volume of material involved and the necessity to review the material with different advisors in Toronto, it is impractical for our firm and Mr. Valentine's other advisors to adequately prepare Mr. Valentine's cases while he is in the United States.



2

Our firm has worked very closely with Mr. Valentine over the past eight months and has found him to be reliable and dependable.  To every extent possible, Mr. Valentine has fully co-operated with various authorities in Canada, the United States and Germany. We submit that Mr. Valentine does not pose a risk of flight in regards to his case in the United States and we support a modification of Mr. Valentine's bail conditions in order for him to attend in Toronto to assist us, and his other advisors, in preparing for various legal proceedings on his behalf in Canada.

Yours faithfully,

Joseph Groia
JG*mcs

# TAB D

✎AO 199A   (Rev. 6/97) Order Setting Conditions of Release                                    Page 1 of _3____ Pages

# UNITED STATES DISTRICT COURT

<u>NORTHERN</u>                **District of**                <u>ILLINOIS</u>

United States of America

V.

**ORDER SETTING CONDITIONS
OF RELEASE**

<u>CONRAD M. BLACK</u>                 Case Number:   05 CR 727
Defendant

IT IS ORDERED that the release of the defendant is subject to the following conditions:

(1)      The defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

(2)      The defendant shall immediately advise the court, defense counsel and the U.S. attorney in writing before any change in address and telephone number.

(3)      The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as directed.  The defendant shall appear at (if blank, to be notified) _____
                                                                                             Place

_____ on _____
                                                           Date and Time

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released provided that:

( ✔ ) (4)  The defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.

( ✔ ) (5)  The defendant executes an unsecured bond *and forfeiture agreement* binding the defendant to pay the United States the sum of
TWENTY MILLION _____ dollars ($ 20,000,000            )
in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

DISTRIBUTION:   COURT    DEFENDANT    PRETRIAL    SERVICES    U.S. ATTORNEY    U.S. MARSHAL

Case 1:05-cr-00727     Document 74     Filed 12/01/2005     Page 2 of 3

AO 199B    (Rev. 5/99)  Additional Conditions of Release                                              Page ___2___ of ___3___

## Additional Conditions of Release

Upon finding that release by one of the above methods will not by itself reasonably assure the appearance of the defendant and the safety of other persons and the community.

IT IS FURTHER ORDERED that the release of the defendant is subject to the conditions marked below:

(  ) (6)   The defendant is placed in the custody of:
           (Name of person or organization) _____
           (Address) _____
           (City and state) _____ (Tel. No.) _____

who agrees (a) to supervise the defendant in accordance with all the conditions of release, (b) to use every effort to assure the appearance of the defendant at all scheduled court proceedings, and (c) to notify the court immediately in the event the defendant violates any conditions of release or disappears.

                                    Signed: _____        _____
                                               Custodian or Proxy                                    Date

( X ) (7)   The defendant shall:
  (  ) (a)   report to the _____ ,
            telephone number _____ , not later than _____
  ( X ) (b)  execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property:
            $20 MILLION AS SECURED BY FLORIDA PROPERTY AND SEIZED ASSETS DESCRIBED IN FORFEITURE AGREEMENT WITH U.S.
  (  ) (c)   post with the court the following indicia of ownership of the above-described property, or the following amount or percentage of the above-described
            _____
  (  ) (d)   execute a bail bond with solvent sureties in the amount of $ _____
  (  ) (e)   maintain or actively seek employment.
  (  ) (f)   maintain or commence an education program.
  (  ) (g)   surrender any passport to: _____
  (  ) (h)   obtain no passport.
  ( X ) (i)  abide by the following restrictions on personal association, place of abode, or travel:
            TRAVEL ONLY PERMITTED BETWEEN CANADA AND U.S. FOR COURT AND CASE PREPARATION ABSENT GOVT & COURT CONSENT
  (  ) (j)   avoid all contact, directly or indirectly, with any persons who are or who may become a victim or potential witness in the subject investigation or
            prosecution, including but not limited to: _____

  (  ) (k)   undergo medical or psychiatric treatment and/or remain in an institution as follows: _____

  (  ) (l)   return to custody each (week) day as of _____ o'clock after being released each (week) day as of _____ o'clock for employment,
            schooling, or the following limited purpose(s): _____

  (  ) (m)   maintain residence at a halfway house or community corrections center, as deemed necessary by the pretrial services office or supervising officer.
  ( X ) (n)  refrain from possessing a firearm, destructive device, or other dangerous weapons. → Turn over to Mr. Greenspan 4:00pm on 12b
  (  ) (o)   refrain from (  ) any (  ) excessive use of alcohol.
  ( X ) (p)  refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical
            practitioner.
  (  ) (q)   submit to any method of testing required by the pretrial services office or the supervising officer for determining whether the defendant is using a prohibited
            substance. Such methods may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or
            any form of prohibited substance screening or testing.
  (  ) (r)   participate in a program of inpatient or outpatient substance abuse therapy and counseling if deemed advisable by the pretrial services office or supervising
            officer.
  (  ) (s)   refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or electronic
            monitoring which is (are) required as a condition(s) of release.
  (  ) (t)   participate in one of the following home confinement program components and abide by all the requirements of the program which   (  ) will or
            (  ) will not include electronic monitoring or other location verification system.  You shall pay all or part of the cost of the program based upon your ability
            to pay as determined by the pretrial services office or supervising officer.
            (  )  (i) Curfew.  You are restricted to your residence every day   (  ) from _____ to _____ , or  (  ) as directed by the pretrial
                     services office or supervising officer; or
            (  )  (ii) Home Detention.  You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse,
                     or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the pretrial services
                     office or supervising officer; or
            (  )  (iii) Home Incarceration.  You are restricted to your residence at all times except for medical needs or treatment, religious services, and court
                     appearances pre-approved by the pretrial services or supervising officer.
  ( X ) (u)  report as soon as possible, to the pretrial services office or supervising officer any contact with any law enforcement personnel, including, but not limited
            to, any arrest, questioning, or traffic stop.  Palm Beach, FLA
  ( X ) (v)  DEFENDANT MUST RESIDE IN EITHER CANADA OR CHICAGO, ILLINOIS UNTIL CONCLUSION OF CRIMINAL CASE

  ( X ) (w)  UNCONDITIONALLY AGREE TO RETURN VOLUNTARILY TO THE UNITED STATES (OR WAIVE ANY EXTRADITION PROCEEDINGS)
            FOR ANY REQUIRED COURT APPEARANCE(S) AS SET FULLY FORTH IN EXECUTED AFFIDAVITS
  ( X ) (x)  ALL PROCEEDS FROM ANY SALE OF FLORIDA PROPERTY (DESCRIBED IN FORFEITURE AGREEMENT) WILL BE MAINTAINED IN
            ESCROW TO SECURE BOND – EVEN IF PROCEEDS ARE IN EXCESS OF CURRENTLY SET BOND AMOUNT

DISTRIBUTION:    COURT    DEFENDANT    PRETRIAL SERVICES    U.S. ATTORNEY    U.S. MARSHAL

AO 199C   (Rev.6/97) Advise of Penalties . . .                                                          Page ___3___ of ___3___ Pages

## Advice of Penalties and Sanctions

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

     A violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of release, an order of detention, and a prosecution for contempt of court and could result in a term of imprisonment, a fine, or both.

