# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :

v.               :      **MAGISTRATE NO.**
                      **08-1220-M**

**GEORGE GEORGIOU**       :

## ORDER MODIFYING PRETRIAL RELEASE CONDITIONS

AND NOW, this 26TH day of September, 2008, upon agreement of the parties, the Court modifies the previous pretrial detention order in this case and sets conditions of pretrial release as set forth below. The basis for this Order is that the circumstances have changed since the original detention hearing in that the defendant now has secured a residence in the United States, near the Eastern District of Pennsylvania, where he has agreed to remain on home detention with electronic monitoring and the defendant has made specific financial arrangements for posting real estate and money

(1)    Defendant shall reside at the residence of his uncle, Gregory Paschalides, at 221-03A, 67th Avenue, Bayside, New York (the "Residence").

(2)    Defendant shall be subject to home confinement with electronic monitoring, at his expense, and may leave the Residence only with the prior approval of Pretrial Services  Such approval shall be permitted for medical appointments, attorney consultations, religious observance, verified employment activities, and daily living activities consistent with the standards applied by Pretrial Services.

(3)    Defendant shall not travel outside the Southern and Eastern Districts of

New York, except to attend to legal matters in this case in **Philadelphia**,

Pennsylvania or to meet with his lawyers in their offices in **Washington, D.C.**

(4)   Defendant shall have no contact, direct or indirect, with the individual identified

in the affidavit in support of the complaint and warrant in this case as "**Individual**

**A**" (or any member of his family).

(5)   Defendant will be released on $2,000,000 bail which shall be secured by the

defendant (a) posting his family home, located at 10150 Pineview Trail, Milton,

Ontario, Canada with equity of approximately $840,000 (**Canadian dollars**); (b)

posting $500,000 (Canadian dollars) from Tom Bock secured by a letter of credit

from HSBC Bank drawable on any branch in the United States; and (c) executing

a $1,000,000 (U.S. dollars) personal recognizance bond.  Defendant shall execute

and file with the Clerk of Court all required documents to ensure that this home

would become the property of the United States government in the event

defendant fails to appear as directed in this case.  All other technical requirements

of the Clerk's office relating to this real estate may be waived,  Defendant shall

file with the Clerk of Court the letter of credit and understands that he and Tom

Bock will forfeit the $500,000 secured by the letter of credit if the defendant fails

to appear as directed in this case.  Further, the defendant understands that he will

be ordered the pay $1,000,000 on the personal recognizance bond if he fails to

appear as directed in this case.

(6)   Defendant shall surrender any passports and shall not apply for any other passport.

- 2 -

(7)    Defendant shall not possess a firearm, ammunition, destructive device, or any
       other dangerous weapon,

(8)    Defendant shall not commit any state or federal crimes while on pretrial release.

(9)    Defendant shall report to Pretrial Services in the Eastern District of New York as
       directed by Pretrial Services.

(10). Defendant shall execute an irrovaible
                                                                    waiver of
                                                                   extradition.
                            BY THE COURT:                              (Tgr.)

                            _____
                            HONORABLE THOMAS J. RUETER
                            *United States Magistrate Judge*

- 3 -

# EXHIBIT B

AO 91. Rev. 11/82 (D. Cohen Authorizing)

# CRIMINAL COMPLAINT

# 08-' 𝓕 𝓕

| **United States District Court** | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>George Georgiou | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>08-1220-M |

Complaint for violation of Title 15, United States Code. §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5

| NAME OF JUDGE OR MAGISTRATE | | OFFICIAL TITLE | LOCATION |
|---|---|---|---|
| Honorable THOMAS J. RUETER | | U.S. Magistrate Judge | Philadelphia, PA |
| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (if known)<br>Toronto, Canada | |
| In or about April 2008 to September 17, 2008 | Philadelphia, PA | | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION.

From in or about April 2008 until on or about September 17, 2008, in the Eastern District of Pennsylvania and elsewhere, defendant **GEORGE GEORGIOU** knowingly and willfully, directly and indirectly, by use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchase and sale of publicly traded stocks, by (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon members of the investing public.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED

## SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title)<br>Corey Riley<br><br>OFFICIAL TITLE<br><br>Special Agent, Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE [1]<br><br>Honorable THOMAS J. RUETER, United States Magistrate Judge | DATE<br><br>9-18-08 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

## AFFIDAVIT

I, COREY RILEY, being duly sworn, deposes and states:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"),
    assigned to the Philadelphia, Pennsylvania field office. I have been employed as a
    special agent for approximately four years. Prior to joining the FBI, I worked in
    the securities industry. In my present capacity, I work principally on
    investigations involving white collar crimes, including securities frauds.

