UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Criminal No. 09-88-1 |
| | : | |
| George Georgiou | : | |

**ORDER**

AND NOW, this _____ day of April, 2009, upon consideration of the

Defendant's Renewed Motion Under 18 U.S.C. § 3145(a)(2) to Amend Conditions of

Pretrial Release and Request for Hearing, it is hereby ordered that the motion is

GRANTED and that the Court finds that the following conditions will reasonably assure

the appearance of the defendant as required and will reasonably assure the safety of any

other person and the community:

1.      Defendant shall reside at 725 Riverside Drive, Unit #203, Pompano

Beach, Florida, 33062 and 120 Arielle Court, Apartment A, Williamsville, New York.

The defendant shall be subject to electronic monitoring using GPS technology at all

times.

2.      Defendant shall be granted curfew hours where he is allowed outside of

the residence from 8:00 a.m. to 10:00 p.m. daily.

3.      The defendant shall maintain the financial security arrangement required

by Judge Rueter's order of September 26, 2008, as modified by the court's order of

October 2, 2008, by which his appearance is secured by an approximately $800,000 CDN

mortgage on the family's home at 10150 Pineview Trail, Campbellville, Ontario, Canada,

$500,000 US cash deposit with the Court and a $1,000,000 personal recognizance bond.

4.      Defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

5.      Defendant shall not commit any state or federal crime while on pretrial release.

6.      Defendant's waiver of extradition shall remain in effect.

7.      Defendant shall have no contact, direct or indirect, with the cooperating witness, Kevin Waltzer, or any member of his family.

8.      The defendant will have no contact with relevant witnesses, victims or co-defendants with respect to this case as shall be identified by the Court.

9.      Defendant's travel is restricted states of Florida and New York and the Eastern District of Pennsylvania including travel through other states as necessary to reach an allowed destination and to attend Court proceedings or to meet with counsel.

10.     Pursuant to 18 U.S.C. § 3142(h), defendant is hereby advised of the following:

   a.      If the defendant willfully violates a condition of release or willfully commits an offense while on pretrial release, he may be subject to criminal prosecution for any such offense as well as for prosecution under the Bail Reform Act for a separate violation of the criminal law.  In addition to the penalties for any new offense, the commission of any crime while on release comes with it a maximum penalty of ten years under the Bail Reform Act (18 U.S.C. § 3147).

   b.      If the defendant willfully violates a condition of release, the Court may also detain the defendant and can issue an immediate bench warrant for his arrest. The defendant would also be subject to prosecution and incarceration for the crime of

willfully failing to appear (18 U.S.C. § 3146) which carries a maximum sentence of 15 years incarceration.

        c.      Under 18 U.S.C. §§ 1503, 1510, 1512 and 1513, the defendant could be subject to criminal prosecution for any willful act or attempt to intimidate witnesses, jurors or officers of the Court, obstructing justice, or tampering with or retaliating against a witness or victim.

By the Court:

_____

Kelly, J.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

United States of America           :
                                  :
           v.                      :       Criminal No. 09-88-1
                                  :
George Georgiou                  :

## RENEWED MOTION PURSUANT TO 18 U.S.C. § 3145(a)(2) TO AMEND CONDITIONS OF PRETRIAL RELEASE AND REQUEST FOR HEARING

Defendant George Georgiou, pursuant to 18 U.S.C. § 3145(a)(2), and by his counsel, respectfully seeks an amendment of his conditions of release in this case. This Court recently modified the conditions of release to add additional restrictions. The instant motion merely seeks permission to relocate for reasons of employment and proximity to family.

The defendant has been on pretrial release since October 3, 2008. The original order included the requirement that Mr. Georgiou reside at 221-03A, 67th Avenue, Bayside, New York, subject to electronic monitoring and that a bail bond in the amount of $2,000,000 be posted. Judge Rueter's order attached as Exhibit A.

The defendant seeks a modification of the Court's release order to permit him to relocate within the United States, pending his trial. Specifically, defendant asks that he be allowed to move to South Florida for employment and to work with newly retained counsel, with permission to visit his wife and family on weekends in upstate New York.

The defense also offers a significantly more secure system of electronic monitoring using GPS technology (Global Positioning Satellite), if deemed necessary by the Court, that will provide reliable information about the defendant's location at all

times.  The GPS technology which is regularly utilized by Pretrial Services and available in the Florida and Buffalo areas would come at a cost of 3 times that currently being charged to the defendant for his existing monitoring services, an expense the defendant is willing to incur in order to obtain employment and be closer to his family.

The defendant seeks these amendments because of a significant change in circumstances.

1.      The lease at the residence where the defendant currently resides with his aunt and uncle expires in a few months and will not be renewed.  The current apartment is only a one bedroom, approximate 500 square foot unit.  The physical space has proven unworkable for 3 adults sharing sleeping arrangements between one bed and the floor.

2.      The defendant requires gainful employment to support his family and to pay his legal fees.  The family has absolutely no savings, contrary to the government's assertions.  There are no international assets and the government has not provided any evidence that would say otherwise.

3.      The defendant's service business described to Pretrial Services as having a value of $1,000,000 at time of his arrest is now worthless, leaving the family home, which has been pledged to the government in this case, as the only tangible asset.  The defendant's wife and children are completely dependent on Mr. Georgiou and are now living month-to-month by borrowing from family and friends for all basic necessities, plunging the family deeper and deeper into debt.

4.      The allegations against Mr. Georgiou involve the shares of certain small capitalization public companies that collectively represent a minor aspect of the defendant's professional efforts.  For instance, on the day of his arrest Mr. Georgiou was

traveling to Ohio to close a transaction in the automotive industry in Alabama and was scheduled the following week to complete a financing negotiation related to a solar manufacturing facility in upper state New York.

