**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| GEORGE GEORGIOU | : | No. 09-88 |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                      **DECEMBER 7, 2009**

Presently before this Court are the following Motions filed by the Defendant George

Georgiou ("Georgiou"):  (1) Motion to Dismiss Count One of the Indictment for Failure to

Charge an Offense and as Impermissibly Duplicitous ("Mot. to Dismiss Count One"); (2) Motion

to Dismiss Wire Fraud Counts and Strike Surplusage from the Indictment ("Mot. to Dismiss and

Strike"); (3) Motion to Dismiss the Indictment for Outrageous Government Conduct in Violation

of the Due Process Clause ("Mot. to Dismiss for Outrageous Gov't Conduct"); and (4) Motion to

Suppress Evidence ("Mot. to Suppress").  For the reasons set forth below, the Motion to Dismiss

Wire Fraud Counts and Strike Surplusage from the Indictment will be granted in part and denied

in part, and the remaining Motions will be denied.

**I.    FACTS**

On February 12, 2009, a federal grand jury entered an indictment against Georgiou,

charging him with leading an international securities fraud conspiracy involving the manipulation

of the stocks of four publicly traded companies from 2004 through 2008 (the "Indictment").

Kevin Waltzer ("Waltzer") is a cooperating witness who will likely testify at trial about his role

in the alleged conspiracy and his active cooperation with the Government from July 2007 to the

present, during which time he recorded numerous conversations with Georgiou.

The Indictment alleges that Georgiou manipulated the stocks of the following companies: (1) Neutron Enterprises, Inc., a publicly traded Nevada corporation based in Ontario, Canada ("Neutron"); (2) Avicena Group, Inc., a publicly traded Delaware corporation based in Palo Alto, California ("Avicena"); (3) Hydrogen Hybrid Technologies, Inc., a publicly traded Nevada corporation based in Ontario, Canada ("HYHY"); and (4) Northern Ethanol, Inc., a publicly traded Delaware corporation based in Ontario, Canada ("Northern Ethanol" or "NOET"). The Indictment charges that Georgiou and his co-conspirators sought to manipulate the markets for Neutron, Avicena, HYHY and NOET stock (collectively, the "Target Stocks") by artificially inflating the demand for, and prices of, the Target Stocks, thus allowing Georgiou and his co-conspirators to profit on their significant holdings of the Target Stocks by selling their holdings and using the artificially inflated prices of the Target Stocks as margin[1] to obtain loans.[2]

The Indictment further asserts that Georgiou and his co-conspirators obtained the loans from two Bahamian brokerage firms, Caledonia Corporate Management Group Limited ("Caledonia") and Accuvest Limited ("Accuvest"). Regarding Caledonia, Paragraph Eleven of Counts Six through Eight of the Indictment states:

> As a result of the false representations of defendant GEORGE GEORGIOU and his co-schemers concerning the collateral for the Caledonia account and their failure to provide additional assets, Caledonia was unable to cover the substantial deficits in the RW account. Defendant GEORGIOU and his co-schemers thus caused Caledonia to suffer approximately $25 million in losses. Because Caledonia was unable to cover those massive losses, the firm could no longer

---

[1] Margin- "cash or collateral that is deposited by a client with a commodity or securities broker to protect the broker from loss on a contract." Webster's Ninth New Collegiate Dictionary 727 (1990).

[2] The Indictment describes various "overt acts" which occurred on more than one hundred dates from 2004 through 2008. The Court will only focus on those dates which are significant for purposes of these Motions.

operate and was liquidated.

(Indictment at 41.) Regarding Accuvest, Paragraph Eight of Count Nine states that Georgiou "and his co-schemers did not repay the money that they had borrowed on margin and in cash loans from Accuvest, and their artificially inflated stock did not cover the loans. As a result, defendant GEORGIOU and his co-schemers caused Accuvest to lose at least $4 million." (Id. at 43.) Counts Six through Nine of the Indictment charge Georgiou with wire fraud. Specifically, the Indictment alleges that Georgiou used wire communications in interstate and foreign commerce to defraud Caledonia and Accuvest. The pertinent portions of these Counts state that Georgiou "devised and intended to devise a scheme to defraud . . . ." (Id. at 39, 42.)

The Indictment also alleges that on August 13, 2008, Georgiou met with Waltzer and the undercover government agent (the "UC") in Philadelphia and discussed Georgiou's scheme to manipulate NOET stock. The Indictment states:

> Defendant GEORGIOU told the UC that he had total control of Northern Ethanol and that the stock was "really tight," meaning that defendant GEORGIOU already had substantial control over the total number of shares that could be traded. Defendant GEORGIOU said that his plan was to increase the share price to approximately $2.50 to $3.00. He said that he wanted to make sure, though, that the stock was "revved up" properly. Defendant GEORGIOU said that they would work the price up slowly for the first 60 days and then "ramp to a sling shot thereafter." Defendant GEORGIOU stated that he wanted the UC's brokers to purchase at least $5 million to $10 million in Northern Ethanol stock and that he would pay the UC a 25-percent kickback for the purchases that he generated as part of this scheme. Defendant GEORGIOU and the UC agreed that the UC would make an initial small purchase in Northern Ethanol stock as a test to make sure that the process for the buying campaign was in place.

