**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|                              |   |                  |
|------------------------------|---|------------------|
| UNITED STATES OF AMERICA     | : | CRIMINAL ACTION  |
|                              | : |                  |
| v.                           | : | No. 09-88        |
|                              | : |                  |
| GEORGE GEORGIOU              | : |                  |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                  **SEPTEMBER 29, 2010**

Presently before this Court is the "Supplemented and Amended Motion for New Trial Pursuant to Rule 33" filed by Defendant George Georgiou ("Georgiou"). For the reasons set forth below, the Motion will be denied.

## I. FACTS

On February 12, 2010, following a three-week trial, a jury found Georgiou guilty of one count of conspiracy, four counts of securities fraud and four counts of wire fraud.[1] On May 7, 2010, Georgiou filed the instant Motion, arguing that this Court must grant him a new trial on the following grounds: (1) the Court erred in permitting interpretation testimony; (2) the Government presented improper opinion testimony through its lay witness in violation of Federal Rule of Evidence 701; (3) Georgiou's Fifth and Sixth Amendment rights were violated as a result of the Court's denial of Georgiou's request to present testimony regarding the "other crimes" of the Government's cooperating witness, Kevin Waltzer ("Waltzer"); (4) the Court's jury instructions constituted reversible error; (5) the Government made improper arguments which

---

[1]A more detailed account of the underlying facts of this case can be found in this Court's December 7, 2009 Memorandum, United States v. Georgiou, No. 09-88, 2009 U.S. Dist. LEXIS 114729 (E.D. Pa. Dec. 7, 2009).

unfairly prejudiced Georgiou; and (6) the Government made arguments that were inconsistent with the evidence known to it.

1.  **Interpretation Testimony**

In his Motion, Georgiou asserts that the Court improperly permitted the Government to elicit interpretation testimony from four Government witnesses:  (1) the undercover Federal Bureau of Investigation ("FBI") agent referred to during the investigation and trial as "Charlie" (the "UC"); (2) Securities Exchange Commission ("SEC") employee Daniel Koster ("Koster"); (3) Waltzer; and (4) the Government's rebuttal witness, Alex Barrotti ("Barrotti").

**A. The UC**

On January 25, 2010, with the agreement of Georgiou's counsel, the Government played a recorded conversation between Georgiou and Waltzer while the UC was on the witness stand. (Trial Tr. vol. 1, 61, Jan. 25, 2010.)  The UC's testimony was as follows:

> Q:      Having heard this, what was the role that you assumed at this meeting, having heard this recording?  What about this recording informed that?
>
> A:      I assumed that the defendant knew what he was going –
>
> Defense:     Objection, Your Honor.  That calls for conclusion.  He said he assumed.
>
> The Court:   Yes, but he's telling us that he assumed that for the purposes of the part he was playing.  Objection overruled.
>
> Q:      You can answer.
>
> A:      For the part I was playing, I could tell from the discussion that the defendant was – by him saying is this guy a cop, not once, but I think twice, just from hearing what I do led me to believe that it was clear this is something illegal.  Also, do we have to meet in person is kind of strange. If you're doing a legitimate deal you would want to meet somebody in person.  It seemed like he didn't want to meet in person, so it led me to

believe to prepare for this meeting that he was a very cautious individual who knew what he was doing, all right?  He knew this was pay to play, he knew the only thing that motivated me was getting paid for what I was going to do, and so preparing for the meeting I knew that he might suspect that I was a cop, because we were going to be discussing something illegal.

(Id. at 67-68.)

The Government then asked the UC to describe his August 7, 2007 conversation with Georgiou memorialized in Government Exhibit 410:

Q:    Before we get too far into this, can you describe to the jury what you're discussing with the defendant with regard to the open market buying, and the second piece that he's describing?

Defense:    Your Honor, I oppose this.  The words speak for themselves.  If there's a term that needs interpretation and the agent wants to say what he understood, we can't object.  But he's trying to say what Mr. Georgiou understood.  I do object, because that's opinion testimony.

(Id. at 71.)  The Court overruled the objection based on the Government's representation that the agent would describe only his own understanding of what they were discussing.  (Id. at 71-72.)

The UC continued:

A:    Okay.  What was being said here [was] that there was going to be two aspects of buying[]. . . . The volume that was being created, that first open market buying to suck up that float, that would be buying that really wasn't – that was artificial.  It was buying that was being done because I was getting paid thirty points, or whatever would be negotiated.  So, that artificial buying, to get the price from four to six so the defendant could sell at a higher price, was all just a scheme.

Defense:    Your Honor, object and move to strike as non-responsive.  The witness is now arguing to the jury what the case is, not interpreting terms.

The Court:    Overrule the objection.  It should have been made earlier, but it's overruled.

(Id. at 72-73.)  When the Government asked the UC to describe his understanding of the term

"ratchet," Georgiou's counsel stated a continuing objection to the "agent interpreting terms as to

what was happening, as opposed to simply describing the facts."  (Id. at 73.)  The Court replied:

"[T]his is a me[e]tng he attended. . . . [H]e's part of the conversation and he may tell us what he

understood it to mean."  (Id. at 73-74.)

When asked to describe his understanding of "a mailer, or e-mail, with regard to bringing

awareness to a company[]. . . . as it relates to this conversation," the UC stated:

> Mailers and e-mail blasts are ways of bringing awareness to companies, and
> typically they are done in coordination with these programs to manipulate stocks.
> It brings awareness to people to know about the stock, and you're hoping that they
> will go and buy the stock.  You know, the liquidity that we've been showing
> them, the investor will go, they will see this liquidity, they will get their mailer,
> their e-mail blasts, and say wow, this is something maybe I should invest in,
> when, in fact, all that volume was false and the price is artificial.

(Id. at 80.)  When the UC was asked to explain what he meant when he said "this was a risky

business" and the purported brokers he represented "aren't doing it for free," he testified:

"[T]hat's what I was referring to, that it was illegal.  The brokers are taking a big risk because

they could be arrested."  (Id. at 86.)  When asked to explain his understanding of Georgiou's

recorded statement about a "prearranged" sale of 200,000 shares, the UC testified that Georgiou

was proposing "an illegal stock transaction."  (Id. at 87.)  The UC's testimony continued:

> Q:      [T]here was some final discussion about doing this with only people that
>         you trust for obvious reasons.  The defendant said, "For a whole lot of
>         reasons."  What did you understand that to mean?
>
> A:      Because this was totally illegal. . . .
>
> . . . .
>
> Q:      The defendant says to you, "I guess what I am trying to understand is not

4

so much your method as to gain an appreciation of how cautious one's approach is to this. That's really what I'm trying to understand. I mean, what is the likelihood of one of these brokers having fifty thousand dollars come into one of their accounts or a hundred and fifty thousand dollars come into one of their accounts and coming all the way back through the trail?"

A:  My understanding is that the defendant knows that this is an illegal payment, and that if the payment ultimately goes to a broker, could it be traced back to me, who ultimately got the money, and then could it ultimately be traced back to him who sent the money? That was his concern. . . .

. . . .

Q:  The defendant says to you, "If somebody were wiring to the U.S. would they be wiring to a dummy company." What is your understanding of this?

A:  A dummy company would be a company just created and established for purposes of receiving these payments. Dummy companies wouldn't be used for legitimate, you know, securities transactions or dealings. . . .

. . . .

Q:  What are you discussing there, when you are discussing the reason that Northern Ethanol works is because it is completely tight?

A:  Because it is completely tight, meaning that the defendant has control of those shares, and he can do volume and manipulate and get that price increased. He has control. He knows what is going on with that deal, the DTCs. He can control the whole deal.

Q:  And when there is some discussion about HyHy having leftovers, what do you understand that to mean?

