## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|  | : |  |
| v. | : | No. 09-88 |
|  | : |  |
| GEORGE GEORGIOU | : |  |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                      **DECEMBER 12, 2011**

Presently before this Court is Defendant George Georgiou's ("Georgiou") Motion for Reconsideration of this Court's denial of his Motion for a New Trial Pursuant to Brady v. Maryland[1] and the The Jencks Act.[2]  Also, before this Court is Georgiou's Motion to Reinstate Bail Pending Appeal, Supplemental Motion for Reconsideration ("Def.'s Supp. Mot."),[3] and Motion to Compel Disclosure of Evidence ("Mot. to Compel").  For the reasons set forth below, these Motions will be denied.

### I.    FACTS AND BACKGROUND

On February 12, 2010, following a three-week trial, a jury found Georgiou guilty of one

---

[1]See Brady v. Maryland, 373 U.S. 83 (1963).

[2]The Jencks Act requires that once a witness called by the United States has testified on direct examination, "the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."  18 U.S.C.A. § 3500(b).

[3]While Georgiou terms this new filing a "Reconsideration," it is, in reality, his fourth Motion for a New Trial and we will call it such ("Fourth Motion for New Trial") because it raises a number of issues not previously presented in his prior Motions.  As will be explained, infra, we have issued Memorandum Opinions in three previous Motions for a New Trial brought by Georgiou.  See  United States v. Georgiou, 742 F. Supp. 2d 613 (E.D. Pa. 2010); United States v. Georgiou, No. 09-88 (filed under seal, Nov. 9, 2010); United States v. Georgiou, No. 09-88, 2011 WL 1081156, at *1 (E.D. Pa. Mar. 18, 2011).

count of conspiracy, four counts of securities fraud and four counts of wire fraud.[4]  At trial, the

Government offered the testimony of its cooperating witness, Kevin Waltzer ("Waltzer"), who, at

the Government's direction, had recorded numerous conversations between himself and

Georgiou in 2007 and 2008.  (Trial Tr. vol. 11, 274, Feb. 8, 2010.)

On May 7, 2010, Georgiou filed a Supplemented and Amended Motion for New Trial

Pursuant to Rule 33.  On August 20, 2010, Georgiou filed a Motion to Compel, seeking:

> [A]n Order disclosing and unsealing, subject to the continuing confidentiality
> provisions of any applicable protective orders, certain documents filed in
> connection with the sentencing of government witness Kevin Waltzer which have
> yet to be produced, for disclosure of Brady material concerning Waltzer's mental
> health and record of substance abuse, and disclosure of, or authorization to
> subpoena if not in the government's possession, additional mental health and
> substance abuse records, as may relate to information contained in the Waltzer
> sentencing and/or Brady materials.

(Doc. No. 206.)  On September 20, 2010, Georgiou filed his Second Motion for New Trial.  On

that same day, this Court entered an Order denying Georgiou's Motion to Compel.

On September 29, 2010, Georgiou filed a Motion for Reconsideration of this Court's denial of

the Motion to Compel.  In addition, on that same date, this Court denied Georgiou's

"Supplemented and Amended Motion for New Trial Pursuant to Rule 33."  See Georgiou, 742 F.

Supp. 2d at 613.

Those Motions focused on various allegations concerning the mental health and record of

---

[4]A more detailed account of the underlying facts of this case can be found in this Court's
December 7, 2009 Memorandum, United States v. Georgiou, No. 09-88, 2009 WL 4641719, at
*1 (E.D. Pa. Dec. 7, 2009), and September 29, 2010 Memorandum, Georgiou, 742 F. Supp. 2d at
613.

substance abuse of Waltzer.[5]  On March 12, 2010, Waltzer was sentenced before United States

District Court Judge Stewart Dalzell in Criminal Number 08-552.  In connection with the

sentencing, Waltzer's counsel submitted a report (the "Lizzi Report") authored by Dr. Luciano

Lizzi ("Dr. Lizzi"), a psychiatrist and Clinical Professor at the University of Pennsylvania

Medical School, who Waltzer had been seeing since August 2007, shortly after he began

cooperating with the Government.  The Lizzi Report indicated that Waltzer suffered from bipolar

disorder and that he had abused cocaine and alcohol during his illegal activities between 1999

and 2006.  Dr. Lizzi stated that it was his medical opinion that "these mental disorders, either

individually, or in concert, so affected Mr. Waltzer's capacity to reason and control his impulses

that they significantly contributed to his" criminal behavior during that time.  (Def.'s 8/20/10

Mot. to Compel, Ex. B.)

Following Waltzer's sentencing, counsel for Georgiou filed a Motion of Defendant for

Disclosure of Sealed Sentencing Documents as to Kevin Waltzer and for Disclosure of Brady

Material, seeking the Lizzi Report, Waltzer's letter to the sentencing court and "all information,

including information contained within the [Presentence Investigation Report], related to Kevin

Waltzer's use of cocaine or other drugs and diagnosis or treatment for any mental disease,

disorder or defect, includ[ing] bipolar disorder, including information concerning the knowledge

of any member of the prosecution team about these subjects."  (Def.'s 8/20/10 Mot. for

Disclosure at 2.)  Georgiou's Motion was subsequently submitted to Judge Dalzell.  On July, 20,

2010, Judge Dalzell granted Georgiou's Motion.  On August 9, 2010, Judge Dalzell amended his

---

[5]We include in our procedural history this information regarding Waltzer's mental health
because Georgiou has once again raised issues concerning Waltzer's mental health in the instant
Motion.

Order and its confidentiality provisions to allow the defense's psychiatric expert, Dr. Peter Breggin ("Dr. Breggin"), to review the sentencing materials concerning Waltzer's mental health and use of controlled substances.  (Def.'s 8/20/10 Mot. to Compel, Ex. E.)

Attached to Georgiou's Second Motion for New Trial was a report by Dr. Breggin (the "Breggin Report").  In the Breggin Report, Dr. Breggin analyzed various documents relating to Waltzer's sentencing hearing, including the Lizzi Report, the Presentence Investigation Report and Waltzer's letter to the sentencing court.  Dr. Breggin stated, inter alia, that "[g]iven Mr. Waltzer's bipolar disorder, cocaine abuse, alcohol abuse, and exposure to Paxil, Xanax and other psychiatric drugs in the period 1995 to 2006-2007, he would be unable to accurately testify about events involving Mr. Georgiou during that period of time.  At the least[,] he is a very unreliable individual."  (Breggin Report at 18, Sept. 16, 2010.)

This Court filed a sealed Memorandum and Order on November 9, 2010 ("November 9, 2010 Memorandum"), denying Georgiou's Second Motion for a New Trial and Motion for Reconsideration.  Georgiou was sentenced by this Court on November 19, 2010, to a total of 240 months imprisonment and ordered to pay restitution in the amount of $55,832,398.00.  Georgiou filed a third Motion for a New Trial ("Third Motion for New Trial") on December 23, 2010, and also filed a Notice of Appeal in the United States Court of Appeals for the Third Circuit on December 29, 2020, appealing our denials of his prior Motions for a new trial.  Georgiou requested that the Court of Appeals stay his appeal until the Third Motion for New Trial was decided, and the Government joined in this request.  We granted such requests and on March 18, 2011 denied the Motion on its merits.  See United States v. Georgiou, No. 09-88, 2011 WL 995826, at *1 (E.D. Pa. Mar. 18, 2011).  On April 1, 2011, Georgiou filed this instant Motion for

Reconsideration of this denial.[6]  On April 15, 2011, Georgiou filed under seal a Supplemental

Motion for Reconsideration, and then filed a sealed Motion to Compel Evidence on June 1, 2011.

On July 15, 2011, the Government filed a sealed Omnibus Response to these Motions, and on

September 9, 2011, Georgiou filed a 73-page Reply to this Response.[7]  Thereafter, on October

24, 2011, the Government submitted a letter response to this Court to Georgiou's Reply

Memorandum, and on October 27, 2011, submitted another letter supplementing its response.

Lefeber filed letter replies to these responses on November 3 and November 14, 2011.[8]

In his Motion for Reconsideration, Georgiou first argues that this Court "used an

incorrect standard of review" to find that the claims in his Third Motion for a New Trial were

"procedurally barred and meritless, because they were deemed not to constitute newly discovered

evidence." (Def.'s Mot. Recons. at 1.)  Georgiou asserts further that:

> The Government has previously conceded that its prosecution team
> was actually aware that its star cooperating witness [Waltzer] had
> made statements about his mental health treatment at his plea
> hearing because one of the Assistant United States Attorneys and
> one of the FBI agents who prosecuted Mr. Georgiou attended and
> participated in that hearing.  Significantly, the defense *repeatedly*
> *requested* all *Brady* and other discovery materials prior to trial,
> even bringing a motion to compel shortly before trial, which was
> denied when the Government represented that all such evidence *in*

---

[6]Michael Bachner, Esq., filed this Motion on behalf of Georgiou.  Shortly after this filing date, Hope Lefeber, Esq. ("Lefeber"), joined Georgiou's defense team.  Most of the filings thereafter were authored by Lefeber.  We note this because, as will be discussed infra, some serious allegations have been made against the Government attorneys, and there have been several contentious letters exchanged between Lefeber and Assistant United States Attorney Louis Lappen ("Lappen").

[7]This Reply was submitted jointly by Bachner and Lefeber.

[8]These letter responses and replies were thereafter filed under seal and docketed.  (Doc. Nos. 255-265.)

*its possession* had been produced.

(Id. at 2.)  Georgiou's counsel, Bachner, also states in this Motion that he was recently apprised

by Lefeber who Georgiou has retained to assist him with his case and appeal that:

> [T]he Government received a draft PSR[9] detailing Kevin Waltzer's mental
> health diagnosis and psychiatric history on **February 12, 2010** – the exact
> date of the verdict in Mr. Georgiou's trial.  The Government failed to
> notify Mr. Georgious's defense about the relevant contents of its key
> witness's draft PSR.

(Id.) (emphasis added).  Bachner states further that Lefeber informed him that: (1) she obtained

an Order directing the Department of Probation to release to her the date it provided the

Government with Waltzer's draft PSR; (2) that the Probation Department ("Probation")

forwarded to her an email memorializing the delivery of the draft PSR to the Government and

Waltzer's counsel at his sentencing; and (3) that Probation provided her with those portions of

Waltzer's draft PSR pertaining to his mental health and substance abuse, for use in connection

with Georgiou's post-trial motions or appeal.  (Id. at 2-3.)

Lefeber maintains in Georgiou's Supplemental Motion  that "both pretrial and post-trial,

in all written submissions, the Government attorneys, Derek Cohen and Louis Lappen have

maintained that they had no knowledge of Waltzer's mental health and substance abuse issues

with the exception of Waltzer's statements to this Court at the plea allocution, which was filed

under seal and also not disclosed to the Georgiou defense."  (Def.'s Supp. Mot. Recons. at 2.)

