**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | NO. 09-088 |
| GEORGE GEORGIOU, | : | |
| *Defendant*. | : | |

## MEMORANDUM

**JONES, II  J.**                                                                                    **March 23, 2021**

## I.      INTRODUCTION

Since the first cases of an unknown respiratory illness were reported in December 2019,[1] a localized outbreak of coronavirus disease 2019 ("COVID-19") has quickly evolved into a global pandemic,[2] causing a public health emergency of international concern.  As of date, the World Health Organization ("WHO") has reported over 123.4 million confirmed cases of COVID-19 total across the six continents, including more than 2.71 million deaths.[3]  In the United States alone, total confirmed cases now exceed 29.9 million, and deaths surpass 543,000.[4]  As the spread of the virus continues to grow exponentially, local public health experts in Pennsylvania have raised concerns "about the risk of a coronavirus outbreak among Pennsylvania's incarcerated population."[5]

---

[1] The World Health Organization ("WHO") traces the origin of COVID-19 to a local outbreak in the City of Wuhan, Hubei Province, in Central China.  *See* World Health Organization, *Timeline of WHO's response to COVID-19*, https://www.who.int/news-room/detail/29-06-2020-covidtimeline (last updated June 30, 2020) [hereinafter *WHO's COVID-19 Timeline*] (reporting that the first cluster of COVID-19 cases emerged in December 2019); *see also* discussion *infra* Section II.B.

[2] On March 11, 2020, the WHO characterized the spread of COVID as a pandemic.  *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020; *see also WHO's COVID-19 Timeline*, *supra* note 1.

[3] World Health Organization, *Coronavirus (COVID-19) Dashboard*, https://covid19.who.int/ (last updated Mar. 23, 2021).

[4] *See Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?auth=login-google1tap&login=google1tap (last updated Mar. 23, 2021).

[5] Chris Palmer & Jeremy Roebuck, *What it's like to be locked in prison during the coronavirus pandemic*, PHILA.

In view of the foregoing, Defendant George Georgiou ("Defendant") presently moves for compassionate release from prison for "extraordinary and compelling reasons" under the First Step Act[6].  Pending before the Court is Defendant's Motion to Reduce Sentence through Compassionate Release (ECF No. 635) [hereinafter Motion].  For the reasons set forth below, Defendant's Motion is denied with leave to re-file.

## II.   BACKGROUND

### A.   Defendant's Sentencing History

Despite his claims of innocence, on February 12, 2010, Defendant was found guilty by a jury of manipulating stocks in four (4) publicly traded companies through a complex scheme involving numerous accounts controlled by both Defendant and his co-conspirators.  Defendant and his co-conspirators manipulated the stocks by creating the false appearance of an active market for them.  From this fraudulent activity, Defendant and his co-conspirators generated proceeds by: (1) selling their holdings; and (2) using the artificially inflated prices of the stocks as collateral to obtain margin and other loans from financial firms.  This activity resulted in an actual loss of over $50 million to thousands of victims and intended losses of at least $100 million.

During Defendant's trial on February 12, 2010, the Government proved Defendant's fraudulent activity through various means, including through recorded conversations in which the jury heard Defendant repeatedly describing his historical stock manipulations and committing stock fraud in real time.  Those conversations culminated in Defendant hiring an undercover FBI agent to help him artificially inflate a company's stock.  In beginning this

---

INQUIRER (last updated Apr. 1, 2020), https://www.inquirer.com/news/coronavirus-covid-19-pennsylvania-prisons-jails-inmates-guards-20200401.html.  *See generally* Pennsylvania Department of Health, *COVID-19 Data for Pennsylvania*, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx (last updated Mar. 23, 2021) (showing that Pennsylvania has had more than 991,000 total confirmed coronavirus cases).
[6] 18 U.S.C. § 3582(c)(1)(A).

process with the FBI agent, Defendant demonstrated consciousness of his guilt by asking if the undercover agent was a "cop" and suggesting they speak in code.  In addition to the FBI's gathered recordings, Defendant also accidentally recorded his own confession where he described his criminal activity to a co-conspirator.

Though the evidence against Defendant was, in the words of the district court, "staggering," he attempted to explain his behavior by stating he was secretly conducting his own investigation of the government's cooperating witness and playing along with the fraud. Ultimately, the jury rejected Defendant's explanation, and he was found guilty of one count of conspiracy in violation of 18 U.S.C. § 371, four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, four counts of wire fraud in violation of 18 U.S.C. § 1343, and aiding and abetting in violation of 18 U.S.C. § 2.