     The commission of a Federal offense while on pretrial release will result in an additional sentence of a term of imprisonment of of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be in addition to any other sentence.

     Federal law makes it a crime punishable by up to 10 years of imprisonment, and a $250,000 fine or both to obstruct a criminal investigation. It is a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to tamper with a witness, victim or informant; to retaliate or attempt to retaliate against a witness, victim or informant; or to intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

     If after release, you knowingly fail to appear as required by the conditions of release, or to surrender for the service of sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

    (1)  an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, you shall be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

    (2)  an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, you shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

    (3)  any other felony, you shall be fined not more than $250,000 or imprisoned not more than two years, or both;

    (4)  a misdemeanor, you shall be fined not more than $100,000 or imprisoned not more than one year, or both.

     A term of imprisonment imposed for failure to appear or surrender shall be in addition to the sentence for any other offense. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

## Acknowledgment of Defendant

     I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Signature of Defendant

_____
Address

_____           _____
City and State                                                                              Telephone

## Directions to United States Marshal

( ✔ )  The defendant is ORDERED released after processing.

(   )  The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and/or complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date: ___12-1-05_____           _____
Signature of Judicial Officer

_____
Name and Title of Judicial Officer
Amy J. St. Eve
US District Court Judge

DISTRIBUTION:   COURT     DEFENDANT     PRETRIAL SERVICE     U.S. ATTORNEY     U.S. MARSHAL

@004

# FILED

DEC - 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff | ) ) ) | No. 05 CR 727 |
| v. | ) ) | The Honorable Amy J. St. Eve |
| CONRAD BLACK,<br>Defendant | ) ) ) | |

### AFFIDAVIT

CONRAD BLACK, being duly sworn, deposes and says:

1.  I am a named Defendant in the above captioned case. I am a citizen of the United Kingdom. My residence is in Toronto, Canada, with my wife and children.

2.  On November 17, 2005, I was charged in the above cited Indictment. Although I am currently in Toronto, Ontario, Canada, I intend to appear before this Honorable Court for the purposes of arraignment in this matter.

3.  I hereby voluntarily and irrevocably waive any rights to contest extradition from Canada or the United Kingdom to the United States, in relation to the charges set out in the Indictment in this case.

4.  In the event that I do not return to the United States of America as required, I hereby consent to my extradition or rendition to the United States of America from Canada or the United Kingdom and waive any and all rights I may have to contest my

extradition or rendition to the United States of America from Canada or the United Kingdom in relation to the charges set out in the Indictment.

5.     I hereby irrevocably consent to my committal for surrender and to my surrender to the United States of America in any extradition proceedings in Canada or the United Kingdom relating to the charges set out in the Indictment, and I irrevocably consent to this affidavit being filed in any such extradition proceedings, pursuant to sections 70 and 71 of the *Canadian Extradition Act*, S.C. 1999, c. 18.

6.     I also hereby irrevocably waive extradition to the United States of America in any extradition proceedings relating to the charges set out in the Indictment and I irrevocably consent to this affidavit being filed in any such proceedings as evidence of my waiver of extradition, pursuant to section 72 of the *Extradition Act*.

7.     I also irrevocably waive my right to seek bail in Canada or the United Kingdom in any extradition proceedings relating to the charges set out in the Indictment.  I fully understand and agree that upon this waiver being filed with the Court in any extradition proceedings relating to the charges set out in the Indictment, I would be conveyed without delay to the United States, without the protection of specialty, and that I would not have the right to make any appeal or application for judicial review.

8.     I hereby irrevocably admit that there is a sufficient basis for extradition and that all the prerequisites exist for extradition, pursuant to the *Extradition Act* and the

Convention on Extradition Between Canada and the United States of America, 27 U.S.T.

983, T.J.A.S. 237, in relation to the charges set out in the Indictment.

9.      I make these admissions solely with regard to the issue of extradition proceedings

and in order to help effectuate my ability to travel to and from Canada or the United

Kingdom while these charges are pending in the United States.  These admissions cannot

be used for any other purpose or in any other proceedings not related to extradition.

10.     I make this waiver freely and voluntarily, after having consulted with my attorney

and with the full knowledge as to the nature of the rights I am waiving.  In this regard I

have spoken with counsel in both Canada and the United States.  My rights and options

have been explained to me and I understand them.

FURTHER AFFIANT SAYETH NOT

_____          _____
CONRAD BLACK                                          30/11/05
                                                      DATE

The foregoing instrument was acknowledged before me this 30th day of
May, 2005, by CONRAD BLACK who is personally known to me and did take an
oath.

DATED this 30th day of November, 2005.

_____
A Commissioner, etc.

FILED

DEC - 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff | ) ) ) | No. 05 CR 727 |
| v. | ) ) | The Honorable Amy J. St. Eve |
| CONRAD BLACK, Defendant | ) ) | |

### AFFIDAVIT OF EDWARD L. GREENSPAN, Q.C.

Edward L. Greenspan, Q.C., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    I was called to the Bar in Ontario in 1970. I received my Queen's Counsel in 1982. I am a member of the American Bar Association, the American National Association of Criminal Defense Lawyers, the International Society of Barristers, the Canadian Bar Association, and the American College of Trial Lawyers. I have lectured extensively on criminal law and related topics. From 1972 to 1999, I lectured on criminal law at the University of Toronto Law School. From 1972 to 1981, I lectured on criminal procedure, and from 1987 to 1989, I lectured on advanced evidence in criminal cases at Osgoode Hall Law School at York University. Since 1978, I have also been the Editor of Martin's Annual Criminal Code and, since 1980, the Editor of Martin's Related Criminal Statutes, an annotated book of numerous federal criminal and quasi-criminal statutes including the *Extradition Act*.

2.    My practice consists almost exclusively of criminal and quasi-criminal defence work. A component of this is extradition. I have been involved in and am presently involved in numerous extradition proceedings as defence counsel.

2

3.     The alleged conduct underlying the charges would, if committed in Canada, constitute criminal offences set out in the *Criminal Code of Canada* and, therefore, the charges in the Indictment are clearly extraditable offences.

4.     I have reviewed the Draft Affidavit of the Defendant, CONRAD BLACK, which is attached to this my Affidavit and marked as Exhibit "A".