2.  The information contained in this affidavit has been personally reviewed by me. I
    am personally knowledgeable regarding the facts and circumstances herein
    described through my personal participation in this investigation and my personal
    review of investigative activities and materials provided by other law enforcement
    and regulatory agencies.

3.  This affidavit is submitted in support of a complaint and warrant charging
    GEORGE GEORGIOU with securities fraud in violation of 15 U.S.C. §§ 78j(b),
    78ff and 17 C.F.R. § 240.10b-5. This affidavit does not include all facts known to
    me, but rather facts sufficient to support these charges.

4.  GEORGIOU is a Canadian citizen and a former registered representative with the
    Investment Dealers Association of Canada (the "IDA"). For conduct unrelated to
    that described here, the IDA banned GEORGIOU from acting as a broker/dealer
    for a period of ten years from January 31, 1995 to January 31, 2005 and imposed a
    $50,000 fine as disciplinary sanctions. GEORGIOU is no longer licensed by the
    IDA, yet he has continued to make substantial investments in stocks publicly
    traded on the United States markets as well as Canadian real estate.

5.  From at least in or about April 2008 through the present, GEORGIOU has been
    involved in a conspiracy to manipulate the share prices of two companies known
    to me and identified here as "Stock A" and "Stock B," which are publicly traded
    in the United States on the "pink sheets," an inter-dealer quotation service that
    provides quotations, prices, and financial information for certain over-the-counter
    securities. These types of stocks are also sometimes referred to as "microcap" or
    "penny stocks." Many pink sheet stocks are thinly traded and are susceptible to
    price manipulation by those controlling the majority of the stock. In this case,
    GEORGIOU and others artificially inflated and/or sought to artificially inflate the
    price of these stocks by causing manipulative market activity that was designed to
    appear to be the product of free and fair market forces.

1

6.    The United States Securities and Exchange Commission (the "SEC") is an
      independent agency of the United States which is charged by law with the duty of
      protecting investors by regulating and monitoring, among other things, the
      purchase and sale of publicly traded securities. Among the national securities
      markets regulated by the SEC are the New York Stock Exchange, the American
      Stock Exchange and the pink sheets.

7.    On or about April 17, 2008, GEORGIOU held a meeting in Chicago, Illinois to
      discuss the manipulation of Stock A and Stock B with an individual who was
      secretly cooperating with law enforcement ("Individual A"). Individual A has
      previously worked with GEORGIOU to manipulate other publicly traded
      securities. This conversation and all other conversations discussed in this
      affidavit were recorded. At this meeting, GEORGIOU stated that he was being
      granted a large amount of Stock A in order to handle "promotion" and that the
      company was willing to put up money for a ten million piece mail campaign.
      Stock manipulators frequently employ mass mailings to generate interest and
      awareness in a stock they intend to manipulate. GEORGIOU stated that he was
      working with a group to actively manipulate Stock A and suggested that
      Individual A could act as a "front" to bid on Stock A shares held in GEORGIOU's
      wife's name in order to further manipulate the price.

8.    GEORGIOU also stated that he would provide Individual A with the shareholder
      list for Stock A, which, in my experience, is often used by stock manipulators in
      order to keep track of who else is buying and selling the target stock.
      GEORGIOU also indicated that he would produce a stream of press releases,
      which, in my experience, is frequently used as a pretext to justify the increased
      volume in a stock to other investors and regulators. Approximately 15,000 shares
      of Stock A were traded that day and the stock closed at approximately 30 cents
      per share. As discussed below, over the next few months, GEORGIOU and others
      artificially increased Stock A's price by more than 800% .

9.    During the same meeting, GEORGIOU discussed manipulating Stock B, of which
      he claimed to control fifty percent (50%) of the free trading shares. GEORGIOU
      agreed to pay an undercover FBI agent (the "UC"), who Individual A had
      previously introduced to GEORGIOU as someone who had the ability to control
      blocks of securities brokers and other individuals who would make purchases in
      publicly traded stocks and then "park," or hold, the stock in order to artificially
      inflate a stock's price. GEORGIOU understood that the UC charged an
      approximately 20% fee for his/her services, a portion of which was purportedly to
      be used to pay secret bribes to brokers in order to cause them to make purchases
      of stock in their clients' accounts.