5.      The government's statements to this Court on March 25, 2009 suggesting Mr. Georgiou's business meetings over the last six months are a continuation of criminal conduct and that he should have to "get a job at the local store" are obviously impractical and remain unproven.  The government presented no evidence to the Court that Mr. Georgiou's business meetings are illegitimate or untoward.

6.      Mr. Georgiou's travel limitations in the United States have made it impossible for him to generate income from his primary business sources, the majority of which are not related to the public companies in this case.  Mr. Georgiou's expertise requires active, hands on involvement, which is hampered by the need to work through sporadic meetings.  By allowing the defendant to reside in Florida during the work week, Mr. Georgiou can accept a consulting contract that would have him focus primarily on depressed Florida real estate opportunities, which has nothing to do with the public companies at issue in this case.  (See Offer of Employment at Exhibit B, to be filed *in camera*).

7.      Mr. Georgiou's need for income has reached a critical point.  On October 30, 2008 the Georgiou family's primary mortgage lender gave notice that the first mortgage on the family home was being called.  Thanks to friends and family the mortgage remains in good standing in all respects, with all payments current to this day; the notice seems driven by the allegations against Mr. Georgiou.  Since issuing initial notice, the financial institution has taken no further steps to foreclose on the mortgage but

unless Mr. Georgiou is afforded an opportunity to provide for his family, Mrs. Georgiou

and the four children face a serious risk of losing their home.  By relocating to the Florida

area Mr. Georgiou can provide at least some income for his family and travel to New

York on weekends to see them.

        8.      The defendant has engaged Michael Pasano from the law firm Carlton

Fields to provide added legal counsel in this case.  Mr. Pasano's offices are in Miami,

Florida.  The defendant needs to have regular access to co-counsel to work on his

defense.  Mr. Pasano is a former Chair of the ABA Criminal Justice Section, a former

federal prosecutor, and has extensive experience with cases involving tape recordings and

with securities fraud cases in particular.  Mr. Georgiou proposes to meet regularly with

Mr. Pasano to discuss and analyze the multiple tape recordings in this case.

        9.      The family's separation from Mr. Georgiou is traumatic with significant

hardship that is entirely unnecessary.  On October 11, 2008, Mr. Georgiou's wife gave

birth to their fifth child.[1]  Since that time she was diagnosed with postpartum depression.

(See Medical Report at Exhibit C).  She is struggling to care and provide for their

children.  In addition, on January 13, 2009 the family's youngest son Christopher had an

x-ray which identified an abnormality near the heart.  The x-ray was repeated on January

20, 2009 which confirmed the abnormality.  The family pediatrician is closely monitoring

Christopher's condition.  As previously stated, Mr. Georgiou's son passed away in

February 2006 after a six-year battle with brain cancer.  Mr. Georgiou requests relocation

---

[1] It is critical that the defendant was released on October 3, 2008, and that his wife gave birth eight days later to their fifth child; nonetheless, Mr. Georgiou continued under home confinement without seeing his family until March 16, 2009 when they visited him in New York.  The separation from his children is particularly harsh considering the family lost their oldest boy to cancer in February 2006.

to be closer to his children, one who faces an unknown medical condition, and his wife who is left alone under immense stress to deal with it.

10.     Mr. Georgiou is entitled to a presumption of innocence and believes it will be proven at trial that the government's representations of "overwhelming" and "indisputable" evidence remain untested and are based on a cooperating witness who is an admitted fraudster of significant stature, seeking to reduce his upcoming sentence.

11.     The defendant's family live nine hours by car from his current location and only one hour and 45 minutes from the proposed new residence in Williamsville, New York.  The cost of air fare for the family is prohibitive.  The Court's allowance for the defendant to work in Florida and see his family on occasional weekends in upper state New York would make frequent family visits a reality and help ease the trauma of the separation.  See Letter from Renaissance Place Associates, L.L.C. granting application for residency as Exhibit D.

12.     The government arrested Mr. Georgiou after a 14-month undercover operation that originated from the arrest of Kevin Waltzer, the cooperating witness in this case.  Mr. Waltzer was the "ring leader" and criminal mastermind behind a six person conspiracy which criminally succeeded in bilking insurance companies out of $41,000,000 over years of premeditated and calculated fraud, according to government filings.  Mr. Waltzer recently pled guilty to three counts under a criminal information. Mr. Georgiou was not involved with Mr. Waltzer's insurance fraud.  According to the government, shortly after Mr. Waltzer's arrest in approximately March 2007, Mr. Waltzer claimed to be separately involved in securities fraud with Mr. Georgiou.  Mr.

Waltzer's motivation and incentive to bring forth such claims will be addressed at or before trial.

13.     The object here is not to belabor the Court with matters to be dealt with in upcoming motions or at trial, but rather to emphasize that this is a complex case that will be hotly contested and certainly will require many months of preparation. To keep Mr. Georgiou from closer proximity to his family during what will prove a lengthy and intense pretrial process is respectfully suggested to be unnecessary.

14.     The defense offers the following reasons to support a finding that release under these amended conditions will reasonably assure the defendant's appearance as required and the safety of any person and the community.