(Id. at 26.) The Indictment alleges that this "test" purchase occurred "[o]n or about September 3, 2008," when, "at the direction of defendant GEORGE GEORGIOU, the UC caused purported retail purchases to be made of 16,000 shares of Northern Ethanol stock at an average price of

3

$1.11 per share, for a total of approximately $17,760. In reality, the FBI made those purchases with its undercover funds." (Id. at 28.) The Indictment further states:

> On or about September 11, 2008, defendant GEORGE GEORGIOU and his co-conspirators caused $5,000 to be wired from a Canadian bank account in the name of Starport to an undercover bank account maintained by the FBI in Philadelphia, Pennsylvania. This $5,000 wire was a kickback for the shares purchased by the FBI on or about September 3, 2008.

(Id.)

Georgiou, however, presents a different version of the events which transpired on August 13 and September 3, 2008. Georgiou states:

> Nearly two hours into the [August 13th] meeting[,] Mr. Georgiou was still asking "Charlie" to explain his business model. No "test trade" occurred after the meeting until the government directed the unsolicited purchase of September 3 which it then deemed as the "test trade". It is this backdrop of fourteen (14) months of failure to get Mr. Georgiou to do something that the Government could call a crime that produces the trick undertaken by Mr. Waltzer and the Government in September 2008. Unable to convince Mr. Georgiou to willfully "bribe" Charlie, the Government allowed Mr. Waltzer to deceive Mr. Georgiou and to arrange monies being sent that Mr. Georgiou thought were for Mr. Waltzer entirely unrelated to the Government's share purchase.

(Mem. Supp. Mot. to Dismiss for Outrageous Gov't Conduct at 15.) Georgiou further asserts that "Waltzer called and e-mailed [him] on dozens of occasions," referring to Georgiou as "my friend" in numerous communications. (Id. at 9-10.) Georgiou also contends that Waltzer lied to him and sought to "trick [him] into believing that legitimate business steps were being undertaken." (Id. at 9.) Georgiou finally alleges that Waltzer called him on the day after his father passed away. (Id. at 10.)

Georgiou was arrested on September 17, 2008 at the Ritz Carlton Hotel in Philadelphia. The Government asserts that he had come to the hotel to meet with the UC. After initially

4

meeting in the restaurant of the hotel, the UC asked Georgiou to meet him in a suite upstairs for a more confidential discussion. The discussion between Georgiou and the UC continued to take place in the suite upstairs at the hotel until the UC excused himself and Georgiou was confronted by other government officials.

At the time Georgiou was taken into custody, Georgiou possessed an IBM Lenovo Thinkpad laptop computer, a BlackBerry telephone and a Motorola cellular telephone (collectively, the "devices"). Government officials seized the devices from Georgiou several hours after he was placed into custody. (Mem. Supp. Mot. to Suppress at 5-6.) The Government asserts that following his arrest, Georgiou negotiated with the Government regarding "various pretrial issues, including detention or release and whether defendant would consent to the search of his computer, BlackBerry, and cell phone. . . . However, the defendant chose not to consent to the search of the electronic items, after which the government promptly obtained a search warrant." (Gov't's Resp. at 34.) The warrant was issued on or around September 22, 2008. (Mem. Supp. Mot. to Suppress at 1.)

Paragraph Two of the warrant authorized the seizure of "all documents and records, including opened or unopened emails, and internet history, pertaining to any securities or other financial holdings or transactions from 2004 through the present." (Mot. to Suppress, Ex. A, Attach. A ¶ 2.) Paragraph Three of the warrant called for the seizure of:

> Stored electronic information and communications, including but not limited to: telephone or address directory entries consisting of names, addresses and telephone numbers; records of telephone numbers dialed, telephone numbers of incoming calls, schedule entries, stored memoranda, stored voice mail messages, and stored photographs from 2004 through the present.

(Id. ¶ 3.) Furthermore, Paragraph Five allowed for the seizure of "records which evidence

ownership of use of [the devices], including, but not limited to, correspondence, sales receipts, bills for internet access, financial records, tax records, personal photographs, or other personal items . . . ."  (Id. ¶ 5.)

In the affidavit, Special Agent Corey Riley ("Agent Riley") of the Federal Bureau of Investigation ("FBI"), one of the agents originally assigned to the investigation of Georgiou, states:

> Based on my experience, I know that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. . . . Based on my experience and information gathered in this investigation from Individual A and other sources, GEORGIOU uses his lap top computer, BlackBerry and cellular telephone to communicate with his co-schemers and other participants in the scheme. . . . Based on my experience, and information gathered in this investigation from Individual A and other sources, records relating to GEORGIOU's securities and financial activities are stored on his electronic storage devices, including his lap top computer and BlackBerry.

(Mot. to Suppress, Ex. B, Riley Aff. ¶¶ 24, 30-31.)

On July 13, 2009, Georgiou filed his Motion to Dismiss Count One of the Indictment for Failure to Charge an Offense and as Impermissibly Duplicitous.  On July 14, 2009, Georgiou filed his Motion to Dismiss Wire Fraud Counts and Strike Surplusage from the Indictment, Motion to Dismiss the Indictment for Outrageous Government Conduct in Violation of the Due Process, and Motion to Suppress Evidence.  On August 17, 2009, the Government filed its "Omnibus Response" to Georgiou's Motions.  On September 9, 2009, Georgiou filed his Reply to the Government's Response.  The Court heard oral arguments regarding these Motions on October 15, 2009.