A:  The leftovers are the shares that he doesn't have control over. So the more desirable deal that he wants to start with is the one he controls, because he can manipulate that one. The one with leftovers, if there is buying, he will be buying other peoples' stock, and it's not necessarily good for the manipulation.

(Id. at 105-08.) After playing a recording memorialized as Government Exhibit 431, the

5

Government asked the UC: "What is your understanding of what you are talking about there?"

> A: A classic market manipulation scheme. To rev up this deal, he is going to put press releases to come out. We are going to [do] something that dwarfs HyHy, which was the campaign they did. They sent out, you know, million piece mailers to generate interest. I mean, it's the same thing as the HyHy deal that he was involved in. . . .
>
> . . . .
>
> Q: And at one point the defendant states, "My position is the way the shareholders are registered is the way they are," and then he says, "Nobody is wearing a wire." What was your understanding of the communication from the defendant to you on that?
>
> A: That he knew he was talking about illegal activities, and his reaction was that Kevin was asking him a question that was really blatant, like that you and your partner had control over the stock. And he said, "Well, my position is the shareholders are the shareholders and is anybody wearing a wire." I mean, you would only be afraid of somebody wearing a wire if –
>
> Defense: Objection, Your Honor.
>
> A: – you are afraid of something being recorded.
>
> The Court: Sustained.
>
> Q: Yes, let's talk about what you understood, rather than what you think he may have meant.

(Id. at 108-10.)

## B. Koster

On February 3, 2010, upon being asked to describe what was depicted on a slide he prepared, Koster testified:

> If you look at the way these trades were executed, it's very interesting. You can see that on July 16th, that account in the name of Starport Landing and others sold thirty-nine thousand Avicena shares to Jason Aintabi for about a hundred and fifty-two thousand dollars. But what is significant about that is the executions were at progressively higher prices. There was a portion at three dollars . . . and seventy-five cents. Then there

was a portion at three dollars and eighty cents. Then there was a portion at three dollars and ninety-two cents, and then a portion at four dollars.

Q:     So by these transactions, the prices are slowly being elevated?

A:     That's right.

Q:     And is that also known as stair stepping?

A:     Yeah.

Q:     And is that also a manipulative technique?

A:     It is.

(Trial Tr. vol. 8, 19-20, Feb. 3, 2010.)

## C. Waltzer

On January 26, 2010, when asked during direct examination if Waltzer had an "understanding of why [he and Georgiou] did more [communicating] on the phone as opposed to email," Waltzer testified:

> Yeah, because George was very nervous and paranoid about what we were doing, because I believe that he knew what we were doing was illegal, and that was – an example of that is the emails where I would – he would get very annoyed at me when I would email things that we were doing.

(Trial Tr. vol. 2, 242, Jan. 26, 2010.) On the following day, also during direct examination, the Government asked Waltzer what his understanding was of Georgiou's statement in a recorded conversation that he "can't tell" Waltzer the identity of certain stock promoters in Florida. In response, Waltzer testified:

> Well, two reasons in my opinion. The first is that I believe that he knows the extent of the illegality that is happening here. I also believe that there is possibly a concern in the back of his mind that I might call them directly and try to do a deal with them directly. So, I think there is [sic] a couple of different factors at work.

### D. Barrotti

During the direct examination of Barrotti on the subject of Brett Salter, a party to certain

transactions relevant to the case, Barrotti's testimony was as follows:

Q:     Okay.  Did you have some discussion with him with regard to an
        individual by the name of Brett Salter?

A:     Yes.

Q:     And who – do you know Brett Salter?

A:     No, I never met him.

Q:     And what did – what did that discussion involve?

A:     On one of my many trips to George, either in Miami or in New York, I
        believe it was in Miami at one point, he says to me well you know that ten,
        fifty that I paid you back?  And I said yeah.

Q:     That ten million, fifty?

A:     Million, fifty that I paid you back, I said yeah.  He goes I never paid you
        back.  I said what are you talking about?  Of course you paid me back.  He
        said I never paid you back.  A guy named Brett Salter bought the shares
        and lent you money to cover that off.  And I said what are you talking
        about?  I already – like that – I never heard of this guy.  And he said, no,
        no, this is what happened.  I did not pay you back.  He bought the shares,
        and he sent you the money, and there was this really sort of convoluted
        explanation.  I was not understanding it whatsoever, and I said what are
        you talking about?  And he was like pay attention, like he was getting
        made [sic] at me, pay attention, this is what happened.  And I said George,
        I do not know what you are talking about.

Q:     And did you have some discussion about Mr. Salter's condition?

A:     Yeah, I said who is this guy?  He said oh, he is dead, don't worry about it.

Q:     Did he – and in connection with that, did – did you have – well, what was
        your understanding of what he was asking you to do?

A:	He was asking me to perjure myself.

(Trial Tr. vol. 11, 301-03, Feb. 8, 2010.)

## 2.	**Opinion Testimony by Koster**

Koster, an SEC employee, testified for the Government as a fact and summary witness.

Because Koster was not offered as an expert witness, Georgiou did not conduct expert discovery

under Federal Rule of Criminal Procedure 16.  On January 25, 2010, counsel for Georgiou stated:

> [A]head of when the issue comes up, from the government's opening it's clear
> that we are going to have a fight over [what] the summary may or may not testify
> to.  We have submitted a response to the government's trial brief, and at some
> point probably before the witness sits, we should find some time to discuss that
> with Your Honor.

(Trial Tr. vol. 1, 53-54, Jan. 25, 2010.)  Prior to Koster's testimony, counsel for Georgiou stated:

> Our position with regard to summaries is that obviously, they are permissible.
> They shouldn't be argumentative.  The government has indicated that one of their
> witnesses is an SEC witness.  We have expressed concerns that the witness may
> stray into 701 opinion testimony.  They say he will not but that they think they
> have a right to take him a little bit in that direction.  We say we don't think so, but
> we can't really tell until we hear the questions and the answers.  So as to the
> summary witness issue, Your Honor, I would simply note that we both have filed,
> both the government and the defense, some legal authority with respect to what
> the limits are.  Our position is that if the government's witness strays from within
> those legal limits, we will be objecting.  Our main objection is the issue of opinion
> testimony or improper summary of things not admissible in evidence.  The
> government insists that there won't be that problem, but we needed to alert the
> Court.

(Trial Tr. vol. 7, 4-5, Feb. 2, 2010.)  The Government responded:  "We are not going to ask him .

. . is this consistent with manipulative trades or anything like that."  (Id. at 5-6.)

On direct examination, Koster described himself as a "senior accountant in the

enforcement division" of the SEC, who "investigate[s] possible violations of the federal

securities laws." (Id. at 247-48.) Koster stated:

> Most of what I have done is a market manipulation type of investigation, and there is [sic] various things you are looking for in those kinds of cases. Some of those things are known as wash sales. Some of them are matched trades. Some of them are called marking the close, prearranged trades, et cetera.

(Id. at 248.) Koster went on to define and describe "market manipulation," "wash sales," "matched trades," "marking the close" and "stair stepping" during direct examination.[2] (Id. at 248-50.)

Koster also testified on direct that Georgiou "controlled" the account at Alliance. (Trial Tr. vol. 8, 30, Feb. 3, 2010.) The Government asked Koster: "In the course of doing your job and looking for various manipulative techniques, is one of the things you look at whether a trade appears to make any economic sense?"

A:    Yes, absolutely. That is a fundamental thing that you look for.

Q:    And why is that?

A:    Because if your intent is to invest in a stock, you can tell that is your intent by seeing that you are trying to make money, and you are executing a trade, and you're buying a stock, and you're trying to make money. And you can tell by the way that that trade is executed and by what that person does. Here you can tell that is not the case.