Lefeber asserts that "the evidence obtained in response to Judge Dalzell's recent Orders proves

that the Government has blatantly misrepresented its knowledge of Waltzer's mental health and

substance abuse issues as the evidence proves that the Government had full knowledge of these

---

[9]Presentence Investigation Report.

issues as early as February 17, 2009, when it received the Bail Report from U.S. Pretrial

Services."  (Id. at 2-3.)  It is further asserted that on the exact date of Georgiou's verdict,

February 12, 2010, the Government received a draft Presentence Investigation Report ("PSR")

further detailing Waltzer's mental health diagnoses and psychiatric history.  In addition, it is

asserted that the Government received Waltzer's Objections to the PSR and Motion for

Downward Departure which outlined in great detail Waltzer's extensive psychiatric history and

substance abuse history, but that the Government never disclosed this information to the defense.

(Id. at 3.)  It is asserted that "upon learning of Waltzer's mental health and substance abuse issues

at this sentencing in March 2010, one month after Georgiou's trial, the Georgiou defense

confronted prosecutors who claim to have had no knowledge of Waltzer's mental health and

substance abuse issues."  (Id. at 4.)  As noted earlier, Judge Dalzell later granted Georgiou's

Motion ordering the release of sentencing documents relating to Waltzer's mental health and

abuse issues.  In addition, by Orders dated March 2, 2011 and April 5, 2011, Judge Dalzell

further directed Probation and Pretrial Services to release to the defense all information in their

possession regarding Waltzer's mental health and substance abuse issues.

Georgiou now contends that "[a]s a result of documents received pursuant to Judge

Dalzell's Orders, the defense has obtained evidence which proves the falsity of the Government's

representations regarding its knowledge of Waltzer's substance abuse and mental health issues."

(Id. at 4-5.)  Georgiou maintains that his Bail Report ("Bail Report") which was given to the

Government as early as January 28, 2009 and/or February 17, 2009, the dates of Waltzer's initial

appearance/guilty plea, "expressly states that Waltzer had a history of psychiatric and substance

disorders."  (Id. at 5.)  Georgiou argues that the Government failed to reveal this critical

information to the defense and has maintained, in all representations to the Court, that it has no

knowledge of Waltzer having mental health and/or substance abuse issues, and that had this

information been made available to the Georgiou defense, "a full investigation would have been

made into Waltzer's extensive history of substance abuse and psychiatric disorders and the

effects of abusing drugs and alcohol while on psychotropic prescription drugs for mental

disorders."  (Id.)  Georgiou further asserts that:

> [t]he records from U.S. Pretrial Services included numerous admissions
> from Waltzer in 2009 that he is an addict and that his life has become
> unmanageable due to his addiction to drugs and alcohol.  See Monthly
> Treating Report Substance Abuse, Exhibit "B," pp.4-8.  Furthermore, on
> January 19, 2010, one week prior to his testimony in the Georgiou trial,
> Waltzer tested positive for opiates at U.S. Pretrial Services.  See Exhibit
> "C," p.4.

(Id. at 6.)  Georgiou maintains that these records prove that Waltzer:

> (1)  had a long history of alcohol and cocaine abuse;
>
> (2)  that he was self-medicating with alcohol and cocaine while on pretrial
> supervision during 2009-2010;
>
> (3)  that he was in treatment for alcohol and cocaine abuse as recently as
> 2009-2010, before and after Georgiou's trial;
>
> (4)  that he was medicated on serious psychotropic drugs for his bipolar
> disorder, anxiety disorder and panic attacks during defendant Georgiou's
> trial; and
>
> (5)  that he combined drugs and alcohol with the prescription psychiatric
> drugs.

(Id.)

Georgiou asserts that documents obtained from Pretrial Services in the Middle District of

Florida, where Waltzer was reporting prior to his trial, entitled "Monthly Treatment Reports"

("Treatment Report") demonstrate Waltzer's drug and alcohol problems during this time.

Specifically, Georgiou points to: (1)  Treatment Report dated August 31, 2009 which notes that

"alcohol is currently a challenge."  (Id. at Ex. B, p. 3.); (2)  Treatment Report dated September

30, 2009, which states that "he has many issues regarding self-medicating with alcohol and

cocaine."  (Id. at Ex. B, p.4.), and (3) Treatment Report dated October 30, 2009, which notes

Waltzer's "willingness to admit his life has become unmanageable due to alcohol and drugs."

(Id. at Ex. B, p. 5.)  Georgiou argues that this evidence shows that:

> this Court was misled by both Waltzer and the Government in making
> evidentiary rulings at trial and in post-trial submissions.  Had the entire
> history of Waltzer's mental health issues and past and present drug and
> alcohol abuse been made known to this Court and the defense, the
> defense's strategy would have been impacted in myriad ways, including
> but not limited to the defendant's decision to testify.  Conversely, the
> Government was able to exploit the fact that the defense was unable to
> challenge Waltzer's credibility based on his mental health issues, or
> proffer an expert witness on the effect of his drug and alcohol use in
> combination with his mental health issues.

(Id. at 9.)

Georgiou also asserts that his trial was "further contaminated, not merely by the

concealment of Waltzer's past history of drug and alcohol abuse and psychiatric issues, but by

the perjury elicited by the Government who presented Waltzer as a reformed man who no longer

uses drugs, concealing Waltzer's present addictions and abuse of cocaine, alcohol and

prescription drugs."  (Def.'s Mot. to Compel at 6.)  In addition, to making the very serious

allegation that the Government attorneys knowingly elicited perjured testimony from Waltzer,

Georgiou's counsel also accuses the Government of other very serious misconduct.  Counsel

states that:

> [i]t is now clear that at the exact time Mr. Georgiou was scheduled for trial in the fall of 2009, Waltzer's life had become "unmanageable," as a result of his drug and alcohol abuse, and he was in no position to testify at Mr. Georgiou's trial.  This would explain the reason for the Government's efforts to continue the trial, over the defense's objection, after the November 2009 date had been previously set by this Court, with no objection from the Government.  Presumably, Waltzer used the extra time to sober up, although still heavily medicated and abusing alcohol at the time of the Georgiou trial.

(Def.'s Mot. to Compel at 7-8.)

Counsel also states that the "defense believes that the Government threatened Waltzer with losing his deal with the Government unless he sobered up in time for trial in January 2010. Clearly, using and abusing illegal drugs and alcohol would be a violation of Waltzer's Plea Agreement with the Government, resulting in the loss of his cooperation deal.  Without this deal, Waltzer was facing decades' imprisonment.  This explains the statements Waltzer made to Dr. Lizzi (Lizzi Report II, p. 5) that he 'feared retaliation . . . of individuals in the Government seeking his imprisonment.'"  (Id. at 8.)

## II.    STANDARDS OF REVIEW

### 1.  Motion for Reconsideration

"The United States Court of Appeals for the Third Circuit has held that the purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence."  Cohen v. Austin, 869 F. Supp. 320, 321 (E.D. Pa. 1994).  Accordingly, a district court will grant a party's motion for reconsideration in any of these three situations:  (1) the availability of new evidence not previously available; (2) an intervening change in controlling law; or (3) the need to correct a clear error of law or to prevent manifest injustice.  Id.  Federal courts have a strong interest in the finality of judgments; as such, motions for reconsideration

10

should be granted sparingly.  Cont'l Cas. Co. v. Diversified Indus., Inc., 884 F. Supp. 937, 943 (E.D. Pa. 1995).  Dissatisfaction with the Court's ruling is not a proper basis for reconsideration.  Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993).

### 2.  Motion for New Trial[10]

Federal Rule of Criminal Procedure 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.[11]  "Whether to grant a Rule 33 motion lies within the district court's sound discretion."  United States v. Ortiz, 182 F. Supp. 2d 443, 446 (E.D. Pa. 2000) (citation and quotation marks omitted).  In evaluating a Rule 33 motion, the court does not view the evidence favorably to the government, but rather, exercises its own judgment in evaluating the

---

[10]As noted earlier, we consider this Motion for Reconsideration to also be a Fourth Motion for a New Trial.  Accordingly, we have included both standards of law.

[11]Federal Rule of Criminal Procedure 33 provides:

> (a) **Defendant's Motion**.  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so desires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
>
> (b) **Time to File.**
>
> (1) **Newly Discovered Evidence**.  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
>
> (2) **Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33.

government's case.  United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).  Nevertheless, "[t]he burden is on the defendant to show that a new trial ought to be granted."  United States v. Clovis, No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

A court must grant a motion for new trial if it finds that there were cumulative errors during the trial that, "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."  United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)).  However, even if the court "believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'"  United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting Johnson, 302 F.3d at 150).  We will now discuss Georgiou's claims in turn.

## III.    DISCUSSION

## 1.    Correct Standard of Review

As noted, Georgiou first asserts that this Court applied the incorrect standard of law in considering his newly discovered evidence claims in his Third Motion for a New Trial.  Georgiou argues "[w]hile, procedurally, *Brady* and Jencks Act motions brought pursuant to Rule 33 are cognizable under the 'newly discovered evidence' clause of the rule, substantively, they are evaluated differently."  (Def.'s Mot. Recons. at 1-2.)  Georgiou contends that this Court should not have used the five-pronged "newly discovered evidence" standard of review,[12] but rather the

---

[12]In interpreting Rule 33, the Third Circuit has held that a district court may grant a new trial on the basis of "newly discovered evidence" if five requirements are met:

three-pronged <u>Brady</u>[13] test. <u>See</u> <u>United States v. Runyan</u>, 290 F.3d 223, 246-47 (5th Cir. 2002)

(stating that "when a motion for a new trial based on newly-discovered evidence raises a *Brady*

claim, this court instead applies the three-pronged <u>Brady</u> test to determine whether a new trial is

appropriate")

   This claim, however, is wholly without merit. We need not discuss which test correctly

applies because it is clear even a casual reading of our Memorandum Opinion denying

Georgiou's Third Motion for a New Trial that we considered Georgiou's claims under both a

"newly discovered evidence" standard and the <u>Brady</u> test. In our Memorandum Opinion we

stated:

> Georgiou also attempts to claim that the Government violated its
> obligation under <u>Brady</u> in not disclosing said electronic evidence.
> We first point out, however, that this <u>Brady</u> claim was not timely
> filed under Fed.R.Crim.P. 33 and could be rejected on that basis
> alone. We, nonetheless, address this issue on its merits below, and
> find that <u>Brady</u> was not violated.

<u>Georgiou</u>, 2011 WL 995826, at *15. In addition, with regard to Georgiou's claim in his Third

---

> (a) the evidence must be in fact, newly discovered, i.e., discovered since
> the trial; (b) facts must be alleged from which the court may infer
> diligence on the part of the movant; (c) the evidence relied on, must not be
> merely cumulative or impeaching; (d) it must be material to the issues
> involved; and (e) it must be such, and of such nature, as that, on a new
> trial, the newly discovered evidence would probably produce an acquittal.