On November 19, 2010, the Honorable United States District Judge Robert F. Kelly sentenced Defendant to 300 months' imprisonment with an order to pay $55,832,398.00 in restitution and a forfeiture money judgment of $26,000,000.00.[7]  On January 20, 2015, the Third Circuit Court of Appeals affirmed Defendant's conviction.  *See United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015); *see* Mandate of USCA, ECF No. 295.  On November 2, 2015, the Supreme Court denied certiorari.  *Georgiou v. United States*, 577 U.S. 954 (2015).

After certiorari was denied, Defendant filed a § 2255 habeas petition and then around

---

[7] At sentencing, after Defendant perjured himself by his own testimony and attempted to convince a witness to lie for him at trial, Judge Kelly made the following comment:

> [Georgiou] obstructed justice by perjuring himself in this court.  The evidence in this case was overwhelming. The defendant sat there and listened to it, and yet he took the witness stand and gave evidence that really left the Court stunned.  It was most almost pathetic.  I could not understand why he thought what he was doing was a good idea.  It obviously failed because this case went almost three weeks, and that jury I think was out about less than two hours, maybe an hour and a half, and lunch was served to them while they were there. That's how powerful the testimony and the evidence were in this case, and they found him guilty on all nine counts.

November 19, 2010 Sentencing Transcript, ECF No. 227.

fifty-four (54) collateral motions within the district court, often raising multiple issues in each motion and repeatedly reiterating past, failed claims.  Despite resurrecting multiple previously litigated issues, the district court granted Defendant a § 2255 hearing and allowed him to call numerous witnesses, many of whom he attacked for alleged wrongdoings.  After considering the evidence, the District Court denied Plaintiff's habeas petition and his request for a certificate of appealability.  *See United States v. Georgiou*, No. 09-cr-088, 2018 WL 9618008 (E.D. Pa. June 19, 2018); Memorandum and Order Denying § 2255 Petition and Certificate of Appealability ECF Nos. 570-571.[8]

After these unsuccessful challenges, Defendant continues to serve his sentence at Moshannon Valley Correctional Institution ("Moshannon Valley").[9]  At this time, Defendant is due to be released from the custody of the Federal Bureau of Prisons ("BOP") on August 26, 2031.[10]

### B.       The COVID-19 Pandemic

According to the United States Centers for Disease Control and Prevention ("CDC"), coronavirus disease 2019 ("COVID-19")[11] is a novel respiratory illness caused by "newly emerged zoonotic coronavirus."[12]   COVID-19 seems to spread easily in the community ("community

---

[8] Repeating the pattern of eliciting and providing false testimony, the Court also found that Defendant attempted to elicit false testimony in the habeas proceeding.  *Georgiou*, 2018 WL 9618008, at *67-69.

[9] *See* Federal Bureau of Prisons, *Find an inmate*, https://www.bop.gov/inmateloc/ (last visited Mar. 23, 2021).

[10] *Id*.

[11] On February 11, 2020, the International Committee on Taxonomy of Viruses ("ICTV") and the World Health Organization ("WHO") announced the official names of the virus responsible for COVID-19 and the disease it causes. ICTV declared "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" as the name of the new virus, while WHO revealed "COVID-19" as the name of this new disease.  *See* World Health Organization, *Naming the coronavirus disease (COVID-19) and the virus that causes it*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Mar. 16, 2021).

[12] European Centre for Disease Prevention and Control, *Coronavirus disease 2019 (COVID-19) and supply of substances of human origin in the EU/EEA* (Mar. 20, 2020), https://www.ecdc.europa.eu/sites/default/files/documents/covid-19-supply-substances-human-origin.pdf [hereinafter EU CDC – COVID-19].

spread"),[13] by way of "respiratory droplets produced when an infected person coughs, sneezes, or talks."[14]   Given the high infectivity of COVID-19, "[a] simple sneeze or brush of the face without washing your hands is now known to easily spread the virus, which generally causes fever, cough, and shortness of breath."[15]   Currently, though several vaccines have shown positive results to prevent COVID-19, only three (3) have been authorized for distribution.[16]

In the initial absence of such solutions and the ongoing slow distribution of vaccines, governments turned to non-medical interventions to try to slow the spread of the disease, including: school closures, restrictions on businesses and large gatherings, stay-at-home orders, and "social distancing" policies.  *United States v. Ortiz*, No. 18-cr-00134, 2020 WL 1904478 (M.D. Pa. April 17, 2020) (citing *Social Distancing, Quarantine, and Isolation*, CENTERS FOR DISEASE AND CONTROL    PREVENTION,    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated Nov. 17, 2020)).

In line with those policies, the Commonwealth of Pennsylvania issued a mandatory stay-at-home order for all individuals in the Commonwealth and has previously closed all schools, among other measures to combat the disease.[17]   Public health experts "now acknowledge that there is little that can be done to stop the spread of COVID-19 absent effective quarantine and social distancing procedures."[18]

---

[13] "Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."  *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last updated Mar. 17, 2021) [hereinafter CDC COVID-19 Basics].