5.     The Draft Affidavit of the Defendant in paragraphs 3, 4, 5, 6, 7 and 8, attached to this my Affidavit and marked as Exhibit "A", irrevocably waives extradition from Canada or the United Kingdom.

6.     The Defendant has consulted with me and has been fully informed of his rights that he waives extradition freely and voluntarily and that for the waiver to be free and voluntary, he must not be doing so under duress or compulsion.

7.     In paragraph 10 of the Draft Affidavit, the Defendant swears that "I make this waiver freely and voluntarily, after having consulted with my attorney and with the full knowledge as to the nature of the rights I am waiving.  In this regard I have spoken with counsel in both Canada or the United Kingdom and the United States.  My rights and options have been explained to me and I understand them."  I confirm that I am the counsel in Canada that the Defendant spoke to and that this waiver is freely and voluntarily given and that he is not doing so under any duress and compulsion.

8.     The *Extradition Act* specifically contemplates that a defendant may consent to committal for surrender (s.70), consent to surrender (s.71) and waive extradition (s.72).  These provisions are as follows:

70. (1) A person may, at any time after the issuance of an authority to proceed, consent, in writing and before a judge, to committal.

(2) A judge before whom a person consents under subsection (1) shall

(a) order the committal of the person into custody to await surrender to the extradition partner; and

3

(b) transmit a copy of the consent to the Minister.

**71.** (1) A person may, at any time after arrest or appearance, consent, in writing and before a judge, to be surrendered.

(2) A judge before whom a person consents to being surrendered shall

    (a) order the committal of the person into custody to await surrender to the extradition partner; and

    (b) transmit a copy of the consent to the Minister.

(3) The Minister may, as soon as is feasible after receiving a consent to surrender, personally order that the person be surrendered to the extradition partner.

(4) When a person consents to being surrendered to the extradition partner, the following sections do not apply:

    (a) section 43 (submissions to the Minister);
    (b) section 44 (reasons for refusal);
    (c) section 48 (discharge of person);
    (d) section 57 (judicial review of Minister's decision); and
    (e) paragraph 62(1)(a) (delay before surrender).

**72.** (1) A person may, at any time after arrest or appearance, waive extradition in writing and before a judge.

(2) A judge before whom a person gives a waiver under subsection (1) must inform the person

    (a) of the consequences of the waiver including the consequences of waiving the protection of specialty; and

    (b) that they will be conveyed without delay to the extradition partner.

(3) The judge shall

    (a) order the conveyance in custody of the person to the extradition partner; and

    (b) transmit a copy of the waiver and the order to the Minister.

(4) The conveyance order must

    (a) contain the name of the person who is to be conveyed; and

    (b) state the extradition partner to which the person is to be conveyed.

4

9.   It is my view that this irrevocable waiver, as specifically set out in the Draft Affidavit and attached to this my Affidavit and marked as Exhibit "A", is an effective, enforceable and valid waiver for extradition purposes.

10.  I believe that the contents of this Draft Affidavit, attached to this my Affidavit and marked as Exhibit "A", would preclude the Defendant from resisting any extradition request made by the United States of America to Canada or the United Kingdom and that extradition would be a foregone conclusion.

11.  An irrevocable authorization by my client tendered before a court of law, in Canadian law means that if my client attempts to withdraw the irrevocable authorization that he has given me in any future proceedings in Canada I, as an officer of the court, am duty bound not to act on any instructions to withdraw his irrevocable authorization or my irrevocable undertaking.

12.  I have been irrevocably instructed by the Defendant that I am a competent and compellable witness on any bail hearing or extradition hearing should either or both events arise as a result of any authorization on the Defendant's part to return to the United States to answer the charges before this Honourable Court.  At such bail hearing or extradition hearing I would confirm and undertake to confirm that the Defendant's irrevocable waiver is truly free and voluntary and I undertake to unequivocally state at such a hearing that any attempt to resist extradition would be an insult to the administration of justice both in Canada, the United Kingdom and the United States and

Case 2:09-cr-00088-CDJ   Document 27-2   Filed 12/16/08   Page 90 of 107
11/30/05  22:49 FAX 416 366 7994        GREENSPAN, WHITE                    ☑011
              Case 1:05-cr-00727   Document 77-2   Filed 12/01/2005   Page 5 of 6

5

as such, in my view, it is totally unlikely that the Defendant would be released on bail as it would be necessary to deny him bail in order to maintain confidence in the administration of justice which is one of the separate standards for a judge to deny bail.

13.    Further, the Defendant's admission in paragraph 8 of the Draft Affidavit, attached hereto to this my Affidavit and marked as Exhibit "A", where he irrevocably admits that there is a sufficient basis for extradition and that all the prerequisites exist for extradition pursuant to the *Extradition Act* and the *Convention on Extradition Between Canada and the United States of America*, 27 U.S.T. 983, T.I.A.S. 237 in relation to the charges set out in the Indictment having been made freely and voluntarily, would obviate the necessity of anything more than a *pro forma* extradition hearing.

14.    With this sworn waiver, attached as a Draft Affidavit and marked as Exhibit "A" to this my Affidavit and my future testimony, it would mean, in my view, under Canadian law that the Defendant's extradition would be a foregone conclusion. There is no doubt in my mind, the irrevocable waiver plus my testimony could be acted upon by the Court as fulfilling the requirements for consent or waiver under sections 70, 71 and 72 of the *Extradition Act* as it could not be successfully argued after my testimony that the Defendant's waiver was not free and voluntary. No such argument could possibly succeed in the face of my clear testimony that his Affidavit was made truly freely and voluntarily.

15.    An order of the Minister could be made easily based solely on my testimony and the Defendant's waiver. Bail would be a non-existent possibility in the circumstances.

Case 2:09-cr-00088-CDJ   Document 27-2   Filed 12/16/08   Page 91 of 107
11/30/05  22:48 FAX 416-388-7884   GREENSPAN, WHITE
Case 1:05-cr-00727   Document 77-2   Filed 12/01/2005   Page 6 of 6

6

Extradition would be a foregone conclusion. The Defendant fully recognizes that it would be a most unusual event for counsel retained by him to testify against him should he fail to respond with each and every order of this Honourable Court but he consents and authorizes it to underscore the *bona fides* in the argument that this Honourable Court can rely on his voluntarily return to meet and address the matters before this Honourable Court.

16.     I make this Affidavit for no improper purpose.

SWORN before me at the City of       )
Toronto, in the Province of Ontario   )
This 30th day of November, 2005.      )
                                      )
                                      )
_____      )
A Commissioner, etc.

EDWARD L. GREENSPAN, Q.C.