2

10.     On or about May 29, 2008, GEORGIOU had a telephone conversation with
        Individual A in which GEORGIOU stated that he had hired a group to help
        manipulate Stock A and that they had started on Friday, May 23, 2008 and would
        be going "full force" the following week. In fact, over 120,000 shares of Stock A
        were traded on May 23, 2008, which represented a 500% increase in trading
        volume from the previous day. By May 23, 2008, GEORGIOU and others
        successfully raised Stock A's price to 77 cents, or more than double its stock price
        from April 17, 2008. On May 30, 2008, the trading volume of Stock A nearly
        tripled to almost 320,000 and Stock A closed at $1.10.

11.     On or about May 30, 2008, GEORGIOU had a telephone conversation with
        Individual A in which GEORGIOU explained that he and his group were going to
        try to take Stock A to $3 per share. That same day, the trading volume in Stock A
        increased by over one million shares from the previous day to approximately
        1,470,000 shares traded and the stock price increased to $1.31.

12.     By June 18, 2008, Stock A's price was up to $2.55 on the strength of over 8
        million shares traded over two days. By the beginning of July, however, Stock
        A's share price had plummeted to 85 cents. In my experience this is consistent
        with a stock manipulation or "pump and dump" scheme where the manipulators
        artificially run up a stock's price and then sell at a profit.

13.     GEORGIOU and Individual A had a number of subsequent telephone
        conversations in which they discussed getting the UC involved in manipulating
        Stock A and Stock B and set up a meeting on August 13, 2008 in Philadelphia to
        discuss their plan.

14.     On or about August 13, 2008, GEORGIOU met with Individual A and the UC in
        Philadelphia to discuss manipulating Stock A and Stock B. At this meeting,
        GEORGIOU bragged that he and others had successfully manipulated Stock A
        from fifty cents to two dollars and fifty cents per share and that they would be
        starting another manipulation campaign soon. GEORGIOU also discussed
        manipulating Stock B and indicated that he and others were going to start a
        manipulation campaign in the fall in conjunction with press releases and that they
        intended to spend three to four times the amount they had spent on Stock A.
        GEORGIOU stated that the objective was to move Stock B's share price from
        approximately $1 to $2.50 -$3 per share by the spring. During this conversation,
        GEORGIOU shared non-public information about Stock B in order to
        demonstrate his control over the company. GEORGIOU also indicated that he
        wanted the UC to buy between $5 million and $10 million worth of Stock B
        during the campaign and agreed to pay him a twenty-five percent (25%) kickback,

3

a portion of which GEORGIOU understood would be used to bribe brokers in order to cause them to purchase and hold Stock B in their clients' accounts. GEORGIOU demanded to get 5% of his kickback returned if the UC failed to buy at least $5 million in Stock B.

15. GEORGIOU also informed Individual A and the UC that Stock A would be actively manipulated again soon and that any purchases the UC did in Stock A would have to be coordinated with GEORGIOU as an open market cross trade because there was now too much uncontrolled stock in the market. In my experience, this means that GEORGIOU would sell the UC stock he controlled as a set price to ensure that other investors who were not in on the scheme could not sell their stock and lower Stock A's price.

16. GEORGIOU and the UC agreed that the UC would make a relatively small purchase in Stock B and GEORGIOU would then wire the kickback in order to test the process before the more significant trading occurred. Individual A requested that GEORGIOU provide them with news about Stock B prior to its public release to that they could prove they had control of the Stock B to the brokers they were purportedly working with on this manipulation scheme.

17. On or about September 2, 2008, GEORGIOU shared non-public news that Stock B was going to release the following day with Individual A.

18. On or about September 3, 2008, Stock B released the news that GEORGIOU had provided the day before and the UC purchased approximately $20,000 worth of Stock B using FBI funds.

19. On or about September 11, 2008, GEORGIOU caused approximately $5,000 to be wired into an account maintained by the FBI in Philadelphia as a kickback for the Stock B purchases caused by the UC.

20. On or about September 15, 2008, GEORGIOU and the UC spoke via telephone and agreed to meet in Philadelphia on September 17, 2008 to discuss how the manipulative purchases in Stock B would be coordinated.