15.     The defendant has been on home confinement pursuant to pre trial release for almost six months. During this time the defendant, pursuant to approval from Pretrial Services, has been out of the residence four times per week for many hours, has crossed state lines by train on over ten occasions and has held all day business meetings away from the residence approximately twenty times. Each and every one of these outings is unsupervised and without monitoring from the moment the defendant leaves the residence until he returned. The government claimed in prior proceedings that the electronic monitoring is what keeps Mr. Georgiou from fleeing – this is illogical and misunderstood. The current monitoring regime serves absolutely no purpose while Mr. Georgiou is out of the residence unless he does not return. The capability to flee does not require "international assets" but rather belongs to anyone with access to a vehicle or means of transportation. This defendant has proven that his compliance with the orders of this Court regardless of the hardship on his family. The government has not addressed

evidence that Mr. Georgiou is a flight risk, beyond unsupported theories delivered to the Court in hyperbolic fashion.

16.     The defendant proffers a means by which his activities can be more actively monitored, if deemed necessary by the Court.  The defendant is presently subject to a form of electronic monitoring that only records his entrance and exit of the residence to which he is confined.  He agrees, that the Court should direct the use of GPS monitoring which will give real time information about his location.  Defendant submits this additional monitoring is unnecessary, but would accept same in order to relocate.

17.     The defendant also offered an expedited means of extradition back to the United States, should the Court be concerned that it could be necessary.  Submitted in connection with his prior motion to Judge Fullam as Exhibit A was a Waiver of Extradition and Supervision Package to support defendant's motion to amend conditions of release to permit residence in Canada.  Although the appeal to return to Canada was denied and the defense does not look to revisit that issue at this time, Judge Fullam stated, "I do agree that the conditions now proposed by defendant's counsel might very well prove workable, and that any attempt by the defendant to become a fugitive or to remain a fugitive for any significant period of time could probably be overcome."  The extradition package tendered is based on the affidavit of an eminent member of the bar in Canada, Edward L. Greenspan, Q.C., who has substantial experience in connection with the release of persons facing criminal charges in the United States who have been permitted to remain with their families in Canada.  Mr. Greenspan's proposal consisted of: (1) an affidavit to be executed by him constituting his descriptions of Canadian law and a description of the procedures by which Mr. Georgiou will waive his attorney-client

privilege with Mr. Greenspan; and, (2) a waiver of extradition by the defendant and a waiver of the right to seek bail pending extradition should the matter come to that.  In addition, the package includes a description of Mr. Greenspan's other cases in which U.S. courts have permitted Canadian citizens to reside in Canada pending criminal charges.  It is respectfully submitted that this proposal, which may be adjusted with regard to the manner and mode of supervision eliminates concerns that the defendant may flee and then effectively thwart this Court's writ by fighting extradition.

18.    This Court has the authority to amend conditions of release "at any time." 18 U.S.C. § 3142(c)(3).  Upon review of conditions of release, the Court "<u>must</u> impose <u>the least restrictive bail conditions necessary</u> to assure appearance and safety."  <u>United States v. Himler</u>, 797 F.2d 156, 159 (3d Cir. 1986) (emphasis added).  Here, appearance and safety are more than adequately assured by Mr. Georgiou's reliability to date; the fact that Mr. Georgiou was never a danger in the first place; and the existing $2 million bail package and the other assurances that Mr. Georgiou proposes.

Accordingly, the defendant respectfully submits that he be allowed to relocate to South Florida to work with his Florida attorney during the pretrial phase of this case and to visit his wife and family on weekends in Williamsville, New York.  Alternatively, he asks that he be allowed to relocate to either South Florida <u>or</u> Williamsville, New York, if

this Court does not grant his primary request.

Respectfully submitted,


/s/
Robert E. Welsh, Jr.
Catherine M. Recker
Welsh & Recker, P.C.
2000 Market Street, Suite 2903
Philadelphia, PA 19103
215-972-6430
Counsel for George Georgiou

Date: March 31, 2009

# EXHIBIT A

SEP-29-2008  14:33        US PRETRIAL SERVICES PAE                267 299 5100      P.02

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA                :

    v.                                  :        MAGISTRATE NO.
                                                     08-1220-M
GEORGE GEORGIOU                         :

### ORDER MODIFYING PRETRIAL RELEASE CONDITIONS

AND NOW, this 26Th day of September, 2008, upon agreement of the parties,
the Court modifies the previous pretrial detention order in this case and sets conditions of pretrial
release as set forth below.  The basis for this Order is that the circumstances have changed since
the original detention hearing in that the defendant now has secured a residence in the United
States, near the Eastern District of Pennsylvania, where he has agreed to remain on home
detention with electronic monitoring and the defendant has made specific financial arrangements
for posting real estate and money.

(1)    Defendant shall reside at the residence of his uncle, Gregory Paschalides, at 221-
      03A, 67th Avenue, Bayside, New York (the "Residence").

(2)    Defendant shall be subject to home confinement with electronic monitoring, at his
      expense, and may leave the Residence only with the prior approval of Pretrial
      Services.  Such approval shall be permitted for medical appointments, attorney
      consultations, religious observance, verified employment activities, and daily
      living activities consistent with the standards applied by Pretrial Services.

(3)    Defendant shall not travel outside the Southern and Eastern Districts of:

New York, except to attend to legal matters in this case in **Philadelphia**,
Pennsylvania or to meet with his lawyers in their offices in **Washington, D.C.**

(4)   Defendant shall have no contact, direct or indirect, with the individual identified
in the affidavit in support of the complaint and warrant in this case as "**Individual
A**" (or any member of his family).