During oral arguments, the Government conducted a direct examination of Special Agent David Joanson ("Agent Joanson") of the FBI, another agent originally assigned to the investigation of Georgiou. Agent Joanson explained to the Court that at the time Georgiou was placed into custody on September 17, 2008, the Government believed that there was a possibility that Georgiou would cooperate with the FBI and "make recordings against other targets." (N.T. at 41-42.) Agent Joanson testified that the FBI "like[s] to have the individual to have their cell phone or their Blackberry so that when they call these other targets, they have their own equipment and their own phone number. They are not calling from the FBI's phone number." (Id. at 42.) Agent Joanson further stated that "when it became less and less likely that Mr. Georgiou was going to cooperate in that fashion, we separated him from his electronic devices." (Id.)

On November 9, 2009, the Court granted the parties leave to file Supplemental Briefs in Response to Georgiou's Motion to Suppress Evidence. On November 25, 2009, Georgiou filed his Supplemental Brief. On that same date, the Government filed its Supplemental Brief.

II.     **DISCUSSION**

1.      **Motion to Dismiss Count One of the Indictment for Failure to Charge an Offense and as Impermissibly Duplicitous**

**A. Failure to Charge an Offense**

Count One of the Indictment alleges a single conspiracy among Georgiou and his co-conspirators. Georgiou argues that this Count must be dismissed because "rather than describing one conspiracy, it actually describes six separate conspiracies among the defendant and nameless 'co-conspirators.'" (Mem. Supp. Mot. to Dismiss Count One at 1.) In support of his argument,

Georgiou maintains that "the Indictment fails to allege who the conspirators are, whether they had knowledge of each other's existence, let alone that they shared a 'common goal.' Nor does the Indictment allege that the actions of the co-conspirators were interdependent or mutually supportive." (Id. at 3.) As a result, Georgiou asserts that Count One violates Kotteakos v. United States, 328 U.S. 750 (1946). Georgiou's argument based upon Kotteakos, however, is premature.

In Kotteakos, although the indictment charged one conspiracy, the government proved several separate conspiracies at trial. Kotteakos, 328 U.S. at 755. Because of this variance between pleading and proof – a variance which the court held to be fatally prejudicial on the facts of the case – the convictions were reversed. Id. at 777. Here, however, there is no variance because this case has yet to go to trial. As stated in United States v. Malik,

> Kotteakos, Blumenthal, and Kemp make clear that the existence of a single conspiracy or multiple conspiracies hinges on factual issues that arise at trial. An indictment that alleges a single conspiracy can result in an impermissible variance if the evidence adduced at trial shows only the existence of multiple conspiracies. In this case, the Government will have to prove facts at trial that allow the jury to find interdependence between Defendant, the hub of the alleged conspiracy, and [the alleged co-conspirators] as the spokes. The Government will have to offer evidence that Defendants were in some way "mutually supportive." At this stage, we must accept the allegations in the Indictment as true. We must decide the sufficiency of the Indictment based on the facts "alleged within the four corners," not the evidence outside of it. The facts within the four corners of the Indictment allege a single conspiracy between Defendant[] and [the alleged co-conspirators]. The burden now rests with the Government to prove this allegation at trial.

No. 08-0614, 2009 U.S. Dist. LEXIS 58811, at *21-22 (E.D. Pa. July 2, 2009) (citations omitted); see also United States v. Rios, No. 96-0540-06, 1997 U.S. Dist. LEXIS 8851, at *2 (E.D. Pa. June 20, 1997) (denying motion to dismiss a count in the indictment as premature under Kotteakos because the determination "necessarily involves the evaluation of the evidence

presented by the government" at trial); United States v. Simon, 186 F. Supp. 223, 227-28 (S.D.N.Y. 1960) (denying motion to dismiss as premature under Kotteakos because the "indictment pleads one conspiracy on its face, and this motion is addressed to the pleading," and noting that "[i]f there is a variance in proof at the trial from what is charged in the indictment, a motion will then be in order"). Thus, the Court must reject Georgiou's argument based upon Kotteakos at this stage in the proceedings.

### B. Impermissibly Duplicitous

Georgiou further argues that Count One is duplicitous and should be dismissed because it "impermissibly joins six different multiple object conspiracies in a duplicitous fashion" rather than describing "a distinct and separate offense." (Mem. Supp. Mot. to Dismiss Count One at 1.) The Government, however, maintains that the Indictment "properly charges a single, multi-object conspiracy operated by the defendant and others to manipulate publicly traded stocks." (Resp. to Mot. to Dismiss Count One at 17.) Because we cannot determine whether multiple conspiracies have been alleged in Count One until after the Government has presented all of its evidence at trial, we cannot agree with Georgiou's claim that "Count One impermissibly joins six different multiple object conspiracies in a duplicitous fashion." Therefore, we must reject Georgiou's argument based upon impermissible duplicity at this stage in the proceedings.