(Id. at 32.) When asked on direct about matched trades, a term which Koster had already defined as manipulative, he testified that certain trades in his slides "compare[d] exactly" to such trades. (Id. at 44.) Finally, Koster stated: "I reviewed [the overt acts alleged in the indictment] for accuracy to make sure the information was correct, and I found one error." (Id. at 55.)

---

[2]As previously mentioned, when asked on direct whether the progressive elevation of stock prices is a "manipulative technique" known as "stair stepping," referring specifically to trades in the case, Koster responded: "It is." (Trial Tr. vol. 8, 20, Feb. 3, 2010.)

On cross-examination, counsel for Georgiou asked Koster about the definitions he had given with respect to matched trades, wash sales and marking the close, to which Koster replied: "I believe that I mentioned that all manipulation is predicated on a false appearance to market." (Id. at 63.) When asked on cross whether trades where no change in beneficial ownership occurs may be legal or illegal, he testified: "It would depend on the specific circumstances. In this case, these were clearly manipulative ones that I went through." (Id. at 64.) When counsel for Georgiou asked Koster whether "trades w[h]ere accounts are buying and selling together" might not necessarily be manipulative, he testified: "It would depend on the circumstances. The ones that I went through in this case were manipulative." (Id. at 64-65.) Koster also described his methodology upon being asked whether he reached "a conclusion in general that there was a manipulation, and then having reached that conclusion, looked to a way to describe the information to support that conclusion": "After doing my analysis, I did conclude there was a manipulation and I selected trades that were indicative of that manipulation." (Id. at 69.) When asked on cross if he was familiar with "pump and dump" manipulations from his experience as an SEC analyst, Koster answered: "I am and we've seen that in this case." (Id. at 140.) Finally, when asked whether he was expressing his opinion when he noted in his chart, "Expresses intent to drive price to three dollars," Koster stated that "that is a paraphrase of what I understood [Georgiou's] words to mean." (Id. at 160.) Counsel for Georgiou did not object to or move to strike any of Koster's responses during cross-examination.

On redirect, Koster's testimony was as follows:

Q:      Are you familiar with something called domination and control of the market?

A:      I am.

Q:      And what is that?

A:      Domination and control basically refers to a manipulative technique in which you are so much of the market that you decide what the price is and you decide what the volume is.

Q:      Okay.  And so we are clear, there are – the SEC puts out various regulations with regard to securities fraud, is that right?

A:      It does.

Q:      And in some instances it will prohibit actual transactions such as match[ed] trades, wash sales, and so forth?

Defense:        Your Honor, objection to the legal implications of the question.  I believe the witness said he does not know the legal aspect of it.

Government:     I am just asking for his understanding of what the SEC puts out in their regulations.

The Court:      He works for the SEC.  If he understands these regulations or thinks he knows what they are, he may say so.

Q:      (Inaudible.)

A:      Yes, there are.  There are rules that specify and prohibit those types of transactions that we just discussed.

Q:      And there are also – are there rules, as you understand it, that also prohibit any sort of deceptive behavior even if it is not that specific type of trade?

A:      That's correct.

Q:      So for instance, domination and control could be something that is prohibited under – by the SEC?

A:      Yes, it is.

Q:      And are there other potential manipulative techniques, like for instance, if somebody were engaging in trades under somebody else's name, (inaudible) nominee, would that be a manipulative technique?

A: It would. Anything that creates the false appearance to a market is prohibited.

Q: And what about agreeing to secretly bribe brokers in order to buy a stock and bury it in their account? Would that also be a manipulative technique?

A: It certainly would.

Q: Would coordinating trading activity with the issuance of press releases in order to provide a false pretext for increased trading and stock, would that be a manipulative technique?

A: It certainly would.

Q: Would using mass promotions including mail and electronic mail to induce the investing public to purchase stocks without revealing your involvement in the promotional campaigns, would that also be a manipulative technique?

A: Yes.

Q: And what about threatening physical violence against somebody who might otherwise want to sell there [sic] stock, would that be – could that be used in manipulations?

A: Yes, to the extent that you are causing somebody else to execute or to not execute a trade, meaning you are interfering with the free flow of supply and demand for [a] security, then yes.

(Id. at 180-82.)

The testimony on redirect continued:

Q: And why would you see trading at the beginning of a pump. If people were involved in manipulations, why would there be trading that would precede this sort of big pump?

A: It is quite common –

Defense: At this point I am going to object under 701.

Government: He asked repeated question[s] over his conclusions, he asked him

13

whether he was familiar with pump and dump. He challenged this.

The Court:     Overruled.

(Id. at 196-97.)

### 3.     "Other Crimes" Evidence as to Waltzer

At trial, counsel for Georgiou cross-examined Waltzer on allegedly criminal acts other than those which were charged in this case or to which Waltzer has pled guilty. Georgiou also sought to present evidence in his case-in-chief that such acts were committed before, during and after his cooperation with the FBI.[3] Upon being questioned about these acts during cross-examination, Waltzer denied their criminality and the Court sustained the Government's objections to further inquiry or proof offered by Georgiou. (Trial Tr. vol. 4, 68-75, Jan. 28, 2010.)

### 4.     Jury Instructions

On February 9, 2010, counsel for Georgiou objected to the Government's request that the Court instruct the jury on specific types of prohibited securities transactions. (Trial Tr. vol. 12, 19-22, Feb. 9, 2010.) The objection was repeated on February 12, 2010.[4] (Trial Tr. vol. 13, 3-5, Feb. 12, 2010.) After the charge, counsel for Georgiou incorporated the defense's prior

---

[3] Georgiou argues that the Court should have allowed him to present extrinsic evidence regarding the following allegations: (1) Waltzer solicited Alan Daniel and Joel Tracy to invest in Costa Rican property which turned out to be worth less than Waltzer represented; (2) Waltzer obtained funds from Craig Spitzer and Coleman Peterson for an investment or loan and failed to repay them as promised; (3) Waltzer obtained funds from his secretary Florence Sague and did not repay them; (4) Waltzer solicited money from Jeff Katz to be sent to his wife; and (5) Waltzer solicited funds on false pretenses from Mohamed Faisel Taz and Michael Gonzalez for an investment in his wife's business, Future Annuities of America.

[4] In raising the objection, however, counsel for Georgiou requested that an additional paragraph be read if the Court decided to instruct the jury on specific types of prohibited securities transactions – a request to which the Court agreed. (Trial Tr. vol. 13, 3-5, Feb. 12, 2010.)

objections.  (Id. at 56-57.)  In charging the jury, the Court stated as follows:

> The SEC has identified some, but not all types of transactions that constitute fraud under these regulations.  These include fictitious transactions effected for the purpose of creating a false or misleading appearance with respect to the market for any security.  One such transaction is a wash sale which involves no change of beneficial ownership of the stock.  In other words, the same party is the buyer and the seller of the stock.  Another prohibited transaction is a match[ed] trade, which is an order to buy or sell securities that is entered with knowledge that a matching order of substantially the same size at substantially the same time and substantially at the same price on the opposite side of the transaction has been or will be entered by or for the same or different parties.  A third prohibited transaction is marking the close which is a form of market manipulation that involve[s] attempting to influence the closing price of a publicly trade[d] share by executing purchase or sale orders at or near the close of normal trading hours.  Such activity can artificially inflate or depress the closing price for that security and can affect the price of the market on close orders, which are orders submitted to purchase shares at or near as possible to the closing price.  These are examples under the SEC regulations of transactions that constitute fraud when effected for the purpose of creating a false or misleading appearance of act of trading in any listed security, or a false or misleading appearance with respect to the market for any such transactions.