<u>United States v. Cimera</u>, 459 F.3d 452, 458 (3d Cir. 2006).

   [13]In <u>Brady v. Maryland</u>, the Supreme Court held that "the suppression by the prosecution
of evidence favorable to an accused upon request violates due process where the evidence is
material either to guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution." 373 U.S. at 87. To establish a due process violation under <u>Brady</u>, a defendant
must make the following three showings: "(1) evidence was suppressed; (2) the suppressed
evidence was favorable to the defense; and (3) the suppressed evidence was material to either
guilt or to punishment." <u>United States v. Pelullo</u>, 399 F.3d 197, 209 (3d Cir. 2005).

Motion for a New Trial that the Government violated its disclosure obligations under <u>Brady</u> by failing to produce Waltzer's statements about his "criminal activities" made in the course of his mental health treatment, we stated: "[w]e again point out that this <u>Brady</u> claim was not timely filed under Rule 33, and could be dismissed on this basis alone.  We, nonetheless, address it on its merits."  (<u>Id.</u> at 17, n.11.)  Thus, this claim is baseless and is denied.

**2.      Suppression of Text Messages**

Next, Georgiou asserts that this Court employed the wrong standard of review in denying his claim that the Government failed to disclose electronic evidence to the defense.  (Def.'s Mot. Recons. at 4.)  Georgiou states:

> In the Court's Memorandum, it states, concerning the defendant's text message claim, that this "*Brady* claim was not timely filed under Fed. R. Crim. P. 33," and that any new evidence contained in text messages could not have satisfied the "probably produce an acquittal standard." (Mem. at 15 & n.10).

(<u>Id.</u>)  However, as we stated in the previous section, any reading of this Court's Memorandum Opinion and analysis of this claim clearly indicates that we considered this claim under the five-pronged Rule 33 "newly discovered evidence" standard <u>and</u> the three-part <u>Brady</u> test.  <u>See Georgiou</u>, 2011 WL 995826, at *3-9.

In his Third Motion for a New Trial, Georgiou asserted that Waltzer traded PINs and/or text messages and emails with FBI Agent Corey Riley and others during his stint as an undercover, cooperating witness, but that the Government produced only a few of those communications during discovery, claiming that it either did not have certain of those communications in its custody or control, or that the defendant was not entitled to them. Georgiou argued that the Government violated its Jencks Act, and/or <u>Brady</u> obligations in not

14

disclosing those messages.  In our Memorandum Opinion, we determined that this claim had no

merit finding that it did not meet the five-prong test in order to grant a new trial based on "newly

discovered" evidence.  <u>See</u> <u>Cimera</u>, 459 F.3d at 458.

Specifically, we determined that Georgiou's counsel had failed to exercise "diligence" in

requesting any alleged missing electronic evidence, and that Georgiou simply speculated "that

the Government somehow failed to produce communications from law enforcement agents to

Waltzer instructing him how to behave during his undercover contacts with Georgiou, and

communications from Waltzer to the agents concerning his observations and assessments of the

undercover meetings with Georgiou."  <u>Georgiou</u>, 2011 WL 995826, at *7.  We stated that

Georgiou offered little or no evidence to establish that the Government failed to produce such

communications, and noted that he only offered as proof of his assertions, his attorney,

Bachner's, Declaration in which Bachner claimed "to have analyzed telephone records that the

Government produced in discovery and concluded that some unidentified communications were

missing and that they showed a 'pattern of instructions between Waltzer and his government

handlers for purposes of guiding Waltzer during the undercover sting operation against Mr.

Georgiou.'"  <u>Id.</u> We concluded that this was "pure speculation."  <u>Id.</u>

In addition, we pointed out that the Government had repeatedly maintained that no such

communications exist or ever existed, and that it produced all discoverable communications

between Waltzer and the federal agents.[14]  <u>Id.</u>  We, thus, concluded that because Georgiou had

---

[14]The Government stated in its Response to the Third Motion for a New Trial that it:

> [r]eviewed records of electronic communication and has queried the
> agents involved in the case.  Based on this review, counsel has confirmed,
> as it has represented throughout this case, that Waltzer was not provided

failed to produce any evidence that such electronic communications exist or existed, it could not be found to be "newly discovered" evidence.[15]  Id.

Moreover,  we also considered this claim under the three-part Brady test and stated:

> [W]ith regard to Brady's first element, we find that the alleged electronic evidence was not suppressed as Georgiou has not offered any evidence establishing that the Government suppressed such evidence.  In addition, even if this evidence existed and the Government was obligated under Brady to disclose such, we find that Georgiou has failed to show that there is a reasonable probability that, had such evidence been disclosed to the defense, the result of the trial would have been different.  See Bagley, 473 U.S. at 682.

Id. at 9.

Georgiou also asserts that this Court "may have misapprehended the factual basis of his claim."  (Def.'s Mot. Recons. at 4.)  Regarding the basis of this claim, Georgiou states that the "defense was seeking production of the communications between Waltzer and the Government that were sent via text message to see if they contained statements or instruction about his role and his efforts in the sting operation."  (Id. at 7.)  However, it is apparent that we did not

---

> with written instructions via electronic communications concerning the undercover investigation of Georgiou.  During the undercover operations, Waltzer received his instructions orally.  Likewise, Waltzer did not communicate through written electronic communications his impressions of meetings with Georgiou.  The electronic communications that Waltzer had with the agents generally involved forwarding electronic communications with Georgiou.  Those communications, as defense concedes, were provided during discovery and were presented at trial.

(Id.)

[15]Moreover, we also determined that even if any evidence relating to communications between Waltzer and the agents constituted "newly discovered" evidence, it would be "merely impeaching," in light of the "substantial evidence" presented against him at trial.  Georgiou, 2011 WL 995826, at *8.)

"misapprehend" the factual basis of Georgiou's claim.  We directly addressed this specific issue

and stated in our Memorandum Opinion that "Georgiou simply speculates that the Government

somehow failed to produce communications from law enforcement agents to Waltzer instructing

him how to behave during his undercover contacts with Georgiou, and communications from

Waltzer to the agents concerning his observations and assessment of the undercover meetings

with Georgiou."  Georgiou, 2011 WL 995826, at *7.

       As noted, the purpose of a motion for reconsideration is to correct manifest errors of law

or fact or to present newly discovered evidence.  See Cohen, 869 F. Supp. at 321.  With regard to

this claim, Georgiou offered nothing in his Motion to convince us that we have committed a

"manifest error of law" or that the alleged text messages were newly discovered evidence in

order for us to reconsider our determination.  As he did in his Third Motion for New Trial,

Georgiou has offered nothing more than speculation that such text messages exist and that they

contain exculpatory information.  As the Government represented in its Response to Georgiou's

Third Motion for a New Trial, it again represents that "it provided to the defendant all

substantive communications between Waltzer and the Government, and that there were no

electronic communications in which the agents directed Waltzer in the investigation of the

defendant or where Waltzer provided his interpretation of the undercover meetings."  (Govt.'s

Omnibus Resp. at 10-11.)  In the absence of any concrete evidence to the contrary, this claim is

without basis and will be denied.

**3.**      **Waltzer's Mental Health and Drug Abuse History**

       For the third time, we address issues concerning disclosure of information regarding

Waltzer's mental health and drug abuse history.  In Georgiou's instant Motion for

Reconsideration, his Supplemental Motion, Motion to Compel, and Replies to the Government's Omnibus Response, Georgiou's counsel primarily focuses on the Government's alleged failure to disclose what is characterized as critical <u>Brady</u> information relating to Waltzer's supposed mental health and substance abuse issues.  Georgiou alleges that the Government "blatantly misrepresented" its knowledge of Waltzer's mental health and substance abuse issues, "was complicit in eliciting perjured testimony" from Waltzer, and failed to provide to the defense critical information relating to Waltzer's issues.  Georgiou essentially contends that the Government hid from the defense, the Court, and the jury the fact that Waltzer was seriously mentally ill and abusing drugs before and during his trial.  The defense also accuses the Government of lying to the Court about a continuance request so that the Government prosecutors had time to secretly "sober up" Waltzer before testifying at his trial.  (Def.'s Mot. to Compel at 7.)

Throughout these lengthy post-trial proceedings, the Government has repeatedly represented that the only information that was actually known by it concerning Waltzer's mental health prior to and during Georgiou's trial was that which was elicited from Waltzer during his guilty plea colloquy before Judge Dalzell on January 28, 2009- namely that he suffered from various anxiety issues, but nothing serious that would bear on his credibility as a witness.[16]

_____

[16]The Government reiterates what it stated in its Response to Georgiou's Third Motion for a New Trial.  It stated:

> Judge Dalzell asked Waltzer whether, in the approximately 1.5 years before the plea hearing of January 28, 2009, Waltzer had seen a mental health care provider.  Waltzer said that he had "in connection with depression and anxiety."  Tr. 1/28/09, 6-7.  In response to further inquiries from the court, Waltzer stated that he was taking Paxil for his depression, and that his "head [has] always

The Government argues that the first flaw in Georgiou's argument that they intentionally withheld <u>Brady</u> material from the defense is that he erroneously maintains that Waltzer was seriously mentally ill.  The Government asserts that the material and information which Georgiou claims were withheld clearly do establish that the Government knew Waltzer was seriously mentally ill and should have turned such records over to the defense.

Georgiou claims that the Government has been caught "red-handed" with <u>Brady</u> materials concerning Waltzers' mental health and drug abuse history including Waltzer's Bail Report dated February 17, 2009, a PSI emailed to the Government attorneys on the very date that he was convicted, February 9, 2010, and Pretrial reports. While the Government asserts that our analysis of each of these documents should be whether they indicate that Waltzer had  "serious" mental issues, we will apply the <u>Brady</u> three-part test to determine if any or all of these materials were <u>Brady</u> material which should have been disclosed to the defense, and whether any suppression of such affected the integrity of the trial.[17]  We are of the opinion, however, that the question of

---

been clear," and that he was able to understand everything he had discussed with his lawyer.  <u>Id.</u> at 8.  In response to an earlier question about medication, Waltzer said that he was not taking any medication that "in any way affects how [he] think[s]."  <u>Id.</u> at 3. Counsel for Waltzer (who had worked extensively with Waltzer), along with the Government, and then the Court all agreed that there was no issue about Waltzer's competency given the medication that he was taking.  <u>Id.</u> at 8.  On February 17, 2009, when Waltzer's guilty plea hearing concluded, Judge Dalzell specifically found that Waltzer was competent to plead guilty, stating, "I find that defendant Kevin Waltzer is competent to plead; there is not an iota of doubt in that department . . . ."  Tr. 2/17/09, 38.

(Govt.'s Resp. Third Mot. New Trial at 30-31.)