[14] *See id.*; *see e.g.*, EU CDC – COVID-19, *supra* note 12 (specifying that the virus is transmitted from human to human via droplets coughed or exhaled by infected persons and by touching droplet-contaminated surfaces or objects and then touching the eyes, nose, or mouth").

[15] *Id.* (citing Centers for Disease Control and Prevention, *How Coronavirus Spreads*).

[16] *Different COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html (last updated Mar. 4, 2021).

[17] *See* Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home (Apr. 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[18] *Bharatkumar G. Thakker v. Clair Doll*, 20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).

"Although most people who become sick from COVID-19 develop only mild or moderate respiratory symptoms and recover with no medical intervention, a minority of cases lead to serious illness that can result in hospitalization or death." *Ortiz*, 2020 WL 1904478, at *2.  While much remains unknown about COVID-19, available data by the CDC identifies certain groups of individuals who are at a "higher risk for severe illness from COVID-19"—most notably "older adults and people of any age who have serious underlying medical conditions."[19]  In addition, the CDC has warned that incarcerated individuals also face the risk of potentially fatal exposure to COVID-19[20] because "[m]any of the recommended measures to prevent infection are impossible or unfeasible in prison." *United States v. Pabon*, No. 17-cr-165-1, 2020 WL 2112265, at * 5 (E.D. Pa. May 4, 2020).

### i.   COVID-19 in Correctional and Detention Facilities

"Correctional and detention facilities 'present unique challenges for control of COVID-19 transmission among incarcerated/detained persons and staff.  According to public health experts, incarcerated individuals 'are at special risk of infection, given their living situations,' and 'may also be less able to participate in proactive measures to keep themselves safe;' 'infection control is challenging in these settings.'" *United States v. Wilson*, No. 14-cr-209-1, 2020 WL 1975082, at *2 (E.D. Pa. Apr. 24, 2020).

Recognizing that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced," the CDC issued guidance on how to control the risk of contagion in prisons and

---

[19] *Coronavirus Disease 2019 (COVID-19): People at Increased Risk and Other People Who Need to Take Extra Precautions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated Mar. 15, 2021).

[20] "The risk from COVID-19 to Americans can be broken down into risk of exposure versus risk of serious illness and death."

detention environments on March 23, 2020 and released more up-to-date suggestions as recent as February 21, 2021. *See* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Feb. 19, 2021). The updates include guidance on how to: release individuals with confirmed COVID-19 cases into medical isolation, perform broad-based testing, define close contact, update quarantining and contact-tracing procedures, and assure that correctional and detention facilities continue to use a fourteen (14) day quarantine period. *Id*. Since the outbreak of the pandemic, the BOP "has implemented a number of protocols to protect the inmate population and staff from COVID-19." *United States v. Stevens*, No. 19-cr-359-02, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 16, 2020).

### Procedural History

On February 3, 2021, Defendant filed the instant Motion (ECF No. 635), requesting compassionate release. The Government submitted a response in opposition to Defendant's Motion on August 25, 2020. ECF No. 86. On December 23, 2020, Defendant submitted a Reply in further support of his Motion. ECF No. 101. His Motion is thus ripe for the Court's review.

## III. LEGAL STANDARD

Pursuant to 18 U.S.C. § 3582(b), a judgment of conviction that includes a sentence of imprisonment "constitutes a final judgment and may not be modified by a district court except in limited circumstances." *See Dillon v. United States*, 560 U.S. 817, 824 (2010) (internal quotations omitted); *In re Morris*, 345 F. App'x 796, 797-98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)) (declaring that a court may not modify a term of imprisonment except in enumerated cases). One limited exception is 18 U.S.C. § 3582(c)(1)(A), which provides for what is commonly referred to as "compassionate release."

On December 21, 2018, the First Step Act ("FSA")[21] amended 18 U.S.C. § 3582(c)(1)(A) to add a provision that allows a defendant to move to a district court for a reduction in sentence, *i.e.* petition the court for compassionate release,[22] after exhausting the BOP's administrative process. Under 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court may reduce an inmate's term of imprisonment only if the following four conditions are met: (1) "the inmate must satisfy an administrative exhaustion requirement;" (2) "the Court must find that 'extraordinary and compelling reasons warrant such a reduction;'" (3) "any reduction granted by the Court must be 'consistent with any applicable policy statements issued by the Sentencing Commission;'" and (4) "the proposed reduction must be consistent with the sentencing factors outlined in 18 U.S.C. §3553(a)." *United States v. Brown*, 13-cr-176-05, 2020 WL 2615616, at * 1 (E.D. Pa. May 22, 2020).