### *CURRICULUM VITAE*

## Edward L. Greenspan, Q.C., LL.D., D.C.L.

Senior Partner in the law firm Greenspan, White

144 King Street East,  Toronto, Ontario, M5C 1G8

| | |
|---|---|
| 1968 | - graduated from Osgoode Hall Law School |
| 1970 | - called to the Bar in Ontario -- member of the Law Society of Upper Canada in good standing |
| 1982 | - received Queen's Counsel |
| 1999 | - received Honourary Doctorate from the Law Society of Upper Canada. LL.D. (Hon.) |
| 2002 | - received Honourary Doctorate of Civil Laws from the University of Windsor.  D.C.L. (Hon.) |
| 2004 | - received Honourary Doctor of Laws from Assumption University, Windsor. LL.D. (Hon.) |
| 1983 to Present | - Canadian Who's Who |

## ACADEMIC INVOLVEMENT

| | |
|---|---|
| 1972 to 1999 | - Lecturer of criminal law at the University of Toronto Law School |
| 1972 - 1981 | - Lecturer of criminal procedure at Osgoode Hall Law School, York University |
| 1987 - 1989 | - Lecturer of advanced evidence in criminal cases at Osgoode Hall Law School, York University |
| 1971 to Present | - Lecturer at the Bar Admission Course in Criminal Law |
| 1982 | - Milvain Chair of Advocacy at University of Calgary Law School |

1983                              - Practitioner-in-Residence, Faculty of Law,
                                    University of Western Ontario

1986                              - Culliton Lecture, University of Saskatchewan Law
                                    School

## EDITORIAL BOARDS

1971 to Present                   - Associate Editor of the Dominion Law Reports

1971 - 1975                       - Associate Editor of the Canadian Criminal Cases

1971 - 1990                       - Associate Editor of the Ontario Reports

1971 to Present                   - Associate Editor of the Criminal Law Quarterly

1975 to Present                   - Editor-in-Chief of the Canadian Criminal Cases

1978 to Present                   - Editor of Martin's Annual Criminal Code – the
                                    most widely referred to Annotated Criminal Code
                                        by judges, lawyers, police officers and students

1980 to Present                   - Editor of Criminal Appeal Rules Annotations
                                    published in Ontario Annual Practice

2001 to Present                   - Editor of the Weekly Criminal Bulletin

1982 to Present                   - Member of Editorial Board of Canadian Charter
                                    of Rights Annotated

1985 - 1990                       - Member of the Board of the Toronto Arts Awards
                                    Foundation

1986 to Present                   - Editorial Board of the Canadian Lawyer

1990 to 2001                      - Editorial Board of the Law Times

## RADIO/TELEVISION  HOST

1982 - 1990                       - Host/Narrator of "The Scales of Justice" CBC FM
                                    Docu-Drama on famous Canadian criminal trials
                                    (Actra Winner 1983 and 1985 as Best Radio Show

of the Year)

1990 - 1994   - Host/Narrator of "The Scales of Justice" CBC TV Docu-Drama on famous Canadian criminal trials (Gemini Award Winner 1993 - Best Television Show of the Year)

## ASSOCIATIONS

1973   - Chairman of Criminal Justice, sub-section of the Canadian Bar Association (Ontario Branch)

1977 - 1981   - Vice-President of the Criminal Lawyers' Association

1988 to Present   - Vice-President of Canadian Civil Liberties Association

**Member of**   - The American College of Trial Lawyers

- The American National Association of Criminal Defense Lawyers

- The American Bar Association

- The International Society of Barristers

- The Advocates' Society

- The Canadian Bar Association

- The Criminal Lawyers' Association

- The Canadian Civil Liberties Association

- Massey College Quadrangle Society

1977 to Present   - Advisory Council of the Centre of Criminology at the University of Toronto

1978-1985   - Uniformity Commissioner of Canada to the Uniform Law Conference

| 1983-1984 | - National Chairman of Criminal Justice, sub-section of the Canadian Bar Association |
| 1998 to 2001 | - Member of the Ontario Judicial Council |
| 2002- to Present | - Member of the Judicial Ethics Advisory Committee |
| 1979 to Present | - Honourary member of the Phi Delta Phi, The International Legal Fraternity |

## AWARDS

| 1965 | - The Maurice Coady Prize - University College, University of Toronto |
| 1992 | - The Commemorative Medal for the125th Anniversary of the Confederation of Canada |
| 2001 | - G. Arthur Martin Medal |

## PUBLICATIONS

"Absolute and Conditional Discharge" (1973) Studies Crim. L., 65

Informing the Jury of the Consequences of an Insanity Verdict, (1978) 40 C.R.N.S. 73

The Role of the Psychiatrist in the Criminal Justice System (1978) 23 Can. Psychiatr. Assoc. J. 137

"The Role of the Defence Lawyer in Sentencing" in New Directions in Sentencing (Butterworths: Toronto, 1980)

"Remedies in Criminal Law" in Special Lectures of the Law Society of Upper Canada 1981 (Richard De Boo Ltd.: Don Mills, Ontario)

"The Preliminary Inquiry", in Criminal Procedure in Canada (Butterworths: Toronto, 1982)

Criminal Statistics (1982) Influence, Winter 1982/83 120

The Preparation of the Trial Brief and the Planning of Trial Strategy and Tactics (CRIMINAL); ADVOCACY, 1982, De Boo, p.35

The Exclusionary Rule, Volume 16, The Law Society of Upper Canada Gazette (Number 1) 107

Bill S-33: Canada Evidence Act Relating To Criminal Proceedings, Advocates' Society Journal, June 1983, p.14

"Fundamental Justice and the Criminal Law" in Isaac Pitblado Lectures 1983 (Manitoba)

"Perspectives in Criminal Law"  by A.N. Doob and E.L. Greenspan, Q.C. Aurora: Canada Law Book, 1985

"Rehabilitation:  The Justice Model and the Victim" Justice Beyond Orwell by E.L. Greenspan, eds. R.S. Abella and M.L. Rothman.  Montreal:  Les Éditions Yvon Blais, 1985

"Opening to the Jury for the Defence in a Criminal Case: in Advocacy in Court, A Tribute to Arthur Maloney, Q.C. (Canada Law Book:  Toronto, 1986)

The Future Role of Defence Counsel (1986-87) 51 Sask. Law. Rev.