4

21. On or about September 17, 2008, GEORGIOU traveled to Philadelphia to meet the UC and they agreed that the UC would begin $10 million in buying of Stock B the next day. GEORGIOU stated that he would make sure Stock B issued press releases to justify the vastly increased trading volume resulting from this scheme. GEORGIOU also proposed manipulating other stocks while this scheme was ongoing.

22. There are approximately 89,000,000 outstanding shares of Stock A and approximately 104,000,000 outstanding shares of Stock B. Thus, GEORGIOU's schemes which artificially inflated, or attempted to artificially inflate, the share prices of these stocks involved hundreds of millions of dollars.

23. Based on the above facts and based on my experience investigating securities fraud, I believe that probable cause exists for the issuance of a complaint and warrant charging GEORGE GEORGIOU with violations of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

COREY RILEY

Special Agent

Federal Bureau of Investigation

SWORN AND SUBSCRIBED
BEFORE ME THIS:
18th Day of September 2008.

BY THE COURT:

HONORABLE THOMAS J. RUETER

*Chief, United States Magistrate Judge*

5

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :     MAGISTRATE NO. 08-1220-M

     v.                                                    :

GEORGE GEORGIOU                              :

### MEMORANDUM ORDER

        AND NOW, this 22nd day of September, 2008, after a pretrial detention hearing

held on September 19, 2008, and after review of the United States Pretrial Services' report, and

the arguments of counsel,[1] it is hereby

### ORDERED

that the Government's Motion for Pretrial Detention is GRANTED for the following reasons:

        (1)  This court has found probable cause to believe that defendant, George

Georgiou, engaged in a stock manipulation scheme in violation of 18 U.S.C. § 371, 15 U.S.C. §

78j(b), 78ff, and 17 C.F.R. § 240.10b5.  The evidence gathered by the Government resulted from

an undercover operation which lasted approximately one year, during which time incriminating

conversations between defendant and a cooperating witness (C.W.) and an undercover F.B.I.

agent were recorded.  During this time, defendant threatened the C.W. with physical injury if the

C.W. failed to go along with the stock manipulation scheme, or otherwise report the scheme to

authorities.

        (2)  Pretrial detention of a criminal defendant should be ordered if, after a hearing

upon motion of the Government, a "judicial officer finds that no condition or combination of

---

    [1]    After the hearing, defense counsel faxed a letter to Chambers, dated September
21, 2008, making additional arguments.  The court also has considered the letter.

conditions will reasonably assure the appearance of the person as required and the safety of any
other person and the community." 18 U.S.C. § 3142(e). In making this determination, the court
should consider four factors: (1) the nature and seriousness of the offense charged; (2) the weight
of the evidence against the person; (3) the history and characteristics of the person; and (4) the
nature and seriousness to any person and the community that would be posed by the person
released. 18 U.S.C. § 3142(g).

          (3) With respect to the first factor, defendant is charged with a very serious
offense involving a scheme to defraud with potential losses to investors of hundreds of millions
of dollars. The Government estimates that if convicted, the advisory guideline sentence would
be approximately twenty years imprisonment. Second, the evidence against defendant is very
strong. During the year long investigation, defendant made numerous tape-recorded
incriminating statements to the undercover agent and the C.W., and instructed the C.W. to use
certain methods to avoid detection by law enforcement agents. Based on the evidence presented
at the detention hearing, it appears there is a strong likelihood that defendant will be convicted of
these serious crimes. Third, regarding the history and characteristics of defendant, defendant is a
Canadian citizen and has strong family ties and employment in Canada, but has no ties in the
United States. He has no criminal record, although his license to deal in securities in Canada has
been revoked because of improper business practices. Last, there is a serious risk of danger to
the C.W. should defendant be released. As stated heretofore, defendant threatened the C.W. with
physical harm. Among his threats were that the C.W. should "sleep with one eye open," and it
would be easier for defendant to "get someone's legs broken in New York than in Canada."
Additionally, defendant also has claimed to have ties with organized crime in Canada.