(5)   Defendant will be released on $2,000,000 bail which shall be secured by the
defendant (a) posting his family home, located at 10150 Pineview Trail, Milton,
Ontario, Canada with equity of approximately $840,000 (**Canadian dollars**); (b)
posting $500,000 (Canadian dollars) from Tom Bock secured by a letter of credit
from HSBC Bank drawable on any branch in the United States; and (c) executing
a $1,000,000 (U.S. dollars) personal recognizance bond. Defendant shall execute
and file with the Clerk of Court all required documents to ensure that this home
would become the property of the United States government in the event
defendant fails to appear as directed in this case. All other technical requirements
of the Clerk's office relating to this real estate may be waived. Defendant shall
file with the Clerk of Court the letter of credit and understands that he and Tom
Bock will forfeit the $500,000 secured by the letter of credit if the defendant fails
to appear as directed in this case. Further, the defendant understands that he will
be ordered the pay $1,000,000 on the personal recognizance bond if he fails to
appear as directed in this case.

(6)   Defendant shall surrender any passports and shall not apply for any other passport.

- 2 -

(7)   Defendant shall not possess a firearm, ammunition, destructive device, or any

      other dangerous weapon.

(8)   Defendant shall not commit any state or federal crimes while on pretrial release.

(9)   Defendant shall report to Pretrial Services in the Eastern District of New York as

      directed by Pretrial Services.

(10).  Defendant shall execute an irrevocable waiver of extradition (TJR)

BY THE COURT:

_____

HONORABLE THOMAS J. RUETER

*United States Magistrate Judge*

- 3 -

# EXHIBIT B
# (TO BE FILED *IN CAMERA*)

EXHIBIT C

# Dr. Stephanie Bot & Associates

for Counselling, Consulting and Psychological Services

1504 Yonge St. 3rd Floor
Toronto, Ontario M4T 1Z6
Phone: (416) 485-5243  Fax: (416) 485-2901
drbot.associates@on.aibn.com

November 11, 2008

**RE: Karen Georgiou**
**10150 Pineview Trail**
**Campbellville  ON  LOP 1BO**

**DOB: February 17, 1970**

To Whom It May Concern:

This letter was written to provide a description of the concerning situation that has developed with Karen Giorgiou and her family since her husband, George Georgiou's arrest on September 17, 2008.  My name is Dr. Stephanie Bot and I am a Psychologist in the province of Ontario, license #3450  working with my associate Donna Marshall M.A. to assist in managing the issues and needs presented by Ms. Karen Georgiou and her family.

Ms. Georgiou is a 38 year old woman with four dependent children:  Alex age 11, Anna age 7, Christopher age 3 and a newborn, three week old Gabriella.  Her son, Johnnie, tragically died in February 2006 at the age of 7 from cancer.

Ms. Georgiou is a gentle, soft spoken young woman who attends her counselling sessions with her newborn.  In her first session with Ms. Marshall,  she reported that her husband, George, was arrested in the United States on September 17, 2008.  Since his arrest she says he has been released from jail and is on house arrest and living with his cousin in New York.  She indicated that he is not allowed to return to Canada.

Ms. Georgiou sought counselling for support in coping with the shock of her husband's arrest and all the issues surrounding that, her problems in dealing with her children's behaviour since their father has been absent, and in managing the day to day challenges without him.  She is also still grieving the tragic death of her young son.

During her first session she reporting getting "panic attacks" whenever she thought about how she would ever get through this ordeal.  She described feeling "overwhelmed" and "scared."  She said that for the first few weeks after her husband

was arrested she "felt violated" by the intrusion into her life by the media, authorities and people who wanted to know information. She said she didn't "feel safe" going out into the community or seeing others and she has kept very much to herself, except for carrying out the necessary duties and commitments of a mother and caregiver. This has increased her isolation and limited the support that could be available to her.

Ms. Georgiou described how unsettling it was for her to go through the delivery of Gabriella without her husband by her side. She presents him as an attentive father and husband and she experiences him as a central source of strength and support to her. He participated in the deliveries of all four other children and she felt a profound sense of loss with his absence. Apparently, the delivery was an emergency as the placenta was ruptured and Karen was bleeding profusely. The experience was terrifying for her and she was concerned about the outcome. She needed her husband's support at this time.

Subsequently, Karen felt depleted emotionally and physically, as the birth was a complicated one. This would be stressful for any mother but coupled with the issue of George's arrest and detainment, was really overwhelming for her.

During sessions this sense of depletion is evident in her tone, which is somewhat vacant, and her body language which appears collapsed and weak. She has dark circles under her eyes and speaks of being tired and worn.

She has been thrust into the role of mother and father, while in the midst of what feels to her like "an awful movie." She describes feeling "disconnected" from what is happening, because it feels "unreal" to her. She has no extra time to spend with any of the children as she is juggling the household and the parenting demands. She says her husband was a very involved partner and parent, cooking, shopping and helping the children with their homework. She describes him as her "rock" and cries when she describes how she misses him. It is difficult for her to cope without his support in this challenging family situation with so many responsibilities.

Ms. Georgiou reports that the children don't understand why "daddy is away." All the children keep asking, "When will daddy be home?" Each child is acting out in their own unique ways, as a result of the loss of their father.

- Christopher's behaviour is "out of control" she reports. He and his father spent a lot of time together and were closely bonded. Ms. Georgiou says, "He needs his father for play and discipline." He has started hitting his sister, cousin and children at school. He sobs a lot, "for no reason." He cries whenever he is dropped at school. He has reverted to talking "baby talk." Ms. Georgiou has

taken him from a full day back to half a day to try and soothe his anxiety and distress.

- Alex, the oldest, is taking over adult responsibilities in George's absence, such as dressing the children and trying to manage them. She cries a lot and frequently talks about how she is missing her father.