### 2. Motion to Dismiss Wire Fraud Counts and Strike Surplusage from the Indictment

### A. Surplusage

As previously noted, Paragraph Eleven of Counts Six through Eight and Paragraph Eight of Count Nine describe the losses suffered by Caledonia and Accuvest. Paragraph Eleven of

Counts Six through Eight also states that "[b]ecause Caledonia was unable to cover those massive losses, the firm could no longer operate and was liquidated." (Indictment at 41.) Georgiou argues that because loss is not an element of the offense of wire fraud, these Paragraphs "are not germane to the charges made or contain inflammatory and prejudicial matter," and therefore, are "surplusage. . . . [that] should be stricken." (Def.'s Reply at 2 (citation omitted).)

The case of United States v. Copple, 24 F.3d 535 (3d Cir. 1994) is instructive. The defendant in Copple was charged with committing mail fraud, an element of which is "participation by the defendant with specific intent to defraud." Copple, 24 F.3d at 544. After setting forth the other elements of the crime, the Third Circuit stated: "Proof of actual loss by the intended victim is not necessary. But that does not mean that evidence of loss was irrelevant." Id. at 544-45 (citations omitted). The court found the evidence of loss to be relevant because "[p]roof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent. Also relevant is the defendant's failure to take any steps to ameliorate the loss." Id. at 545. Thus, the court agreed with the government's argument that "the evidence about the victims' losses and Copple's refusal to make good those losses was relevant to show Copple's specific intent to defraud." Id. The Third Circuit, however, added a qualification: "that district judges should exercise their wise discretion in imposing limits on such testimony." Id. The court concluded that "victim impact testimony" which "went beyond anything that was reasonable to prove Copple's specific intent to defraud" should have been excluded under

Federal Rule of Evidence 403[3] because such testimony "had either no, or very little, probative value and was unfairly prejudicial."[4] Id. at 545-46.

Here, as in Copple, the evidence showing loss is relevant to show Georgiou's specific intent to defraud. However, the statement that "[b]ecause Caledonia was unable to cover those massive losses, the firm could no longer operate and was liquidated" must be excluded under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the danger of unfair prejudice. As with the victim impact testimony in Copple, the fact that Caledonia was dissolved as a result of the losses it suffered goes beyond what is reasonable to prove Georgiou's specific intent to defraud. Therefore, Georgiou's Motion to Dismiss will be granted in part because while the proof of loss is admissible, the statement regarding the liquidation of Caledonia is inadmissible and must be stricken from the Indictment.

## B. Wire Fraud Counts

Georgiou also moves to dismiss Counts Six through Nine for "failure to adequately allege scienter." (Def.'s Reply at 3.) In support of this claim, Georgiou argues that "[a]ll that these counts say is that the defendant 'devised and intended to devise a scheme to defraud.' There is no allegation that the defendant acted 'knowingly' and the phrase 'devised and intended to devise' is ambiguous." (Id.) The Government responds that the requisite mental state is included in the Indictment implicitly. The Government points out that the language in the Indictment

---

[3] Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

[4] The testimony which the Third Circuit found inadmissible included statements that the victims made up for the losses using money from their savings for their children's college educations or for other special purposes, and that the losses had affected the victims' health. Id. at 545-46.

stating that Georgiou "devised and intended to devise a scheme to defraud" necessarily "includes the mental state of 'knowingly' because one cannot devise or intend to devise a scheme 'unknowingly.' It would be redundant to charge the defendant with 'knowingly' devising or intending to devise a scheme." (Gov't's Resp. at 11-12.) We agree.

"[F]ailure to explicitly recite the element of specific intent is not fatal to the indictment." United States v. Tykarsky, 446 F.3d 458, 475 (3d Cir. 2006). In Tykarsky, the Third Circuit found that "[the indictment] states all of the essential elements of the crime by necessary implication and meets all of the requirements of Rule 7(c)(1) of the Federal Rules of Criminal Procedure." Id. at 474 n.10; see also Gov't of the V.I. v. Moolenaar, 133 F.3d 246, 249 (3d Cir. 1998) ("Failure to allege the statutory elements will not be fatal provided that alternative language is used or that the essential elements are charged in the indictment by necessary implication."); United States v. Hodge, 211 F.3d 74, 77 (3d Cir. 2000) (holding that although specific intent is an element of the Virgin Islands robbery statute, the failure to explicitly recite it is not fatal to an indictment). Because the Indictment in this case states all of the essential elements of wire fraud by necessary implication, we find Georgiou's argument for dismissal of Counts Six through Nine to be meritless.

3.    **Motion to Dismiss the Indictment for Outrageous Government Conduct in Violation of the Due Process Clause**

Georgiou argues in this Motion that: (1) "Waltzer called and e-mailed Mr. Georgiou on dozens of occasions"; (2) "Waltzer played on his friendship with Mr. Georgiou to try to get Mr. Georgiou to act"; (3) "Waltzer used family tragedy and stories about Mr. Waltzer's own family circumstances to try to get Mr. Georgiou to act"; (4) "Waltzer lied to Mr. Georgiou"; and (5)

Waltzer sought to "trick Mr. Georgiou into believing that legitimate business steps were being undertaken." (Mem. Supp. Mot. to Dismiss for Outrageous Gov't Conduct at 9.) Georgiou asserts that "[i]t is this deceit that is outrageous and a violation of due process." (Id. at 15-16.) We disagree.