(Id. at 26-27.)  The Court further instructed:

> In order to find the defendant guilty of securities fraud, you must find that the government has proven beyond a reasonable doubt all of the elements of the securities fraud as I am about to instruct you, including that the defendant acted wil[l]fully, knowingly and with the intent to defraud.

(Id. at 27.)

## 5.    **"Improper Arguments" by the Government**

During cross-examination of Georgiou, the jury learned that trial counsel for the

Government was present at Georgiou's arrest in a hotel room upstairs at the Ritz Carlton,

Philadelphia:

> Q:    You discussed the IRS – are the words IRS discussed on any of these recordings with Charlie or Kevin after the purchase?

A: Yes.

Q: Okay.

A: On many of them.

Q: All right.  When you were arrested and you were being interviewed by the FBI –

A: Yes.

Q: You realized you were in trouble at that point, right?

A: Well I wasn't –

Q: It is a serious moment?

A: Well I wasn't sure when you and I were speaking upstairs at the Ritz I had said to you what does this have to do with Kevin Waltzer and you said to me this has nothing to do with Kevin Waltzer.

Q: All right, sir.

A: You said to me you are here bribing brokers and I said no I'm not.

Q: Okay.

A: We spoke at length upstairs at the Ritz and I denied the allegations you told me about.

Q: Okay.  I think what occurred, sir, is that you were informed of what was happening and you were brought down to the FBI, you were given Miranda warnings, you called your lawyer, after which you then agreed to talk, isn't that what happened?

A: You and I discussed this at length upstairs at the Ritz.

(Trial Tr. vol. 11, 218-20, Feb. 8, 2010.)

The Government's expert, Justin Price ("Price"), testified on cross-examination as follows:

Q:      Could you tell from your forensic analysis whether or not the remote access had been enabled for some time, but by September 17th of 2008 disabled?

A:      I was just able to determine that the – at the time of the analysis the feature was disabled.

Q:      So whether remote access was possible in '07, '06, '05, you could not really tell one way or another, right?

A:      That's correct, yes.

(Trial Tr. vol. 9, 115-16, Feb. 4, 2010.)

In its closing argument on February 9, 2010, the Government stated:

[Georgiou] says, well I had this laptop and a lot of people use it, they don't live there, they live in the Bahamas and Cuba and everywhere else, Ron Wyles and Andreas Augland, but they might call in sometimes and have a secretary dictate an e-mail from a laptop in the defendant's office where he says they would call in, they would be able to remotely access the computer which Justin Price, the expert[,] told you those e-mails that were all found in the defendant's sent box, there was no way they could have ever been put on there from any remote access.

(Trial Tr. vol. 12, 101-02, Feb. 9, 2010.)

Also in its closing argument, the Government stated:

When all was said and done the defendant tried to pull the ultimate con, the ultimate con on you, the ladies and gentlemen of the jury. He sat on that witness stand and he tried to tell you a fairy tale that not even a child could believe[]. . . . He told this fictional tale of chasing some phantom IRS documents from Kevin Waltzer directly in contradiction of the overwhelming evidence that was presented to you of the defendant's fraud. The recordings, the financial records, the testimony, the e-mails and then you have this fairy tale. . . . That is why, that is why he had to tell you the fairy tale, because he knew as he said if he did any of that it was illegal, so he made up a story. . . . What is interesting is what the defendant says about this because it shows what an incredible lie he is telling and just how guilty he is. . . . So it is a fanciful tale . . . . [w]hen he gets on the stand he tells you something that is incredible that you cannot believe. . . . Then we get to April 17th, 2008 after some back and forth. This is a critical point in the case because this is now where the defendant's lies kind of enter the stratosphere because he can no longer try to explain, well those emails aren't really what they

17

look like[]. . . . So it is a fictional universe and it doesn't make any sense and when you hear the defendant's words in these and all the successive conversations, you are not hearing the defendant trying to get any IRS documents from Kevin Waltzer[]. . . . What you saw him do on the stand, was it at all credible, he put his head down and he said, this was the worst decision I've ever made in my life and the case took a turn for the bizarre, the bizarre when he said he was somehow chasing Kevin Waltzer. . . . [I]t took him a little time to kind of concoct that story. . . . [H]e tries to tell you that five thousand dollars is for something else. That is the lie. . . . [I]t is a seven[-]minute call and if you believe the defendant, Kevin Waltzer picked up the phone and the defendant said everything we've just said and done for the last four years isn't true and we are changing everything in one seven[-]minute phone call, it is absurd.

(Id. at 94-136.)

In its rebuttal, the Government stated:

This case was over after the first witness, and I suspect you were all sitting there thinking how much longer do we have to endure all this. . . . [Georgiou] got the full treatment, three weeks of everybody's time, he is entitled to it, he is presumed innocent coming in. He is not presumed innocent once you have heard this evidence. This evidence is ridiculous. . . . I submit to you, ladies and gentlemen, if there was something different in this case, something the government failed to put to you, you would have saw [sic] it, and all you saw was perhaps the biggest lie I submit one could see from the witness stand in the testimony of that man. He says the government charts are not proof. You are going to hear otherwise. The judge is going to tell you those charts in evidence are proof. And what do they show? They show – and by the way, undisputed proof. They want to talk about what does it mean and what does it not mean, but the undisputed proof is that Dan Koster from the SEC went in and spent months tracking all of these trades, and those were the actual shares being sold from the Vince DeRosa accounts to Kevin Waltzer to Caledonia and so forth. . . . The wires went out to his guy, Tom Bock. Want to know what Tom Bock was doing? I suggest th[is] evidences, Tom Bock was laundering money for him. . . . He is a person who will tell lies when it is convenient, and he lied to you over and over and over again. . . . But that is like a real moment because you do not normally see that kind of fiction in a courtroom . . . . Ladies and gentlemen, please. You would not buy a used car from him, do not buy this. . . . It is like a Ponzi scheme in a way. You have got people in, but they do not want to be the last ones holding the bag. . . . You have not one but two confessions in this case. The first one when he talks about his wife being clairvoyant, and the second one where he says Avicena is an artificial market. Artificial does not mean unstable, it does not mean it in Toronto and it does not mean it in Philly. That is a lie. . . . The investigation. The George Georgiou

investigation will go down, I believe, in history as perhaps the most bizarre thing ever said from a witness stand. . . . Now, I told you at the beginning he is a clumsy criminal, and there is no doubt.  And maybe he did not make all the money he tried to, but this as an investigation is laughable.  I just do not even know what else to say about that because it is so ridiculous.  It is so ridiculous that it frankly insults your intelligence for it to have been said, and it is more insulting to even then come up and argue that it has some validity. . . . You have got to believe that all these recordings, all these investigations, private investigations were going on, the discussions and all that.  We have no proof of that.

(<u>Id.</u> at 201-16.)

Following the Government's rebuttal, counsel for Georgiou stated:  "Judge, once the jury is discharged I do have a motion, but I can make it after the jury is discharged."  (<u>Id.</u> at 219.)