[17]We note that Georgiou asserts that these documents have all just recently been discovered by his defense team.  Thus, it could be argued that they should be considered under

whether the information at issue shows "serious" mental illness, is certainly a factor in considering whether the information is "favorable to the defense" and "material" under the second and third parts of the <u>Brady</u> test.

As noted earlier, to establish a due process violation under <u>Brady</u>, a defendant must make three showings: "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or to punishment." <u>Pelullo</u>, 399 F.3d at 209. In <u>United States v. Bagley</u>, the Supreme Court explained its holding in <u>Brady</u>, stating that evidence favorable to the defense is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). In other words, a "reasonable probability" of a different result is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678. We will now consider each of these materials in turn.

### A.    Bail Report

We first consider a Bail Report which Georgiou asserts was provided to the Government by Pretrial Services during Waltzer's allocution on February 17, 2009 before Judge Dalzell. (<u>See</u> Def.'s Supp. Mot. Recons., Ex. A.) Georgiou asserts that the Bail Report dated January 26,

───────────────

the five-part "newly discovered evidence" test. <u>See</u> <u>Cimera</u>, 459 F.3d at 458. However, we will consider each of these documents under the less-stringent three-part <u>Brady</u> test.

2009, was "given to the government as early as January 28, 2009 and/or February 17, 2009, the dates of Waltzer's initial appearance/guilty plea," and "expressly states that Waltzer had a history of psychiatric and abuse disorders." (Id. at 5.)  Georgiou contends that the Government misrepresented their knowledge about this Bail Report and deprived the defense of critical information about Waltzer's drug use and mental health issues.

The Government states that:

> [A]t Waltzer's change of plea hearing, the Bail Report was in the possession of the Pretrial Services Officer and was available for the government's inspection.  However, the government attorneys did not inspect the report at the hearing because the government was not seeking pretrial detention.  Waltzer was actively cooperating in numerous government investigations at the time of his plea, and thus both parties agreed that Waltzer should remain free on bail to continue his active cooperation.  The government attorneys did not need to address the uncontested issue of bail.  The Government also did not obtain a copy of the bail report for its files because the rules of Pretrial Services prohibit the parties from removing the bail report from the courtroom.  Put simply, the bail report may have been in the same courtroom as the Government attorneys, but they never possessed it - never reviewing the report or removing it from the courtroom for their files.  The Government was not aware of the contents of the bail report until the defendant raised the issue in this post-trial litigation.

(Govt.'s Omnibus Resp. at 20-21.)  Thus, the Government argues that since it did not possess the Bail Report it could not have violated Brady in failing to produce it.  (Id.)  The Government further argues that even if the Government "were deemed to have constructively possessed the bail report, there is no Brady violation because the information contained in the report is not material under Brady."  (Id. at 21, n.12.)

We first note that we are not aware of any official Pretrial Services rule which prohibits the taking of the Bail Report out of the courtroom by the Government.  However, the Bail Report

does specifically state at the top in bold capital letters that it "**MUST NOT BE TAKEN OUT OF COURTROOM.**"[18]  ( Def.'s Supp. Mot. Recons., Ex. A.)  We, thus, accept the representation of the Government that it believed that such a rule existed and that it did not leave the courtroom with the Bail Report in its possession.  We also accept as reasonable the Government's assertion that it did not review the contents of the Report because it was not contesting bail for Waltzer.  We, thus, find that the Government did not "suppress" this material from the defense under the first part of the Brady test.  However, even assuming that the Government did review the Bail Report, was aware of its contents, and even had it in its possession, we find that its contents do not meet the second and third parts of the Brady test.

The Bail Report stated that Waltzer has a "history of substance abuse," and that the "defendant reported that he began using cocaine and marijuana at age 16 and last used these substances about 2 and ½ years ago." (Def.'s Supp. Mot. Recons., Ex. A.)  It further stated that Waltzer related that he had seen "numerous psychiatrists and psychologists for his substance abuse issues between the years of 1994 and 2004."  (Id.)  It also stated that Waltzer indicated that he had been diagnosed in the past with Anxiety Disorder and Substance Abuse Disorder and that he was currently under the care of his primary physician for his anxiety, and is prescribed Paxil, which he had been taking for the last ten years.  (Id.)  Regarding drug abuse and mental health

---

[18]The Bail Report actually states in full:

**FOR COURTROOM USE ONLY**
**RETURN TO PRETRIAL SERVICES OFFICER IMMEDIATELY AFTER HEARING**
**MUST NOT BE TAKEN OUT OF COURTROOM**

( Def.'s Supp. Mot. Recons., Ex. A.)

issues, Pretrial Services recommended that Waltzer receive "drug testing/treatment" and "mental health treatment" if they "deemed" such "necessary." (Id.)

Under Brady's second prong, we are of the opinion that it is questionable, at best, that the information in the Bail Report is "favorable" to the defense. The Bail Report stated that Waltzer suffered from "Anxiety Disorder," but did not indicate that such condition was severe and would in any way affect his ability to recall the past and to truthfully and accurately testify on behalf of the Government in its case against Georgiou and/or any other defendants in which he was cooperating with the Government. (Id.) In addition, the Bail Report did not indicate that he suffered from any other mental or emotional conditions other than "Anxiety Disorder." It is also notable that, at the time Pretrial Services interviewed Waltzer for this Bail Report, Waltzer was only being seen by his primary care physician for his Anxiety Disorder and not a mental health professional, nor was he being treated by substance abuse professionals for a current drug problem. (Id.) In fact, it is apparent that Pretrial Services did not consider Waltzer to have serious mental health or substance abuse issues because it did not recommend that Waltzer receive immediate "drug testing/treatment" and/or "mental health treatment." Pretrial Services' recommendation only stated that Waltzer should obtain such if it was "deemed necessary" by it, and at this time, it did not deem such treatment necessary. (Id.)

Moreover, even if the information in the Bail Report were considered "favorable" to the defense, we do not find the Bail Report to be "material" under Brady's third prong because we believe that there is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. As we discussed in our previous Memorandum Opinions denying Georgiou's Second and Third

Motions for New Trial, evidence was presented at trial which detailed Waltzer's history of

misconduct and his alleged bias for the government in that he admitted to a $40 million dollar

fraud to which he pled guilty under a plea cooperation agreement.  We found that this evidence

provided ample opportunity for Georgiou to attack Waltzer on the basis that he was

untrustworthy and biased for the Government.  See Georgiou, 2011 WL 1081156, at *7.  In

addition, we also pointed out that counsel for Georgiou thoroughly cross-examined Waltzer on

his history of deception and alleged bias for the Government.  (See Trial Tr. vols. 4-5, 47-177,

Jan. 26, 27, 2010).

      **B.**      **"Worksheet for Presentence Report"**

      We next consider a "Worksheet for Presentence Report"[19] ("Worksheet") that was

completed by Probation for Waltzer's plea hearing.  It indicates that Waltzer was interviewed on

January 28, 2009, and names Lappen as the Assistant United States Attorney in this matter.

(10/24/11 Letter Resp., Ex. C.)  The Government asserts that this Worksheet shows that "Waltzer

himself stated, in connection with the preparation of his PSI, that he did not suffer from any

serious mental illness."  (10/24/11 Letter Resp., at 5.)

      On the Worksheet under the section headed "Physical Health," there is a notation that

Waltzer has an "anxiety disorder."  (Id., Ex. C.)  Under the section titled "Current Medications,"

as best as can be deciphered from the handwritten notes, it is written that Waltzer had been

---

      [19]This Report was not cited by Georgiou in any of his filings as proof that the
Government knew that Waltzer had serious mental health and drug abuse issues prior to
Georgiou's trial.  It was included as an Exhibit in the Government's October 24, 2011 Letter
Response ("10/24/11 Letter Resp.") to Georgiou's Reply Memorandum.  (See 10/24/11 Letter
Resp., Ex. C.)  The Government maintains that it was neither aware of this Worksheet nor was in
possession of it at the time it was completed by Probation.  Despite the fact that Georgiou has not
cited to this Worksheet in his arguments, we, nonetheless, will consider it under the Brady test.

taking Paxil for the past eleven years and Xanax "if needed." (Id.) Dr. John Glazer was listed as

Waltzer's physician and a notation was included which stated "no counseling." (Id.) In addition,

under the heading "Mental and Emotional Health," it was written that Waltzer was diagnosed

with an anxiety disorder in 1993- 94, but was "not bipolar." (Id.)

In considering this Worksheet under the three-part Brady test, we first find that there is

no evidence of record that the Government "suppressed" this document from the defense. In

addition, we again find it questionable whether this Worksheet was "favorable to the defense."

The Worksheet indicates that Waltzer had an anxiety disorder for which he took medication, but

it does not indicate that Waltzer was suffering with a mental impairment that would prevent him

from testifying truthfully and accurately. In fact, the Worksheet indicated that Waltzer was

receiving "no counseling," and was "not bipolar." (Id.) Accordingly, we find that there is

nothing in this Worksheet that would alert the Government that Waltzer had serious mental

health issues which would affect his ability to testify. In addition, this Worksheet makes no

mention of any drug or alcohol abuse problems. Accordingly, we, and do not find this report to

be Brady material that the Government was obligated to produce to Georgiou.

### C.    Monthly Treatment Reports

Georgiou next relies on "Monthly Treatment Reports" ("Treatment Reports") in the

Pretrial Services records from the Middle District of Florida to contend that the Government

knew that Waltzer was abusing illegal drugs and alcohol in the months prior to and at the time of

his trial. (Def.'s Supp. Mot. Recons., Ex. B.) These Treatment Reports include "comments"

from Barbara Dusckas ("Dusckas"), a counselor, who was seeing Waltzer during his pretrial

release period in Florida from June 10, 2009 through February 22, 2010. They also include

"comments" from Bethaney Graf, a counselor who saw Waltzer from April 26, 2010 through June 30, 2010.  (Id.)

Georgiou asserts that Dusckas' notations in these Treatment Reports prove that the Government, not only knew of Waltzer's past drug abuse issues, but was fully aware that Waltzer was abusing drugs and alcohol in the fall of 2009, and was abusing them right up to and including the time of his trial when Waltzer testified against him on January 26, 27, and 28, 2010.  Georgiou quotes from Dusckas' report on September 30, 2009 for proof that Waltzer was currently "self-medicating with alcohol and cocaine."  (Id. Ex. B, Report of 9/30/09.)  Georgiou also points to Reports from Dusckas, one dated October 30, 2009, and the other dated November 30, 2009, for further proof that Waltzer admitted that his life had become currently "unmanageable" because of drug and alcohol issues.  (Id. Ex. B, Reports of 10/30/09 and 11/30/09.)