## IV.    DISCUSSION

In his Motion, Defendant broadly describes the dangers of COVID-19, the increased risks of COVID-19 transmission in detention facilities, and how his age of fifty-one (51) places him at higher risk for complications arising from potential infection with COVID-19 while incarcerated. Defendant states that these, coupled with family circumstances, his inability to fully practice his religion while incarcerated, the fact that non-citizens are legally eligible for a recommendation of a sentence reduction, and the alleged disproportionate length of his sentence constitute "extraordinary and compelling reasons" pursuant to the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A)(i).   Mot. 2.   Accordingly, the Court considers the following: (1) whether

---

[21] First Step Act, PL 115-391, 132 Stat 5194 (Dec. 21, 2018).
[22] 18 U.S.C. § 3582(c)(1)(A) "defines the mandatory conditions precedent to a defendant filing a motion for compassionate release." The Court notes that the Sentencing Guidelines have not been updated to reflect the First Step Act, which provides that incarcerated defendants may file motions for compassionate release for disposition by the court. Pub. L. 115-391, §§ 603(b)(1), 132 Stat. 5194, 5239. Previously, such motions could be filed only by the Director of the BOP. U.S.S.G. § 1B1.13.

"extraordinary and compelling reasons" exist to reduce Defendant's sentence based on the enumerated criteria in the policy statement and an independent assessment; and (2) whether the § 3553(a) factors support a sentence reduction and whether Defendant is a danger to the community under § 3142(g). *Pabon*, 2020 WL 2112265, at *2.

### A.    Exhaustion of Administrative Remedies

Before a defendant can proceed to the merits of a motion for compassionate release, the defendant must satisfy Section 3582(c)(1)(A)'s exhaustion requirement.[23]  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  To accomplish this, the First Step Act furnishes prisoners with "two direct routes to court: [either] (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion [for compassionate release], or (2) file a motion 'after the lapse of 30 days from the receipt . . . of such a request' by the warden of the prisoner's facility, 'whichever is earlier.'"  *Wilson*, 2020 WL 1975082, at * 2 (E.D. Pa. Apr. 24, 2020) (quoting *United States v. Rodriguez*, No. 03-cr-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Raia*, 954 F.3d at 595.  Under the exhaustion requirement, the BOP is given "a chance to review a defendant's request in the first instance[, which] can result in the request being 'resolved much more quickly and economically . . . than in litigation in federal court.'"  *Woodford v. Ngo.*, 548 U.S. 81, 89 (2006).  Moreover, it permits the BOP "to gather the defendant's administrative and medical records, helping to produce a useful . . . record for subsequent judicial consideration."  *Id*. (citation omitted).

Although courts are split on whether the failure to satisfy 18 U.S.C. § 3582(c)(1)(A)'s filing requirements bars defendants from filing motions for compassionate release, the Third

---

[23] Section 3582(c)(1)(A) prohibits a defendant from moving for compassionate release, and the court from acting on that motion, until after the defendant has satisfied the statute's exhaustion requirement.  Prior to the First Step Act, a motion for compassionate release could be brought by only the director of the BOP, not the defendant.  *See* 18 U.S.C. § 3582(c)(1)(A) (2017).

Circuit has determined that an inmate may file a motion for compassionate release in a United States District Court thirty (30) days after presenting the request to the warden, regardless of whether the administrative appeal process is complete.  *See United States v. Harris*, 973 F.3d 170 (3d Cir. 2020).  In the present case, Defendant submitted his request to the Warden on July 7, 2020, and it was received by the Warden on July 14, 2020.  Mot. 2; *see* Request to Warden, Attached to Mot. as Exhibit A.  Defendant's request was denied on July 29, 2020.  Mot. 3; *see* Warden's Denial, Attached to Mot. as Exhibit B.  His Motion is thus ripe for consideration.

### B.  Extraordinary and Compelling Reasons

Given that Defendant has met the administrative exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A), his "next hurdle is to establish that 'extraordinary and compelling reasons' warrant a reduction of his sentence."  *United States v. Cantatore*, No. 16-cr-0189, 2020 WL 2611536, at *3 (N.D.J. May 21, 2020).

"Section 3582(c)(A)(1) does not define what constitutes 'extraordinary and compelling reasons.'  Instead, Congress delegated authority to the Sentencing Commission to 'describe what should be considered extraordinary and compelling reasons for sentence reduction.'"  *United States v. Hammond*, No. 18-cr-184, 2020 WL 2126782, at *4 (E.D. Pa. May 5, 2020).[24]

---

[24] The Commission provided its definition of the term "extraordinary and compelling reasons" in U.S.S.G. § 1B1.13, Application Note 1, which provides, in its entirety:

> 1. Extraordinary and Compelling Reasons – Provided the defendant meets the requirements of subdivision (2) [*i.e., danger to the community*], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>> (A) Medical Condition of the Defendant. –
>>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>> (ii) The defendant is –
>>>> (I) suffering from a serious physical or medical condition,
>>>> (II) suffering from a serious functional or cognitive impairment, or
>>>> (III) experiencing deteriorating physical or mental health because of the aging process that substantially diminishes the ability of the defendant to

Here, Defendant alleges a combination of his age (51), concerns over possible exposure to COVID-19, his disproportionately long sentence, family circumstances, lack of religious services in the correctional institution, and the fact that non-citizens are legally eligible for a recommendation of a sentence reduction[25] constitute an extraordinary and compelling reason to reduce his sentence.  Considering the totality of these claims, the Court disagrees.