GREENSPAN:  The Case for the Defence by E.L. Greenspan, Q.C. and George Jonas (Macmillan of Canada: Toronto, 1987)

"The Royal Commission:  History, Powers and Functions, and the Role of Counsel" in Administrative Tribunals, a Practice Handbook for Legal Counsel (Canada Law Book:  Aurora, 1989)

The Quality of Life and the Practice of Law,  The Law Society of Upper Canada Gazette Volume XXVI, Number 1, March 1992, page 86

God's Ideal is Justice, The Law Society of Upper Canada Gazette, Volume XXVII, Number 1, March 1993, page 48

Freedom of Expression in Canada:  "Ifs, Buts & Whereases", The Law Society of Upper Canada Gazette, Volume XXIX, Number 3/4, September/December 1995, page 212

Discipline and Parole, by Edward Greenspan, Andrew Matheson and Ronald Davis, Queen's Quarterly 105/1 (Spring 1998)

# TAB 2



# TIPS & TACTICS

*By Theodore Simon*

I thought it would be easy: grab a valuable prize for the best of Tips & Tactics while leaping from obscurity to celebrity for my brilliant and innovative revelations. But having read your first three installments of Tips & Tactics, I see this ain't going to be easy; I am in fast company.

*Lawrence Hochheiser,*
*New York, New York*

## Closing Argument — *Falsi In Uno*

Inspired by New York defense counsel Lawrence Goldman's tip on incorporating the court's favorable charge language into one's own summation (Tips & Tactics, Sept./Oct. 1994), Hochheiser candidly admits he stole the following tip from fellow New York lawyer Herald Price Fahringer. (For purposes of this column, stealing is encouraged for two reasons, it 1) assures wider distribution of helpful tips, and 2) provides the impetus for the originator to provide the tip before it is stolen and claimed by another. Hochheiser, if you do not receive the award for the best tip, you may have a lock on the new Honesty by Stealth Award, also known as the "Hochheist Award.")

This tip involves denigrating the unfavorable aspect of the standard instruction (accepting part of the testimony as truthful, notwithstanding the witness has lied in part) and elevating the favorable aspect (rejecting all testimony of a witness who has lied in part.)

First, Hochheiser previews for the jury the judge's *Falsi in uno Falsi in omnibus* instruction which allows the jury the option of disregarding the entire testimony of a witness who has perjured himself, or choosing that portion of the testimony they find wholesome enough for use. Then he tells the jury an old story told to him as a fledgling lawyer by a wise old retired judge (or a wise old whatever). He likes to give this story the imprimatur of some reliable, objective, non-defense lawyer/elder. When done in a casu-

al style no prosecutor is quick enough to articulate an objection.

Hochheiser begins, "Imagine you are in a restaurant about to devour your favorite dish — Irish stew. It looks and smells great. You stick your fork into a tender piece of beef which appears to be cooked to perfection. You take a big bite and — ugh! Rancid! The beef is spoiled. You call the waiter over and tell him. He gives you a brief instruction on *Falsi in uno, Falsi in omnibus:* '1) You can reject the entire Irish stew and choose an alternative, or 2) perhaps you would like to dig in the bowl and try to find some other pieces of the beef which may be good enough to eat."

"Later, when the judge gives the *Falsi in uno, Falsi in omnibus* instructions, glance at the jurors; they will be looking over at you to share a smile and a quiet chuckle."

Rhetorically, Hochheiser concludes "Did I win yet? How long does this have to go on? I warn you, if I don't get my prize soon, I'm just going to increase the frequency of submissions."

## Evidence — Defensive Use of 404(b)

Evidence professor and attorney Edward J. Imwinkelried, of the University of California (Davis) suggests that we be alert for opportunities to use Federal Rule of Evidence 404(b) against the prosecution. He explains:

Although the overwhelming majority of



the Rule 404 (b) cases are situations in which the prosecution is the proponent, Rule 404(b) is not the exclusive property of the government. The rule does not refer to the misconduct of the "accused" or "defendant;" rather, the language of the rule refers to "a person." That language is certainly broad enough to include parties such as the complainant, an informant, the police, and other persons who might have committed the crime for which the accused is being tried.

Common sense suggests that if anything, the standards for admitting defense evidence under 404(b) should be more liberal than the standards for admitting prosecution evidence under the statute. The principal danger recognized by the Rule 404(b) cases is the risk that the jury will decide the case on an improper basis. That risk is present to a lesser degree when the misconduct is that of a third person other than the accused. *United States v. Cohen,* 888 F.2d 770, 777 (11th Cir. 1989). The New Jersey Supreme Court has stated that the admissibility standard should be less stringent when the defense offers uncharged evidence. *State v. Garfole,* 76 N.J. 445, 388 A.2d 587 (1978). The Illinois Supreme Court recently echoed the same sentiment. *People v. Cruz,* 1994 Ill. LEXIS 88.

Professor Imwinkelried says the beauty of this argument is that it allows you to turn the worst prosecution precedents on 404(b) to your advantage. For example, take the case in which a local court has applied a very lax standard for finding a "plan" under Rule 404(b) to determine the admissibility of prosecution evidence. The standard should be at least as lax and perhaps even more lax when the defense invokes a "plan" theory for bringing in evidence of the misconduct of a third party.

The next horrendous 404(b) case you see, don't dismay, clip it. Remember "what's sauce for the goose is sauce for the gander."

## Discovery — Police Radio Tapes

Lisa Kemler, a partner in the firm of Moffitt, Zwerling, and Kemler, Alexandria, Virginia, reminds us to obtain tapes of police radio dis-

patcher transmissions and/or 911 calls.

Kemler notes, "A good source of exculpatory and useful evidence with respect to the basis for a person's original detention, arrest and search can often be found on 911 calls and police radio dispatcher transmissions. Sometimes, the arresting officer will have communicated over the radio his or her basis for stopping the person, thereby precluding them from embellishing their story in court. Generally, tapes of these conversations are maintained for a limited time, usually 30 days, and then are destroyed." (Check your jurisdiction, some retain the tapes for more days, some for less.)

To ensure that this evidence is preserved, Kemler sends a letter to the chief of police, the custodian of records, and the chief prosecutor requesting preservation of such evidence. The letter puts the prosecution on notice that there may be potentially exculpatory evidence. In addition, Kemler has sought production of this information prior to a suppression hearing or a preliminary hearing either by subpoena *duces tecum* or by motion for exculpatory evidence on the basis that this information is required to be produced under *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Bagley*, 474 U.S. 667 (1985). [right to call for evidence in his favor under Article I, Sec. 8 of the Virginia Constitution only need to get a court order to obtain the tapes (often *ex parte*) and in those jurisdictions you have preserved the element of surprise as well.]

## Bail — Irrevocable Waiver of Extradition

I recently gave a presentation on Tips & Tactics in Aspen, Colorado, at the Fifteenth Annual Advanced Criminal Law Seminar, where Program Director Victor Sherman, of Los Angeles, and other NACDL members annually put on an excellent seminar.

A number of the seminar attendees showed an interest in this tip. It had its genesis when I represented an Israeli national charged in the United States District Court For The Eastern District of Pennsylvania (Philadelphia) with two counts of perjury. In order to secure bail and further to assure that my client would be able to return to Israel during the pendency of his case, we filed an irrevocable waiver of extradition. As drafted in the expanded version, it would also work for an American seeking bail here and/or desirous of traveling abroad.