(4) There is no doubt that should defendant be released on bail, he would present a substantial risk of flight and a danger to the C.W. To minimize the risk of flight, defendant's counsel proposes that his client would sign a waiver of extradition form and a personal appearance bond in excess of one million dollars to be co-signed by his wife, his friend, Thomas Bock, a multi-millionaire, and a priest, Father Michael Platanis, who appeared in court. Counsel further proposed that Mr. Bock would post one million dollars via a Letter of Credit as surety, and defendant and his wife would give the Government a second mortgage on their Canadian home in the approximate amount of $700,000. There is already a primary mortgage on the property in the amount of $1.8 million. See Pretrial Services Report at 2. After the hearing, defense counsel also offered that defendant's mother would post $25,000 in cash and the equity in her Canadian home. This proposal does mollify the risk of flight, but in the end it does not reasonably assure the court that the defendant will return to the United States to face these charges. Should he not return, the Government would have to commence extradition proceedings in Canada which may take several years to resolve, and both parties agree that a waiver of extradition may not be enforceable in Canada. While the money offered as surety is ostensibly substantial, the court is not convinced that it would assure the defendant's appearance, given that defendant is a person of very substantial means.

(5) Furthermore, defendant's proposal does not address the serious risk of danger to the C.W. Should the court release defendant to reside in his home in Canada, there would be no mechanism to enforce any court-imposed conditions, such as house arrest or electronic monitoring, which would restrict defendant's ability to carry out his threats to the C.W. There would be no way a United States Pretrial Services officer could effectively monitor the activities

3

of the defendant in Canada to ensure defendant's compliance with any conditions of release to address the danger posed by defendant to the C.W., as well as the substantial risk of flight. In counsel's letter, dated September 21, 2008, he now proposes, in the alternative, that defendant would be willing to establish a residence in New York should the court not be satisfied with him residing with his family in Canada pending the trial. While establishing a residence in the United States would give United States Pretrial Services the opportunity to monitor defendant's activities to minimize the treats to the C.W., the court is not reasonably assured that defendant will not return to Canada to flee the jurisdiction of the United States. He has absolutely no ties to the United States, his wife and his children are in Canada, and he faces nearly twenty years imprisonment if convicted. In addition, he has the financial resources to flee this country and return home. See Pretrial Services Report at 2.

(6) The court has reviewed the case of U.S. v. Cirillo, 1999 WL 1456536 (3d Cir. July 13, 1999) (non precedential), where the court found that a Canadian citizen indicted on drug conspiracy charges was entitled to pretrial release where he had signed an irrevocable waiver of extradition and had strong Canadian family ties and employment and no criminal record. This case is distinguishable from the facts before this court in that there was no threat to a cooperating witness as in the instant case. It also does not appear that Mr. Cirillo had substantial financial assets, as does Mr. Georgiou, that could be used to evade the jurisdiction of the United States. Furthermore, defense counsel concedes that a waiver of extradition may not be enforceable in Canada, a fact the court in Cirillo did not mention in its opinion.

Therefore, **IT IS ORDERED** that the defendant be committed to the custody of the Attorney General for confinement in a correction facility, separate, to the extent practicable,

from persons awaiting or serving sentences or being held in custody pending appeal; that the

defendant be afforded reasonable opportunity for private consultation with counsel; and that, on

order to of the Court of the United States, or on request of an attorney for the Government, the

person in charge of the corrections facility in which the defendant is confined deliver the

defendant to a United States Marshal for the purpose of an appearance in connection with a court

proceeding.

BY THE COURT:

/s/ TJR_____
THOMAS J. RUETER
CHIEF UNITED STATES MAGISTRATE JUDGE

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

         v.          :          NO. 08-M-1220

GEORGE GEORGIOU          :

## MEMORANDUM ORDER

        AND NOW, this 10th day of December, 2008, upon consideration of defendant's

Motion Pursuant to 18 U.S.C. § 3142(c)(3) to Amend Conditions of Pretrial Release and Request

for a Hearing (Doc. No. 23) (the "Motion"), and the Government's objections thereto (Doc. No.

24), it is hereby

## ORDERED

that the Motion is **DENIED** for the reasons stated below.

        On September 22, 2008, this court filed a Memorandum Order ordering that

defendant, a citizen of Canada, be detained pending trial. Prior to the entry of the order, the court

held a lengthy hearing and subsequently explained the rationale of its decision in the

Memorandum Order. See Doc. No. 5. Defendant appealed this order. While the appeal was

pending, counsel for defendant and the Government reached an agreement to release defendant

under strict conditions of confinement, including that he reside in New York with his uncle, to be

enforced by electronic monitoring (the "Agreement"). The court approved the Agreement and

signed the proposed order submitted by the parties. See Doc. No. 11. Defendant discharged his

previous counsel and retained new counsel, who filed the Motion to amend the release order to

allow defendant to return to his native Canada to reside with his family. Counsel asserts that

three "new" facts justify reconsideration by this court of the Agreement reached by prior counsel.