- Anna "gets left out" because she has resorted to going to her friend's homes to be out of the house. Ms. Georgiou says Christopher's behaviour is making it very difficult for everyone to cope and Anna copes by leaving.

Karen Georgiou is a young mother, who through no fault of her own has become a single mother to four children. The demands and strains of parenting alone, coupled with the stress of dealing with her husband's absence and her unknown future are taking their toll. Christopher, Alex, and Anna are at risk of deteriorating further emotionally and socially as Ms. Georgiou is beyond her depths, as anyone would be, in managing all the issues this situation is presenting her with. If this situation persists, these negative patterns the children are presenting may become more entrenched and consequently more difficult to reverse or resolve. Gabriella, as a newborn, keeps Ms. Georgiou constantly engaged in her care. While this mother is a resilient and competent parent and person, her emotional well-being is too stressed under these circumstances and her ability to manage the needs of her children, her own worries, the management of the house while still mourning for her son is too much to sustain in an ongoing way. She speaks often of needing her husband's emotional and physical support for herself and her young children. Having her husband present to help carry the load will allow her to recoup and carry on with all of her responsibilities.

It would be essential that Mr. Georgiou be allowed to attend to his family's needs. They are a close knit and interdependent family for whom this experience has had a dramatic impact on four children and a devoted mother. To minimize any further damage or toll to this family's already diminished well-being, this father's presence would be most helpful.

Should you have any questions, please feel free to contact me.

Respectfully submitted,

Stephanie Bot Psy.D., C.Psych

Donna Marshall M. A.

EXHIBIT D

*Renaissance Place Associates, L.L.C.*

10 Arielle Court • Williamsville, NY 14221



03/13/09

George Georgoiu
Karen Georgiou
10150 Pineview Trail
Campbellville, Ontario Lop1bO

Dear  George&Karen

We are pleased to inform you that your application for residency at Renaissance Place Apartments has been approved! Welcome to your new home; your address will be 120 Arielle Ct., Apt A Williamsville, NY 14221.

Enclosed are three original leases for you to sign, initial and return to us as soon as possible in the enclosed self addressed envelope. All persons listed in the upper, right section on the first page of the lease must initial and sign. The areas of the lease that require initials or signatures are highlighted for your convenience. Signing the lease in advance will allow for a quick move-in appointment on or before your move-in date.

I have enclosed as well the W-Ben which has to be filled out and returned. This allows us to deposit your money in a bank where it is held until move out.

I will need proof of income as well. Please send that when returning the leases.

To facilitate a smooth move to Renaissance Place Apartments, we are requesting you call the office to set up a move-in appointment. This will minimize your valuable time on the move-in date.

Move-In Appointment:
The following list of pre-move in procedures must be completed on or before your scheduled move-in date. It is necessary to schedule an appointment with us at which time you will:

    Sign your new lease (only if not returned earlier by mail).
    Receive further information and paperwork concerning your apartment.
    Pay your first month rent and security deposit*.
    Conduct a move-in inspection of your apartment.
    Receive apartment keys.



**716•689•7983** / Fax 716•689•6385 / Email: renplace@aol.com
Visit our Web Site at luxuryaptswny.com



*The balance due on your account is as follows:

| | | |
|---|---|---|
| Rent | Prorate for March | $152.58 |
| | Application Deposit | $1200.00 |
| | Less Application Deposit Applied | $1200.00 |
| | Balance Due on or before move-in | $152.58 |

Please allow up to ½ hour for these pre move-in procedures. Appointments are scheduled between the hours of 8:30 A.M. to 4:30 P.M. Monday through Friday. If you have not yet scheduled this appointment, please call the office at (716) 689-7983.

Utilities:
To ensure your utilities are on for your move-in date, please call for service at least one (1) week prior to your possession date. Failure to switch utilities into your name prior to move-in date will not be our responsibility. For corporate apartments that have entered into a separate agreement which includes utilities, we will take care of this. Please contact the following companies to arrange for utility services:

| | |
|---|---|
| NATIONAL GRID (Electric Company) | 1-800-932-0301 |
| NATIONAL FUEL (Gas Company) | 1-716-686-6123 |
| VERIZON (Telephone and DSL) | 1-716-890-5555 |
| CABLE SERVICE (no need to call for service) | |

Change of Address:
Change of address cards should be mailed to the Williamsville Post Office at 5325 Sheridan Drive, Williamsville NY 14221. The phone number for the Williamsville Post Office is (716) 632-0421 if you need assistance or additional information.

Moving Day:
For protection of the apartment carpeting, we suggest that you or your moving company place temporary runners over same. All cardboard boxes must be crushed, tied together and placed out for recycling on the scheduled pick up day.

In closing, we are pleased that you have chosen Renaissance Place Apartments for your new home and we hope that you will enjoy a long residency with us. If you have any questions or concerns, please feel free to call us at the Leasing Office at (716) 689-7983.

Sincerely,

Tammey Cosgrove
Community Manager
Renaissance Place Apartments

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| United States of America | : | |
| | : | |
| v. | : | Criminal No. 09-88-1 |
| | : | |
| George Georgiou | : | |

BRIEF IN SUPPORT OF MOTION SEEKING
PERMISSION TO RELOCATE

I.   INTRODUCTION

The defendant, George Georgiou, a citizen and resident of Ontario, Canada, has

been on release since October 3, 2008, following his arrest on a complaint and warrant

charging securities fraud.  The conditions of release include the requirements that he post

substantial security and reside at the residence of his uncle, Gregory Paschalides, in

Bayside, New York, subject to home confinement with electronic monitoring (Bail Order

of Judge Rueter attached as Exhibit A).