The Third Circuit has established that defendant may assert a due process challenge to an indictment based on a claim that the government used "outrageous law enforcement investigative techniques." United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998). However, "[w]hile continuing to recognize, in theory, the outrageousness defense," the Third Circuit has "nonetheless observed that, because of the extraordinary nature of the doctrine, the judiciary has been 'extremely hesitant' to uphold claims that law enforcement conduct violates the Due Process clause." Id. at 230. For the outrageousness defense to be successfully invoked, "the challenged conduct must be shocking, outrageous, and clearly intolerable. . . . The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating." Id. at 230-31 (quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)). Indeed, as stated in United States v. Christie,

> the Third Circuit, in United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), found that the government's investigatory misconduct was so egregious that the due process clause demanded dismissal of the indictment against him, but the Nolan-Cooper court, twenty years later, observed that the Third Circuit had "not found another set of facts that satisfy the rigorous requirements" of the outrageous misconduct defense.

570 F. Supp. 2d 657, 674 (D.N.J. 2008).

Concerning Georgiou's first two arguments, there is nothing "shocking, outrageous, and

clearly intolerable" about the Government's cooperating witness repeatedly calling and emailing

Georgiou or playing on his friendship with Georgiou. Nowhere in his Motion does Georgiou

state that he told Waltzer to cease calling or emailing him. Moreover, as the Third Circuit has

stated, "undercover agents cannot be deprived of the ability to develop strong bonds with their

targets in order for investigations to proceed." Nolan-Cooper, 155 F.3d at 232. Regarding the

third argument, Georgiou does not allege that Waltzer and the Government were aware that

Georgiou's father had passed away at the time Waltzer called Georgiou. Thus, such conduct

does not rise to the level of "shocking, outrageous, and clearly intolerable." Finally, regarding

the fourth and fifth arguments, an allegation that the Government acted deceptively also does not

rise to the level of outrageousness that is required under this defense. Nolan-Cooper, 155 F.3d

231. On the contrary, "subterfuge is a well recognized and permissible means of investigation."

United States v. Barbosa, 271 F.3d 438, 469 (3d Cir. 2001). Furthermore, Georgiou's claim that

he believed the $5000 he wired to the FBI's undercover bank account on September 11, 2008

was "for Mr. Waltzer entirely unrelated to the Government's share purchase" is disputed by the

Government, and this Court is not inclined to dismiss the Indictment, or any of the Counts

therein, based on Georgiou's selective presentation of the evidence.[5] Rather, the resolution of

---

[5] In this Motion, Georgiou sets out a fourteen-page "factual discussion" for the ostensible purpose of providing the Court with a "detailed understanding of the underlying facts." (Mem. Supp. Mot. to Dismiss for Outrageous Gov't Conduct at 2.) Georgiou's account of the events, however, is detailed only insofar as it favors Georgiou. For example, Georgiou states in his Motion:

> On September 3, 2008[,] Mr. Waltzer informed Mr. Georgiou that 16,000 shares of Northern Ethanol were purchased. This occurred that morning without Mr. Georgiou's knowledge or involvement. When Mr. Georgiou learned of the transaction for the first time after it happened, he immediately objected, sending Mr. Waltzer a message saying "you can't do that..." Mr. Waltzer responded with "sorry." Mr. Georgiou never approved the stock purchase.

(Id. at 3-4.) As the Government points out, Georgiou's message to Waltzer actually stated: "You can't do that without telling me first." (Gov't's Resp., Ex. A at 64.)

14

this factual dispute is a task for the jury once all of the evidence in this case has been presented. As such, we will deny Georgiou's Motion to Dismiss the Indictment for Outrageous Government Conduct in Violation of the Due Process Clause.

**4.      Motion to Suppress Evidence**

Finally, Georgiou moves this Court to suppress evidence obtained from:  (1) the warrantless seizure of the devices in his possession on September 17, 2008; and (2) the subsequent search of the devices executed pursuant to a warrant issued on or around September 22, 2008.

**A. Seizure**

Georgiou contends that government officials improperly seized the devices because "[t]hese items were not taken as incident to Mr. Georgiou's arrest but rather several hours after he was taken into custody."  (Mem. Supp. Mot. to Suppress at 5-6.)  This argument is meritless.

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."  United States v. Robinson, 414 U.S. 218, 226 (1973).  Under this exception, an arresting officer may, without a warrant, search an arrestee's person and the area "within his immediate control," a phrase which courts have construed to mean "the area from within which he might gain possession of . . . destructible evidence." Chimel v. California, 395 U.S. 752, 763 (1969).  In United States v. Edwards, the Supreme Court addressed the question of "whether the Fourth Amendment should be extended to exclude from evidence certain clothing taken from [the defendant] while he was in custody at the city jail approximately 10 hours after his arrest."  415 U.S. 800, 801 (1974).  In finding no Fourth Amendment violation, the Court stated:

This was no more than taking from [the defendant] the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that [the defendant] was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention.

Id. at 805.