After the jury was discharged for the day, counsel for Georgiou stated:

| | |
|---|---|
| Defense: | Judge, just very quickly, during the rebuttal closing, on at least a couple of occasions, particularly early in the closing, the government suggested that if their charts or other evidence was wrong, the defense could have come in and presented evidence that it was wrong.  That is burden shifting.  I move for a mistrial based upon the closing argument by the government. |
| The Court: | Did you say that? |
| Government: | A, I do not believe I said it.  B, there was no objection to anything I said there.  What I said was that they have no burden.  What I said was with regard to cherry picking evidence, that we made our decisions as to what we were putting in, and we turned everything over, and I said despite the fact that they have no burden, they put on a case and they have shown you many of their own documents. |
| The Court: | Okay. |
| Government: | And I said that the charts were evidence. |
| The Court: | I know that you did say at one point, with regard to the summary documents, that they were not rebutted – |
| Government: | That's true. |

| | |
|---|---|
| The Court: | – as I recall. |
| Government: | That's true, I said they were undisputed. |
| The Court: | And I do not – undisputed, maybe that was the word.  In any event, the motion is denied. |
| Government: | I think – just so the record is clear, I think the larger point here is that the defense sat silently during the closing, and if there was a chance to correct any error that they believed happen[ed], they did not make that objection until after.  And they specifically requested to make their motion after the jury left. |
| Defense: | It is still possible to cure it, Your Honor.  And frankly, the government talked so fast my ears caught up with me about the time he sat down. |
| The Court: | Well, I will tell them about it in the charge. . . . |
| . . . . | |
| Government: | Th[e] government has no objection to Your Honor when Your Honor charges to also give curative instruction saying that nothing we say changes the burden, and that was certainly not my intention. |

(Id. at 219-22.)

### 6.      Arguments by the Government that are "Inconsistent with Evidence Known to the Government"

Georgiou asserts that the Government argued that there was no evidence that Georgiou sought information from Waltzer about his need to pay the IRS.  Georgiou further contends that Koster used a methodology that was flawed.

To support his first claim, Georgiou argues that the Government "possessed evidence in the form of recorded conversations and PIN and email communications that neither party offered into evidence that did support the defendant's claim that he was seeking information from Mr. Waltzer concerning the IRS debt he claimed he owed."  (Def.'s Mot. New Trial at 37.)  Georgiou

notes that "this evidence was disclosed to the defense by the government in advance of trial. The defense does not raise a claim of ineffectiveness of counsel at this time." (Id.) Georgiou has attached a chart to the instant Motion as "evidence that the defendant was seeking information about Mr. Waltzer's claimed IRS problems." (Id. at 38.)

In its closing argument, the Government stated with regard to the recorded conversations:

[Y]ou are not hearing the defendant trying to get any IRS documents from Kevin Waltzer. . . . The defendant even admitted as you heard his words, he says I was making that up, that was all part of me trying to, I don't know, chase these IRS documents which you never hear in any phone call, you don't hear about it in any of the recordings, what you hear about is stock manipulation.

(Trial Tr. vol. 12, 131-35, Feb. 9, 2010.) Further, on rebuttal, the Government argued: (1) "This whole IRS thing is ridiculous" (id. at 202); (2) "there is no evidence in this case that supports [Georgiou's investigation into Waltzer's alleged IRS problems]" (id. at 214); and (3) "you have got to believe that all these recordings, all these investigations, private investigations were going on, the discussions and all that. We have no proof of that" (id. at 216).

Regarding Georgiou's argument that Koster used a methodology that was flawed, Georgiou argues that the jury was "shown slide after slide of alleged, unlawful, 'matched trades' between alleged conspiring contra-parties." (Def.'s Mot. New Trial at 38.) On direct examination, the Government asked Koster to define a "matched trade," to which Koster replied: "That is executing a trade between accounts, such that that trade is designed to match up between that account so they are contra-parties. So one account is selling to the other in a way that creates that appearance, that false appearance to the marketplace." (Trial Tr. vol. 7, 249, Feb. 2, 2010.)

Georgiou asserts that "Koster presented a number of transactions that he described to the jury as unlawful 'matched trades,' which were not 'matched trades' as he defined them but rather

21

a show of stock 'flow' which is quite different."  (Def.'s Mot. New Trial at 39.)  Georgiou states

that the slides "showed alleged 'matched' trades occurring be[tween] party 'A' to 'B' and

sometimes to 'C' and other permutations but failed to explain that in many instances the accounts

were not contra-parties and had not transacted with each other completely inconsistent with the

presentation before the jury claiming unlawful 'matched' trades."  (Id.)  Georgiou claims that

where "shares may have ultimately 'flowed' from 'A' to 'C' or vice versa," such occurrences

were not "matched trades" because "the parties did not transact with each other; they were not

contra[-]parties."  (Id.)  Georgiou maintains that the Government's methodology was flawed

because it "used 'matching' undertaken by market makers or the end of day settlements that

reconcile the volume of shares flowing in the system to create the appearance that an unlawful

'matched' trade occurred."  (Id. at 41.)  Georgiou states, however, that "[t]he evidence that

undercuts the government's methodology . . . was disclosed to the defense in discovery.  The

defense does not argue ineffectiveness at this stage but contends that the government's

presentation was inaccurate in light of evidence know[n] to it, thus violating the due process

clause."  (Id. at 40.)

## II.     STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 states that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

R. Crim. P. 33.  "Whether to grant a Rule 33 motion lies within the district court's sound

discretion."  United States v. Ortiz, 182 F. Supp. 2d 443, 446 (E.D. Pa. 2000) (citation and

quotation marks omitted).  In evaluating a Rule 33 motion, the court does not view the evidence

favorably to the government, but rather exercises its own judgment in evaluating the

government's case.  United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).  Nevertheless, "[t]he burden is on the defendant to show that a new trial ought to be granted."  United States v. Clovis, No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

A court must grant a motion for new trial if it finds that there were cumulative errors during the trial that, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'"  United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). However, even if the court "believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'" United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting Johnson, 302 F.3d at 150).

## III.    DISCUSSION

### 1.    Interpretation Testimony

Georgiou claims that the Court erred in permitting testimony wherein lay witnesses offered their understanding of conduct and statements.  In United States v. O'Grady, the Third Circuit explained that under Federal Rule of Evidence 701, "this Court permits lay witnesses to interpret 'code-like' conversations if it is helpful to an understanding of the testimony of the witness on the stand.  But interpretation of clear statements is not permissible."  280 Fed. Appx. 124, 130 (3d Cir. 2008) (citations omitted); see also United States v. Hoffecker, 530 F.3d 137, 170-71 (3d Cir. 2008); United States v. De Peri, 778 F.2d 963, 977-78 (3d Cir. 1985).  The defendant in O'Grady challenged the admissibility of a government agent's testimony that the defendant's statement that "you guys are hot" meant "that law enforcement is taking an interest

or looking into our activities." 280 Fed. Appx. at 128. The Third Circuit found that the meaning

of the defendant's statements were "not clear and straightforward but 'code-like'" and that "[t]he

agent's testimony was based on his direct perception of the conversation and helped the

factfinder to determine O'Grady's mental state regarding his involvement in the scheme." Id. at

130.

Georgiou relies primarily on United States v. Dicker to support his argument that the

interpretation testimony at trial was impermissible.[5] 853 F.2d 1103 (3d Cir. 1988). In Dicker,

the Third Circuit found that an undercover agent's interpretation testimony was improper because

the agent had "simply ascribed his own, illicit meaning to straightforward, potentially legitimate

statements" to conversations that "were perfectly clear without [the witness's] 'interpretations.'"

853 F.2d at 1110. The Third Circuit found that the witness's testimony mischaracterized the

recorded conversations with the defendant by stating that when the defendant discussed

"paperwork" he meant "phony" paperwork, despite the fact that the defendant had never made

such a statement. Id.