The Government asserts that, contrary to Georgiou's conclusions that these comments referred to current drug and alcohol use and abuse, these comments refer to his past conduct and current willingness to address his issues.  We agree with the Government.  It is apparent from an overall, rather than an isolated, reading of Dusckus' counseling "comments" that they were referring to Waltzer's past drug abuse issues and that he was currently in a state of "sobriety." For example, Georgiou asserts that Dusckus' statement in her November 30, 2009 Report that Waltzer had admitted "how his life has become unmanageable due to his addiction" is proof that Waltzer was not only doing drugs, but abusing them, and that the Government knew about Waltzer's drug abuse.  (Id., Ex. B, Report of 11/30/09.)  However, this Report clearly indicates that this comment was referring to Waltzer's past drug abuse and that he was currently sober and

taking steps to prevent relapse.  The comment states in its entirety:

> Clt [Waltzer] is moving from preparation to action stage of change as evidenced by his <u>sobriety</u> and accepting that he is an addict.  He is identifying triggers for his use of drugs and alcohol.  He is practicing relapse prevention skills as evidenced sharing his fears and stressors in tx [sic] instead of intellectualizing, sharing his understanding of addiction with his spouse, and admitting how his life has become unmanageable due to addiction (step 1).  Clt has shown progress in finally being able to verbalize his understanding of the relationship between his addictive and compulsive behaviors and the serrious [sic] consequences that he and his family are experiencing.  He is encouraged to attned [sic] AA, but as of yet, he still thinks he is different.  That is addict thinking and he is continuing to address such issues in tx [sic].  He is [sic] wife has not attended tx [sic] yet, but she is supposed to attend next time.

(<u>Id.</u>) (emphasis added).

The Government has also submitted to the Court a Declaration from Dusckas dated October 18, 2011, which corroborates the Government's assertions that Dusckas' treatment notes were referring to Waltzer's past drug problems, and that he was in a state of "sobriety" in the fall of 2009, and at the time of Georgiou's trial.[20]  (10/24/11 Letter Resp., Ex. B.)  In her Declaration,

---

[20]Georgiou asserts in a letter reply dated November 3, 2011 ("11/03/11 Reply") to the Government's 10/24/11 Response that this Court should not rely upon the "unsworn declaration" of Dusckas and cites <u>Small v. Lehman</u>, 98 F.3d 762 n.5 (3d Cir. 1996).  (11/03/11 Reply at 2.) <u>Small</u>, however, differs from the instant case.  <u>Small</u> was a habeas case involving motions for summary judgment, and stated that "Rule 56 of the Federal Rules of Civil Procedure states that motions for and in opposition to summary judgment may be supported by affidavits; unsworn statements, such as those relied upon in the instant matter, fail to meet this requirement."  (<u>Id.</u>)

 We first note that, here, we are not relying on the unsworn Declaration in deciding a motion for summary judgment and, therefore, we are not subject to the requirements of Rule 56.  In addition, we are not relying on Dusckas' Declaration to support our determination that the Treatment Reports did not show current drug and alcohol abuse during this time period.  Rather, we credit this Declaration and find that it supports our conclusions after our own independent reading of the Treatment Reports.  Moreover, Georgiou's assertion that the Declaration was "clearly drafted by the government" is entirely without basis in the record.  (11/03/11 Reply at 2.)

27

Dusckas explains that she is a certified chemical dependency counselor who worked for the Ruth

Cooper Center in Fort Myers, Florida from 1992 through March 2010.  She stated that she is "not

a psychiatrist or licensed mental health counselor."  (Id.)  She indicated that while working at

Ruth Cooper, she provided chemical dependency counseling to Waltzer who was under the

supervision of Pretrial Services, and that she prepared monthly substance abuse treatment

reports.  (Id.)  Dusckas stated:

> While I was working with Kevin Waltzer, I observed him to be completely
> lucid, and high functioning.  He had no difficulty intelligently and
> coherently engaging in conversations with me about his life history, his
> prior substance abuse, and his criminal thinking.  He demonstrated no
> difficulty with memory, short term or long term.  He was anxious and
> worried about going to prison and reported having anxiety and panic
> disorders.  To the best of my recollection, without reviewing his
> assessment, he said that except for his anxiety and panic issues, he had not
> been diagnosed with any mental illnesses, but wondered if he could be
> considered bipolar.  He denied previous diagnosis or treatment for bipolar
> disorder.  Waltzer did not receive a referral for mental or psychiatric
> services while in substance abuse counseling with me at Ruth Cooper.
> These options were available to him if needed.  His statements about his
> mental health were consistent with my observations.
>
> During the time I was counseling Waltzer, he advised me that he was
> engaged in occasional alcohol use but not using illegal drugs.  I was also
> aware that Waltzer was tested regularly for illegal drug use and that his
> test results were all negative.  Waltzer's statements and the results of his
> drug testing were consistent with my observations.  He showed no
> indication of being under the influence of mood altering chemicals during
> his counseling sessions.  Waltzer appeared to be addressing his substance
> abuse problems during the counseling period and appeared to be
> committed to remaining free of illegal drugs.  This is evidenced by
> Waltzer's consistent negative urine screens, through pretrial services, his
> self-reporting, my clinical observations, and Waltzer's desire to avoid
> further negative consequences of chemical dependency.
>
> In the monthly treatment report for Waltzer that I signed and dated
> 10/30/09 (for sessions on 10/14, 10/19, and 10/26), I referred to Waltzer's
> "willingness to admit that his life has become unmanageable due to

> alcohol and drugs. . . ."  This phrase was not meant to suggest that Waltzer
> was abusing drugs and alcohol during his counseling.  Rather, this phrase
> is from Step One of the 12-steps of Alcoholics Anonymous and refers to
> the unmanageability of one's life resulting from chemical dependence.
> Mr. Waltzer was addressing the life changes he was willing to make in
> order to be responsible and continue his recovery.

(10/24/11 Resp., Ex. B.)

It is apparent from this Declaration that Dusckas' treatment notes never were intended to

mean that Waltzer was currently abusing drugs and alcohol.  In fact, it clearly supports the

Government's position that Waltzer was "sober" during this time.  Moreover, it supports the

Government's position that Waltzer was experiencing anxiety and panic over his worry about

going to prison, and that, except for anxiety and panic issues, Waltzer had not been diagnosed as

having any mental illnesses such as bipolar disorder at this time.  It also supports the

Government's position that Waltzer was not suffering from drug or alcohol abuse and/or mental

health issues that would have affected Waltzer's ability to testify truthfully and accurately at trial.

Accordingly, under the Brady test, we first find that there is no evidence that the Government

suppressed these Treatment Reports from the defense.  In addition, we do not find them

"favorable to the defense," and "material" under Brady's second and third prongs.  See Pelullo,

399 F.3d at 209.[21]

### D.    Waltzer's Drug Testing

In addition to the Pretrial Treatment Reports, Georgiou asserts that the results of one of

Waltzer's drug tests also proves that Waltzer was abusing drugs in the months prior to his trial

---

[21]The Government's position that Waltzer was not abusing drugs and alcohol in the fall of
2009 and at the time he testified at Georgiou's trial, is further supported Waltzer's consistent
negative drug testing that was conducted by Pretrial Services during this time.  We will discuss
this in further detail in the next section.

and during his trial as well.  This claim, however, is also without a basis in the record.  The

"Pretrial Services Chronological Record Report" ("Chronological Record") from the Middle

District of Florida reflects that between February 20, 2009 and July 6, 2010, Waltzer "submitted

to twenty-three (23) urinalysis [sic] with negative results."  (Def.'s Mot. to Compel, Ex. E at 23.)

Despite this report, Georgiou relies on an entry dated January 19, 2010, which indicates that

Pretrial Services in Philadelphia administered a drug test to Waltzer that initially appeared to be

positive for opiates.  However, this same entry also states that the "specimen" was "sent to the

national lab for confirmation testing."  (Def.'s Supp. Mot. Recons., Ex. C, at 4.)  It further states

that "[t]he National Testing Lab (NTL) received the specimen on 01/25/2010 and test results

came back on 01/26/2010."  (Id.)  The January 26, 2010 entry reflects that the specimen collected

on January 19, 2010 "returned Negative."  (Id. at 4.)[22]  As mentioned above, every other pretrial

drug test of Waltzer was negative for illegal drugs.  (Govt.'s Omnibus Resp., Ex. B.)        In

addition, Georgiou asserts that an indication that Waltzer was abusing drugs before and during

his trial was because he "frequently" missed drug testing appointments.  (Def.'s Reply at 28,

n.34.)  Georgiou contends that "Waltzer's frequent missing of his scheduled drug tests is

consistent with the behavior of someone who knows that they may fail a drug test, but wants to

hide their behavior.  Indeed, he may have been deceiving Pretrial Services, and been continuing

---

[22]Moreover, the Chronological Record stated in a February 1, 2010 entry that Pretrial Services in the Middle District of Florida was contacted by Pretrial Services in Philadelphia and informed that Waltzer "did report as directed and submitted to drug testing on 1/12/10, 1/19/10 and 1/20/10.  His test on 1/19/10 initially came back positive for opiates, but the confirmation test was negative.  He was taking OTC cough medicine, and our u/a tech indicated that could have been the reason for the positive result."

(Def.'s Mot. to Compel, Ex. E at 16.)

to abuse cocaine and alcohol, or other medications, such as prescription drugs or over-the-counter cough syrup."  (Id.)  However, contrary to these assertions that Waltzer "frequently" missed drug tests, the records indicate that Waltzer missed four drug tests during the period from May 26, 2007 to June 21, 2010.  He missed tests on November 16, 2009, December 11, 2009, June 17, 2010, and June 18, 2010.  (Govt.'s Omnibus Resp., Ex. B).  However, in each of these instances, Waltzer reported shortly thereafter and tested negative.  It must be noted that the latter two of the missed appointments occurred several months after Georgiou's trial.  We are of the opinion that two missed appointments prior to the time that Waltzer testified at the Georgiou trial certainly isn't proof that he was abusing drugs in the months prior to and at the time of the trial. We, thus find that these drug testing records also support the Government's position that Waltzer was not suffering from drug or alcohol abuse issues in the months prior to trial and at the time of Georgiou's trial that would have affected Waltzer's ability to recall the past and testify accurately at trial.  Accordingly, under the Brady test, we find that the drug testing results were not suppressed by the Government, were not "favorable to the defense," and were not "material." See Pelullo, 399 F.3d at 209.

There are two remaining allegations concerning the Government's knowledge of Waltzer's drug abuse from the Georgiou defense that we must address at this point.  In addition to making the serious allegations against the Government that it intentionally withheld Brady material from the defense as supposedly evidenced by the Treatment Reports and the Chronological Record of Georgiou's drug testing, Georgiou's counsel goes further and makes the even more serious allegations that the Government, not only knew of Waltzer's current drug and alcohol abuse in the fall of 2009 and at the time of trial, but also took steps to cover such abuse

31

and lied to this Court in seeking a continuance of the trial so it could "sober" Waltzer up.  (Def.'s

Mot. to Compel at 7-8.)  Counsel also accuses the Government attorneys of threatening Waltzer

that his plea deal would be taken away if he didn't "sober" up in time for the January trial.  (Id.)