### 1.    Defendant's Concerns about the COVID-19 Pandemic

To be clear, the severity of the COVID-19 pandemic cannot be discounted, and the Court empathizes with Defendant's health concerns.  However, the Third Circuit has made apparent, "[t]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  *Raia*, 954 F.3d at 597.  "Thus, the Court must conduct a highly individualized inquiry of this Defendant to determine whether COVID-19 in conjunction with [his] alleged underlying medical conditions constitute extraordinary and compelling reasons for a reduction of [his] sentence to time served."  *Cantatore,* 2020 WL 2611536, at *3.

---

provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious health deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reasons other than, or in combination with, the reasons described in the subdivisions (A) through (C).

[25] This is a factor neither the Government nor this Court will dispute.  However, the Court will not consider this as a factor warranting release because it is applicable to all foreign inmates and, thus, does not constitute anything extraordinary and compelling about Defendant.

While the Court recognizes Defendant's age of fifty-one (51) places him at a slightly

higher risk for contracting severe illness from COVID-19, Defendant was already nearly forty

(40) when he was first sentenced.  The CDC has reported, "the risk of severe illness from

COVID-19 increases with age, with older adults at highest risk."[26]  However, just because

Defendant was already somewhat advanced in age at the time of his arrest does not discount this

Court's need to ensure justice for his wrongdoings.  *See United States v. Haney*, No. 19-cr-541,

2020 WL 1821988, at *5 (S.D.N.Y. Apr. 13, 2020) ("If [the defendant's] age alone [was] a

sufficient factor to grant compassionate release in these instances, it follows that every federal

inmate in the country above the age of 60 should be forthwith released from detention, a result

that does not remotely comply with the limited scope of compassionate release[.]").

Additionally, Defendant's desire to "work for the family real estate and development business,"

should he be released early proves contrary to concerns of potential exposure to COVID-19.

Mot. 7, *see* Request to Warden, Attached to Mot. as Exhibit H.

Though Defendant's fears of exposure to COVID-19 while incarcerated are

understandable, the health of inmates is of the utmost concern to the BOP, and the BOP has

made many strides to protect the safety of both inmates and staff during these unprecedented

times.  With protocol updated as recently as November 25, 2020, the BOP has been: issuing face

masks to all staff and inmates, encouraging social distancing, strengthening cleaning, and

limiting social gatherings in all facilities. [27]  Further, inmates who are symptomatic and/or test

positive for COVID are placed in medical isolation, and those who are asymptomatic but have a

---

[26] Centers for Disease Control and Prevention, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Mar. 17, 2021).
[27] Federal Bureau of Prisons, *BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last updated Nov. 25, 2020).

risk of exposure are placed in quarantine.[28]

Defendant currently resides at Moshannon Valley where there are 467 total inmates.[29] Even though a defendant may face a greater risk of contracting COVID-19 at a particular prison location, the increasing cases arising daily outside of the prison must be considered and offset this concern.  *United States v. Thornton*, No. 18-cr-167-01, 2020 WL 4368155, at *4 (W.D. Pa. July 29, 2020).  *See United States v. Brinson*, No. 15-cr-85, 2020 WL 4736258, at *3 (W.D. Pa. Aug. 25, 2020) (finding the mere existence of COVID-19 insufficient to establish extraordinary and compelling circumstances without some proof that the defendant is at a more severe risk than his fellow inmates).

Without any evidence beyond his age and the mere presence of COVID-19, Defendant has failed to present any health concerns to contribute to a finding of an extraordinary and compelling reason for release.

### 2.       Defendant's Desire to Connect with his Children

Finding his health concerns insufficient, the Court next turns to Defendant's alleged extraordinary and compelling family circumstances.  Particularly in light of the loss of his child to brain cancer in 2006, Defendant makes a clear desire to maintain a close relationship with his four (4) surviving children.  Though the Court does not discount the tragedy that is the loss of Defendant's child, a death that occurred years before Defendant was even sentenced is insufficient to warrant compassionate release.