While Israel has an extradition treaty with the United States, whether that treaty can be enforced remains in question because the Begin law prohibits the extradition of an Israeli citizen as long as the crime for which he is sought postdates his citizenship. For native Israelis this provides life protection. For the naturalized Israeli citizen, timing is everything.

Essentially, the waiver insures the bail candidate will not contest extradition anywhere in the world and will irrevocably do so, trying to enhance his bail prospects. It worked for my client. In fact, my client remains on bail with the ability to travel between the U.S. and Israel, despite a conviction on one count (the jury hung on the other) and a short jail sentence while the U.S. Supreme Court considers his Petition for Writ of *Certiorari*. (The Supreme Court has granted *cert.* in the government's later-filed petition on the same issue in *U.S. v. Gaudin*, 28 F.3d 943 (9th Cir.1994) (*en banc*); whether "materiality" as an element of the offense must be determined by the jury. Historically this has been an issue reserved for the court.)

An expanded version, as noted above, would include 1) an irrevocable agreement to be deported from any country in the world that does not have an extradition treaty with the U.S. and 2) a waiver of all rights to contest the termination of one's passport pursuant to 22 C.F.R. 51.70-51.89. These C.F.R.'s provide the basis to terminate a U.S. passport, including such reasons as being a fugitive; and further provides rules, procedures, and the requisite for a hearing.

*This column is designed to be a concise form of continuing legal education. Here is a forum that encourages NACDL members to share their knowledge and wisdom to the benefit of all. The Champion is a primary benefit of NACDL membership. This column is intended to make it a better benefit for all. Please send your tip or tactic to:*

*Tips & Tactics/Theodore Simon
1818 Market St.
35th Floor
Philadelphia, PA 19103
(215) 563-5550
Fax: (215) 563-8798*

---

United States District Court For
The Eastern District Of Pennsylvania

UNITED STATES OF AMERICA:

v.

(Defendant)                                    : No. 00-000

IRREVOCABLE WAIVER OF EXTRADITION

I, [defendant], do hereby swear and affirm that in regard to U.S. v. Defendant, No. 00 000 filed in the Eastern District of Pennsylvania charging two counts of perjury that:

**1.** I absolutely and without any question agree to appear at all required court appearances in the case of U.S. v. Defendant, No. 00-000 in the Eastern District of Pennsylvania.

**2.** I further absolutely and without any question agree to irrevocably waive any and all rights I may have to contest extradition either in Israel or any where else in the world in regard to this case.

**3.** This waiver is made after consultation with counsel and it is meant to absolutely and unequivocally make any and all terms, rights I may have or any there with regard to this case and to further insure the court of my intention to appear at all times required.

**4.** Further it is my intention and I hereby assert that I will not interpose any defense to any extradition request made anywhere in the world in this case.

**5.** I make these promises under oath and wish to be forever bound by these statements.

**6.** I make these statements under oath full well knowing that if I violate any of these statements I can and will be prosecuted for additional offenses including but limited to perjury.

Sworn to and Subscribed
This __ day of _____ .

_____
                                              (Defendant)

(Notary)

# TAB 3

20TH CASE of Level 1 printed in FULL format.

COMMONWEALTH OF PENNSYLVANIA, Appellee v. ROBERT MCMASTER, Appellant

No. 2877 Philadelphia 1998

SUPERIOR COURT OF PENNSYLVANIA

1999 PA Super 111; 730 A.2d 524; 1999 Pa. Super. LEXIS 890

March 10, 1999, Argued

May 11, 1999, Filed

PRIOR HISTORY: [***1] Appeal from the Order Entered September 14, 1998 in the Court of Common Pleas of Montgomery County, Criminal Division, at No. 4977-91. Before ROSSANESE, J.

DISPOSITION: Vacated, case remanded.

CORE TERMS: parole, bail

COUNSEL: Mary M. Killinger, Executive Assistant District Attorney, Norristown, for Commonwealth, appellant.

Francis M. Walsh, Pottstown, for appellee.

JUDGES: Before KELLY, LALLY-GREEN and BROSKY, JJ.

OPINIONBY: LALLY-GREEN

OPINION: [**525]

OPINION BY LALLY-GREEN, J.:

Filed: May 11, 1999

[*P1] The Commonwealth appeals the Order granting Appellant, Robert McMaster, bail pending parole. We vacate the order and remand for proceedings consistent with this opinion.

[*P2] The record reveals that on April 20, 1992, a jury convicted Appellant, Robert McMaster, of involuntary deviate sexual intercourse (IDSI) and incest. The convictions stemmed from the following facts, as previously summarized by a panel of this Court:

From December 20 through December 29, 1988, Appellant, who was then residing in Canada, went to Bryn Athyn, Montgomery County, to visit his wife and three children, from whom he was separated. On Christmas morning, according to A.L., Appellant's daughter, who was four years old at the time, Appellant took her into her bedroom and 'put his penis in [her] mouth and he peed in [her] mouth and some stuff came out of his [***2] penis and he told [her] to swallow it, and [she] did.' Thereafter, the victim testified, Appellant turned around and 'pooped' into her mouth and forced her to chew it. The victim further stated that Appellant had also 'licked and kissed' her private parts. Subsequently, the victim described two other incidents during Appellant's visit in which he 'pooped and peed' into her mouth. During one of these incidents, the victim said, Appellant took pictures of her while she was naked. Also, according to the victim, Appellant threatened that if she told her mother about what Appellant was doing he would 'kill [her] brother and sister and chop them up.'

*Commonwealth v. McMaster, 446 Pa. Super. 261, 666 A.2d 724, 726-27 (Pa. Super. 1995).*

[*P3] At trial, the Commonwealth introduced evidence that in April, 1989, a throat culture taken from A.L. had tested positive for gonorrhea. *666 A.2d at 728.* Although defense counsel argued to exclude this evidence on the ground that the Commonwealth [**526] had no evidence that Appellant ever tested positive for gonorrhea, the Court permitted the Commonwealth to introduce the test results as evidence that A.L. had been sexually assaulted. Id.

[***3] [*P4] The record further reveals that following his convictions, Appellant's bail was revoked and he was incarcerated on April 24, 1992. Thereafter, the trial court sentenced Appellant to serve concurrent terms of imprisonment of five to ten years for the IDSI convic-

1999 PA Super 111, *P4; 730 A.2d 524, **526;
1999 Pa. Super. LEXIS 890, ***3

tion and one to five years for the incest conviction, with
credit for time served since April 24, 1992.

[*P5] On direct appeal, a panel of this Court vacated
judgment of sentence and remanded for an evidentiary
hearing on the sole issue of whether trial counsel was
ineffective for failing to present medical testimony that
Appellant tested negative for gonorrhea. *McMaster, 666
A.2d at 734.* On remand, following an evidentiary hear-
ing, the trial court found Appellant's trial counsel inef-
fective and granted a new trial. The Commonwealth
then appealed.