First, defendant alleges that his wife recently gave birth and suffers from post-partum depression.

Second, a Canadian attorney will arrange for defendant to be supervised by a local police

department in Canada. Last, additional friends have come forward willing to post "unsecured

bonds" as security for the appearance bond.

    The court is keenly aware of the hardship caused by pretrial detention on a

defendant's family. Before entering the detention order, the court knew that defendant's wife

was pregnant and that defendant's detention would cause hardship to her. Nevertheless,

sympathy for defendant's family alone does not justify allowing defendant to return to Canada

beyond the jurisdiction of the United States. See United States v. Anderson, 2008 WL 1820819,

at *2 (D.N.D. Apr. 22, 2008) (refusing to release defendant because of "great hardship" to his

family, noting that "[t]he defendant only has himself to blame for his detention and the hardship

which it has occasioned"). The court also notes that nothing in the Release Order prohibits

defendant's wife and children from visiting defendant in New York.

    The court makes special note of the Waiver of Extradition and Supervision

Package attached as Exhibit B to the Motion. See Motion, Ex. B. Pursuant to these documents,

defendant would irrevocably waive his rights to contest extradition from Canada to the United

States. See Motion, Ex. B, ¶¶ 5-12. However, Canadian counsel Edward L. Greenspan, Q.C.,

acknowledges in his Affidavit that defendant may "attempt[] to withdraw the irrevocable

authorization" not to contest extradition. (Motion, Ex. B (Greenspan Affidavit, ¶ 11).) This

statement confirms the representation of defendant's prior counsel that irrevocable waivers of

extradition may, in some circumstances, be withdrawn and/or may not be enforceable in Canada.

(Memorandum Order (Sept. 22, 2008) at ¶¶ 4, 6.) Should defendant seek to withdraw the waiver,

2

Mr. Greenspan declares that he is "duty bound not to act on any instructions to withdraw [defendant's] irrevocable authorization." (Motion, Ex. B (Greenspan Affidavit, ¶ 11).)  While Mr. Greenspan would take no steps to withdraw defendant's waiver of extradition, other counsel or defendant himself might take such steps resulting in the commencement of potentially lengthy extradition proceedings in Canada to return defendant to the United States.

The court denies the Motion to amend the Agreement entered into by prior counsel and the Government.  The court reluctantly agreed to the release of defendant because defendant agreed to reside in the United States, surrender his passport, and remain subject to electronic monitoring.  The court remains convinced that its September 22, 2008 detention order was the proper decision.  Therefore, in addition to the above, the court refers the parties to its September 22, 2008 Memorandum Order for the court's explanation as to why allowing defendant to return to Canada and to be supervised by Canadian police, and accepting additional posting of unsecured bonds would not assure defendant's appearance in the United States or protect the safety of a confidential witness.

BY THE COURT:


/s/ Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge

3

# EXHIBIT E

# Dr. Stephanie Bot & Associates

for Counselling, Consulting and Psychological Services

1504 Yonge St. 3rd Floor
Toronto, Ontario M4T 1Z6
Phone: (416) 485-5243  Fax: (416) 485-2901
drbot.associates@on.aibn.com

November 11, 2008

**RE: Karen Georgiou**
**10150 Pineview Trail**
**Campbellville ON  LOP 1BO**

**DOB: February 17, 1970**

To Whom It May Concern:

This letter was written to provide a description of the concerning situation that has developed with Karen Giorgiou and her family since her husband, George Georgiou's arrest on September 17, 2008. My name is Dr. Stephanie Bot and I am a Psychologist in the province of Ontario, license #3450 working with my associate Donna Marshall M.A. to assist in managing the issues and needs presented by Ms. Karen Georgiou and her family.

Ms. Georgiou is a 38 year old woman with four dependent children: Alex age 11, Anna age 7, Christopher age 3 and a newborn, three week old Gabriella. Her son, Johnnie, tragically died in February 2006 at the age of 7 from cancer.

Ms. Georgiou is a gentle, soft spoken young woman who attends her counselling sessions with her newborn.  In her first session with Ms. Marshall, she reported that her husband, George, was arrested in the United States on September 17, 2008. Since his arrest she says he has been released from jail and is on house arrest and living with his cousin in New York. She indicated that he is not allowed to return to Canada.