Mr. Georgiou seeks an amendment to his conditions of bail to permit him to work

and to be near defense co-counsel in Florida during the week and reside closer to his

family in upstate New York at 120 Arielle Court, Apartment A, Williamsville, New

York, 14221 pending trial, and proposes substantially more secure bail conditions to

satisfy the requirements of the Bail Reform Act, including most notably, the use of

greater electronic security, if deemed necessary by the Court and a procedure or regime

for the waiver of any extradition rights or right to bail pending extradition, as is described

in the Motion to Amend Conditions of Pretrial Release filed simultaneously herewith.

The addition of real time GPS electronic monitoring and the defendant's six month history of compliance with conditions of release (even though he could have fled many times) will provide assurance to the Court that he will continue to comply. Furthermore, the substantial bail posting is particularly robust because the people closest to Mr. Georgiou, his wife, children, and close friends would suffer the consequences if he defaults. Mr. Georgiou will not subject his wife and children to the loss of their home. He will not cause his close friend Mr. Bock to lose $500,000. The substantial amounts posted and the severe consequences to those close family and friends on default effectively secure Mr. Georgiou's appearance for trial.

II.   DISCUSSION

   A.   Procedural Background

Mr. Georgiou was arrested on September 17, 2008, on the basis of the charges set forth a Complaint and Warrant. An indictment was filed on February 12, 2009 and is assigned to this Court.

Upon his initial appearance, Mr. Georgiou was temporarily detained by order of Magistrate Judge Rueter. Following Judge Rueter's order, Mr. Georgiou sought review by the district court, and the matter was assigned to Judge Fullam. Before any action was taken by Judge Fullam, the government approached the defense offering pretrial release, leading to an agreement that resulted in the bail order presently in force; attached as Exhibit A.

On December 2, 2008,[1] undersigned counsel filed a motion to amend the conditions of bail to permit the defendant to return to his family in Ontario, Canada pending disposition of the criminal charges in this Court and proposed a substantial increase in financial security, active GPS monitoring whilst in Canada, reporting to and supervision by the Toronto Police and a system/regime by which the defendant will waive his rights to fight extradition and the right to bail during the pendency of any such proceeding.  On December 10, 2008, Judge Rueter denied the motion to amend the conditions of bail without a hearing.  The defense then filed a motion before Judge Fullam who, after a hearing on two separate days, denied the request to permit him to live with his family in Toronto but allowed for the matter of returning to Canada to be revisited without prejudice.

In summary, the background of this case is that, after having been briefly detained, the defendant has been on release living in New York subject to electronic monitoring; he sought leave to live in Toronto subject to certain assurances and a comprehensive waiver of extradition package successful for other Canadians in more serious circumstances, but was denied.  He now seeks leave to live in Florida during the week and upstate New York on occasional weekends, subject to a tighter regime of electronic monitoring, if deemed necessary by the Court.

B.      This Court Has Jurisdiction Over the Instant Motion

Under 18 U.S.C. § 3145(a)(2), a defendant may file, "that the Court having original jurisdiction over the offense, a motion for amendment of the conditions of release."  Under this rule, the defendant must seek review of the conditions of release in

---

[1] In the interim since the defendant's release, Judge Rueter denied a request for leave to travel to Florida to meet with a Florida lawyer.

Court where the charges are lodged.  United States v. Vega, 438 F.3d 801 (7th Cir. 2006).

Accordingly, this Court has jurisdiction over the instant motion.

>  C.      The Defendant's Proposed Conditions of Release to Permit Him to Reside
>          in Florida and New York Provide Reasonable Assurance of the
>          Defendant's Appearance When Directed and the Safety of Any Person and
>          the Community

This motion is prompted in part by the fact that prior to this month, Mr. Georgiou

has not seen his family since his arrest in September 2008 and because he needs to find

gainful employment.

While the previous bail agreement was entered into in good faith, the defense

respectfully submits that the combination of changed circumstances in the Georgiou

family, Mr. Georgiou's proven reliability and the availability of substantially tighter GPS

monitoring, if deemed necessary by the Court, make it reasonable and appropriate that he

be permitted to work in Florida and have access to counsel and reside in upper state New

York on weekends to be closer to his family.

A "judicial officer may at any time amend the order [to release on conditions] to

impose … different conditions of release."  See United States v. Byrd, 969 F.2d 106, 110

(5th Cir. 1992).  Although conditions may be imposed to "provide the requisite

assurance" of later appearance, "the judicial officer must impose the least restrictive bail

conditions necessary to assure appearance and safety."  Himler, 797 F.2d at 159.  This is

because "[i]n our society liberty is the norm, and detention prior to trial or without trial is

the carefully limited exception."  United States v. Salerno, 481 U.S. 739, 755 (1987).

The conditions of release under the pretrial release order are not the least

restrictive necessary to ensure Mr. Georgiou's appearance and the safety of individuals in

the community.  Indeed, the four factors set forth under 18 U.S.C. § 3142(g) for

consideration of the appropriate release conditions — the nature and seriousness of the offense, the weight of the evidence, the history and characteristics of the person, and the nature and seriousness of any danger to the community — all support the conclusion that Mr. Georgiou would appear as required by this Court if he were allowed to change residence and that he would not pose a danger to the safety of any individuals.