As previously stated, Agent Joanson testified that at the time Georgiou was placed into custody on September 17, 2008, the Government believed that there was a possibility that Georgiou would cooperate with the FBI and "make recordings against other targets." (N.T. at 41-42.) The reason why Georgiou was not segregated from his devices, according to Agent Joanson, was because the FBI "like[s] to have the individual to have their cell phone or their Blackberry so that when they call these other targets, they have their own equipment and their own phone number." (Id. at 42.) Agent Joanson further explained that "when it became less and less likely that Mr. Georgiou was going to cooperate in that fashion, we separated him from his electronic devices." (Id.) In light of Agent Joanson's testimony, the Court finds that the delay in seizing Georgiou's devices was entirely reasonable under the circumstances.

Georgiou further argues that "[e]ven if viewed as taken incident to arrest, there was no basis to continue to hold these items without a warrant." (Mem. Supp. Mot. to Suppress at 6.) Georgiou's argument here appears to be that the Government acted unreasonably when it obtained a search warrant five days after it seized Georgiou's devices. The Government, however, asserts that Georgiou negotiated with the Government over whether he would consent to the search of devices, and when it became apparent that he would not to consent to the search, the Government "promptly obtained a search warrant." (Gov't's Resp. at 34.) Georgiou has not

challenged this assertion.  Therefore, in light of the Government's uncontradicted explanation,

we cannot find that the Government acted unreasonably when it obtained a search warrant five

days after it seized Georgiou's devices.

**B. Search Warrant and Affidavit**

Georgiou asserts that the affidavit failed to provide probable cause for the seizure of all

financial records from 2004 through the present.  In support of his assertion, Georgiou first

argues:

> Agent Riley did not know at the time of the seizure whether, in fact, this precise
> laptop or the BlackBerry were the devices used by Mr. Georgiou to exchange e-
> mails with the informant, especially considering that Mr. Georgiou had another
> laptop in his possession at that time that was not seized.

(Mem. Supp. Mot. to Suppress at 6-7.)

However, the Supreme Court in Illinois v. Gates held that probable cause requires simply

"a fair probability that contraband or evidence of a crime will be found in a particular place."

462 U.S. 213, 235 (1983).  In United States v. Yusuf, the Third Circuit expounded on the

standard set forth in Gates, stating that courts must look at the "totality of the circumstances" as

set forth in the affidavit to determine whether probable cause exists.  461 F.3d 374, 390 (3d Cir.

2006).  The court further explained that such a determination "requires courts to consider the

cumulative weight of the information set forth by the investigating officer in connection with

reasonable inferences that the officer is permitted to make based upon the officer's specialized

training and experiences."  Id. (citing United States v. Arvizu, 534 U.S. 266, 275 (2002)).

Importantly, for purposes of this case, the Third Circuit noted that "[t]hat determination ***does not

require absolute certainty that evidence of criminal activity will be found at a particular place***,

but rather that it is reasonable to assume that a search will uncover such evidence." Id. (emphasis added); see also United States ex. rel Campbell v. Rundell, 327 F.2d 153, 163 (3d Cir. 1964) ("[P]robable cause which will justify the issuance of a search warrant is less than certainty of proof, but more than suspicion or possibility, the test being whether the allegations of the supporting affidavit warrant a prudent and cautious man in believing that the alleged offense has been committed.").  Thus, the fact that Agent Riley did not know at the time of the seizure whether the devices seized were the precise devices used by Georgiou to exchange emails with Waltzer does not lead to the conclusion that the search warrant affidavit failed to provide probable cause.  As previously noted, Agent Riley states in his affidavit that based on his experience, he knows that computer hardware, software and electronic files may be "contraband, evidence, instrumentalities, or fruits of crime" and may be "used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data."  (Mot. to Suppress, Ex. B, Riley Aff. ¶ 24.)  Agent Riley further states that based on his experience "and information gathered in this investigation from Individual A and other sources":  (1) Georgiou "uses his lap top computer, BlackBerry and cellular telephone to communicate with his co-schemers and other participants in the scheme"; and (2) records pertaining to Georgiou's "securities and financial activities are stored on his electronic storage devices, including his lap top computer and BlackBerry."  (Id. ¶¶ 30-31.)  The Court finds that these statements, in addition to numerous other paragraphs in the affidavit, established a fair probability that contraband or evidence of a crime would be found in the devices seized from Georgiou.

Georgiou's next argument is that "there is absolutely nothing in the affidavit related to probable cause for personal records."  (Mem. Supp. Mot. to Suppress at 9.)  We disagree.

"Personal property . . . [can]not be taken unless it somehow tie[s] the owner of the personal property to the location being searched.  Such evidence . . . is relevant because it [i]s important to connect the place being searched to the people who own, reside in or frequent it." United States v. Stewart, No. 96-583, 1997 U.S. Dist. LEXIS 5181, at *11 (E.D. Pa. Apr. 16, 1997); see also United States v. Kepner, 843 F.2d 755, 762-63 (3d Cir. 1988) (holding that a search warrant seeking "documents, records, and personal effects" of the defendant in connection with an investigation into violations of the Taft-Hartley Act was not impermissibly overbroad because such items established defendant's use and control of the place to be searched).  We previously noted that Agent Riley alleges in the affidavit that Georgiou "uses his lap top computer, BlackBerry and cellular telephone to communicate with his co-schemers and other participants in the scheme."  (Mot. to Suppress, Ex. B, Riley Aff. ¶ 30.)  Agent Riley asserts that this allegation is based on his experience and information gathered in the investigation of Georgiou.  (Id.)  Thus, in light of the above case law and Agent Riley's statements in the affidavit, we find that the affidavit established a fair probability that evidence linking Georgiou to the devices – and therefore to the alleged crimes committed through, or memorialized on, the devices – would be found on the devices.