In this case, Georgiou argues that the UC was improperly permitted to explain his

understanding of various terms and phrases which were used or referred to in the recorded

conversations with Georgiou, including: "this is a risky business"; brokers "aren't doing it for

free"; "ratchet"; "mailers and e-mail blasts"; a "prearranged" sale; "dummy company"; stock

---

[5] It is noted that counsel for Georgiou failed to object on this basis at trial. On the contrary, during the UC's testimony, counsel for Georgiou admitted that interpretation testimony was permissible, stating: "If there's a term that needs interpretation and the agent wants to say what he understood, we can't object. But he's trying to say what Mr. Georgiou understood. I do object, because that's opinion testimony." When counsel for Georgiou objected again, it was on the basis that the answer was "non-responsive," rather than impermissible interpretation testimony, stating: "The witness is now arguing to the jury what the case is, not interpreting terms."

being "completely tight"; company having "leftovers"; "rev up" a deal; something that "dwarfs" HyHy; "[n]obody is wearing a wire"; "coming all the way back through the trail"; and "doing this with only people that you trust for obvious reasons . . . for a whole lot of reasons."[6]  Unlike the relevant language in Dicker, these terms and phrases are far from "clear and straightforward." Rather, they involve jargon, technical securities terms and code-like references.  As such, we find that the interpretation testimony was properly admitted to aid the jury's understanding of the recorded conversations.[7]

Georgiou also asserts that interpretation testimony elicited from Koster, Waltzer and Barrotti was also improper.  As previously stated, Koster testified that the transactions depicted on a slide which he created involved stock prices that were slowly being elevated.  When asked whether that is also known as stair stepping, he stated that it is; when asked whether "that [is]

---

[6] The Government points out that the UC also explained such terms and phrases as:  "parking a stock"; "open market buying"; "buying the stock up"; "liquidity"; "putting shares away"; "DTC"; "hitting the tape"; "Jeffries and Pershing"; "real buying"; "float"; "bury a stock"; "on market"; "spillage"; "cross trades"; "NOBO list"; "low offer"; "wash trading"; "IR"; "cover"; "venture capitalism"; "cowboys"; and "churn."

[7] We note that at trial, the parties jointly requested a curative instruction during the UC's testimony designed to address the very challenge that Georgiou raises here.  (Trial Tr. vol. 1, 117-18, Jan. 25, 2010.) Counsel for Georgiou requested that the Court inform the jury that "the Court instructs on the law, and that the testimony of the witness is designed to state either his understandings or why, you know, he did things he did, period, so it separates it from what Mr. Georgiou might be thinking."  (Id. at 118.)  Thereafter, the Court read a jointly submitted instruction that stated that the Court would instruct the jury on the law and "that the [UC] has testified about communications with Georgiou that he interpreted as involving illegal activity.  That testimony was permitted to explain what the witness understood for purposes of explaining his conduct.  It is ultimately for you to decide what the defendant's intent was based on the law that I give you at the end of the trial, and the facts that you find from the evidence."  (Id. at 150.)  "A jury is presumed to follow a curative instruction and a defendant faces a high hurdle when he or she contends that the instruction was insufficient to cure any error."  United States v. Nelson, 372 Fed. Appx. 289, 293 (3d Cir. 2010) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).  Moreover, as the Third Circuit has explained, "[i]nasmuch as appellants did not object to the curative instruction or request additional instructions, they apparently were satisfied with the district court's response and cannot now complain that comments gave rise to reversible error."  United States v. Pungitore, 910 F.2d 1084, 1128 (3d Cir. 1990).

also a manipulative technique," Koster replied: "It is."[8] Because the term "stair stepping" is another example of jargon, the interpretation testimony here was properly admitted to aid the jury's understanding.

Regarding Waltzer and Barrotti, Federal Rule of Evidence 701 states that a lay witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Moreover, pursuant to Rule 701, "lay witnesses may state their understanding of the use of another person's statements 'only if rationally based on the perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue.'" De Peri, 778 F.2d at 977 (quoting United States v. Cox, 633 F.2d 871, 875 (9th Cir. 1980)). It is undisputed that Waltzer and Barrotti expressed their understanding of conduct and statements which they perceived. We find that the inferences which they drew from the relevant conduct and statements were rationally based on their perception, helpful to a clear understanding of their testimony and not "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." See United States v. Anderskow, 88 F.3d 245 (3d Cir. 1996) (finding that defendant was not entitled to new trial based on co-conspirator's testimony regarding his belief that defendant knew of the fraudulent scheme); see also Hoffecker, 530 F.3d at 171-72 (permitting witness to testify that his conversations with defendant were part of a

---

[8] Counsel for Georgiou did not object to this testimony on the basis of improper interpretation.

"scam" because he had "first-hand knowledge" and it "explained why he was a government cooperator"); De Peri, 778 F.2d at 977-78 (holding that it was permissible for a lay witness to testify to his understanding of defendant's ambiguous references and unfinished sentences). As such, we find that the testimony of Waltzer and Barrotti was properly admitted.

### 2. Opinion Testimony by Koster

Georgiou argues that he is entitled to a new trial because Koster "gave testimony that was not based on his own perceptions but were simply his opinions." (Def.'s Mot. New Trial at 9.) According to Georgiou, Koster's testimony was improper because he was not offered as an expert and "the defense was not given expert discovery." (Id.)

Prior to Koster's testimony, counsel for Georgiou stated that its "position" was "if the government's witness strays from within those legal limits, we will be objecting. Our main objection is the issue of opinion testimony or improper summary of things not admissible in evidence. The government insists that there won't be that problem, but we needed to alert the Court." (Trial Tr. vol. 7, 4-5, Feb. 2, 2010.) Counsel for Georgiou, however, did not object on the basis of opinion testimony or improper summary at any point during Koster's direct testimony.

Of the approximately seventy pages of trial transcript involving Koster's direct examination, Georgiou argues that the following incidents converted Koster's testimony into expert testimony: (1) Koster briefly explained his role as an employee at the SEC and went on to define "market manipulation," "wash sales," "matched trades" and "marking the close"; (2) Koster testified that Georgiou "controlled" the account at Alliance; (3) when asked whether "[i]n the course of doing your job and looking for various manipulative techniques," "one of the things

27

you look at [is] whether a trade appears to make any economic sense," Koster replied that it is and "[h]ere you can tell that is not the case"; (4) Koster stated that certain trades on the slides he prepared "compare[d] exactly" to matched trades; and (5) Koster stated that he "reviewed [the overt acts alleged in the indictment] for accuracy to make sure the information was correct" and he "found one error."

We conclude that Koster did not provide impermissible expert testimony during his direct examination. First, a lay witness's introductory statements about his or her training and experience does not automatically convert the witness's testimony into expert testimony. See United States v. Breland, 366 Fed. Appx. 548, 552 (5th Cir. 2010). Second, the fact that Koster defined certain terms does not render his lay testimony impermissible expert testimony. See United States v. McMillan, 600 F.3d 434, 456-57 (5th Cir. 2010) (finding that accountant did not provide impermissible expert testimony where despite the fact that accountant defined certain accounting terms during the course of his testimony, he provided factual information about the circumstances of the case). Rather, to the extent that Koster provided his opinion on direct examination, we find that his opinions were: (1) rationally based on his perception of the record; (2) helpful to a clear understanding of his testimony and the determination of facts in issue; and (3) not based on specialized knowledge within the scope of Rule 702.

Koster provided factual information from his investigation of the stock transactions in this case and summarized that information in his slides and on the witness stand. His opinions were based on the factual information which he perceived during his investigation. We also find that in light of the large volume of stock transactions which Koster was required to review in this case, his summary of the relevant transactions was helpful to the jury. See United States v.

28

Rigas, 490 F.3d 208, 224-25 (2d Cir. 2007) (finding that "testimony that summed up the government's allegations was quite 'appropriate' in this complicated case" involving a securities fraud prosecution and that an employee did not give impermissible expert testimony where his testimony was based upon his observations as an employee, he was well acquainted with relevant records and his testimony was not based on specialized knowledge). Finally, we conclude that although the volume of stock transactions in this case was substantial, Koster's comparisons of similar stock quantities and dollar amounts did not require a specialized knowledge within the scope of Rule 702. Rather, as the court in SEC v. Treadway found, the Government's witness was "simply an SEC employee providing his view of the facts as a summary of certain evidence and as an aid to the Court." 430 F. Supp. 2d 293, 322 (S.D.N.Y. 2006) (finding SEC employee's declaration to be "more akin to a summary document than an expert analysis").