Counsel contends:

> Moreover, it is now clear that at the exact time Mr. Georgiou was
> scheduled for trial in the fall of 2009, Waltzer's life had become
> "unmanageable," as a result of his drug and alcohol abuse, and he
> was in no position to testify at Mr. Georgiou's trial.  See Exhibit
> "B" to Motion to Compel, pp. 3-8) [sic] This would explain the
> reason for the government's efforts to continue the trial, over the
> defense's objection, after the November 2009 date had previously
> been set by this Court, with no objection from the government.
> Presumably, Waltzer used the extra time to sober up, although still
> heavily medicated and abusing alcohol at the time of the Georgiou
> trial.
>
> Thereafter, the defense believes that the government threatened
> Waltzer with losing his deal with the government unless he
> sobered up in time for trial in January 2010.  Clearly, using and
> abusing illegal drugs and alcohol would be a violation of Walter's
> [sic] Plea Agreement with the government, resulting in the loss of
> his cooperation deal.  Without this deal, Waltzer was facing
> decades' imprisonment.  This explains the statements Waltzer
> made to Dr. Lizzi (Lizzi Report II, p.5) that he "feared retaliation . .
> . of individuals in the government seeking his imprisonment."

(Id.)

     While this Court certainly recognizes the duty of an attorney to zealously represent his or

her client, we believe that Georgiou's counsel here has crossed over the line of zealous

representation.  As discussed above, there is no basis in the Chronological Reports or Waltzer's

drug testing records for defense counsel to make the leap from asserting that the Government

withheld Brady materials to accusing the Government of lying to this Court about continuing the

Georgiou trial in November 2009 and threatening Waltzer to withdraw the plea agreement so the

Government could "sober" up Waltzer to testify.  Moreover, there is absolutely no other evidence in this entire record to support such reckless allegations.[23]

### E.    Presentence Investigation Report

Georgiou next asserts that the Government was caught "red-handed" withholding <u>Brady</u> material when his counsel discovered that on the day that the verdict came down in his trial, February 9, 2010, the Government was emailed a draft Presentence Investigation Report ("Draft PSR") concerning Waltzer by Pretrial Services which indicated that Waltzer currently, and in the past suffered from mental health issues and drug abuse problems.  (Def.'s Reply at 15.) Georgiou argues that this Draft PSR is further proof that the Government knew of Waltzer's mental health and drug issues, but failed to disclose this <u>Brady</u> information to the defense.  On the other hand, the Government continues to assert that "it had no information at the time of Georgiou's trial about Waltzer's mental health."  (Govt.'s Omnibus Resp. at 14, n.6.)  It further maintains that "the case was over by the time the Government had any additional information about Waltzer's mental health, as the jury convicted the defendant before the Government ever saw the information."  (<u>Id.</u>)  The Government states that on the day of the verdict, February 9, 2010, Pretrial emailed the Draft PSR to it, but it never looked at such email until after the jury came back with Georgiou's conviction.  Thus, the Government argues that it never possessed the Draft PSR before or during Georgiou's trial.

We are of the opinion that even though this Draft PSI was emailed to the Government on this date, this does not establish that the Government was caught "red- handed" with <u>Brady</u>

---

[23]Moreover, this Court observed Waltzer over the course of three days of testimony and such observations did not indicate in any way that Waltzer appeared to be under the influence of controlled substances and/or alcohol.  To the contrary, Waltzer appeared sharp and alert.

evidence.  There is no evidence in this record that the Government read the Draft PSR before the

conviction came down, recognized it as <u>Brady</u> material with regard to Waltzer's drug abuse and

mental health history, and suppressed it from defense counsel.  Moreover, we find that even if the

Government did read the Draft PSR and/or possessed the Draft PSR before the verdict was

handed down, a reading of the Draft PSR indicates that it did not contain any information that

would have alerted the Government that Waltzer had mental health and/or drug abuse issues that

constituted <u>Brady</u> material that had to be given to the defense.  Concerning Waltzer's mental

health, the Draft PSR stated in relevant part:

> The defendant informed that he suffers from Anxiety Disorder.  He was
> diagnosed with this condition in 1993 or 1994.  Following the diagnosis,
> the defendant began to use medication.  He has used medication
> continually for the past fifteen years.  The defendant's medication is
> prescribed to him by Dr. Glazer.
>
> The defendant's wife confirmed the defendant's diagnosis of Anxiety
> Disorder.  He has not been diagnosis [sic] with any other mental or
> emotional disorders.  She confirmed that he been [sic] treated with
> medication.  Despite his prescription medication, he was hospitalization
> [sic] for a panic attack in the spring of 2009.  In addition to anxiety, the
> defendant has also experienced difficulty sleeping.

(10/27/11 Reply Letter, Ex. A at 23.)

In considering this information under the three-part <u>Brady</u> test, we first find that there is

no evidence that the Government suppressed this Draft PSI.  Next, once again, we find it

questionable that this information is "favorable to the defense" under <u>Brady</u>'s second part.  The

Draft PSR indicates that Waltzer's historical mental health issues were limited to an anxiety

and/or panic disorder, and not a mental health issue that would affect Waltzer's ability to testify

truthfully and accurately.  The Draft PSR states that Waltzer was diagnosed with an "Anxiety

Disorder" in 1993 for which he takes medication that was prescribed by his primary physician.

(Id.)  It added that Waltzer's wife confirmed that he had not been diagnosed "with any other

mental or emotional disorders."  (Id.)  However, even assuming that this information is somehow

"favorable to the defense," for the same reasons that we have discussed above, we do not find

under Brady's third part that there is a "reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473

U.S. at 678.

     Regarding substance abuse, the Draft PSR stated:

> The defendant reported a past history of cocaine abuse.  He began to use
> cocaine while in college in Boston.  The defendant's wife confirmed this
> fact, acknowledging that she witnessed him do so when they were in
> college.  Although he was a recreational user of cocaine during all four
> years of college, the defendant said he was able to stop after college.  He
> then abstained from cocaine for six years.  However, he started to use
> cocaine again upon his move back to the Boston area in 1998.  Despite
> moving from Boston to Pennsylvania, the defendant's use of cocaine
> moved with him.  In 1999, he contends that he was using cocaine at least
> five times per week.  Yet, he was able to conceal this fact from his wife.
>
> In 2000 or 2001, the defendant said his wife learned of his drug use, a fact
> that she confirmed to the probation officer.  He sought counseling at this
> time.  However, he admits that he only attended sporadically.  The
> Defendant did not recall where he sought counseling.  The defendant's
> wife was unable to state from whom the defendant sought help.  Although
> he did stop, it did not last long.  By 2003, and throughout the time frame
> that he recognized that he became addicted to cocaine, the defendant's
> wife said the defendant traveled frequently.  She believes he used cocaine
> while away from the house, not in their home.
>
> The defendant informed that he also consumed alcohol, including beer and
> hard liquor, while he snorted cocaine.  The defendant did not view alcohol
> as problematic.  He still consumes alcohol but limits his intake to three
> glasses of red wine per week.  The defendant said his use of cocaine ended
> more than a year before he entered his guilty plea in the instant offense.
> He did not seek assistance to curb his drug use, nor is he currently

> involved in drug treatment.  The defendant's wife confirmed the same.
> She believes that his drug use is behind him.

(10/27/11 Reply Letter, Ex. A at 24.)  Like the Draft PSR's information concerning Waltzer's

mental health, we likewise find that it is questionable, at best, that this information concerning

drug and alcohol abuse is "favorable to the defense" under Brady's second prong.  The Draft PSR

does not indicate that Waltzer had past or current drug and/or alcohol abuse problems that would

have affected his ability to testify both truthfully and accurately.  In fact, Waltzer told Pretrial

Services that his use of cocaine ended more than a year before he entered his guilty plea in

January 2009, and that he was currently not using drugs.  (Id. at 24.)  In addition, even if such

information were deemed "favorable to the defense," we again conclude that under Brady's third

prong there is not a "reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different."  Bagley, 473 U.S. at 678.

### F.    Revised PSR

Pretrial Services revised the Draft PSR ("Revised PSR") on March 4, 2010.  Georgiou

contends that the contents of the Revised PSR are further proof that the Government knew that

Waltzer suffered from mental health and substance abuse issues that would have affected his

credibility at trial, and that the Government continued to violate its continuing Brady obligations

by suppressing this information from his counsel.  In the Revised PSR, concerning Waltzer's

mental health, Pretrial Services added after the sentence, "[t]he defendant's medication is

prescribed to him by Dr. Glazer," that: "[h]owever, he [Waltzer] now sees Nancy Troast, M.D.

and Luciano Lizzie, a psychiatrist, for this condition [Anxiety Disorder]."  (Id., Ex. B at 24.)

After the sentence, "[d]espite his prescription medication, he was hospitalization [sic] for a panic

attack in the spring of 2009," in the Revised PSR, the following excerpt was added:

> At this time, as the defendant has advised, he was diagnosed with bipolar disorder by Dr. Richard Machiaroli and prescribed the medications Ativan and Depakote.  The defendant informed that he never took the Depakote.  The defendant also underwent evaluation by Barbara Dusckas, a psychologist, who also referred to bipolar disorder in her report.  Defense counsel informed that further information may be presented to the Court concerning the defendant's mental health, suggesting that he may suffer from a mental impairment that affected his judgment in this case and warrants departure, pursuant to U.S.S.G. § 5K2.13.

(Id.)  The Government asserts it was only after Waltzer's Draft PSR was prepared that defense counsel began pursuing a downward departure or variance based on Waltzer's mental health.  (Id. at 1-2.)  It further asserts that the Revised PSR then reflected information that Waltzer and his counsel provided to the Probation Office in anticipation that counsel was going to file a sentencing memorandum seeking a reduced sentence because Waltzer's alleged mental health issues, at least partially, explained his decision to engage in a massive fraud scheme.  (Id. at 2.)  The Government also contends that at Waltzer's sentencing hearing, Waltzer and his counsel withdrew this claim and did not rely on mental health issues to try and achieve leniency.  (Id.)