 "A family member's illness, absent incapacitation or death, is not enough to constitute an extraordinary and compelling family circumstance.  District Courts routinely deny motions for

---

[28] *Id*.
[29] Federal Bureau of Prisons, *CI Moshannon Valley*, https://www.bop.gov/locations/ci/mvc/ (last updated Mar. 23, 2021).

compassionate release where the defendant cannot show that they would be the only available caregiver even if their incarceration imposes substantial burdens on their spouse or co-parent to a minor child." *United States v. Cruz-Rivera*, No. 11-cr-43, 2020 WL 5993352, at *5 (E.D. Pa. Oct. 9, 2020). *See United States v. Nassida*, No. 14-cr-241, 2020 WL 4700845, at *3 (W.D. Pa. Aug. 13, 2020) (Denying compassionate release where Defendant's wife was getting pre-breast cancer treatment and a knee replacement, and the defendant's daughter, who would care for her during these times, also suffered from severe health conditions); *Thornton*, 2020 WL 4368155, at *5 n.10 (Denying compassionate release where the defendant's child suffered from cancer and the mother, who recently lost her job, could not properly care for their children because there was no incapacitation or death of the caregiver).

Here, Defendant fails to provide any evidence of incapacitation on the part of his children's caretaker. Rather, Defendant makes clear that even with his incarceration and their divorce, he and his ex-wife "have maintained good communication and cooperation with respect to parenting of their children[.]" Mot. 5 n.4. Though it is entirely understandable for Defendant to want to resume an in-person relationship with his children, and the Court admires the Defendant's ability to stay connected with his children and ex-wife as much as possible, many incarcerated individuals have similar desires to keep close relationships with their families. Without more, this fact does not contribute to finding an extraordinary and compelling reason for release.

### 3.    Defendant's Limitations in Practicing Religion

Having considered Defendant's family circumstances, the Court will now review Defendant's inability to practice his religion while incarcerated. Defendant claims he presently lacks access to practice his religion by receiving the ministrations of a Greek Orthodox priest,

including the sacraments of Holy Communion and Confession.  Mot. 5.  The Government

responds that such statement is inaccurate because the BOP allows prisoners to practice whatever

religion they like, though there are obvious limitations that must exist in the prison setting.

Response in Opposition 8 n.5.  Neither has Defendant, nor this Court's research, been able to

produce any precedent suggesting that a limitation on religious practice factors into finding

extraordinary and compelling reason for release. Without further evidence suggesting such

conclusion, the Court declines to further consider Defendant's alleged limitations on practicing

religion for purposes of his present Motion.

### 4.        Length of Defendant's Sentence

Finally, the Court will now address the length of Defendant's sentence.  Defendant

claims his 300-month sentence was a "trial penalty" given the fifty (50)-month sentence he was

allegedly offered in a plea deal.  Mot. 2-3.  The Government responds that there is no record of

such a plea deal being offered, but even if there was, Defendant received an appropriate sentence

for his severe crimes, as was affirmed by the jury, District Court, Third Circuit Appellate Court,

and the United States Supreme Court.  Response in Opposition 16, 19.  Having reviewed all the

pleadings, the Court agrees with the Government.

Though this District has found the stacking of 18 U.S.C. § 924(c) sentences, when paired

with other factors, to be an extraordinary or compelling reason for compassionate release

because such defendants would have had clearly lower sentences if sentenced today, it is unclear

if Defendant's sentence would be different at all.  "Many courts have recently been faced with

compassionate release motions of defendants whose sentences for successive § 924(c) violations

imposed before the passage of the First Step Act are disproportionately long compared to the

sentences that would be imposed today."  *United States v. Bayron*, No. 95-cr-338-01, 2021 WL

632677, at *4 (E.D. Pa. Feb. 18, 2021).  Accordingly, "an increasing number of judges—

including in this District—have...found the stacking of sentences under section 924(c) to be a

relevant consideration in analyzing compassionate release motions, though not sufficient on its

own to warrant release."  *United States v. Harris*, No. 97-cr-399-01, 2020 WL 7861325, at *9

(E.D. Pa. Dec. 31, 2020).

   While Defendant cites to many cases where § 924(c) sentence stacking occurred,

Defendant was never charged with a crime whose sentence was altered by the § 924(c)

amendment.  Though Defendant attempts to equate the First Step Act statutory sentencing

changes to the alleged "trial penalty" he experienced, this conclusion rests on the assumption that

Defendant's sentence was "disproportionately long compared to the sentences that would be

imposed today."  *Bayron*, 2021 WL 632677, at *4.  Additionally, even though Defendant states

he received a plea offer of six (6) years, there is no record of such a deal ever being formalized.

The Honorable Judge Kelly was the sentencing judge who, after hearing all the evidence

presented, determined an appropriate sentence for this particular Defendant.