[*P6] On May 13, 1997, the trial court granted
Appellant's motion for bail pending appeal and released
Appellant on $ 5,000 bail. The court required that
Appellant: remain in Pennsylvania; surrender his pass-
ports; report to the Montgomery County probation office
each and every month; have no contact with the victim,
his ex-wife or in-laws, except in legal [***4] settings;
and obtain and maintain employment. On July 3, 1997,
the court amended its May 13, 1997 order and continued
bail pending appeal in the amount of $ 5,000. The court
required, inter alia, that Appellant: obtain a residence in
Ontario, Canada; sign waivers of extradition; and report
to the Royal Canadian Mounted Police each and every
month. The record fails to reveal the court's rationale
for amending the May 13, 1997 bail order.

[*P7] On November 18, 1997, a panel of this Court re-
versed the trial court's grant of a new trial and remanded
for resentencing after finding that counsel was not inef-
fective because the evidentiary record reflected that: the
gonorrhea test performed on Appellant was not reliable;
the evidence presented at the evidentiary hearing was
not available on direct appeal; and the medical testimony
presented at the evidentiary hearing was not exculpatory.
*Commonwealth v. McMaster, 1997 Pa. Super. LEXIS
3755, No. 01092 Philadelphia 1997,* unpublished mem-
orandum at 4-6 (Pa. Super. filed November 18, 1997).

[*P8] On September 14, 1998, the court resentenced
Appellant and imposed the original sentence of concur-
rent terms of imprisonment of five to ten years for the
IDSI [***5] conviction and one to five years for the
incest conviction. The court entered an order that "re-
leased" Appellant on $ 5,000 "bail pending his being
paroled" by the Pennsylvania Board of Parole under the
same terms and conditions stated in its July 3, 1997
order. Trial Court Order of September 14, 1998, incor-
porating by reference Bail Order of July 3, 1997. This
appeal followed.

The Commonwealth raises one issue on appeal:

Did the court err when it refused to return [Appellant]
to the Department of Corrections so that the Board of
Probation and Parole could determine his eligibility for
parole?

Commonwealth's Brief at 2.

[*P9] Before addressing the merits of the issue as framed
by the Commonwealth, we must first set out certain
rules governing bail and address the preliminary ques-
tion of whether a sentencing court has the authority to
grant "bail pending parole." The Pennsylvania Rules
of Criminal Procedure define "bail" as "the security or
other guarantee required and given for the release of a
person, conditioned upon a written undertaking, in the
form of a bail bond, that the person will appear when
required and comply with all conditions set forth in the
[***6] bail bond." Pa.R.Crim.P. 3. When a defendant
is released on bail, one of the mandatory conditions of
the bail bond is that the defendant will [**527] "appear
at all times required until full and final disposition of
the case." Pa.R.Crim.P. 4005(a)(1). In addition, unless
bail is revoked, a post-verdict bail bond is valid un-
til full and final disposition of the case. Pa.R.Crim.P.
4014. The intent of this rule is to continue the valid-
ity of the bail bond through all avenues of direct appeal
in state courts, but to exclude any post-conviction col-
lateral proceedings. Pa.R.Crim.P. 4014 cmt. On the
basis of the rules governing bail for post-verdict release
as set forth in Pa.R.Crim.P. 4009-16 and the comments
thereto, we interpret the phrase "full and final disposi-
tion of the case" to mean the time at which direct review
of appellant's conviction ends. Thus, a court may allow
bail pending appeal after a finding of guilt, so long as an
avenue of direct appeal is open. n1 Pa.R.Crim.P. 4009
& cmt.

   n1 Although not applicable to the instant case, we
   note that a Post Conviction Relief Act petitioner may
   be admitted to bail pending disposition of the petition
   when such an order would be necessary in the interest
   of justice in certain exceptional cases for compelling
   reasons. *Commonwealth v. Bonaparte, 366 Pa.
   Super. 182, 530 A.2d 1351, 1354-55 (Pa. Super.
   1987)* (per Kelly, J., with two judges concurring in
   result).

[***7]

[*P10] The Rules of Criminal Procedure regarding post-
verdict bail make no provision for "bail pending parole."
As stated above, bail is the security a person gives to be

MAR-07-00 19:45 FROM:LAW OFFICE S EISENBERGER    ID:2124223044      PAGE    474

released from confinement and is conditioned on a bail bond that the person will appear at subsequent proceedings as required until full and final disposition of the case. Pa.R.Crim.P. 3; Pa.R.Crim.P. 4005(a)(1).

[*P11] Here, the initial inquiry is whether Appellant's case was "fully and finally disposed of." The record reveals that on November 18, 1997, this Court reversed the trial court's grant of a new trial and remanded for resentencing upon finding that counsel was not ineffective. *McMaster, No. 01092 Philadelphia 1997.* This finding constituted the reimposition and affirmance of judgment of sentence. Pa.R.A.P. 1113; *McMaster, 666 A.2d at 734.* Appellant failed to petition for allowance of appeal to our Supreme Court within 30 days of this Court's reversal. Thus, as of December 18, 1997, Appellant was no longer eligible for release on bail, as his case was "fully and finally disposed of." Accordingly, on this ground alone, the learned trial court erred in releasing Appellant on bail pending [***8] his being paroled.

[*P12] We now address the Commonwealth's issue of whether the court erred when it refused to return Appellant to the Department of Corrections so that the Parole Board could determine his eligibility for parole. Parole is a conditional release from prison before the completion of sentence. See Pennsylvania Criminal Practice Manual, Vol. 2, Ch. 32 § 32.01 at 2 (West 1997). The Pennsylvania Parole Board is statutorily authorized to release on parole any convict confined in any Pennsylvania penal institution when the Board is granted such power and whenever, in its opinion, the interests of the convict justify or require parole, and the interests of the Commonwealth will not be injured by the grant of parole. 61 P.S. § 331.21.