Ms. Georgiou sought counselling for support in coping with the shock of her husband's arrest and all the issues surrounding that, her problems in dealing with her children's behaviour since their father has been absent, and in managing the day to day challenges without him. She is also still grieving the tragic death of her young son.

During her first session she reporting getting "panic attacks" whenever she thought about how she would ever get through this ordeal. She described feeling "overwhelmed" and "scared." She said that for the first few weeks after her husband

was arrested she "felt violated" by the intrusion into her life by the media, authorities and people who wanted to know information. She said she didn't "feel safe" going out into the community or seeing others and she has kept very much to herself, except for carrying out the necessary duties and commitments of a mother and caregiver. This has increased her isolation and limited the support that could be available to her.

Ms. Georgiou described how unsettling it was for her to go through the delivery of Gabriella without her husband by her side. She presents him as an attentive father and husband and she experiences him as a central source of strength and support to her. He participated in the deliveries of all four other children and she felt a profound sense of loss with his absence. Apparently, the delivery was an emergency as the placenta was ruptured and Karen was bleeding profusely. The experience was terrifying for her and she was concerned about the outcome. She needed her husband's support at this time.

Subsequently, Karen felt depleted emotionally and physically, as the birth was a complicated one. This would be stressful for any mother but coupled with the issue of George's arrest and detainment, was really overwhelming for her.

During sessions this sense of depletion is evident in her tone, which is somewhat vacant, and her body language which appears collapsed and weak. She has dark circles under her eyes and speaks of being tired and worn.

She has been thrust into the role of mother and father, while in the midst of what feels to her like "an awful movie." She describes feeling "disconnected" from what is happening, because it feels "unreal" to her. She has no extra time to spend with any of the children as she is juggling the household and the parenting demands. She says her husband was a very involved partner and parent, cooking, shopping and helping the children with their homework. She describes him as her "rock" and cries when she describes how she misses him. It is difficult for her to cope without his support in this challenging family situation with so many responsibilities.

Ms. Georgiou reports that the children don't understand why "daddy is away." All the children keep asking, "When will daddy be home?" Each child is acting out in their own unique ways, as a result of the loss of their father.

- Christopher's behaviour is "out of control" she reports. He and his father spent a lot of time together and were closely bonded. Ms. Georgiou says, "He needs his father for play and discipline." He has started hitting his sister, cousin and children at school. He sobs a lot, "for no reason." He cries whenever he is dropped at school. He has reverted to talking "baby talk." Ms. Georgiou has

taken him from a full day back to half a day to try and soothe his anxiety and distress.

- Alex, the oldest, is taking over adult responsibilities in George's absence, such as dressing the children and trying to manage them. She cries a lot and frequently talks about how she is missing her father.

- Anna "gets left out" because she has resorted to going to her friend's homes to be out of the house. Ms. Georgiou says Christopher's behaviour is making it very difficult for everyone to cope and Anna copes by leaving.

Karen Georgiou is a young mother, who through no fault of her own has become a single mother to four children. The demands and strains of parenting alone, coupled with the stress of dealing with her husband's absence and her unknown future are taking their toll. Christopher, Alex, and Anna are at risk of deteriorating further emotionally and socially as Ms. Georgiou is beyond her depths, as anyone would be, in managing all the issues this situation is presenting her with. If this situation persists, these negative patterns the children are presenting may become more entrenched and consequently more difficult to reverse or resolve. Gabriella, as a newborn, keeps Ms. Georgiou constantly engaged in her care. While this mother is a resilient and competent parent and person, her emotional well-being is too stressed under these circumstances and her ability to manage the needs of her children, her own worries, the management of the house while still mourning for her son is too much to sustain in an ongoing way. She speaks often of needing her husband's emotional and physical support for herself and her young children. Having her husband present to help carry the load will allow her to recoup and carry on with all of her responsibilities.

It would be essential that Mr. Georgiou be allowed to attend to his family's needs. They are a close knit and interdependent family for whom this experience has had a dramatic impact on four children and a devoted mother. To minimize any further damage or toll to this family's already diminished well-being, this father's presence would be most helpful.

Should you have any questions, please feel free to contact me.

Respectfully submitted,

Stephanie Bot Psy.D., C.Psych

Donna Marshall M. A.