Judge Rueter previously cited <u>United States v. Anderson</u>, 2008 WL 1820819 at *2 (D.N.D. Apr. 22, 2008) (refusing to release defendant because of "great hardship" to his family, noting that "[t]he defendant only has himself to blame for his detention and the hardship which it has occasioned").  Respectfully, the cases could not possibly be more opposed.  In <u>Anderson</u> the defendant jumped bail, a bench warrant was issued for his arrest, he was apprehended and re-incarcerated.  Thereafter, the defendant sought leave to attend a family funeral which was denied.  Mr. Georgiou is not detained, he has not fled, there is no bench warrant for his arrest and he does not deserve to be subject of such comparison.  Mr. Georgiou is a family man that has respected the orders of this Court regardless of the misstatements by the government.

Mr. Georgiou is not charged with "a crime of violence, a federal crime of terrorism, or [a crime that involves] a minor victim or a controlled substance, firearm, explosive, or destructive device," which are the offenses of specific concern identified in the bail statute.  18 U.S.C. § 3142(g)(1).  He is accused of securities fraud — an altogether different type of offense — and nothing about this offense suggests that Mr. Georgiou's appearance and the safety of persons cannot be guaranteed by appropriate conditions of release.

Submitted as Exhibit F to the motion before Judge Fullam are many statements by friends and business associates attesting to Mr. Georgiou's character as a peaceful and law-abiding member of the community.

Indeed, the government has not argued that these crimes are violent.  Instead, the government argued that Mr. Georgiou has a tremendous incentive to flee because he faces a twenty-year sentence, because the scheme involved "hundreds of millions of dollars" in intended losses – an amount calculated by simply multiplying the total shares outstanding amongst all shareholders by an arbitrarily predicted change in the price of the shares.

This analysis by the government is superficial, speculative, analytically flawed and unsupported by any evidence - and it will be hotly contested at trial.  Intended financial loss is one of the most vigorously disputed issues in securities fraud cases and is extremely difficult to prove.  This government's inflated estimate of exposure, which is subject to substantial attack, does not support a finding that Mr. Georgiou has no incentive to remain and fight the case.

Notwithstanding the government's assertions to the Court on five different occasions that Mr. Georgiou's conduct involved fraud into the "hundreds of millions," a claim used to detain him, the indictment of February 12, 2009 alleges losses totaling $26,000,000, not a single dollar of which the government indicates went directly to Mr. Georgiou.

First, "the weight of the evidence against the person" does not support separating Mr. Georgiou from his family pending trial.  18 U.S.C. § 3142(g)(2).  The bail statute expressly preserves the presumption of innocence.  18 U.S.C. § 3142(j) ("Nothing in this

section shall be construed as modifying or limiting the presumption of innocence."). In fact, if the case proceeds to trial, Mr. Georgiou will vigorously contest liability. Much of the evidence the government cites to show stock manipulation can be explained as legitimate investment activity and alternatively were failed schemes premeditated and manufactured by the government in alliance with a criminal mastermind.

Many witnesses have submitted testimony that Mr. Georgiou is "a peaceful person," that they "have never witnessed or heard of any incidents that would suggest that Mr. Georgiou has a propensity to act violently," and that "Mr. Georgiou has no violent tendencies." Ex. J, ¶ 7; Ex. K. ¶ 7; Ex. L. ¶ 7; Ex. M from motion before Judge Fullam. In addition, a number of Mr. Georgiou's friends and family have written in his support and also have confirmed that Mr. Georgiou is not a danger. Ex. N from motion before Judge Fullam.

The Pretrial Services Officer did not find Mr. Georgiou to pose <u>any</u> danger to the community. Mr. Georgiou has been separated from his wife and four children on allegations of danger that are unfounded and unsupported.

Second, the history and characteristics of Mr. Georgiou strongly support the conclusion that he will return to appear at trial as promised. 18 U.S.C. § 3142(g)(3). Mr. Georgiou has no criminal record and no criminal history, and was not on probation, parole, or under any other restriction at the time of his arrest. Moreover, he has strong family ties — including a wife of 14 years (together 19 years), and four children. He has deep community roots, having lived in the same area for 38 of his 39 years, was a member of his church council prior to his arrest and has supported multiple charitable organizations such as church, hospital, and childrens' foundations. As stated, Mr.

Georgiou has been on electronic monitoring since October 03, 2008.  Since this time, on many occasions, Mr. Georgiou has been unsupervised, on his own recognizance for entire day business or legal meetings, in and out of the jurisdiction without incident.

Contrary to the government's assertions, the defendant has demonstrated his commitment to comply with the orders of the Court as stated above.  Even in the face of his family's continued mourning for their lost child, his wife's depression, his youngest son's unknown medical condition, severe hardship and the birth of a new baby, his respect and compliance for this Court outweighs all personal considerations.  While one could easily understand why he would feel so strongly about returning home, he has chosen to comply and seek relief to be closer to his family through the appropriate means (the filing of a motion before this Court) and without fleeing back to Canada.

Flight would be a false hope in any event, and Mr. Georgiou has no incentive to pursue it.  If Mr. Georgiou does not return, the government will surely pursue and extradite him.  See United States v. Cirillo, 1999 WL 1456536, at *1.  While awaiting extradition, he risks being imprisoned in Canada.  See Greenspan Affidavit.  Upon his eventual return, he would face certain pretrial detention.  And in addition to the substantive fraud charges, he would face consecutive years of imprisonment for bail jumping and undoubtedly new arguments of consciousness of guilt by the government. See 18 U.S.C. § 3146.  For these reasons, courts often allow foreign defendants to return home pending trial.  See Cirillo, 1999 WL 1456536, at *1; United States v. Maximov, 1998 WL 4185834 (D. Ariz. Sept. 5, 2008) (approving a $500,000 bond to ensure the appearance of an Israeli defendant in a bank fraud and money laundering case);  cf. United States v. Hansen, 108 Fed. Appx. 331, 332 (6th Cir. 2004) (upholding release

order allowing defendant to return to his home in Denmark, which does <u>not</u> have an extradition treaty with the United States).  The government's own submission before Judge Fullam in a memo dated December 23, 2008 from the U.S. Probation Office (District of Vermont) Canadian Liaison states in the opening paragraph, "In reference to the issue of bond release, it is not unusual for bordering states to release defendants residing in Canada on bond.  In the District of Vermont, the only reporting requirement for our Canadian defendants is that they report by telephone weekly to the U.S. Probation Office."