Georgiou further argues that "the affidavit provided probable cause to seize records related to Mr. Georgiou's involvement with the share prices of HYHY and NOET from April 2008 forward only.  The allegations related to the securities or financial holdings of other companies and in other time periods is not credible."  (Mem. Supp. Mot. to Suppress at 9.)  In support of this argument, Georgiou asserts:

The only basis for expanding the scope of the warrant to financial records beyond

19

> those two companies and prior to April 2008 comes from a catch-all paragraph in the affidavit that contains a conclusory allegation that the informant and numerous documents and records indicate that Mr. Georgiou "has been involved…in securities fraud" with various securities since 2004. Thus, the probable cause for anything beyond HYHY and NOET is based on the statements of a single informant. . . . Nowhere in the affidavit does Agent Riley describe the reliability of his informant.

(Id. at 9-10.) Georgiou's argument is meritless. In the affidavit, Agent Riley states that his assertions are based on his experience and "information gathered in this investigation from Individual A *and other sources*." (Mot. to Suppress, Ex. B, Riley Aff. ¶¶ 30-31 (emphasis added).) These other sources include recordings of conversations involving Georgiou as well as observations of Georgiou's conduct. As stated in Gates, "[i]t is enough, for purposes of assessing probable cause, that '[corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" 462 U.S. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)). Thus, because the information provided by Waltzer was corroborated through other sources of information, the Court finds that the affidavit established probable cause for the seizure of evidence relating to securities fraud from 2004 to the date of Georgiou's arrest.

Georgiou's next argument is that "the affidavit failed to provide any justification for the wholesale seizure of the entire contents of the laptop computer and BlackBerry." (Mem. Supp. Mot. to Suppress at 11.) Again, Georgiou's argument must fail.

In Stewart, the government seized the defendant's computers "with the intent to copy the files, return the computers, then later sort through the files for relevant information." 1997 U.S. Dist. LEXIS at *10. The court found that "such a procedure, that is, taking voluminous documents or computer files for copying and sorting away from the search location, has been

upheld." Id. at *10-11 (citing several circuit courts upholding the practice). In finding that "such procedure is proper and does not violate the Fourth Amendment," the court reasoned that "[i]t was simply not practical for the agents to search at the scene all the files on the computer hard drives . . . especially since their computer expert was not at the search location." Id. at *11. We agree with the court in Stewart and find that the seizure of the computer and BlackBerry for copying and sorting away from the Ritz Carlton Hotel in Philadelphia did not violate Georgiou's Fourth Amendment rights.

Georgiou also argues that the search warrant was not only unsupported by probable cause, but was impermissibly overbroad as well, stating:

> While the Government agents may have had probable cause to look for e-mails and documents relating to HYHY and NOET, the scope of examination should have been limited to April 2008 and after. A broad search for all financial documents as far back as 2004 was neither supported by reliable information that crimes were occurring, nor appropriate. Searching for and seizing all data referencing Waltzer or stocks and companies like Neutron, Avicena Group, Caledonia Corporate Management Group and Accuvest Limited was not supported by probable cause and was overbroad.

(Mem. Supp. Mot. to Suppress at 15.) Again, we disagree.

A warrant must give a "particular description" of the things to be seized in order to prevent the police from undertaking a general, exploratory rummaging through a person's possessions. See United States v. Johnson, 690 F.2d 60, 64 (3d Cir. 1982). Nevertheless, in United States v. American Investors of Pittsburgh, Inc., the Third Circuit found that a broad range of documents was required to be searched to "sort[] out the details of th[e] sophisticated scheme." 879 F.2d 1087, 1106 (3d Cir. 1989). The court noted that "[t]he fact that the warrant authorized a search for a large amount of documents and records does not necessarily render the

search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses." Id. at 1105-06. In declining to suppress the evidence obtained, the court concluded that "[g]iven the complex nature of a money-laundering enterprise, we cannot say that the categories overdescribed the extent of the evidence sought to be seized." Id. at 1106. Numerous other courts have similarly struck down arguments based on lack of particularity or probable cause where the crime charged was complex in nature. See, e.g., Andresen v. Maryland, 427 U.S. 463, 480 n.10 (1976) (stating that the government was investigating a "complex real estate scheme whose existence could be proved only by piecing together many bits of evidence," and accordingly, "[l]ike a jigsaw puzzle, the whole 'picture' of [the unlawful scheme] . . . would be shown only by placing in proper place the many pieces of evidence that, taken singly, would show comparatively little"); United States v. Christine, 687 F.2d 749, 760 (3d Cir. 1982) (finding no Fourth Amendment violation "merely because [a search] cannot be performed with surgical precision" or "merely because [a seized item] happens to contain other information not covered by the terms of the warrant," and stating that "[t]his flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records"); Yusuf, 461 F.3d at 395 ("[T]he government is to be given more flexibility regarding the items to be searched when the criminal activity deals with complex financial transactions."); Stewart, 1997 U.S. Dist. LEXIS at *9-10. As the court in Stewart explained:

> In examining a warrant for probable cause and particularity, this court is to apply "commonsense." In some circumstances "the use of a generic classification in a warrant is acceptable when a more precise description is not feasible." Such "flexibility is especially appropriate" in the investigation of white collar crimes, particularly those based on intricate financial transactions.