Regarding the remainder of Koster's testimony, we find that the "opinion" testimony which Georgiou challenges was elicited by counsel for Georgiou during cross-examination and was only explored by the Government after the defense had "opened the door." On cross-examination, counsel for Georgiou asked for Koster's opinions on numerous occasions regarding whether manipulations had occurred and the bases for his conclusions. For example, the defense invited Koster to opine on the legality of transactions where: (1) "there is no change in beneficial owner[ship]"; (2) "accounts are buying and selling together"; and (3) "trades that affect the closing price." (Trial Tr. vol. 8, 64-65, Feb. 3, 2010.) Counsel for Georgiou then suggested that Koster had reached a conclusion "in general that there was a manipulation, and then having reached that conclusion, looked to a way to describe the information to support that conclusion." (Id. at 69.) Koster explained: "After doing my analysis, I did conclude there was a

manipulation and I selected trades that were indicative of that manipulation." (Id.) Counsel for Georgiou invited Koster to explain "pump and dump" manipulations (id. at 140) and why he "concluded" that Georgiou controlled the Alliance account (id. at 143-45). The defense did not move to strike or otherwise object during the cross-examination.

On redirect, the Court permitted Koster to explain his understanding of the various types of manipulative activities that the SEC prohibits. (Id. at 180-81.) When Koster was asked to further explain how "pump and dump" manipulations typically operate, the defense raised its first and only objection regarding "impermissible expert testimony."

The Third Circuit has explained that "'opening the door,' better known as the doctrine of curative admissibility, provides that once a party introduces inadmissible evidence, the opposing party may introduce otherwise inadmissible evidence to rebut or explain the first offering." Gov't of the V.I. v. Archibald, 987 F.2d 180, 187 (3d Cir. 1993). In other words, "where the injection of allegedly inadmissible evidence is attributable to the action of the defense," as it was in this case, "its introduction does not constitute reversible error." United States v. Martinez, 604 F.2d 361, 366 (5th Cir. 1979) (citations omitted); see also United States v. Caldwell, 586 F.3d 338, 348 (5th Cir. 2009) (finding no reversible error where the "testimony elicited by the defense is closer to expert testimony than is the testimony of which it complains").

Finally, although Koster was a fact and summary witness, the Government provided Georgiou not only with an outline of the areas about which Koster would testify, but also produced the slides which Koster had prepared to explain his analysis. Therefore, we find that the fact that Koster offered his opinions and "the defense was not given expert discovery" does not constitute reversible error.

### 3. "Other Crimes" Evidence as to Waltzer

As previously stated, Georgiou argues that the Court should have allowed him to present extrinsic evidence regarding various allegedly criminal acts committed by Waltzer. When Waltzer was questioned about these acts on cross-examination, he denied their criminality and the Court sustained the Government's objections to further inquiry or proof offered by Georgiou.

The Sixth Amendment guarantees a defendant the right to cross-examine witnesses. See U.S. Const. amend. VI. Federal Rule of Evidence 403 authorizes a district court "in its broad discretion to exclude collateral matters that are likely to confuse the issues." United States v. Casoni, 950 F.2d 893, 919 (3d Cir. 1991). This broad discretion may be based on various concerns, including "harassment, prejudice, confusion of the issues, or interrogation that is only marginally relevant." United States v. Lore, 430 F.3d 190, 208 (3d Cir. 2005). Further, Federal Rule of Evidence 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence." Fed. R. Evid. 608(b); United States v. McNeill, 887 F.2d 448, 453 (3d Cir. 1989). A matter is collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002). The purpose of the ban on extrinsic evidence under Rule 608(b) is to "avoid minitrials on wholly collateral matters which tend to distract and confuse the jury." Carter v. Hewitt, 617 F.2d 961, 971 (3d Cir. 1980) (internal quotation marks and citation omitted). The Third Circuit construes Rule 608(b) as "requiring the exclusion of extrinsic impeachment evidence concerning a witness' prior instances of conduct." McNeill, 887 F.2d at

453.

Georgiou argues that extrinsic evidence should have been permitted to show Waltzer's bias under Federal Rule of Evidence 404(b). Georgiou claims that additional evidence of Waltzer's alleged criminal activity would have showed bias because "he was not required to plead guilty to any criminal charges related to these events," and thus, had an additional incentive to help the Government. (Def.'s Mot. New Trial at 25.) Georgiou also asserts that some of these allegedly criminal acts took place during Waltzer's period of cooperation with the Government, thus contradicting Waltzer's assertion that he had not engaged in any criminal activity during his period of cooperation. (Id. at 17.) We find Georgiou's arguments to be meritless.

First, the Court allowed counsel for Georgiou to cross-examine Waltzer regarding the alleged criminal acts and only precluded defense counsel from further exploring each collateral matter once Waltzer denied wrongdoing. Second, substantial evidence was presented which detailed Waltzer's history of misconduct and his alleged bias for the Government. For example, at trial, Waltzer admitted to a $40 million fraud to which he pled guilty under a cooperation plea agreement.[9] This evidence provided ample opportunity for Georgiou to attack Waltzer on the basis that he was untrustworthy and biased for the Government. Indeed, counsel for Georgiou thoroughly cross-examined Waltzer on his history of deception and alleged bias for the Government.

Where "[t]he jury [is] in possession of sufficient information to make a discriminating appraisal of [a witness's] possible motives for testifying falsely in favor of the government," it is within the Court's discretion to exclude collateral matters that are likely to confuse the issues.

---

[9] Waltzer also admitted to additional criminal conduct, such as illegal drug use.

See McNeill, 887 F.2d at 454.  The market manipulation scheme involving Georgiou was complex in itself without subjecting the jury to numerous "minitrials" on allegations which were unrelated to the crimes charged.  See United States v. Farrington, 58 Fed. Appx. 919, 925 (3d Cir. 2003).  As such, we find that no error was committed in precluding Georgiou from presenting extrinsic evidence regarding Waltzer's prior misconduct.

**4.      Jury Instructions**

Georgiou also seeks a new trial as a result of the Court defining certain terms in its charge to the jury, including "wash sale," "match[ed] trade" and "marking the close."  As stated in United States v. Rennert:

> The Court finds that any objections with respect to the instructions which dealt with market manipulation terms and practices are wholly without merit.  The Court, in these instructions, merely described certain market practices which have been found to be manipulative.  These definitions were necessary because the terms and practices are "terms of art" or only readily understandable if you are actually involved in the securities industry.  Thus, the Court instructed the jurors as to these terms so that they could more properly and fairly consider the case.

No. 96-51, 1997 WL 597854, at *22 (E.D. Pa. Sept. 17, 1997).

Numerous cases define the terms "wash sale," "matched trade" and "marking the close" as manipulative or deceptive practices.  See, e.g., SEC v. Wilson, No. 04-1331, 2009 WL 2381954, at *1 (D. Conn. July 31, 2009); SEC v. Kimmes, 799 F. Supp. 852, 859 (N.D. Ill. 1992).  The goal of jury instructions is to aid the jury in its understanding of the applicable law, which includes both the language of the relevant statute and the case law which explains it. Moreover, at Georgiou's request, the parties jointly submitted additional language regarding the challenged instruction in order to clarify the mental state required for conviction.  Therefore, we conclude that no error was committed as a result of the Court defining the relevant terms in its

jury instructions.