Considering this Revised PSR under the Brady test, we first note the obvious -that the Government did not possess this PSR until after Georgiou was convicted, and therefore, cannot be deemed to have suppressed this information from the defense before or during Georgiou's trial.  Under Brady's second prong, as we have concluded with the other alleged "new evidence" regarding Waltzer's mental health and drug abuse history, we do not find that the Revised PSR is necessarily "favorable to the defense."  First, regarding Waltzer being seen by Dr. Lizzi for his Anxiety Disorder, in connection with Waltzer's sentencing, his counsel submitted the Lizzi Report which indicated that Dr. Lizzi had been seeing Waltzer since August 2007, shortly after

37

he began cooperating with the Government.  The Lizzi Report stated that Waltzer suffered from bipolar disorder and that he had abused cocaine and alcohol during his illegal activities between 1999 and 2006.  Dr. Lizzi opined that  "these mental disorders, either individually or in concert, so affected Mr. Waltzer's capacity to reason and control his impulses that they significantly contributed to his criminal behavior during that time."  (Def.'s Mot. to Compel, Ex. B.) However, as we already discussed in two previous Memorandum Opinions, we found that the Government was not even aware of Dr. Lizzi at the time of Georgiou's trial and only became aware of him because of the Lizzi Report that was prepared in connection with Waltzer's sentencing on March 12, 2010.   See Georgiou, 2011 WL 995826, at *17-18; Georgiou, No. 09-88, at *8-9 (filed under seal, Nov. 9, 2010).  In addition, we determined that the Government only used Dr. Lizzi to clarify the analysis he set forth in the Lizzi Report.  We noted that Dr. Lizzi clarified his report and stated that he did not "believe that he [Waltzer] experienced impairment in memory, or communication. . . ."[24]  (Id.)

    We also note that the Revised PSR states that Waltzer "underwent evaluation by Barbara Dusckas, a psychologist, who also referred to bipolar disorder in her report."  (10/27/11 Resp., Ex. B at 24.)  However, as indicated earlier, Dusckas is not a psychologist or any other type of health care professional, but is a certified chemical dependency counselor who never conducted any type of mental testing on Waltzer.  In fact, Dusckas stated in her Declaration that "Waltzer did not receive a referral for mental or psychiatric services while in substance abuse counseling

---

    [24]We also previously determined that "even if the Government possessed such evidence regarding statements Waltzer made to Dr. Lizzi, Georgiou has failed to show that there is a reasonable probability that, had such evidence been disclosed to the defense, the result of the trial would have been different."  Georgiou, 2011 WL 995826, at *19.  We do so again here.

with me at Ruth Cooper."  (10/27/11 Resp., Ex. B.)

However, assuming that the Revised PSR is "favorable to the defense," we again conclude under <u>Brady</u>'s third prong that Georgiou has failed to show that there is a reasonable probability that, had such evidence been disclosed to the defense, the result of his trial would have been different.[25]  See <u>Bagley</u>, 473 U.S. at 682.  Thus, we make the same finding with regard to the Revised PSR that we have concerning all the alleged new evidence and <u>Brady</u> material that Georgiou has submitted concerning Waltzer's mental health and drug abuse history.  We conclude that there is nothing in any of this material that persuades this Court to conclude that such alleged mental health and drug abuse issues had any affect on Waltzer's ability to recall the past, perceive reality, or testify truthfully.  We further find that even if the defense had in their possession all of the above-discussed material, in light of the staggering evidence against Georgiou that was presented at trial, the result of his trial would not have been different.  As we stated in denying Georgiou's Third Motion for New Trial, we reiterate as follows:

> the Government's evidence against Georgiou included voluminous recordings, emails, financial records and other evidence that overwhelmingly demonstrated that Georgiou had committed the crimes charged.  All of which was consistent with Waltzer's testimony. Georgiou, on the contrary, produced no evidence to corroborate his claim that he had actually been investigating and recording Waltzer.  "The testimony of [a

---

[25]The Revised PSR included nothing new regarding Waltzer's substance abuse other than adding after the last sentence of the Draft PSR that "[t]he defendant has since discussed his substance abuse with Dr. Dusckas over the past ten months of his counseling.  This is the first time that he has participated in counseling with regard to his use of drugs."  (Govt.'s 10/27/11 Resp., Ex. B.)  However, as noted above, Dusckas is not a doctor, but a counselor.  In addition, she clarified in her Declaration that [w]hile I was working with Kevin Waltzer, I observed him to be completely lucid, and high functioning.  He had no difficulty intelligently and coherently engaging in conversations with me about his life history, his prior substance abuse, and his criminal thinking.  He demonstrated no difficulty with memory, short term or long term."  (10/24/11 Resp., Ex. B.)

witness] must be considered in the totality of the circumstances and all of
the evidence introduced at trial."  United States v. Hankins, 872 F. Supp.
170, 174-75 (D.N.J. 1995) (citing Bagley, 473 U.S. at 628).  Waltzer's
version of the relevant events conforms with the staggering physical
evidence in this case.  As such, we conclude that even if the jury had found
Waltzer to be unreliable, Georgiou's trial nevertheless resulted in a verdict
worthy of confidence, considering the totality of the circumstances and all
of the evidence introduced at trial.

See Georgiou, 09-88, at 12 (filed under seal, Nov. 9, 2010).

**4.      Alleged Perjured Testimony**

Next, we address another serious accusation leveled by Georgiou's counsel against the

Government attorneys.  Counsel not only makes the accusations that the Government knew of

Waltzer's serious drug and alcohol abuse, withheld Brady material concerning such abuse,

concealed this abuse from the defense and from this Court prior to and during Georgiou's trial,

but also alleges that the Government knowingly and willfully elicited perjured testimony from

Waltzer at trial concerning his use of drugs.  Georgiou contends that his trial was not only

contaminated by the Government's "concealment of Waltzer's past history of drug and alcohol

abuse and psychiatric issues, but by the perjury elicited by the government who presented him as

a reformed man who no longer uses drugs, concealing Waltzer's present addictions and abuse of

cocaine, alcohol and prescription drugs."  (Def.'s Mot. to Compel at 6.)

Defense counsel asserts further that:

> Instead of correcting Waltzer's false and misleading statements,
> however, the government actively participated in the deception
> (and emboldening Waltzer on the stand) by, among other things,
> attempting to vouch for his credibility, parsing his testimony to
> leave the jury and the Court with the impression that Waltzer's
> drug and alcohol problems were relatively minor, that those
> substance abuse problems were in the past, and that Waltzer was a
> completely changed man who would not lie because he had strong

40

incentives to tell the truth as part of his cooperation agreement.

(Def.s' Reply at 31-32.)

We first note that these are claims of prosecutorial misconduct rather than claims of "newly discovered evidence" which Georgiou can and presumably will pursue on appeal.[26] However, in light of our findings above concerning the Government's knowledge of Waltzer's drug abuse and mental health issues, we find no evidence of prosecutorial misconduct, and are of the opinion that the Georgiou defense has again crossed the fine line between zealously representing their client and making unfounded accusations.

As we stated in our Memorandum Opinion denying Georgiou's Second Motion for New Trial, Waltzer testified on direct examination about his use of cocaine from 2004 through 2007:

> Q.  During that period of time [summer 2004 till spring 2007], did you engage in any cocaine use?
>
> A.  Yes I did.
>
> Q.  And can you describe for the jury what your level of cocaine use was during that time?
>
> A.  I was a social user of cocaine during that time.
>
> Q.  What does it mean to be a social user of cocaine?
>
> A.  In my definition, I would do it approximately once every six weeks.

---

[26]To succeed on a claim of prosecutorial misconduct for allowing false testimony, a defendant must show that: (1) the witness committed perjury; (2) the government knew or should have known that its witness committed perjury but failed to correct his testimony: and (3) there is a reasonable likelihood that the false testimony could have affected the verdict.  United States v. Hoffecker, 530 F.3d 137, 183 (3d Cir. 2008).  For the same reasons that we find that the Government has not violated its Brady obligations, we find that Georgiou has failed to establish any part of this test.

Q.  And when you say you would do it, were you doing it to a level of complete incoherence or were you doing it, as you say, in some other way?

A.  I was doing it, "to party," basically, to, you know, get a high and enjoy myself.

Q.  And were you ever using it during your dealings with George Georgiou?

A.  Never.

Q.  And did your, as you described, your social use of cocaine ever affect your ability to understand the stock fraud activities that you were participating in?

A.  No, sir.

Q.  Or did it affect your ability to remember those stock fraud activities or testify about them here?

A.  Not at all.

(Trial Tr. vol. 11, 208-09, Jan. 26, 2010.)  As discussed in length above, the defense has argued extensively that the Government knew of Waltzer's serious drug abuse and mental health issues, yet withheld Brady material concerning such, and in fact, concealed it from the defense. However, the fact remains that cocaine use on Waltzer's part was disclosed to the defense and it had knowledge of such as evidenced by Waltzer's testimony.  As we determined in our prior Memorandum Opinion denying Georgiou's Second Motion for a New Trial, we again find that this testimony "provided ample opportunity for Georgiou to attack Waltzer on the basis that his testimony was untrustworthy due to his history of drug use.  In addition, it also gave Georgiou the opportunity to cross-examine Waltzer regarding if and how such drug use affected his mental health and his ability to testify truthfully and accurately."  Georgiou, No. 09-88, at *10-11, n.6

42

(filed under seal, Nov. 9, 2010).

Moreover, the Government did provide other information to the defense concerning

Waltzer's drug use.  In fact, Georgiou acknowledges that in an "FBI 302" interview report[27] that

was given to the defense, Waltzer stated that he had "an addiction to cocaine," and had used it

approximately six months before he began to cooperate.[28]   (Def.'s Reply at 31, n.38.)  However,

trial counsel, for whatever reasons, chose not to cross-examine Waltzer about these statements.[29]

_____

[27]Specifically, an FBI 302 interview report dated July 27, 2007 stated that Waltzer said that he "did drugs and drank alcohol. . . and developed an addiction to cocaine. . . [and] last did cocaine six months ago."  (Def.'s Reply at 31, n.38.)

[28]Georgiou's counsel argues that the Government attempts to use Waltzer's statement that he had an "addiction to cocaine" in the FBI 302 interview as both a "sword and a shield" in that the Government "cannot now disavow that it had knowledge that Waltzer had on-going substance abuse problems, and was likely to abuse drugs during his period of cooperation." (Def.'s Reply at 31, n.38.)  However, the defense cannot now do the same and claim to have been denied Brady material concerning Waltzer's drug use when it was given this interview report.  In addition, we do not find that this statement in which Waltzer indicated that he had last done cocaine approximately six months before he began cooperating with the Government to have alerted the Government that Waltzer had a continuing cocaine problem that would have affected his ability to testify truthfully and accurately at Georgiou's trial.

Georgiou also argues that the Government was aware as early as April 3, 2009 of issues relating to Waltzer's mental health, when FBI Agent Joanson specifically noted in a 302 interview report that an individual, who had accused Waltzer of additional crimes, stated to the FBI Agent that, in his opinion, "WALTZER is a *medicated* piece of s- -t."  (Def.'s Reply at 10); (Def.'s Reply, Ex. A.)  However, we likewise find that this statement is not information that establishes that the Government knew that Waltzer suffered with serious mental issues.

[29]In addition, Georgiou asserts that:

> The defense has also identified a far more sinister motive for Mr.
> Waltzer's perjury.  On August 15, 2008 (one month before Mr. Georgiou's
> arrest), Mr. Waltzer's nephew and protégé (Mr. Mason), died of a cocaine
> over-dose while working for Mr. Waltzer at Future Annuities of America
> in Florida.  Mr. Waltzer discovered the body.  The defense never pursued
> this questioning at trial because there was no evidence at the time that Mr.
> Waltzer was still a cocaine addict.  In light of the new evidence, this would

Accordingly, we find no basis for the allegations that the Government, knowingly or otherwise, elicited perjured testimony from Waltzer.