   Time and time again, Judge Kelly's proposed sentence and conviction have been

affirmed by the District Court, the Third Circuit Appellate Court, and the United States Supreme

Court.  The most recent review of Defendant's case was an affirmation by the Third Circuit on

April 8, 2020.  *See* Mandate of USCA, ECF NO. 633.  Though Defendant claims, in 2019, the

average sentence for securities fraud was fifty (50) months with the sentencing guideline's floor

being seventy-five (75) months, as Defendant states, only 18.2% of those fraud cases stemmed

from losses above just $9.5 million.  Reply Brief 4.  Defendant's case cannot be appropriately be

compared to sentences at the bottom of his stated guideline range when he was found guilty of

actions resulting in actual losses of <u>more than $50 million</u> and intended losses of at least $100

million.  Response in Opposition 2.  Given the severity of Defendant's crimes and having had the

benefit of repetitious judicial review, the Court has no reason today to second-guess Judge

Kelly's sentence or presume it would have been different ten (10) years later.

       Even if Defendant would have received a more lenient sentence today, a conclusion that

cannot be made with certainty, Defendant still would fail to present an extraordinary or

compelling reason because, on its own, a disproportionately long sentence is insufficient to

warrant compassionate release.  Many Courts have determined that "a district court may consider

the severity of a defendant's sentencing disparities...as *one* factor in a comprehensive assessment

of whether a defendant presents extraordinary and compelling reasons for compassionate

release." *Bayron*, 2021 WL 632677, at *4 (emphasis added).  Without other compelling factors,

a disproportionately long sentence is not an extraordinary and compelling reason.  All of the

cases Defendant cites found extraordinary and compelling reasons based upon multiple factors

warranting release.  *See Bayron*, 2021 WL 632677, at *5-6 (Considering the defendant has a high

body-mass index ("BMI"), served twenty-six (26) years of his thirty (30) year sentence, served

as an educational tutor in prison for multiple years, lacks a criminal history, was under the age of

twenty (20) at the time he was convicted, and would have a lighter sentence if convicted today in

light of the § 924(c) amendment, the court found an extraordinary and compelling reason for

release); *United States v. Ezell*, No. 02-cr-815-01, 2021 WL 510293, at *4 (E.D. Pa. Feb. 11,

2021) (Finding a disproportionately long sentence in conjunction with the defendant's efforts

towards rehabilitation to be an extraordinary and compelling reason); *Harris*, 2020 WL 7861325,

at *6 ("We conclude [the defendant's] generalized fear of contracting COVID-19 does not

warrant his release, but his lengthy sentence...when combined with his body mass index and

significant evidence of rehabilitation, his young age at the time of the offense, and the over

twenty three years already served in prison, constitute extraordinary and compelling circumstances warranting his release.").

Defendant cannot point to any health concerns, beyond his age, that would make him more susceptible to severe illness should he contract COVID-19. Though Defendant is fifty-one (51) at present, he committed the present crimes just over ten (10) years ago, when he was almost forty (40), so Defendant cannot blame his criminal activity on youthful behavior. Unlike the cases he cites, Defendant has yet to take responsibility for his actions and, instead of taking steps toward rehabilitation, Defendant continues to mimic deceptive behavior by trying to convince witnesses to perjure themselves on his behalf.

Having reviewed all the circumstances, the Court finds Defendant's argument that his sentence is disproportionately long or a "trial penalty" to be unavailing. Moreover, even if Defendant's sentence would have been lighter if he were convicted today, a conclusion that cannot be made with certainty, Defendant has failed to point to any other factor warranting early release. *See United States v. Williams*, No. 08-cr-704-09, 2020 WL 5573046, at *4 (E.D. Pa. Sept. 17, 2020) ("The remedy that [defendant] seeks is reserved for circumstances peculiar to an individual—his health, his age—and is not designed to challenge the guidelines themselves...[This] would undermine the very function of the federal sentencing regime: to provide certainty and consistency across sentences.").

**Section 3553(a) Factors and Dangerousness to Community**

Even if this Court found the Defendant's age, together with the presence of COVID-19, his desire to connect with his family, and the length of his sentence rose to a level of extraordinary and compelling reasons, those considerations would be outweighed by the §3553(a) factors and that Defendant presents a danger to the community.

Prior to modifying a term of imprisonment under Section § 3582(C)(1), a court must also consider Section § 3553(a)'s factors "and establish that the defendant is not a danger to the safety of any person in the community as provided in 18 U.S.C. § 3142(g)." *Cantatore*, 2020 WL 2611536, at *5. The factors include:

> (1) the nature of the circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and,
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
> (3) the kinds of sentences available;
> . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty in similar conduct[.]

18 U.S.C. § 3553(a).

The Government suggests a sentence reduction is not appropriate because Defendant "ignores the crimes he committed in this case, ignores his repeated perjury and obstruction of justice, and ignores how poorly those facts reflect on his character." Response in Opposition 17. Considering the totality of these factors, the Court finds the same.