[*P13] In Pennsylvania, the authority to parole convicted offenders lies with the Common Pleas Court when the offender is sentenced to a maximum term of imprisonment of less than two years, and with the Parole Board when the sentence is in excess of two years. *Commonwealth v. Tilghman, 438 Pa. Super. 313, 652 A.2d 390, 391 (Pa. Super. 1995),* aff'd *543 Pa. 578, 673 A.2d 898 (1996).* Any order by a sentencing court which purports [***9] to grant parole to a person serving a maximum sentence in excess of two years is beyond the authority of the court and is, therefore, a nullity. *Commonwealth v. Harris, 423 Pa. Super. 190, 620 A.2d 1175, 1178-81 (Pa. Super. 1993).* The grant of parole is not a right, but a matter of discretion. *Commonwealth v. Gooslin, 280 Pa. Super. 384, 421 A.2d 775, 776 (Pa. Super. 1980).*

[*P14] [**528] Here, the trial court had no power to release Appellant on bail pending parole because the trial court had no authority respecting parole. First, since parole is available only to those confined, and since Appellant is not confined, parole does not apply in Appellant's case. The Parole Act states that under certain circumstances, the Parole Board may "release on parole any convict confined in a penal institution of this Commonwealth . . ." 61 P.S. § 331.21 (emphasis added). Here, Appellant was neither confined at the time of his resentencing, nor is he confined today. Second, since Appellant's maximum sentence was in excess of two years, the authority to parole was solely within the Parole Board. See *Tilgman, 652 A.2d at 391.* Thus, the trial court did not have the authority to deal with parole [***10] in any fashion.

[*P15] Accordingly, any possibility of Appellant being paroled at the time of sentencing, and at present, depends on his being returned to prison. Once Appellant resumes serving his sentence, the Parole Board may exercise its discretion and determine whether Appellant should be released on parole. n2 *Tilghman, 652 A.2d at 391;* 61 P.S. § 331.21.

n2 We note that following Appellant's return to prison, the Parole Board may exercise its discretion to determine whether to release Appellant on parole because the minimum of term of Appellant's imprisonment fixed by the trial court has been served and is expired. 61 P.S. § 331.21.

[*P16] Order vacated. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

# TAB 4

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.3d
(Cite as: 1999 WL 1456536 (3rd Cir.(Pa.)))

## UNITED STATES OF AMERICA
v.
## Vincenzo CIRILLO a/k/a Enzo Cirillo a/k/a Mike Fusco Vincenzo Cirillo, Appellant

### No. 99-1514.

United States Court of Appeals, Third Circuit.

July 13, 1999.

On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C.Crim. No. 99-cr-00335-1).

Before: BECKER, Chief Judge, RENDELL and ALDISERT Circuit Judges.

### ORDER

BECKER, Chief J.

*1 This case comes before us as a Motion to Vacate the District Court's Pretrial Detention Order and to Reinstate the Magistrate Judge's Release Order, On May 17, 1999, appellant Vincenzo Cirillo, a citizen and resident of Canada, was arrested in Philadelphia, and later charged with conspiracy to distribute a controlled substance. On May 25, 1999, a Magistrate Judge found that probable cause existed to charge Cirillo, but ordered his release upon posting of $500,000 (10 percent cash) bond. The Magistrate Judge also established certain conditions of release, including Cirillo's signing of an "irrevocable waiver of extradition." On June 3, 1999, the District Court entered an oral order from the bench, revoking the Magistrate Judge's order. A written order followed, on June 8, 1999, revoking the release order and ordering Cirillo held in custody pending trial. On June 25, 1999, Cirillo, through counsel, filed the present motion to vacate the District Court's order and to reinstate the Magistrate Judge's order.

We have jurisdiction to consider this motion under 18 U.S.C. § 3145(c), and 28 U.S.C. § 1291. Our review of the District Court's order is de novo. See United States v. Delker, 757 F.2d 1390, 1400 (3d Cir.1985) ("[A]ppellate courts [must] give the reasons articulated by trial judges respectful consideration, but if, after careful assessment of the trial judge's reasoning, together with such papers, affidavits, and portions of the record as the parties present, the court of appeals independently reaches a conclusion different from that of the trial judge the court of appeals has the power to amend or reverse a detention or release decision.").

A defendant may not be detained pending trial unless "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In ordering Cirillo held pending trial, the District Court relied solely on the fact that Cirillo's appearance at trial could not be "reasonably assured," even with the conditions imposed by the Magistrate Judge. The burden is on the government to prove by a preponderance that no

condition or combination of conditions exists that can reasonably assure the defendant's appearance at trial. See United States v. Himler, 797 F.2d 156, 161 (3d Cir.1986).

The factors governing the above determination are outlined in 18 U.S.C. § 3142(g). They include the weight of the evidence against the defendant, the "nature and circumstances of the offense charged," the "history and characteristics of the person," including whether the defendant was on probation or parole at the time of the alleged offense, and the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." The government has presented sufficient prima facie evidence of Cirillo's commission of the charged crime that the Magistrate Judge found probable cause existed to charge Cirillo. Our review of the record supports this conclusion. However, the weight of the evidence against the defendant is only one of the relevant factors. Each of the other factors favors Cirillo.

**\*2** Cirillo's strong family ties, lack of a prior criminal record, employment in a well-established family business, alleged commission of a nonviolent crime, and signing of an "irrevocable waiver of extradition" all support the Magistrate Judge's conclusion that his appearance at trial can be reasonably assured. This is particularly true given his family's willingness to secure his release through a mortgage against their home, worth an estimated $200,000, and a pledge of the substantial (over $500,000) assets of their business. See United States v. Carbone, 793 F.2d 559, 561 (3d Cir.1986) (holding that district court correctly released defendant before trial, when defendant's friends "posted one million dollars in property as surety," defendant was a first time offender with an offer of employment pending trial, and he was confined to his parent's home from 8pm to 6am every day until trial); cf. Himler, 797 F.2d at 161-62 (holding that lower court erred in ordering defendant held pending trial, despite the fact that the defendant's father had offered only $2000 to secure his release, defendant was unemployed, and he was "clearly capable of obtaining false identification"). Finally, the supporting documents produced on Cirillo's behalf by Canadian and United States attorneys adequately respond to the government's single document from the Department of Justice indicating that collecting Canadian assets in a bail forfeiture proceeding or extraditing a defendant from Canada would not be "simple matter[s]." [FN1]

FN1. Contrary to the District Court's intimations, see Dist.Ct.Op. at 7 n. 2, the rebutable presumption in § 3142(e) does apply in this case, as Cirillo was charged with one of the enumerated offenses that carry a maximum prison term of more than ten years. See 21 U.S.C. § 841(b)(1)(C). The presumption applies regardless of the maximum term that Cirillo would face under the Sentencing Guidelines. We have considered the presumption, however, and find that Cirillo has presented sufficient evidence to rebut it. Once he has done so, the burden of persuasion remains on the government, see United States v. Suppa, 799 F.2d 115, 119 (3d Cir.1986), and our consideration of all of the factors in § 3142(g) leads us to conclude that Cirillo's appearance at trial can be reasonably assured, even given the offenses with which he is charged.

For the foregoing reasons, the Motion to Vacate the District Court's Order is hereby granted, and the case remanded to the District Court with directions to reinstate the Release Order of the Magistrate Judge, with such additional conditions that the District Court deems necessary to reasonably assure defendant's appearance at trial.

2000057413

END OF DOCUMENT