Third, Mr. Georgiou does not pose a danger to any person.  18 U.S.C. § 3142(g)(4).  Many witnesses have submitted testimony that Mr. Georgiou is a peaceful individual and law-abiding person.  The Pretrial Services Officer found that Mr. Georgiou did not pose <u>*any*</u> danger to the community.

Fourth, the defense proposes a tight plan of electronic monitoring, one that uses GPS technology, if deemed necessary by the Court, that would provide real time information about the defendant's location.  The present system only provides information about his entry and exit of his residence.

Fifth, the defendant has been on release for six months and has been free for significant hours at a time when he visits his counsel and otherwise is permitted to be out of the residence; yet, despite ample opportunity, he has not fled but has continued to comply with his obligations to this Court.

Sixth, the defendant needs to generate income to support his family and pay for his legal defense.  The defendant's home is in foreclosure proceedings and his family needs income to survive.  There are no international assets.

D.   The Waiver of Extradition and Supervision Regime Proposed by Edward
     L. Greenspan Would Effectively Preclude Flight by Remaining in Canada

Submitted with the motion before Judge Fullam is what has been labeled Waiver of Extradition and Supervision Package to Support Motion to Amend Conditions of Release to Permit Residence in Canada.  This submission is based upon the expertise and experience of one of Canada's most eminent criminal lawyers and a highly respected member of the bar.   The defense does not hereby seek to "appeal" Judge Fullam's decision to deny the defendant the ability to live in Canada.  But, the waiver procedures are important to this motion because they mean that the defendant would be promptly sent back here if he were to flee.

The defense proposes the execution of the Affidavit by Mr. Greenspan constituting his assertion that he has fully warned and advised the defendant of his rights under Canadian law and that the defendant has waived his rights to resist extradition and to request bail pending extradition.  In addition, the package includes an appropriate waiver of those rights by the defendant.

The upshot of this package, and the testimony presented to Judge Fullam at the hearing on the motion, is that the defendant would be effectively unable to resist extradition, and in any event, has waived bail pending extradition.  Thus far, to some extent, the Court and counsel in this case have been addressing matters of Canadian law and practice in discussing the question of whether the defendant might effectively flee to Canada.  It is respectfully submitted that Mr. Greenspan's submission removes uncertainty about Canadian law and practice, that this Court may now rely upon the defense assertions of Canadian law and that ultimately, release to reside in New York does not advance the defendant's opportunity to flee if he were to choose to do so.

10

The Greenspan submission serves to eliminate the uncertainty of the state of extradition procedure that the parties and the Court labored under in prior hearings.[2] American lawyers can only guess at how extradition works in Canada, leaving a Court to rely upon what is ultimately of limited reliability.  Mr. Greenspan, an expert by any standard, has opined that the waiver of extradition and release pending extradition would be enforceable.  More to the point, however, is that the defendant's submissions demonstrate that an extradition proceeding would turn Mr. Greenspan into a witness against the defendant, providing testimony that the defendant made a knowing and informed waiver of extradition and release rights, thus vitiating any defense with which he can resist extradition.

III.   <u>CONCLUSION</u>

Mr. Georgiou is entitled to bail on the least restrictive conditions.  The burden on his wife of caring for their four children, including a newborn, while suffering from postpartum depression, is enormous.  The proposed amendments to the conditions of release reasonably will assure Mr. Georgiou's appearance.  For the foregoing reasons, George Georgiou respectfully asks the Court to modify the conditions of pretrial release

---

[2] In the prior bail hearing before Judge Fullam it was shown that Canadian Courts recognize waivers of extradition.  In that example, the Ontario Superior Court, Mr. Justice Paul Lamek presiding, determined that affidavits waiving extradition in the case of <u>Benquesus</u> and <u>Weltman</u> of New York state constituted valid consents to surrender and valid waivers as anticipated by section 71 and 72 of the Extradition Act. The Canadian Court found that despite the fact that there were no extradition proceedings in Canada yet, and the government of the United States had not yet made a request for extradition, the executed affidavits by the two accused persons, that were executed in the United States constituted valid waivers of extradition.  The U.S. Court subsequently allowed the two accused to travel back and forth to Toronto and the two accused traveled back and forth and appeared as required.  There is no known incident where a Canadian national operating under the regime previously presented to this Court violated the orders of the U.S. Court.

to allow him to change residence to work in Florida which serves to also provide access

to counsel and to be closer to his family within the state of New York.

Respectfully submitted,


/s/_____
Robert E. Welsh, Jr.
Catherine M. Recker
Welsh & Recker, P.C.
2000 Market Street, Suite 2903
Philadelphia, PA 19103
215-972-6430
Counsel for George Georgiou


Date: March 31, 2009

## <u>CERTIFICATE OF SERVICE</u>

I, Robert E. Welsh, Jr., certify that a copy of the foregoing document was served by electronic means on:

AUSA Derek A. Cohen
AUSA Louis D. Lappen
U.S. Attorney's Office of the Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106

/s/_____
Robert E. Welsh, Jr.

Date: March 31, 2009

13