1997 U.S. Dist. LEXIS at *7-8 (quoting Christine, 687 F.2d at 760). The court found that "[g]iven the nature and complexity of the crimes with which [the defendant was] charged," and the fact that the paragraph of the warrant at issue in that case "limited the records to be taken to those of certain identified persons or entities and for a specific period of time," the paragraph was "sufficiently specific" and "did not leave any discretion to the searching officers." 1997 U.S. Dist. LEXIS at *9-10. As a result, the court declined to suppress the evidence seized under the paragraph. Id.

In this case, Paragraph Two of the warrant limited the records to be taken to those pertaining only to "securities or other financial holdings or transactions" over a specific period of time. Like the crimes charged in American Investors, Andresen, Christine, Yusuf and Stewart, the crime charged here involved a relatively complex scheme to defraud. As stated by the Supreme Court in Andresen, "[t]he complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." 427 U.S. at 480 n.10. We have already found that the affidavit established probable cause for the seizure of evidence relating to securities fraud from 2004 to the date of Georgiou's arrest. In light of the relevant case law and the complex nature of this case, we also find that Paragraph Two of the warrant was not impermissibly overbroad.

In his Supplemental Brief, Georgiou goes beyond his previous attack on the warrant, arguing that the warrant "is not merely overbroad but rather is a general warrant so lacking in particularity so as to be invalid." (Def.'s Supp'l Br. at 2.) To support this assertion, Georgiou points to Paragraphs Two and Three of the warrant as proof that "the warrant had no limitation

whatsoever." (Id.) Having already found that Paragraph Two was not impermissibly overbroad, we can also conclude that it did not transform the warrant into a general warrant. Therefore, the only remaining issue is whether Paragraph Three rendered the warrant "general."

The Supreme Court has found that the Fourth Amendment prohibits warrants which authorize a "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971). In determining whether a warrant is general, however, it must be read as a whole. Johnson, 690 F.2d at 64. In Johnson, the Third Circuit noted that the Supreme Court in Andresen "interpreted a broad phrase at the end of a sentence in a warrant as referring only to the crime described earlier in the same sentence." Id. The court also quoted the First and Fourth Circuits for the following propositions: (1) that "the 'general' tail of the search warrant will be construed so as not to defeat the 'particularity' of the main body of the warrant," id. (quoting United States v. Abrams, 615 F.2d 541, 547 (1st Cir. 1980)) (quotations omitted); and (2) that "a sufficiently particular qualifying phrase may have the effect of bringing an otherwise 'general' warrant within the constitutional standard," id. (quoting United States v. Jacob, 657 F.2d 49, 52 (4th Cir. 1981)) (quotations omitted). In applying the approach in Andreson to the warrant in Johnson, the court found that "the necessary particularity appears." Id.

Georgiou claims the following phrase renders the warrant in this case a general warrant: "the following items may be searched for and seized: . . . Stored electronic information and communications . . . ." (Mot. to Suppress, Ex. A, Attach. A ¶ 3.) As Johnson and Andreson explain, however, we cannot merely view this language in isolation, but must examine the phrase in the context of the warrant as a whole. Moreover, as stated in Johnson, "[w]hen a warrant is

24

accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant." 690 F.2d at 64. The warrant in this case specifically incorporates Agent Riley's affidavit. (Mot. to Suppress, Ex. A, Attach. A ¶ 1.) Thus, the Court may properly consider the affidavit as part of the particularity analysis. Because the affidavit clearly details Georgiou's alleged participation in a securities fraud scheme, the warrant can only be construed as authorizing a search for evidence related to that conduct, rather than allowing a search for anything, as Georgiou argues. Furthermore, the language following the phrase "[s]tored electronic information and communications" clearly refers only to information stored on a cellular telephone or Blackberry. (Id. ¶ 3.) As the Government correctly points out, "[i]t would not make sense to read the affidavit as specifying in detail the types of items that can be searched for and seized in six paragraphs and then in one paragraph authorizing the search and seizure of everything." (Gov't's Supp'l Br. at 19.) Therefore, the Court finds that Paragraph Three, when analyzed in the context of the warrant and affidavit as a whole, merely authorizes a search for information on Georgiou's Blackberry and cellular telephone which evidences Georgiou's alleged involvement in the alleged securities fraud scheme from 2004 to the date of Georgiou's arrest. As previously discussed, a broad range of documents may be required to be searched in order to understand the details of a complicated crime. Am. Investors of Pittsburgh, Inc., 879 F.2d at 1106. As such, we cannot find that Paragraph Three transformed the warrant into a general warrant. Georgiou's Motion to Suppress Evidence will therefore be denied.

An appropriate Order follows.