### 5.     "Improper Arguments" by the Government

Georgiou requests a new trial on the basis that during its closing argument and rebuttal, the Government made improper comments about Georgiou's credibility.  Georgiou also contends that:  (1) the prosecutor improperly injected his first-hand knowledge of the arrest into the case; (2) the Government improperly likened a portion of Georgiou's fraud to a "Ponzi scheme" and described Tom Bock's conduct as "laundering money"; and (3) the Government mischaracterized the expert testimony of Price as establishing that Georgiou sent emails from his computer that were purported to be from Ron Wyles and Andreas Augland.

In order for an objection to be preserved for appeal, the objection must be timely and must "stat[e] the specific ground of objection, if the specific ground was not apparent from the context."  United States v. Gibbs, 739 F.2d 838, 849 (3d Cir. 1984) (quoting Fed. R. Evid. 103(a)(1)).  Where a defendant raises objections on specific grounds at trial, but raises different ones on appeal, the defendant is deemed to have failed to preserve his objections.  United States v. Mitchell, 365 F.3d 215, 257 (3d Cir. 2004).  Where a defendant has failed to preserve an objection for appeal, the alleged error is subject to plain error review.  Id.; see also United States v. Lee, 612 F.3d 170, 193 (3d Cir. 2010) ("[A]ny non-contemporaneous objections are reviewed for plain error."); United States v. Saada, 212 F.3d 210, 224 (3d Cir. 2000).  In order to be plain error, an error must not only be "obvious," but must also "have affected the outcome of the District Court proceeding."  United States v. Olano, 507 U.S. 725, 734 (1993).

Georgiou contends that his counsel made a contemporaneous objection to the allegedly improper remarks when he objected once the jury was removed following the Government's

rebuttal. At that time, Georgiou's counsel objected on the basis that the Government attempted to shift the burden to Georgiou "during the rebuttal closing, on at least a couple of occasions, particularly early in the closing" where "the government suggested that if their charts or other evidence was wrong, the defense could have come in and presented evidence that it was wrong." (Trial Tr. vol. 12, 219-20, Feb. 9, 2010.)

Even if we were to assume that the objection of Georgiou's counsel following removal of the jury constituted a contemporaneous objection, the objection pertained only to the Government's alleged shifting of the burden of proof to Georgiou. Regarding the alleged burden shifting, the Government suggested that the Court provide a curative instruction to the jury, to which counsel for Georgiou agreed. Per the agreement of the parties, the curative instruction was delivered as part of the Court's charge to the jury. As previously discussed, "[a] jury is presumed to follow a curative instruction and a defendant faces a high hurdle when he or she contends that the instruction was insufficient to cure any error." Nelson, 372 Fed. Appx. at 293 (citing Marsh, 481 U.S. at 211). We find that Georgiou has not met his burden of showing that the instruction was insufficient to cure the error alleged.

Regarding Georgiou's remaining complaints, it is well settled that a prosecutor's comments constitute reversible error only if they are so erroneous "as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Pungitore, 910 F.2d at 1126 (quotation marks omitted). Further, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11 (1985). Rather, the statement or conduct must be viewed in context; only by doing so can it be determined whether

the prosecutor's conduct affected the fairness of the trial.  <u>Pungitore</u>, 910 F.2d at 1126.

We find that the Government's comments do not constitute plain error.  It is true that a prosecutor may not vouch for his personal belief as to the credibility of the witnesses or the guilt of the accused based on matters outside of the record, <u>Young</u>, 470 U.S. at 18-19, impermissibly comment on the defendant's failure to testify, or shift the burden of proof, <u>United States v. Balter</u>, 91 F.3d 427, 441 (3d Cir. 1996).  Nevertheless, a prosecutor is "entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence."  <u>United States v. Green</u>, 25 F.3d 206, 210 (3d Cir. 1994).  Where the prosecution's comments "focus the jury's attention on holes in the defense's theory" and point out the failure of the defense to provide evidence in support of its theory, such comments do not constitute plain error.  <u>Balter</u>, 91 F.3d at 441.

Georgiou presented a version of the relevant events which largely contradicted the evidence presented at trial.  The Government captured Georgiou in various recordings stating "[n]obody is wearing a wire," suggesting that they conduct their meetings in a "hot tub" and asking if the UC was "a cop."  On the witness stand, Georgiou insisted that he had actually been investigating and recording Waltzer, but produced no evidence to corroborate his claims.  The Government also offered into evidence a recording in which Georgiou accidentally recorded himself stating:

> Well, Karen has read the letter now, and she said you need to explain to me how twenty-two million dollars in losses have occurred.  She goes you know.  And it is almost like she is clairvoyant.  Some of the things she started saying she goes what, you guys put up a bunch of stock that was inflated, and you borrowed against it and you sunk a firm.  These are her words now.  I am not paraphrasing.

(Trial Tr. vol. 11, 247, Feb. 8, 2010.)  Numerous other recordings presented by the Government,

in addition to voluminous emails and financial records, overwhelmingly demonstrated that Georgiou had committed the crimes charged.  The Government's comments regarding Georgiou's testimony, while passionate, were not based on anything outside of the record.  Further, the Court instructed the jury about its role in resolving credibility issues and about remarks by the attorneys.  Finally, Georgiou was represented by experienced federal criminal defense attorneys who did not object to the Government's comments on any basis other than burden shifting.  This fact further demonstrates that the plain error standard has not been met.  See, e.g., United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995) (finding no reversible error where defendant was represented by counsel who "impressed" the court as being "articulate and experienced" but failed to object during the prosecution's rebuttal).  Therefore, we find that the challenged statements, when viewed in light of the entire record, did not undermine the fundamental fairness of the trial or contribute to a miscarriage of justice.

**6.      Arguments by the Government that are "Inconsistent with Evidence Known to the Government"**

Georgiou's final arguments are:  (1) that the Government asserted that there was no evidence that Georgiou sought information from Waltzer about his need to pay the IRS; and (2) that Koster used a methodology which was flawed.  Georgiou does not provide any case law to support these arguments, but merely states that his due process rights were violated by the Government's conduct.

We find that these remaining arguments are completely meritless.  As discussed, where the prosecution's comments "focus the jury's attention on holes in the defense's theory" and point out the failure of the defense to provide evidence in support of its theory, such comments

do not constitute plain error.  Balter, 91 F.3d at 441.  We find that the Government fairly commented on the overwhelming evidence that Georgiou had been bribing the UC rather than conducting an investigation of Waltzer.  Furthermore, Georgiou's chart – which he has attached to the instant Motion as "evidence that the defendant was seeking information about Mr. Waltzer's claimed IRS problems" – is unavailing.  Georgiou submits that the chart indicates that there was "evidence in the form of recorded conversations and PIN and email communications that neither party offered into evidence" despite the fact that it was "disclosed to the defense by the government in advance of trial."  Georgiou obviously did not consider this "evidence" to be significant enough to present at trial and we reject it as grounds for a new trial.

Regarding his second argument, Georgiou again states in his Motion that "[t]he evidence that undercuts the government's methodology . . . was disclosed to the defense in discovery."[10] Georgiou clearly had the opportunity to offer this "evidence" at trial and argue the theory which he presents here.  Again, Georgiou did not consider this argument to be significant enough to present at trial, and therefore, we reject it as grounds for a new trial.

For the above-stated reasons, we conclude that a new trial in this case is unwarranted.

An appropriate Order follows.

---

[10] On the last page of his Motion, Georgiou requests "that a hearing be convened to permit the defense to present additional evidence to support the argument that the government presented a methodology that was inconsistent with other evidence in its possession."  (Def.'s Mot. New Trial at 50.)  Georgiou offers no explanation as to why this "additional evidence" was not presented at trial and has failed to persuade the Court that a hearing at this stage regarding this alleged evidence is appropriate.