**5.     Witness Daniel Koster**

Koster, an employee of the Security Exchange Commission ("SEC"), testified at Georgiou's trial for the Government as a fact and summary witness.  Georgiou asserts that:

> The gravitas and authority of the SEC was presented through Daniel Koster, leading the jury to believe that the SEC had conducted an independent investigation that identified corroborating matched trades, when the truth, his conclusions were based on the information given to the SEC by Waltzer.  It is now clear that the SEC did not conclude a manipulation occurred after undertaking objective, unbiased analysis, but rather, started with the premise that a manipulation had occurred after being guided by Waltzer.

(Def's Mot. to Compel at 13.)  Georgiou asserts that the Middle District of Florida Pretrial Services' Chronological Record included a statement from Waltzer that he "provided information to the SEC on a regular basis."  (Id., Ex. E at 28.)  Georgiou argues further that:

> At all times material hereto, the government has denied the existence of any witness interviews regarding Waltzer's communications with the SEC and none were produced as a result of the government's representation.  Moreover, the jury was led to believe that the SEC reached its own independent conclusions as to alleged stock manipulation when in reality, its conclusions were based upon the information provided by Waltzer.  The government's failure to disclose witness interviews with the SEC of its star witness in a case alleging securities fraud and mail and wire fraud is yet another factor which eviscerated the defense's ability to effectively cross-examine Waltzer.

_____

have been an important area of cross-examination to determine if, Mr. Waltzer was involved in the events which led to Mr. Mason's death- a terrifying reason for Waltzer to lie about his cocaine use.

(Def.'s Mot. to Compel at 10.)  There is no evidence in the record to support these allegations.

44

(Id. at 9.)  Georgiou basically maintains that Koster perjured himself at trial when he testified that he conducted an independent review of trading data and financial records rather than basing his testimony solely on information provided by Waltzer.

The Government maintains that it conferred with Koster and other members of the SEC who were involved in the Georgiou investigation, and that the SEC only spoke directly to Waltzer on approximately two occasions about this case, and always in the presence of the prosecutors.  (Gov't.'s Omnibus Resp. at 42.)  The Government further asserts that Waltzer, also through the prosecutors, provided information to the SEC about numerous other securities fraud investigations, which explains Waltzer's supposed comments to Pretrial in Florida that he "provided information to the SEC on a regular basis."  (Id.)  The Government asserts that it has "reviewed SEC notes of meetings with Waltzer about the Georgiou investigation, and they do not contain Brady or Giglio information."  (Id.)

As with Georgiou's other claims, we will consider this claim under the three-part Brady test in that Georgiou is arguing that the prosecution withheld Brady materials including the "Chronological Record Report" from the Middle District and SEC notes of meetings with Waltzer about the Georgiou investigation.[30]  We, however, find that this claim fails under the Brady test.  Under the first part, we find that there is no basis in the record that the Government "suppressed" this information.  However, even assuming arguendo that the Government did suppress this alleged Brady material and assuming further that such evidence was favorable to

---

[30]As we noted earlier, Georgiou has argued that we erred in considering his earlier claims in his Third Motion for New Trial under the five-part "newly discovered evidence" test.  See Chimera, 459 F.3d at 458.  While we certainly do not agree that considering his prior claims under this test was in error, we have considered Georgiou's present claims under the less-stringent three-part Brady test.

the defense, we do not find that it was "material."  See Pelullo, 399 F.3d at 209.

The trial record indicates that Koster testified at length about his extensive review of financial and trading records, and provided summary charts reflecting that review.  (Trial Tr. vol. 7, Feb. 2, 2010; Trial Tr. vol. 8, 3-56, Feb. 3, 2010.)  We have already discussed the basis of Koster's testimony in our prior Memorandum Opinion denying Georgiou's First Motion for New Trial, and will not do so again here.  See Georgiou, 742 F. Supp. 2d at 620-23.  In addition, Koster was subjected to extensive cross-examination concerning his analysis and the basis of his knowledge.  (See, Trial Tr. vol. 8, 56-179, Feb. 3, 2010.)  Accordingly, we find that Georgiou's claim that Koster's testimony was based on information provided by Waltzer to be without a basis in the record, and thus, fails to meet the Brady test.

**6.      Other Evidence Allegedly Withheld**

Lastly, in his Reply brief, Georgiou sets forth a list of "additional items" that he claims the Government improperly withheld under its continuing post-trial Brady obligations.  They are as follows:

> 1)  Waltzer's bail report or the information contained therein;
>
> 2)  Barrotti recordings and interview notes;
>
> 3)  Waltzer witness statements to the SEC;
>
> 4)  Information Waltzer provided to the SEC;
>
> 5) FBI 302 interview reports concerning Waltzer produced in other cases where he cooperated containing impeachment materials or statements about his crimes, but not produced to Georgiou, or produced to the Court for its in camera review such as in the Gotshalk, Johnson and "DH" cases, which would have shown Waltzer's similar modus operandi in other cases, and were not disclosed pretrial;

6)  Recordings in other cases that Waltzer cooperated;

7)  Suspected recordings between Brad Jensen and Biagio
Simonetta/Vince DeRosa;

8)  Recording and notes made by rebuttal witness Alex Barrotti;

9)  FBI rough notes of interviews:

10)  Waltzer's CI file with the FBI and any supervision reports;

11) Access to recording devise Waltzer used in light of allegations that others,
besides Georgiou, have alleged unrecorded calls;

12) Boxes of material related to Waltzer's other crimes that were
discussed by the FBI Agent at the Hall sentencing;

13)  Access to Waltzer's electronics and/or images of his computer, cell phones or
blackberry;

14)  Communications between Waltzer's attorneys and the government,

15) Text messages involving Waltzer;

16)  Disclosure related to U.S. Attorney's investigation of Waltzer in Grand Jury
2001-768;

17)  Dr. Lizzi's notes and Waltzer's statements to him;

18)  Florida mental health treatment information and statements
involving Barbara Dusckas and Bethany Graff; and

19)  Waltzer's 15-plus year medical, alcohol and drug history.

(Def.'s Reply at 11.)  Georgiou, however, has failed to offer any convincing support for his

allegations that the Government violated its Brady obligations by suppressing this material from

his defense team.  In addition, Georgiou has also failed to offer any argument or support that such

material is "favorable" to the defense under the second prong of the Brady test or that under the

third part that there is a  "reasonable probability" that, had any of this information been disclosed

to the defense, "the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682.  Thus, these claims, like Georgiou's preceding claims, are not supported by the record. Accordingly, Georgiou's Motion for Reconsideration, which we also have considered as his Fourth Motion for New Trial, is denied.[31]

In conclusion, we have now thoroughly considered and denied the claims that Georgiou has raised in four Motions for a New Trial, and a Motion for Reconsideration.  We find that none of his claims undermine confidence in the outcome of his trial.  <u>See</u> <u>Bagley</u>, 473 U.S. at 678.   As we have steadfastly held in three prior Memorandum Opinions denying Motions for New Trials, we again find that the trial record reflects a staggering amount of evidence against Georgiou that overwhelmingly demonstrates that Georgiou committed the crimes charged.  We will not entertain any further filings, and Georgiou is now free to appeal to the Court of Appeals.

**7.      Motion to Compel Evidence**

As noted, in addition to his Motion for Reconsideration, Georgiou has also filed a Motion to Compel Disclosure of Evidence.  In this Motion, Georgiou requests that the Government be ordered to produce the following to the defense:

> (1) Waltzer's confidential informant file and 1A envelope,
> including but not limited to all FBI rough notes of all interviews
> with Waltzer and logs of all discussions or meetings;

---

[31]Georgiou also attempts to assert new claims in his Reply Brief that are not "newly discovered evidence" claims and/or <u>Brady</u> claims.  He spends several pages of his briefing arguing that Koster's testimony was "inaccurate and misleading," and that Koster's "improper use of a summary chart with flawed data" misled the jury.  (Def.'s Reply at 51-59.)  However, these claims are untimely under Rule 33 (b)(2) because they were presented long after the 14-day deadline.  <u>See</u> Fed. R. Civ. P. 33 (b)(2).  In addition, as stated, we have adequately discussed Koster's testimony in a prior Memorandum Opinion.  <u>See</u> <u>Georgiou</u>, 742 F. Supp. 2d at 620-23.

(2) Waltzer's undisclosed witness statements to date, all written communications and notes of verbal communications, including but not limited to any electronic communications, PIN, email or text messages between Waltzer and any person part of the prosecution team, including the SESC [sic] and IRS;

(3) Waltzer's communications with the SEC, in any form, including but not limited to reports, electronic communications, PIN, email or text messages between Waltzer and any person at the SEC, including a summary of discussions and all work product resulting from Waltzer's transfer of information of the SEC;

(4) a detailed summary from the FBI and prosecution as to what Waltzer told them, and when, in any oral discussion related to Waltzer's substance abuse and psychiatric history;

(5) all internal government memorandum, FBI 302's, and IRS Memorandum of Interview [sic] relating to Waltzer;

(6) all correspondence, in any form, between Waltzer's attorneys and the government relating to mental health or substance abuse issues;

(7) disclosure of all cases and defendants against whom Waltzer cooperated and any Brady, Giglio, or Jencks Act material therein.

(8) all evidence related to Grand Jury Proceeding No. 2001-768 relating to Waltzer;

(9) all government work product, in any form, including notes of oral discussions, that contains any Brady, Giglio, or Jencks Act material related to Waltzer; and

(10) a summary of any and all evidence that may have been destroyed or spoliated by any member of the prosecution team.[32]

(Def.'s Mot. to Compel at 10-11.)

_____

[32]In this Motion, Georgiou also requests this Court to enter an Order "compelling the disclosure of all medical records, including interview notes, contact with the government, diagnoses and documentation of medications in the possession of Dr. Ivan Mazzarano, Dr. Luciano Lizzi, Dr. John Glazer, Bethaney Graf, Lee Mental Health Center and St. Mary's Hosptial (Philadelphia), relating to Kevin Waltzer."  (Def.'s Mot. to Compel at 11.)

It is evident from these requests that Georgiou seeks to obtain more discovery in order to retry his case.  We will not allow him to do so.  However, for all the reasons discussed above, the Government has not committed <u>Brady</u> violations and Georgiou has not established that any of his claims "undermines confidence in the outcome of the trial."  <u>Bagley</u>, 473 U.S. at 678.  We, thus, deny this Motion to Compel in its entirety.[33]  In addition, we deny Georgiou's request that he be granted bail pending appeal.

An appropriate Order follows.

---

[33]In addition, Georgiou has not identified any legal basis supporting his request for discovery at this post-trial stage of this action.

50