Defendant has shown little growth from or remorse for his convictions, a fact further recognized by his multiple attempts to obstruct justice. Defendant engaged in a massive stock fraud scheme that resulted in over $50 million in actual losses to thousands of victims and intended losses of at least $100 million. Response in Opposition 2. Despite the evidence against him being "staggering" in the words of Judge Kelly, Defendant attempted to explain and justify his criminal actions at trial and perjured himself. *Id*. at 5. Additionally, in both the original trial and his § 2255 proceedings, Defendant tried to convince a witness testify falsely on his behalf. *Id*. Defendant's behavior has not much improved since his time in custody as he has committed several disciplinary

infractions, including: abusing phone privileges, being absent from an assignment, bribing a prison official/staff member, and twice possessing a contraband cell phone. *Id*. at 6. Because he is a Canadian citizen, Defendant also faces an immigration retainer that was originally lodged on January 3, 2011. *Id*.[30]

Cutting Defendant's sentence short by nearly one hundred and twenty-four (124) months would promote disparity in sentencing and "would certainly fail to reflect the seriousness of [his] violations." *Brown*, 2020 WL 2466081, at *4. Defendant's conduct warranted a lengthy prison sentence, and the sentence Defendant received appropriately reflects the severity of his actions. Courts have generally denied release in circumstances comparable to those presented here. *See United States v. Kolodesh*, 484 F. Supp. 3d 245, 248-249 (E.D. Pa. 2020) (Denying compassionate release to a fifty-eight (58) year old inmate with heart disease, hypertension, high cholesterol, and obesity who took steps toward rehabilitation because of the seriousness of being a co-conspirator in a multi-million dollar Medicare fraud scheme); *United States v. Bogdanoff*, 459 F. Supp. 3d 653, 658-659 (E.D. Pa. 2020) (Denying compassionate release when the Court lacked jurisdiction to decide the motion but noting that, "reducing [the defendant's] sentence could undermine the need to promote deterrence of other large-scale financial crimes," particularly when the defendant has only served seven (7) years of his eighteen (18) year sentence); *United States v. Tartaglione*, No. 15-cr-491, 2020 WL 3969778, at *7 (E.D. Pa. July 14, 2020) (Refusing compassionate release to a sixty-four (64) year old inmate who was convicted for scheming to steal over two (2) million dollars); *United States v. Shulick*, No. 16-cr-428, 2020 WL 3250584, at *5 (E.D. Pa. June 15, 2020) (Finding compassionate release was not warranted for an inmate with asthma because, "this court

---

[30] Because he is a Canadian citizen, Defendant attempts to argue that this should be a further reason to grant his release because the COVID-19 rates are less in Canada, and he would no longer be an expense to the United States. Mot. 6-7. The Court finds this argument entirely unpersuasive because the same could be said about any other prisoner from another country and does not warrant special circumstances for Defendant.

cannot ignore the seriousness of defendant's convictions for embezzlement, fraud, and filing false tax returns.").

Where Defendant's statutory maximum sentence was life imprisonment and Defendant received a 300-month sentence, no further reduction would be appropriate in order to prevent disparity in sentencing and reflect the seriousness of Defendant's actions. *See* Response in Opposition 16. Thus, granting Defendant a sentence reduction at this stage would not reflect the seriousness of his crimes, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes, or prevent sentence disparities. Supplemental Reply 3-4.

Finally, this Court must consider the danger Defendant could present to the community. To do this, courts turn to the factors set forth in §3142(g), which include the nature and circumstances of the crime charged; the defendant's personal history; and the defendant's criminal history. 18 U.S.C. §3142 (g). Defendant claims he is not a danger to the community because he has no prior criminal record, would not be released in the United States because he would be deported to Canada, and is less likely to recidivate due to his age. Mot. 6, 9, 12. While the Court recognizes Defendant lacks a criminal history, this fact was also considered by Judge Kelly when he originally sentenced Defendant. Judge Kelly also likely took into account the fact that Defendant was already around forty (40) years old at the time he committed the present crimes. Accordingly, just because Defendant states most people do not recidivate when past their 20s or 30s, such a fact appears inapplicable here where Defendant was not even sentenced until his 40s. As to Defendant's argument that he would not be a danger to the United States because he would be deported to Canada upon release, such a fact does not negate the Court's ability to consider him dangerous when Defendant lived in Canada when he committed the present crimes. Considering

all these factors, the Court cannot confidently say that releasing Defendant at this stage or reducing his sentence would not bring greater danger to the community.

**CONCLUSION**

The Court concludes that Defendant has not demonstrated extraordinary and compelling reasons justifying his release or a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) and § 1B1.13 of the Sentencing Guidelines at this time.  For the foregoing reasons, Defendant's Motion for Compassionate Release is denied with leave to re-file.  An Order consistent with this Memorandum follows separately.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II      J.